No. 24-1261

_____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

DAVID M. KISSNER, an individual,

*Plaintiffs-Appellants*,

v.

LOMA PRIETA JOINT UNION SCHOOL DISTRICT; ET AL.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of California, San Francisco
No. 5:22-cv-00949-CRB
Hon. Charles R. Breyer

**APPELLANT'S EXCERPTS OF RECORD
VOLUME II OF III**

WILLIAM J. BECKER, JR., ESQ.
Bill@FreedomXLaw.com
FREEDOM X
11500 Olympic Blvd., Suite 400
Los Angeles, California 90064
Telephone: (310) 636-1018

Attorneys for Appellant
DAVID M. KISSNER

1  Golnar J. Fozi (Cal. Bar No. 167674)
   Daniel S. Modafferi (Cal. Bar No. 294510)
2  Fozi Dwork & Modafferi, LLP
   5942 Priestly Drive, Suite 100
3  Carlsbad, California 92008
   Tel: (760) 444-0039; Fax: (760) 444-0130
4  Email:   gfozi@fdmattorneys.com
              dmodafferi@fdmattorneys.com
5
   Attorneys for Defendants,
6  Lisa Fraser, Kevin Grier, Billy Martin, Deana
   Arnold, Ben Abeln, Ron Bourque, Charlotte
7  Khandelwal, and Erin Asheghian

8                **UNITED STATES DISTRICT COURT**

9                **NORTHERN DISTRICT OF CALIFORNIA**

10

11  DAVID M. KISSNER,                    **Case No.:  3:22-cv-00949-CRB**
                                         **Assigned to: Hon. Charles R. Breyer**
12            Plaintiff,
                                         **REPLY IN SUPPORT OF**
13       v.                              **DEFENDANTS LISA FRASER,**
                                         **KEVIN GRIER, BILLY MARTIN,**
14  LOMA PRIETA JOINT UNION              **DEANA ARNOLD, BEN ABELN,**
    SCHOOL DISTRICT, et al.,             **RON BOURQUE, CHARLOTTE**
15                                       **KHANDELWAL, AND ERIN**
                                         **ASHEGHIAN'S MOTION FOR**
16            Defendants.                **SUMMARY JUDGMENT OR, IN**
                                         **THE ALTERNATIVE, PARTIAL**
17                                       **SUMMARY JUDGMENT**
18
                                         **Date:   July 28, 2023**
19                                       **Time:  10:00 a.m.**
                                         **Ctrm:  6**
20
                                         **Case Filed:  February 16, 2022**
21                                       **Trial Date:  None Set**
22
23
24
25
26
27
28
                                    1

REPLY IN SUPPORT OF DEFENDANTS' MSJ                3:22-cv-00949-CRB

1

### TABLE OF CONTENTS

2   TABLE OF AUTHORITIES ..................................................................................... 3

3   SUMMARY OF ARGUMENT ................................................................................. 4

4   REPLY BRIEF ......................................................................................................... 5

5    I.  INTRODUCTION ................................................................ 5

6    II.  PLAINTIFF DOES NOT OPPOSE SUMMARY JUDGMENT
    IN FAVOR OF ALL DEFENDANTS AS TO THE EQUAL
7       PROTECTION CLAIM ........................................................... 5

8    III.  PLAINTIFF DOES NOT OPPOSE SUMMARY JUDGMENT
    IN FAVOR OF ALL DEFENDANTS AS TO THE
9       CONSPIRACY CLAIM ........................................................... 5

10   IV.  PLAINTIFF DOES NOT OPPOSE SUMMARY JUDGMENT
    IN FAVOR OF DEFENDANTS MARTIN, ARNOLD, ABELN,
11      BOURQUE, KHANDELWAL, AND ASHEGHIAN AS TO
    THE STIGMA-PLUS DEFAMATION CLAIM ............................. 6
12
 V.  PLAINTIFF'S OPPOSITION DOES NOT ADDRESS HIS
13      16TH CAUSE OF ACTION FOR VIOLATION OF THE
    RIGHT TO DUE PROCESS, AND THEREFORE,
14      DEFENDANTS MUST BE GRANTED SUMMARY
    JUDGMENT AS TO THIS CLAIM ............................................. 6
15
 VI.  FRASER AND GRIER ARE ENTITLED TO SUMMARY
16      JUDGMENT AS TO THE STIGMA-PLUS DEFAMATION
    CLAIM, AS PLAINTIFF CANNOT REFUTE THAT HE WAS
17      AFFORDED DUE PROCESS ..................................................... 7

18      A.  Substantive Due Process Is Not Applicable to Stigma-Plus
      Defamation, and Even if It Were, Plaintiff Cannot
19        Maintain a Substantive Due Process Claim in This Case ........ 8

20      B.  Regardless of Whether Plaintiff Was Deprived of a
      Constitutionally Cognizable Liberty or Property Interest,
21        His Due Process Claim Fails, Because He Was Afforded
      All Process Reasonably Due ................................................... 9
22
 VII.  PLAINTIFF HAS NOT PRESENTED EVIDENCE
23      SUFFICIENT TO CREATE A TRIABLE ISSUE OF FACT AS
    TO WHETHER GRIER, KHANDELWAL, MARTIN, OR
24      FRASER PARTICIPATED IN THE DECISION TO LAY
    PLAINTIFF OFF .................................................................. 10
25
 IX.  PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIM
26      IS BARRED UNDER *MOUNT HEALTHY* ................................. 14

27   X.  CONCLUSION .................................................................. 16

28

REPLY IN SUPPORT OF DEFENDANTS' MSJ    3:22-cv-00949-CRB

1

**<u>TABLE OF AUTHORITIES</u>**

2   **Cases**

3   *Albright v. Oliver* (1994) 510 U.S. 266 ............................................................ 7, 9

4   *Bd. of Regents v Roth* (1972) 408 U.S. 564 ......................................................... 9

5   *Doe v. Pasadena Unif. Sch. Dist.* (9th Cir. 2020) 810 F'Appx. 500 .................... 5

6   *Fikre v. F.B.I.* (9th Cir. 2022) 35 F.4th 762 ........................................................ 8

7   *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 ........................... 14, 15

8   *Mount Healthy Sch. Dist. Bd. of Ed. v. Doyle* (1977) 429 U.S. 274 .......... 4, 15, 16

9   *San Jose Teachers Ass'n v. Allen* (1983) 144 Cal.App.3d 627 .......................... 13

10  *Segal v. City of N.Y.* (2d Cir. 2006) 459 F.3d 207 ............................................... 8

11  *Vanelli v. Reynolds Sch. Dist. No. 7* (9th Cir. 1982) 667 F.2d 773 ...................... 9

12  *Zalac v. Governing Bd. of Ferndale Unified Sch. Dist.* (2002) 98 Cal.App.4th 838 13,

13       14

14  *Zinermon v. Burch* (1990) 494 U.S. 113 ............................................................. 8

15  **Statutes**

16  Ed. Code, § 44955 ........................................................................................ 4, 13, 14

17  Ed. Code, § 44956 ............................................................................................... 11

18

19

20

21

22

23

24

25

26

27

28

REPLY IN SUPPORT OF DEFENDANTS' MSJ                    3:22-cv-00949-CRB

1

## SUMMARY OF ARGUMENT

Plaintiff concedes that summary judgment should be granted in favor of all defendants as to the 17th and 18th causes of action in the operative complaint. Plaintiff further concedes that summary judgment should be granted in favor of defendants Martin, Arnold, Abeln, Bourque, Khandelwal, and Asheghian, as to the 3rd cause of action in the operative complaint. Therefore, the only claims left for the Court to decide are the 1st and 16th causes of action against all defendants, as well as the 3rd cause of action against defendants Fraser and Grier.

Plaintiff's opposition does not address the 16th cause of action for due process. Instead, plaintiff's due process arguments are limited to the 3rd cause of action, for stigma-plus defamation without procedural due process. By failing to oppose defendants' motion as to the 16th cause of action, plaintiff has conceded that summary judgment should be granted in favor of all defendants as to claim 16.

Plaintiff's stigma-plus defamation claim against defendants Fraser and Grier cannot survive summary judgment, because plaintiff does not – and cannot – dispute that plaintiff was afforded all process reasonably due in the course of his termination and layoff proceedings.

Defendants also seek summary judgment on all claims arising from plaintiff's layoff. Under Education Code, section 44955, the school board has the legislative prerogative to eliminate particular kinds of service, which it did when it voted to eliminate 4.0 FTE of classroom teaching positions. Because this reduction in force was inherently legislative, absolute legislative immunity applies.

Finally, defendants are entitled to summary judgment as to plaintiff's 1st cause of action, for First Amendment retaliation, because the undisputed evidence clearly establishes that the Commission on Professional Competence ordered plaintiff's termination based on unfitness for service. Plaintiff can present no evidence that the Commission's decision was motivated by his First Amendment-protected speech or activity. Therefore, summary judgment must be granted under *Mount Healthy*.

4

**REPLY BRIEF**

Defendants Lisa Fraser, Kevin Grier, Billy Martin, Deana Arnold, Ben Abeln, Ron Bourque, Charlotte Khandelwal, and Erin Asheghian respectfully submit the following reply in support of their motion for summary judgment:

## I. INTRODUCTION

Plaintiff's opposition either concedes or fails to address many of the arguments raised in defendants' motion for summary judgment. Even as to those arguments which plaintiff purports to oppose, plaintiff fails to address the actual arguments raised by defendants and instead mischaracterizes defendants' arguments in an effort to mislead the Court. The Court must see past plaintiff's non sequiturs and focus instead on the actual legal issues raised in defendants' motion. When it does so, it will be clear that defendants are entitled to summary judgment.

## II. PLAINTIFF DOES NOT OPPOSE SUMMARY JUDGMENT IN FAVOR OF ALL DEFENDANTS AS TO THE EQUAL PROTECTION CLAIM

Plaintiff's 17th cause of action alleges that defendants deprived plaintiff of his right to equal protection of law under the Fourteenth Amendment. Defendants moved for summary judgment as to this claim, on the grounds that plaintiff's claim of disparate treatment *because of* his engagement in speech and/or conduct protected under the First Amendment must be "analyzed under the rubric of the First Amendment," not as an equal protection claim. (*Doe v. Pasadena Unif. Sch. Dist.* (9th Cir. 2020) 810 F'Appx. 500, 503.) "Plaintiff does not oppose Defendants' motion as to the Seventeenth Cause of Action for Violation of the Fourteenth Amendment Equal Protection Clause." (ECF No. 99, 32:15-16.) Therefore, summary judgment must be granted in favor of all defendants as to the 17th cause of action.

## III. PLAINTIFF DOES NOT OPPOSE SUMMARY JUDGMENT IN FAVOR OF ALL DEFENDANTS AS TO THE CONSPIRACY CLAIM

Plaintiff's 18th cause of action alleges that defendants conspired to violate plaintiff's constitutional rights. Defendants moved for summary judgment as to this

REPLY IN SUPPORT OF DEFENDANTS' MSJ          3:22-cv-00949-CRB

claim, on the grounds that plaintiff cannot present evidence sufficient to create a triable issue of fact as to whether defendants ever engaged in a conspiracy. "Plaintiff does not oppose Defendants' motion as to… the Eighteenth Cause of Action for Civil Rights Conspiracy." (ECF No. 99, 32:15-17.) Therefore, summary judgment must be granted in favor of all defendants as to the 18th cause of action.

## IV. PLAINTIFF DOES NOT OPPOSE SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS MARTIN, ARNOLD, ABELN, BOURQUE, KHANDELWAL, AND ASHEGHIAN AS TO THE STIGMA-PLUS DEFAMATION CLAIM

Plaintiff's 3rd cause of action alleges stigma-plus defamation without due process of law, in violation of the Fourteenth Amendment. Defendants moved for summary judgment as to this claim on several grounds, including the undisputed fact that defendants Billy Martin, Deana Arnold, Ben Abeln, Ron Bourque, Charlotte Khandelwal, and Erin Asheghian played no role in the disclosure of allegedly defamatory materials. "Plaintiff does not oppose dismissal of Defendants former Principal Billy Martin or Board members Deana Arnold, Ben Abeln, Ron Bourque, Charlotte Khandelwal, or Erin Asheghian as to Plaintiff's Third Cause of Action for Civil Rights Defamation." (ECF No. 99, 32:18-20.) Therefore, summary judgment must be granted in favor of these six defendants, as to the 3rd cause of action.

## V. PLAINTIFF'S OPPOSITION DOES NOT ADDRESS HIS 16TH CAUSE OF ACTION FOR VIOLATION OF THE RIGHT TO DUE PROCESS, AND THEREFORE, DEFENDANTS MUST BE GRANTED SUMMARY JUDGMENT AS TO THIS CLAIM

Plaintiff's operative complaint alleges two separate causes of action, both of which arise under the Due Process Clause of the Fourteenth Amendment: (1) the 3rd cause of action, for stigma-plus defamation; and (2) the 16th cause of action, for violation of the right to due process. At the pleadings stage of this litigation, defendants moved to dismiss the stigma-plus claim, on the grounds that it was

6

1   duplicative of the due process cause of action. (ECF No. 43-1, p. 15.) The Court
2   denied defendants' motion as to this issue, holding that the two claims were
3   sufficiently distinct to survive dismissal. (ECF No. 65.)

4          In the motion for summary judgment, defendants addressed claims 3 and 16
5   separately. As to claim 16, defendants argued that plaintiff could not maintain a
6   procedural due process claim, because he was afforded all process reasonably due in
7   relation to both his termination and his layoff. Defendants further argued that, to the
8   extent claim 16 alleges a violation of the right to substantive due process, defendants
9   are entitled to summary judgment, because "[w]here a particular amendment provides
10  an explicit textual source of constitutional protection against a particular sort of
11  governmental behavior, that Amendment, not the more generalized notion of
12  substantive due process, must be the guide for analyzing [the plaintiff's] claims."
13  (*Albright v. Oliver* (1994) 510 U.S. 266, 273.)

14         Plaintiff's opposition does not address claim 16 at all. Instead, plaintiff focuses
15  his due process arguments exclusively on claim 3, the stigma-plus defamation claim.
16  (See ECF No. 99, 24:7-8 (Heading E: "Whether Plaintiff Has Suffered a Stigma-Plus
17  Defamation Injury That Violates Procedural Due Process Presents a Triable Issue of
18  Fact").) By failing to address defendants' arguments as to claim 16, plaintiff has
19  conceded the issues raised in defendants' motion as to that claim. Therefore, summary
20  judgment must be granted in favor of all defendants as to the 16th cause of action.

21  **VI.   FRASER AND GRIER ARE ENTITLED TO SUMMARY JUDGMENT**
22  **AS TO THE STIGMA-PLUS DEFAMATION CLAIM, AS PLAINTIFF**
23  **CANNOT REFUTE THAT HE WAS AFFORDED DUE PROCESS**

24         As detailed above, plaintiff concedes that summary judgment should be granted
25  in favor of 6 of the 8 defendants, with regard to the 3rd cause of action for stigma-
26  plus defamation. Additionally, the 2 remaining defendants, Lisa Fraser and Kevin
27  Grier, are entitled to summary judgment on this claim, because plaintiff was afforded
28  all process reasonably due in connection with his termination and layoff.

REPLY IN SUPPORT OF DEFENDANTS' MSJ                    3:22-cv-00949-CRB

A.   **Substantive Due Process Is Not Applicable to Stigma-Plus Defamation, and Even if It Were, Plaintiff Cannot Maintain a Substantive Due Process Claim in This Case**

In his opposition, plaintiff first makes a substantive due process argument in favor of the stigma-plus defamation claim. However, stigma-plus defamation implicates *procedural* due process only – substantive due process is not relevant to the stigma-plus claim. (See, e.g., *Fikre v. F.B.I.* (9th Cir. 2022) 35 F.4th 762, 776 (referring to this type of claim as "stigma-plus procedural due process claim" and explaining that "a plaintiff who has suffered reputational harm at the hands of the government may assert a cognizable liberty interest *for procedural due process purposes*" if the plaintiff satisfies the "stigma-plus" test); see also *Segal v. City of N.Y.* (2d Cir. 2006) 459 F.3d 207, 213 ("the availability of adequate process defeats a stigma-plus claim").)

Moreover, even if the concept of substantive due process were relevant to the stigma-plus claim (which it is not), plaintiff cannot establish that he is entitled to relief under a substantive due process theory. As plaintiff himself concedes, substantive due process does not apply where a particular amendment – in this case, the First Amendment – provides an explicit textual source of constitutional protection. (ECF No. 99, 17:23-25 (citing *Albright*, *supra*).)

Despite this admission, however, plaintiff misconstrues the Supreme Court's opinion in *Zinermon v. Burch* (1990) 494 U.S. 113. The Court in *Zinermon* explained that the Due Process Clause of the Fourteenth Amendment has three distinct functions to protect individual rights. First, the Due Process Clause has been used to incorporate the rights enumerated in the Bill of Rights against state and local government actors. (*Id.* at p. 125.) Second, the Due Process Clause contains a substantive component, commonly referred to as substantive due process. (*Ibid.*) And third, the Due Process Clause prohibits the government from depriving any person of life, liberty, or property, without adequate procedural protections, commonly referred to as

8

1   procedural due process. (*Ibid*.)

2      Plaintiff mistakenly argues that the Supreme Court's holding in *Albright*, *supra*,

3   applies only to the first category of claims – those which arise under the Bill of Rights,

4   as incorporated through the Due Process Clause. Contrary to plaintiff's erroneous

5   conclusion, however, the Supreme Court's holding in *Albright* actually precludes the

6   second category of claims – those which are brought under the substantive component

7   of the Due Process Clause itself. Because the "particular sort of government behavior"

8   at issue in this case, i.e., termination of plaintiff's employment in retaliation for his

9   political speech and activities, arises under the First Amendment, the holding in

10  *Albright* mandates that that claim is not actionable under the theory of substantive due

11  process. (510 U.S. at p. 273.)

12  **B.    <u>Regardless of Whether Plaintiff Was Deprived of a Constitutionally</u>**

13      **<u>Cognizable Liberty or Property Interest, His Due Process Claim Fails,</u>**

14      **<u>Because He Was Afforded All Process Reasonably Due</u>**

15      Plaintiff next argues that he was deprived of a constitutionally cognizable

16  liberty or property interest, and therefore, that he had a right to due process. "The

17  fourteenth amendment's guarantee of procedural due process applies when a

18  constitutionally protected liberty or property interest is at stake." (*Vanelli v. Reynolds*

19  *Sch. Dist. No. 7* (9th Cir. 1982) 667 F.2d 773, 777.) A government employee's liberty

20  interest could be implicated if he were dismissed based on charges that "imposed on

21  him a stigma or other disability that foreclosed his freedom to take advantage of other

22  employment opportunities." (*Bd. of Regents v Roth* (1972) 408 U.S. 564, 573.) A

23  plaintiff's interest in liberty may be "implicated if a charge impairs his reputation for

24  honesty and morality." (*Vanelli v. Reynolds Sch. Dist. No. 7*, *supra*, 667 F.3d at p.

25  777.) "The procedural protections of due process apply if [1] the accuracy of the

26  charge is contested, [2] there is some public disclosure of the charge, and [3] it is made

27  in connection with the termination of employment or the alteration of some right or

28  status recognized by state law." (*Id.* at pp. 777-778.)

9

REPLY IN SUPPORT OF DEFENDANTS' MSJ                3:22-cv-00949-CRB

1    Plaintiff's argument does not respond to defendants' motion, however, as
2  defendants *did not* argue that plaintiff had not been deprived of a protected interest. It
3  is undisputed that plaintiff's employment at the school district was terminated. As a
4  matter of state law, the termination of a tenured public school teacher's employment
5  implicates a constitutionally protected interest, and the teacher is therefore entitled to
6  procedural due process. All of that is presumed in defendants' motion, without the
7  need for plaintiff to spend nearly 6 pages of his opposition to prove it. (See ECF No.
8  99, pp. 18-23.) Instead, what defendants argued was, *even assuming plaintiff was*
9  *deprived of a constitutionally protected interest when his employment was terminated*,
10 plaintiff cannot maintain a procedural due process claim, *because he was afforded all*
11 *process reasonably due*. Plaintiff's opposition fails to address the adequacy of the
12 process afforded to him, and therefore, summary judgment must be granted.

13    As detailed in the moving papers, plaintiff was afforded notice, multiple
14 hearings, the right to conduct discovery, the right to be represented by counsel, the
15 right to depose witnesses, the right to call witnesses in his defense, the right to cross-
16 examine witnesses, and the right to appeal. Plaintiff had every procedural safeguard
17 required by state law and certainly more than the minimum process reasonably
18 required under the Due Process Clause of the Fourteenth Amendment. By failing to
19 refute these facts in his opposition, plaintiff has conceded the issue. Defendants are
20 entitled to judgment as a matter of law as to plaintiff's stigma-plus procedural due
21 process claim, *even assuming* the accuracy of the charges against plaintiff was
22 contested, the charges were public disclosed, and that plaintiff was terminated.

23 **VII.**   **PLAINTIFF HAS NOT PRESENTED EVIDENCE SUFFICIENT TO**
24    **CREATE A TRIABLE ISSUE OF FACT AS TO WHETHER GRIER,**
25    **KHANDELWAL, MARTIN, OR FRASER PARTICIPATED IN THE**
26    **DECISION TO LAY PLAINTIFF OFF**

27    Defendants moved for summary judgment as to all claims, or parts of claims,
28 that arise from plaintiff's layoff. Rather than address the layoff issue in isolation, as

10

REPLY IN SUPPORT OF DEFENDANTS' MSJ          3:22-cv-00949-CRB

1   defendants did in their motion, plaintiff's opposition attempts to confuse the issues by

2   referencing other matters such as the termination and the PRA disclosures. While

3   defendants recognize that some of plaintiff's claims are based, in whole or in part, on

4   those other alleged wrongs, defendants' arguments in section VII of the motion pertain

5   exclusively to the layoff. As it pertains specifically to the layoff, plaintiff has not

6   presented evidence sufficient to create a triable issue of fact on the issue of whether

7   Grier, Khandelwal, Martin, or Fraser actually participated in the alleged constitutional

8   deprivation. Therefore, these defendants are entitled to summary judgment as to all

9   claims, or parts of claims, that arise from the layoff.

10          As detailed in the moving papers, Grier was not employed at the District until

11   July 2021 – after the Board had already adopted the reduction in force resolutions,

12   plaintiff had already been given notice that he would be laid off, plaintiff had already

13   requested a hearing to challenge his layoff, and the ALJ had already issued the

14   decision recommending plaintiff's layoff. Nevertheless, plaintiff argues that Grier is

15   liable for the layoff, because his signature was on a cover letter responding to a public

16   records request, and he did not *rehire* plaintiff *after* plaintiff's layoff and termination.

17   Neither of these arguments presents a credible basis on which to hold Grier liable *for*

18   *the layoff*. The publication of the termination charges in response to the PRA request

19   is a distinct alleged harm – Grier's participation in the PRA response does not make

20   him liable for the layoff. Furthermore, plaintiff was not eligible to be rehired under

21   Education Code, section 44956, because he had been terminated by the District in

22   separate proceedings. Therefore, the failure to rehire plaintiff post-termination does

23   not make Grier liable for the layoff, either.

24          It is also undisputed that Khandelwal was not on the Board at the time the layoff

25   resolutions were adopted. Nevertheless, plaintiff argues that Khandelwal can be liable

26   *for the layoff* because she subsequently voted to move forward with plaintiff's

27   *termination*. Again, the termination is a distinct alleged harm. Khandelwal's vote to

28   move forward with plaintiff's *termination* does not make her liable for the layoff.

REPLY IN SUPPORT OF DEFENDANTS' MSJ                    3:22-cv-00949-CRB

1     Plaintiff next argues, without support, that then-Principal Martin and then-
2     Superintendent Fraser are liable for *the Board's* layoff resolutions. Plaintiff
3     characterizes Fraser as "the architect[ ] of Kissner's layoff." (ECF No. 99, 25:2-3.)
4     However, the only evidence plaintiff cites in support of this assertion is Fraser's
5     testimony that, as Superintendent, her job was "to make sure that we follow the
6     process." (*Id.* (citing ECF No. 9-9, 16:7-13).) Making sure that the District "follow[s]
7     the process" is a far cry from deciding which particular kinds of service to eliminate.
8     The latter decision was made exclusively by the Board, when it adopted the layoff
9     resolutions. Because there is no evidence that Fraser participated in the adoption of
10    those resolutions or had the authority to override them, she cannot be liable for
11    plaintiff's layoff.

12    Finally, plaintiff argues Martin is liable for the layoff based on his response to
13    a hypothetical question. During the administrative hearing on plaintiff's challenge to
14    the layoff, plaintiff's counsel asked Martin if plaintiff "could teach 6th grade math
15    and science in that core block," if he were still employed by the District. (ECF No.
16    99-10, 53:5-6.) Martin responded that plaintiff "could" teach 6th grade math and
17    science, but that "would not support [Martin's] core vision of the 6th grade model."
18    (*Id.*, 53:7-8.) Regardless of how Martin answered this hypothetical question, however,
19    it did not change the fact that *plaintiff was laid off as a result of the Board's adoption*
20    *of the layoff resolutions*. There is no evidence that the Board adopted the layoff
21    resolutions in order to effectuate Martin's "core vision of the 6th grade model." No
22    reasonable inference can be drawn from this response to a hypothetical question, on
23    which a reasonable fact finder could conclude that Martin personally participated in
24    the layoff decision. Therefore, Martin is entitled to summary judgment, as well.

25    **VIII.  ALL OF THE DEFENDANTS WHO PARTICIPATED IN THE LAYOFF**
26    **ARE ENTITLED TO ABSOLUTE LEGISLATIVE IMMUNITY**

27    In the moving papers, defendants argued that any of the defendants who
28    participated in the *layoff* are entitled to absolute legislative immunity for any claims

12

REPLY IN SUPPORT OF DEFENDANTS' MSJ                    3:22-cv-00949-CRB

1  *arising from the layoff.* Plaintiff's opposition again attempts to mislead the Court by

2  broadening the focus from the layoff alone to the layoff and termination together.

3  (ECF No. 99, 9:20-22 ("The question before the Court is whether the school Board

4  Defendants' layoff and dismissal resolutions, when 'stripped of all considerations of

5  intent and motive,' were legislative rather than administrative or executive.").) Again,

6  the defendants never argued that legislative immunity applies to the termination. Only

7  the layoff is at issue with regard to legislative immunity.

8       Plaintiff argues that the layoff did not truly involve a legislative reduction in

9  force, because the District never sought to eliminate the position of 6th grade math

10 teacher. This argument betrays a fundamental misunderstanding of how reductions in

11 force are effected under the Education Code. The Education Code provides that a

12 school district may reduce its certificated staff because of a decision *by the school*

13 *board* to reduce or discontinue a particular kind of service ("PKS"). (Ed. Code, §

14 44955, subd. (b); *San Jose Teachers Ass'n v. Allen* (1983) 144 Cal.App.3d 627, 631.)

15 Classroom teaching *of any subject*, *regardless of grade level*, is recognized as a

16 particular kind of service which can be reduced to the minimum level required by law.

17 (*San Jose Teachers Ass'n v. Allen*, *supra*, 144 Cal.App.3d at pp. 637-638 ("a particular

18 kind of service includes a service or curricular offering which cannot be eliminated,

19 but can be reduced to the minimum level required by law").) "As long as there is a

20 change in the method of teaching or in the particular kind of service in teaching a

21 subject, a particular kind of service provided in excess of any statutorily mandated

22 minimum can be reduced or eliminated pursuant to section 44955." (*Id.* at p. 637.)

23      In *Zalac v. Governing Bd. of Ferndale Unified Sch. Dist.* (2002) 98 Cal.App.4th

24 838, 854, the school board determined that it was necessary to reduce or eliminate

25 certain particular kinds of services and that as a result it was necessary to decrease the

26 number of certificated employees of the district. The petitioner, a kindergarten

27 teacher, challenged her termination arguing, in part, that the district made no reduction

28 in a PKS because at the time of the hearing no determination had been made as to the

13

REPLY IN SUPPORT OF DEFENDANTS' MSJ                    3:22-cv-00949-CRB

1  number of kindergarten classes that would be taught in the following year, and

2  subsequent developments had shown that there would still be two kindergarten

3  classes, the same number as when the petitioner had been employed. In rejecting her

4  argument, the court held:

> A school district facing an anticipated unbalanced budget has a variety
> of means of meeting its financial problems: It may, for example, reduce
> the number of permanent and probationary teachers pursuant to section
> [44955].… In PKS cases the determination of the amount by which a
> service is to be reduced is the determination of the number of positions
> to be eliminated. A school board may reduce services by determining
> that proffered services shall be reduced in extent because fewer
> employees are made available to deal with the pupils involved.

9  (*Id.* at pp. 853-854 (quotes and cites omitted).) Whether by larger classes, regrouping

10  of other classes, or otherwise, where there is a PKS reduction, layoff is authorized

11  under section 44955. (*Id.* at p. 854.)

12  In this case, the undisputed evidence clearly establishes that the Board adopted

13  Resolution No. 21-XIV, approving the "reduction or elimination of particular kinds

14  of service." (Request for Judicial Notice, Exh. B.) In particular, the Board resolution

15  eliminated 4.0 full-time equivalent ("FTE") positions of grades K-8 classroom

16  teaching, in accordance with Education Code, section 44955. (*Ibid.*) It was not

17  necessary that the District eliminate the position of sixth grade math teacher in order

18  for the layoff to comply with California law. Rather, the Board properly exercised its

19  legislative authority to reduce PKS in the form of 4.0 FTE of classroom teachers.

20  Because this act was purely legislative in nature, any of the defendants who

21  participated in the layoff are entitled to absolute legislative immunity *for the layoff*.

22  **IX.   PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIM IS**

23  **BARRED UNDER *MOUNT HEALTHY***

24  Finally, defendants moved for summary judgment as to plaintiff's 1st cause of

25  action, for First Amendment retaliation, on the grounds that the District would have

26  terminated plaintiff, even in the absence of any motive to retaliate. Plaintiff once again

27  mischaracterizes defendants' argument by attempting to reframe the analysis using

28  the *McDonnell Douglas* pretext test, rather than addressing defendants' entirely

14

REPLY IN SUPPORT OF DEFENDANTS' MSJ            3:22-cv-00949-CRB

1   separate argument under *Mount Healthy*. When defendants' argument is properly
2   considered, it is clear that defendants are entitled to summary judgment.

3      The *McDonnell Douglas* burden-shifting framework (see 411 U.S. 792) is one
4   way of using circumstantial evidence to analyze whether a plaintiff can establish a
5   prima facie case of retaliation. (See *Ballou v. McElvain* (9th Cir. 2022) 29 F.4th 413,
6   422.) Plaintiff frames the issue using the *McDonnell Douglas* framework of "pretext."
7   (ECF No. 99, 11:18.) However, defendants never argued whether or not plaintiff could
8   proffer evidence sufficient to create a triable issue of fact as to the prima facie
9   elements of his retaliation claim. Instead, defendants argued, *even assuming plaintiff*
10   *could establish a prima facie case*, defendants are entitled to summary judgment in
11   accordance with *Mount Healthy*. Plaintiff fails to address this argument.

12      *Mount Healthy* is essentially a same-decision defense. The Supreme Court held,
13   *even if* the plaintiff teacher satisfied his burden of showing that his conduct was
14   constitutionally protected *and* that protected conduct was a substantial motivating
15   factor in the defendant school board's decision to terminate the plaintiff, the plaintiff's
16   First Amendment retaliation claim is nonetheless defeated if the plaintiff would have
17   been terminated even in the absence of protected conduct. (429 U.S. 274, 285-286.)
18   By focusing entirely on the former questions and ignoring the latter, plaintiff failed to
19   rebut the defense raised in the motion.

20      As the Supreme Court explained in *Mount Healthy*, "[a] rule of causation which
21   focuses solely on whether protected conduct played a part, 'substantial' or otherwise,
22   in a decision not to rehire, could place an employee in a better position as a result of
23   the exercise of constitutionally protected conduct than he would have occupied had
24   he done nothing." (*Id.* at p. 285.) Instead, the Court held that "[t]he constitutional
25   principle at stake is sufficiently vindicated if such an employee is placed in no worse
26   a position than if he had not engaged in the conduct. A borderline or marginal
27   candidate ought not be able, by engaging in such conduct, to prevent his employer
28   from assessing his performance record and reaching a decision not to rehire on the

1   basis of that record, simply because the protected conduct makes the employer more
2   certain of the correctness of its decision." (*Id.* at pp. 285-286.)

3       Plaintiff does not – and cannot – dispute that the ultimate termination decision
4   in this case was made by a disinterested, three-member administrative Commission
5   on Professional Competence. Plaintiff has presented no evidence that any of the
6   Commission members harbored any retaliatory animus toward plaintiff or that the
7   Commission's decision to terminate plaintiff was substantially motivated by
8   plaintiff's First Amendment-protected activity or speech. On the contrary, it is
9   undisputed that the Commission concluded that plaintiff was unfit for service and
10   ordered plaintiff's termination based on that conclusion. As the Supreme Court held
11   in *Mount Healthy*, plaintiff cannot prevent the Commission from assessing his
12   performance record and reaching a decision as to his fitness for service on the basis
13   of that record, simply because plaintiff engaged in activity or speech protected under
14   the First Amendment. Because the undisputed evidence clearly establishes that
15   plaintiff would have been terminated irrespective of his First Amendment speech and
16   activity, defendants are entitled to summary judgment under *Mount Healthy*.

17   **X.**    **CONCLUSION**

18       For all of the foregoing reasons, and those further detailed in the moving papers,
19   defendants are entitled to summary judgment or, alternatively, partial summary
20   judgment on individual claims, defenses, and issues.

21   Dated: July 14, 2023         Fozi Dwork & Modafferi, LLP

22

23                   By:    /s/ Daniel S. Modafferi
24                       Golnar J. Fozi
                      Daniel S. Modafferi
25                       Attorney for Defendants,
                      Lisa Fraser, Kevin Grier, Billy Martin,
26                       Deana Arnold, Ben Abeln, Ron Bourque,
                      Charlotte Khandelwal, and Erin
27                       Asheghian

28

REPLY IN SUPPORT OF DEFENDANTS' MSJ         3:22-cv-00949-CRB

William J. Becker, Jr., Esq. (SBN: 134545)
Bill@FreedomXLaw.com
Freedom X
11500 Olympic Blvd., Suite 400
Los Angeles, California 90064
Telephone: (310) 636-1018

Counsel for *David M. Kissner*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DAVID M. KISSNER**, | Case No. 22-CV-00949-CRB |
| Plaintiff, | *Hon. Charles R. Breyer* |
| vs. | **NOTICE OF ERRATA** |
| **LOMA PRIETA JOINT UNION SCHOOL DISTRICT, et al.,** | **[PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND STATEMENT OF NON-OPPOSITION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF]** |
| Defendants. | |

**Date:**    July 28, 2023
**Time:**    10:00 a.m.
**Ctrm.:**    6

**Compl. Filed:**    February 16, 2022
**SAC Filed:**    March 20, 2022
**Trial Date:**    None set

/ / /
/ / /
/ / /

1

**Notice Of Errata**                                              Case No. 22-CV-00949-CRB

PLEASE TAKE NOTICE of the following correction to Plaintiff's Opposition to Defendant's Motion for Summary Judgment:

| **Page:Line** | **Original** | **Change to:** |
|---|---|---|
| 15:10 | *Id.* | *McRae v. Dept.of Corrections & Rehab.* (2006) 142 Cal. App. 4th 377, citing *Morgan* at 69. |

Date: July 8, 2023

Respectfully submitted,

FREEDOM X

By:   /s/ *William J. Becker, Jr.*
     William J. Becker, Jr.

**Notice Of Errata**                                                    Case No. 22-CV-00949-CRB

William J. Becker, Jr., Esq. (SBN: 134545)
Bill@FreedomXLaw.com
Freedom X
11500 Olympic Blvd., Suite 400
Los Angeles, California 90064
Telephone: (310) 636-1018

Counsel for *David M. Kissner*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **DAVID M. KISSNER**, | Case No. 22-CV-00949-CRB |
| Plaintiff, | *Hon. Charles R. Breyer* |
| vs. | **PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND STATEMENT OF NON-OPPOSITION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| **LOMA PRIETA JOINT UNION SCHOOL DISTRICT, et al.,** | |
| Defendants. | |

**Date:** July 28, 2023
**Time:** 10:00 a.m.
**Ctrm.:** 6

**Compl. Filed:** February 16, 2022
**SAC Filed:** March 20, 2022
**Trial Date:** None set

1

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................... i

TABLE OF AUTHORITIES................................................................................ iii

SUMMARY OF ARGUMENT...........................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES......................................2

I.      INTRODUCTION ....................................................................................2

II.     SUMMARY OF RELEVANT AND MATERIAL FACTS ........................2

   A.   An Anonymous Community Member, Upset At Kissner For Political Reasons, Opened The Door To False Allegations Of Grooming Against Kissner .........................2

   B.   The District Has Never Substantiated The False Allegations Of Grooming Yet Refused To Withdraw Them ...................................4

   C.   The District Ignored A Demand To Withdraw The False Allegations Of Grooming And Released Them To The Public ................................4

   D.   The District Knew Of Kissner's Political Activities Opposed To Its Funding Measure And Board Appointment .....................................6

   E.   Kissner's Layoff Had Nothing To Do With The District's Budget Priorities.....................6

   F.   The District Invented A Policy Basis To Punish Kissner ........................7

III.    ARGUMENT ............................................................................................7

   A.   Summary Judgment Cannot Be Granted If Evidence Supports Plaintiff's Causes Of Action............................................................7

   B.   District Board Defendants Do Not Enjoy Legislative Immunity ..........................8

   C.   Because The District Has Not Met Its Burden Of Producing Evidence Of Retaliation, Plaintiff Has No Obligation To Produce Any Evidence Of Retaliation For His Protected Actions...............................................11

   D.   Even Though Plaintiff Has No Burden To Produce Evidence, Should The Court Feel Otherwise, Plaintiff Can Establish That The District Was More Likely Than Not Motivated To Terminate Him In Retaliation For His Protected Actions .......................................14

   E.   Whether Plaintiff Has Suffered A Stigma-Plus Defamation Injury That Violates Procedural Due Process Presents A Triable Issue Of Fact .............................17

      1.   Introduction ...........................................................17

      2.   Plaintiff has properly alleged substantive due process claims against the District Defendants due to their arbitrary and wrongful conduct..........................17

      3.   Plaintiff has properly alleged facts demonstrating the District's violation of procedural due process ..........................18

      4.   Stigma-plus defamation implicates Plaintiff's liberty interest ..............................20

FREEDOM X
11500 OLYMPIC BLVD., SUITE 400
LOS ANGELES, CA 90064

F. Grier and Khandelwal Do Not Have Absolute Immunity ...................................................23

G.  Whether Martin and Fraser Are Liable For Kissner's Layoff And Dismissal Presents A Triable Issue ...............................................................................................24

IV. STATEMENT OF NON-OPPOSITION ...................................................................................25

V.  CONCLUSION ...........................................................................................................................25

**Pl.'s Opp'n To Motion For Summ. J.**                    Case No. 22-CV-00949-CRB

**ER-59**

**TABLE OF AUTHORITIES**

**Cases**

*Ahearn v. City of Palos Verdes*
2008 WL 1330461 (C.D. Cal. Apr. 9, 2008) ...................................................8

*Albright v. Oliver*
510 U.S. 266 (1994) ...................................................17

*Bagley v. Blagojevich*
646 F.3d 378 (7th Cir.2011) ...................................................9

*Bakersfield City School Dist. v. Superior Court*
118 Cal.App.4th 1041 (2004) ...................................................19

*Bechard v. Rappold*
287 F.3d 827 (9th Cir.2002) ...................................................9

*British Airways Bd. v. Boeing Co.*
585 F.2d 946 (9th Cir.1978) ...................................................12

*Canary v. Osborn*
211 F.3d 324 (6th Cir.2000) ...................................................10, 11

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) ...................................................11

*Citizens for Better Forestry v. United States Dep't of Agric.*
341 F.3d 961 (9th Cir 2003) ...................................................8

*Cleveland Board of Education v. Loudermill*
470 U.S. 532 (1985) ...................................................20

*Consol. Elec. Co. v. U.S. for Use and Benefit of Gough Industries, Inc.*
355 F.2d 437 (9th Cir. 1966) ...................................................8

*Daniels v. Williams*
474 U.S. 327 (1986) ...................................................17

*Dent v. West Virginia*
129 U.S. 114 (1889) ...................................................17

*Doe v. Michigan Dept. of State Police*
490 F.3d 491(6th Cir. 2007) ...................................................20

*Endy v. County of Los Angeles*
975 F.3d 757 (9th Cir. 2020) ...................................................18, 22

*ERV, Inc. v. Superior Ct.*
143 Cal.App.4th 742 (2006) ...................................................19

*Fikre v. Fed. Bureau of Investigation*
35 F.4th 762 (9th Cir. 2022) ...................................................21

iii

*Guidry v. Marine Engineers' Beneficial Ass'n,*
    2007 WL 707511 (N.D. Cal. Mar. 6, 2007) ................................................. 13

*Guz v. Bechtel Nat. Inc.*
    24 Cal.4th 317 (2000) ...................................................................................... 14

*Hafer v. Melo*
    502 U.S. 21 (1991) ............................................................................................. 8

*Hart v. Parks*
    450 F.3d 1059 (9th Cir. 2006). .......................................................................... 20

*Haskell v. Washington Twp.*
    864 F.2d 1266 (6th Cir. 1988) ............................................................................ 8

*HiRel Connectors, Inc. v. U.S.*
    2006 WL 3618012 (C.D. Cal. Sept. 15, 2006) ................................................. 12

*Humphries v. County of Los Angeles*
    554 F.3d 1170 (9th Cir. 2008) ............................................................... 20, 21, 22

*In re Appeal of Woods*
    7 Ohio App.3d 226, 455 N.E.2d 13 (1982) ...................................................... 10

*Kaahumanu v. County of Maui*
    315 F.3d 1215 (9th Cir.2003) .............................................................................. 9

*Kannan v. Apple Inc.*
    2020 WL 6135994 (N.D. Cal. Oct. 19, 2020) ................................................. 13

*Kentucky v. Graham*
    473 U.S. 159 (1985) ........................................................................................... 8

*La Conner Associates LLC. v. Berg*
    73 Fed. Appx. 994 (9th Cir. 2003) ...................................................................... 9

*Llamas v. Butte Community College Dist.*
    238 F.3d 1123 (9th Cir.2001) ............................................................................ 21

*Lyons v. England*
    307 F.3d 1092 (9th Cir. 2002) .......................................................................... 14

*Marken v. Santa Monica-Malibu Unified School Dist.*
    202 Cal.App.4th 250 (2012) ............................................................................. 19

*Mathews v. Eldridge*
    424 U.S. 319 (1976) .................................................................................... 18, 23

*McRae v. Dept. of Corrections & Rehab.*
    142 Cal. App. 4th 377 (2006) ........................................................................... 14

*Miller v. California*
    355 F.3d 1172 (9th Cir.2004) ........................................................................... 22

FREEDOM X
11500 OLYMPIC BLVD., SUITE 400
LOS ANGELES, CA 90064

iv

*Morgan v. Regents of U. of Cal.*
    88 Cal. App. 4th 52 (2000) ..................................................................14

*Nicanor–Romero v. Mukasey*
    523 F.3d 992 (9th Cir.2008) ...............................................................22

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*
    210 F.3d 1099 (9th Cir. 2000) ....................................................11, 13

*Paul v. Davis*
    424 U.S. 693 (1976) .............................................................................21

*Peloza v. Capistrano Unif. Sch. Dist.*
    37 F.3d 517 (9th Cir.1994) .................................................................21

*Pickering v. Board of Ed. of Tp. High School Dist. 205, Will County, Illinois*
    391 U.S. 563 (1968) .............................................................................14

*Rateree v. Rockett*
    852 F.2d 946 (7th Cir. 1988) ...........................................................9, 10

*Schechner v. KPIX–TV*
    686 F.3d 1018 (9th Cir. 2012) ...........................................................14

*Skinner v. Medivators, Inc.*
    2022 WL 4544701 (N.D. Cal. Sept. 28, 2022) ..................................13

*So. Cal. Gas Co. v. City of Santa Ana*
    336 F.3d 885 (9th Cir.2003) ...............................................................12

*Tolan v. Cotton*
    572 U.S. 650 (2014) ...............................................................................8

*Trevino v. Gates*
    23 F.3d 1480 (9th Cir.1994) .................................................................8

*Valmonte v. Bane*
    18 F.3d 992 (2d Cir.1994) ...................................................................22

*Wenger v. Monroe*
    282 F.3d 1068 (9th Cir. 2002) ...........................................................21

*Wisconsin v. Constantineau*
    400 U.S. 433 (1971) .............................................................................20

*Zamora v. Security Industry Specialists, Inc.*
    71 Cal.App.5th 1 (2021) ......................................................................14

*Zamsky v. Hansell*
    933 F.2d 677 (9th Cir.1991) .................................................................9

*Zinermon v. Burch*
    494 U.S. 113 (1990) ................................................................17, 18, 20

FREEDOM X
11500 OLYMPIC BLVD., SUITE 400
LOS ANGELES, CA 90064

**ER-62**

**Constitutional Provisions**

California Constitution, Art. 1, section 1 ...................................................................5

**Statutes**

42 U.S.C. § 1983 .......................................................................................passim

Cal. Educ. Code Ann. § 44956 .............................................................................7, 23

Cal. Lab. Code §§ 1101-1102 ...............................................................................15

Fed. R. Evid. 402 ...........................................................................................12

Fed. R. Evid. 802 ...........................................................................................12

Gov. Code § 6254 ............................................................................................5

Gov. Code, § 6253 ..........................................................................................23

**Other Authorities**

Websters Third New Int'l Dictionary 26 (4th ed.1976) ...................................................9

**Rules**

L.R. 7-3 ...............................................................................................12, 25

vi

Pl.'s Opp'n To Motion For Summ. J.　　　　　　　　　Case No. 22-CV-00949-CRB

### SUMMARY OF ARGUMENT

The Defendants, Loma Prieta Joint Union School District administrators and board members (collectively referred to herein as "Defendants" or the "District") Motion for Summary Judgment ("Motion") presents solely questions of law and disputes none of the material facts in this case. Defendants are not entitled to summary judgment under any of their theories as a matter of law for the following reasons:

Defendants are not entitled to judgment as a matter of law on the ground of absolute legislative immunity because "stripped of all considerations of intent and motive," the dismissal and layoff decisions in substance were not essentially and clearly legislative, but administrative, involving a personnel matter affecting just one employee.

Defendants are not entitled to judgment as a matter of law on Plaintiff's First Cause of Action for First Amendment Retaliation because they have not satisfied their initial burden of either producing evidence that negates an essential element of Plaintiff's claims which would entitle them to a directed verdict if the evidence went uncontroverted at trial or showing that Plaintiff does not have enough evidence of an essential element to carry his ultimate burden of persuasion at trial.

Defendants are not entitled to judgment as a matter of law on Plaintiff's Third and Sixteenth Causes of Action for Civil Rights (Stigma-Plus) Defamation and violation of his right to Due Process under the Fourteenth Amendment because Kissner has raised a triable issue as to whether public records containing stigmatizing grooming charges released by the District to the public and the District's failure to withdraw the stigmatizing grooming charges from the public records deprived him of a constitutional liberty interest and therefore violated his procedural Due Process rights.

Defendants Martin and Fraser are not entitled to judgment as a matter of law because triable issues exist regarding their role in the decision to layoff and dismiss Plaintiff.

Defendants Grier and Khandewal are not entitled to judgment as a matter of law on the ground of absolute immunity because there are triable issues regarding their direct involvement in the decisions to terminate him and failure to restore his employment.

Pl.'s Opp'n To Motion For Summ. J.          Case No. 22-CV-00949-CRB

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Plaintiff David Kissner ("Plaintiff" or "Kissner") was separately fired and laid off in early 2020 from his employment as a permanent, tenured 6th-grade math and science teacher with the Loma Prieta Joint Union School District ("District"), located in Los Gatos, California. In 2018, Kissner had objected to a school-endorsed political student protest. When three students failed to show up for a scheduled quiz so that they could attend the assembly, Kissner treated their unexcused absences as truancies and gave them failing grades on the quiz. His decision became national news, and the Defendants responded to it by commissioning two investigations into his conduct.

One of these investigations came in response to an anonymous letter falsely accusing Kissner of the stigmatizing act of child grooming. Though the accusation was never substantiated, and no cause was found to discipline him, in 2021 the Defendants included it in a Statement of Charges filed in connection with dismissal proceedings. It then released the Statement of Charges to the public in response to a public records request.

In late 2020, Kissner publicly campaigned against a Board measure seeking the extension of public financing for the district. He additionally publicly opposed the Board's decision to fill a Board vacancy by appointment, and led the petition campaign to force a special election. Both of Kissner's initiatives were successful. In early 2021, Kissner was notified that he was being both fired and laid off. Kissner alleges that his termination was in retaliation for his protected actions and that the publication of false allegations of child grooming in connection with the District's dismissal proceedings defamed him.

The Defendants have not shown that the material evidence is undisputed. Instead, they bring their challenge on the basis of questions of law alone. As demonstrated below, each of their arguments fails to satisfy their burden on summary judgment, and their motion must be denied.

## II. SUMMARY OF RELEVANT AND MATERIAL FACTS

### A. An Anonymous Community Member, Upset At Kissner For Political Reasons, Opened The Door To False Allegations Of Grooming Against Kissner

The District serves over 400 students in grades TK-8 and administers just two schools, Loma Prieta Elementary School (K-5) and CT Middle (6-8). Second Amended Complaint (Dkt. No. 16) ("SAC"), ¶ 29. Kissner was hired in 2012 specifically to teach 6th-grade math and science

2

Pl.'s Opp'n To Motion For Summ. J.      Case No. 22-CV-00949-CRB

**ER-65**

1   in a "core" model at CT Middle (Exh. 1 (Hiring Contract)), and he continued to teach math and

2   science as a tenured ("permanent") employee until February 12, 2021, when he was placed on

3   administrative leave pending his dismissal proceedings. *Id*., ¶ 196.

4          Following the Parkland, Florida, school shootings in 2018, students across the nation

5   staged political protests calling for stricter gun legislation. These protests were instigated by

6   partisan groups cynically turning to the nation's impressionable youth to advance a political

7   agenda. *Id*., ¶¶ 5, 61-62, 238. CT Middle administrators sought to join the national conversation

8   by allowing students to cut class so they could attend school-sanctioned student assemblies calling

9   attention to the need for stricter gun legislation. It was against this politically-animated and

10  emotionally-charged backdrop that Kissner was drawn into a controversy involving his decision

11  to comply with California truancy laws and disallow his students from attending the assembly

12  without an excused absence. For his part, Kissner believed that a school-sanctioned student protest

13  on any subject violated California's truancy laws and placed the school in a compromising

14  position. *Id*., ¶¶ 54, 56-64, 69. His position was supported by legal guidance from two counties.

15  *Id*., ¶ 59.

16         The first of two student assemblies was planned for March 14, 2018—"Pi Day"—a day

17  Kissner had scheduled to give his annual quiz regarding the value of pi (expressed as 3.14

18  representing the ratio of the circumference of a circle to its diameter). *Id*., ¶¶ 74, 86. When three

19  students elected to skip class to attend the assembly, Kissner gave them failing grades on the quiz.

20  *Id*., ¶¶ 82-86. The parent of one of the students appeared on a Bay Area newscast to complain

21  about the grade given to his child. The nationwide media attention devoted to the incident

22  subsequently revealed Kissner's identity to the public. *Id*., ¶ 89. His action drew rancor from some

23  members of the public, one of whom reacted to it by anonymously notifying the school that Kissner

24  was a child "groomer." *Id*., ¶¶ 91-101, 110-112.

25         On the basis of the anonymous writer's false grooming accusation, the District launched

26  an investigation into his conduct with children. *Id*., ¶¶ 110, 123, 125, 130. The District's

27  investigator prepared a report quoting the anonymous grooming allegation but did not find it to be

28  substantiated. *Id*., ¶ 148. The report additionally referred to a 2016 incident in which Kissner had

    given a 17-year-old a sip of alcohol. *Id*., ¶ 50. Relying on the report's reference to the anonymous

    writer's grooming allegation and the alcohol incident, the school's then-superintendent, Defendant

    Lisa Fraser ("Fraser") warned Kissner that any "reports" of similar misconduct in the future would

FREEDOM X
11500 OLYMPIC BLVD., SUITE 400
LOS ANGELES, CA 90064

3

Pl.'s Opp'n To Motion For Summ. J.                          Case No. 22-CV-00949-CRB

**ER-66**

1    be grounds for dismissal. Exh. 2 (Fraser Letter). Kissner responded to the letter denying any

2    wrongdoing. Exh. 3. No further action was taken against Kissner regarding the matter. SAC ¶ 152.

3    **B.    The District Has Never Substantiated The False Allegations Of Grooming**
     **Yet Refused To Withdraw Them**

4    On February 12, 2021, Kissner received a Notice of Intent to dismiss him based, in part,

5    on allegations of "[p]otential grooming behavior, such as: singling out a minor and being alone

6    with a minor … asking about sex/sexual encounters; and posting images of youth partially

7    unclothed on the internet… failing to maintain professional boundaries, including via technology

8    and sharing private texts/messages with minors/students." On March 22, 2021, Kissner's attorney

9    sent a letter to District counsel demanding the unsubstantiated allegations be removed from the

10   Statement of Charges:

11
12       These slanderous charges lack any substance and are shamelessly based on nothing
         more than anonymous inadmissible hearsay. Accusations of "potential grooming,"
13       asking about sex, etc., are made with NO SOURCE, NO VICTIM, NO DETAILS,
         NO OFFICIAL COMPLAINT, NO REPORTS…. Should these accusations remain
14       in these proceedings or otherwise find their way toward republication, we will not
         hesitate to hold the District and each person involved accountable.
15

16   Exh. 23 (Demand Letter). The District never responded to counsel's letter and did not remove the

17   offensive allegations from either the initial Statement of Charges or an amended version of it.

18   Fraser has since admitted that she had no evidence to support the grooming allegations.

19   Exh. 4 (Fraser Dep. 103:11-106:6, 110:2-6, 114:19-115:6, 121:11-123:18, 135:9-15, 135:24-

20   136:3, 140:1-141:25, 142:1-143:19, 144:7-21); Exh. 5 (Elliot Dep. 154:25-155:11, 161:4-162:16,

21   173:8-24, 174:3-17).

22   **C.    The District Ignored A Demand To Withdraw The False Allegations Of**
     **Grooming And Released Them To The Public**
23

24   On April 16, 2021, the District received a California Public Records Act ("PRA") request

25   seeking a copy of the initial Statement of Charges. Exh. 6. Defendant Fraser responded to the

26   request in less than an hour by releasing the Statement of Charges containing the grooming

27   allegations. *Id.* On July 6, 2021, the District received a PRA request seeking a copy of the amended

28   Statement of Charges. Fraser's successor, Defendant Grier, responded to the request by releasing

     the Amended Statement of Charges containing the grooming allegations. Exh. 7.  Both responses

     included a cover letter relating the following information:

     • The District has determined that your request, as written and submitted, <u>does not meet</u>
       <u>the requirement for a proper PRA request</u> in that it fails to identify records with

FREEDOM X
11500 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064

4

Pl.'s Opp'n To Motion For Summ. J.                    Case No. 22-CV-00949-CRB

reasonable particularity.

- Moreover, the request is objected to on the grounds that <u>it would require potential information to be disclosed which is exempt from the PRA</u> based on: personnel, medical, or similar files, the disclosure of which would constitute an unwarranted invasion of personal privacy, attorney client privilege and attorney work product.

- Specifically, under Government Code section 6255, a public entity may withhold a record if, based on the facts of the particular case, <u>the public interest served by not disclosing the record clearly outweighs the public interest served by disclosing the record.</u>

- Additionally, the California Government Code excludes from disclosure other records, including "[r]ecords, the disclosure of which is exempted or prohibited pursuant to federal or state law, including, but not limited to, provisions of the Evidence Code relating to privilege." (Gov. Code § 6254(k).) In this regard, Article I, Section 1 of the California Constitution provides that:

  o All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and <u>liberty</u>, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.

- <u>The District is not able to produce records that are exempt from disclosure under the PRA and/or state and federal law.</u>

- Documents potentially responsive to your request may be exempt from production under the PRA's <u>pending litigation</u>, <u>preliminary drafts</u>, attorney-client privilege, attorney work product privilege, and/or <u>deliberative process privilege exemptions.</u>

- Furthermore, the District is not able to disclose records which may constitute an <u>unwarranted invasion of personal privacy</u> and employee privacy.

- Further, the California Court of Appeals held that records of complaints or investigations against a public employee can be disclosed only if the complaint is of a substantial nature and <u>there is reasonable cause to believe the complaint or charge of misconduct is well-founded.</u> However, in such instances, <u>a public agency's decision to release confidential documents under the PRA is reviewable by petition for writ of mandate in a "reverse-PRA" lawsuit.</u>

*Id*. (Emphasis added.)

The District voluntarily dropped the allegations of grooming and associated conduct before the dismissal proceedings began and the allegations did not appear in the heavily redacted statement of charges presented to the Commission. Dkt. No. 51-1 (Exh. 1). Nevertheless, the ALJ's decision included unfounded allegations concerning an incident that the public seized upon to further mischaracterize Kissner as a child groomer based on the District's release of the Statements of Charges. Dkt. No. 44-2 (pp. 45-61 (Email Thread)).

Pl.'s Opp'n To Motion For Summ. J.                                    Case No. 22-CV-00949-CRB

**D.      The District Knew Of Kissner's Political Activities Opposed To Its Funding Measure And Board Appointment**

During the 2019-2020 school year, the District struggled with budget deficits and declining reserves. Exh. 8 (Layoff Testimony, v.1, 16:7-18:18). Fraser convened a Budget Advisory Committee ("BAC") to assist in planning for program cuts for the following year. *Id.* As part of the strategy for addressing its budget woes, Fraser recommended to the Board that the District pursue a new parcel tax to replace one that was expiring. *Id.* The Board unanimously voted to pursue the ballot measure, Measure N. Exh 9 (Layoff Testimony, v. 2, 125:9-21). The measure was backed by district Board members and administrators who actively campaigned for its support. Exh. 8 (71:9-72:17).

Plaintiff led the campaign opposing the tax measure and advocated for transparency, accountability, and responsible use of public funds. *Id.* The District was aware of his efforts to publicly oppose the measure, *Id.,* and Kissner notified Fraser in December 2019 of his intent to campaign in opposition. Exh. 17 (Dismissal Tr., 52:4-15). The District suffered a major setback on December 1, 2020, when the measure was defeated, and it was forced to plan for much deeper budget cuts than it had hoped. Exh. 8 (71:9-72:17). But the District's chief business official (CBO) determined that the proposed budget cut purporting to implicate Kissner's position had no effect on teaching positions or budget savings. *Id.* (220:1-221:4, 223:7-224:2, 229:22-230:4, 238:13-15, 252:24-253:21, 257:10-12).

**E.      Kissner's Layoff Had Nothing To Do With The District's Budget Priorities**

While at first the district had budgetary concerns and sought to reduce four positions district-wide, the CBO determined that Kissner's position could not be eliminated. Exh. 10 (Vance Email to Fraser). In fact, it wasn't eliminated. The resolution had not specified the reduction or elimination of any service related to 6th-grade math or science instruction. Exh. 11 (PKS Resolution). Fraser and Martin even reassured parents that there would be no significant changes to the 6th-grade curriculum (Exh. 28, Fraser and Martin email). And Martin has confirmed it. Exh. 9 (28:11-15) ("[T]he curriculum is not in flux, [but] who's teaching it is.").

On March 12, 2021, the District served Plaintiff with a layoff notice, which included the approved Board resolution to lay him off. Exh. 12 (Layoff Notice.) Kissner was replaced with a more junior teacher possessing less experience. Exh. 13 (Screenshot); Exh. 9 (55:7-56:3). In fact, he was the only teacher laid off. Exh. 14 (Martin's Supplementary Response to Interrogatories No. 5); Exh. 15 (Approved Personnel Report). By June, 2021, all of the noticed layoffs, except

6

Kissner's, were rescinded. *Id.* The District received unexpected funding in Spring 2021 and did not implement any budget cuts or reduce or eliminate teaching positions for the 2021-2022 school year. Exh. 16 (Board Presentation, Slide 2 (no budget cuts), Slide 23 (did not cut 4.0 FTE)). Kissner's layoff had nothing to do with the District's budget priorities or the Board resolution authorizing layoffs.

Because Kissner was not laid off due to budget priorities, he is entitled to be reappointed to his former job (Cal. Educ. Code Ann. § 44956), but the current superintendent, Grier, has failed to reappoint him.

### F.     The District Invented A Policy Basis To Punish Kissner

Soon after notifying Fraser of his intent to oppose her parcel tax in December 2019 (Exh. 17 (Dismissal Tr., 52:4-15)), Fraser brought a new proposed amendment to Board Policy 4119.21 to the Board for approval in February 2021. Exh. 18 (Board Meeting Agenda and Minutes). The amended version (Exh. 19) added unconstitutionally vague language to the original version (Exh. 20), proscribing broadly-described conduct. Once the Amended Policy was approved, Fraser promptly wrote Kissner two unprecedented disciplinary letters, citing only the new policy, and inexplicably used the language for two different statutory causes for dismissal. Exh. 21 (March 31, 2020 Warning of Unprofessional Conduct); Exh. 22 (Warning of Unsatisfactory Performance). Neither of these charges were upheld by the commission. The District would cite this Amended Policy as the only policy basis for Kissner's dismissal in its lengthy Statement of Charges.

## III.     ARGUMENT

### A.     Summary Judgment Cannot Be Granted If Evidence Supports Plaintiff's Causes Of Action

The District's Motion must be denied for every cause of action upon which Plaintiffs offer sufficient evidence to establish the prima facie case. "The judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial ... Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions ..." *Anderson v. Liberty Lobby, Inc.*, 477 U.S., *supra*, at 249-255.  Summary judgment is a drastic remedy and must therefore only be granted "with caution."  *Id.* at 255.  Summary judgment cannot be granted when there is a "genuine dispute" as to any "material fact."  Fed. R. Civ. P. 56(a).

In determining whether a case presents any questions of material fact under the applicable substantive law, the trial court must view the evidence in the light most favorable to the nonmoving

party. *Citizens for Better Forestry v. United States Dep't of Agric.*, 341 F.3d 961, 969 (9th Cir 2003); *see also Tolan v. Cotton*, 572 U.S. 650, 656-657 (2014) (courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment). This requires the trial court to believe the evidence of the opposing party, and to draw all reasonable inferences that may be drawn from the facts before the court in favor of the opposing party. *Anderson v. Liberty* Lobby, Inc., *supra*, 477 U.S. at 255. "An issue of fact may arise from inferences to be drawn from the evidence, and all doubts as to the existence of a genuine issue as to a material fact must be resolved against the party moving for a summary judgment." *Consol. Elec. Co. v. U.S. for Use and Benefit of Gough Industries, Inc*., 355 F.2d 437, 440, n. 11 (9th Cir. 1966).

**B.      District Board Defendants Do Not Enjoy Legislative Immunity**

Personal-capacity suits seek to impose individual liability upon a government officer for actions taken under color of state law. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Thus, on the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). While the plaintiff in a personal-capacity suit need not establish a connection to governmental "policy or custom," officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law. *Id*., at 166–167.

Individual members of local governmental bodies, such as the school Board Defendants, are absolutely immune from suit for damages under § 1983 when conducting "legitimate legislative activity." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1951). "Absolute legislative immunity attaches to all actions taken in the sphere of legitimate legislative activity." *Id.* (Emphasis added.) However, not all governmental acts by local government bodies are necessarily legislative in nature, and "[t]he various activities of most local or municipal officials cannot be characterized as only administrative, legislative, or judicial." *Haskell v. Washington Twp*., 864 F.2d 1266, 1277-78 (6th Cir. 1988). "[L]egislators performing administrative or executive functions involving decisions directed at one or a few individuals are not entitled to legislative immunity." *Ahearn v. City of Palos Verdes*, CV 07-2029-AHS-RNB, 2008 WL 1330461, at *9 (C.D. Cal. Apr. 9, 2008); citing *Trevino v. Gates*, 23 F.3d 1480, 1481 (9th Cir.1994) ("city council members who vote to pay a punitive damage award" for an individual "perform an administrative, not a legislative, act; therefore, they are not entitled to absolute immunity"); *Zamsky v. Hansell*,

933 F.2d 677, 679 (9th Cir.1991) (local officials are not entitled to legislative immunity for "an action against a specific individual enforcing the general zoning ordinance"). "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 523 U.S. at 54.

In *Kaahumanu v. County of Maui*, 315 F.3d 1215 (9th Cir.2003), the Ninth Circuit summarized the factors that should be considered in determining whether a local legislator is entitled to absolute immunity as follows:

> We determine whether an action is legislative by considering four factors: (1) whether the act involves ad hoc decision making, or the formulation of policy; (2) whether the act applies to a few individuals, or to the public at large; (3) whether the act is formally legislative in character; and (4) whether it bears all the hallmarks of traditional legislation.

*Id.* at 1220 (internal quotation marks and citations omitted). The court also noted in *Kaahumanu* that these factors are not mutually exclusive. *Id.* "Whether an act is ad hoc can depend on whether it is aimed at a few people or many, and whether an act bears all the hallmarks of traditional legislation can depend on whether it is ad hoc." *Id*. at 1220, n. 4 (citing *Bechard v. Rappold*, 287 F.3d 827, 829–32 (9th Cir.2002)). "An 'ad hoc' decision is one made 'for the particular end or purpose at hand and without reference to wider application.' " *La Conner Associates LLC. v. Berg*, 73 Fed. Appx. 994, 996 (9th Cir. 2003) (unpublished), quoting Websters Third New Int'l Dictionary 26 (4th ed.1976).

The question before the Court is whether the school Board Defendants' layoff and dismissal resolutions, when "stripped of all considerations of intent and motive," were legislative rather than administrative or executive. *Bogan v. Scott-Harris*, 523 U.S. at 55. Employment decisions generally are administrative. *Rateree v. Rockett*, 852 F.2d 946, 950 (7th Cir. 1988). In *Bogan*, the Supreme Court held that a decision by local legislators to eliminate an employment position from local government was clearly a legislative act. *Id*. at 55-56. The Court contrasted that situation with "the hiring or firing of a particular employee," which the Court implied was not a legislative act. *Id*. The distinction, according to the Court, was that the former activity "may have prospective implications that reach well beyond the particular occupant of the office." *Id*. at 56.

In *Bagley v. Blagojevich*, 646 F.3d 378, 392 (7th Cir.2011), the Seventh Circuit cited substantial precedent that "supports the distinction between the firing of an employee," which is administrative, "and the elimination of a position," which is legislative. *Id*.; *see also Bogan*, 523

FREEDOM X
11500 OLYMPIC BLVD, SUITE 400
LOS ANGELES, CA 90064

9

U.S. at 56; *Rateree v. Rockett*, 852 F.2d at 950 (distinguishing between employment decisions and budget decisions that "have an effect on employment by either creating or eliminating positions or by raising or lowering salaries").

A Sixth Circuit case, *Canary v. Osborn*, 211 F.3d 324, 330–31 (6th Cir.2000), stands practically on all fours with the present case. In *Canary*, the court found legislative immunity inapplicable to a vote by the defendant school board members against the renewal of the plaintiff's contract as an assistant principal. The plaintiff sued them individually and alleged that they had retaliated against him in violation of his First Amendment rights. The court determined that even though the board's minutes referred to the vote as based on the school district's financial status and implicated the board's budgetary priorities, the record did not otherwise reflect that this was a budgetary decision. *Id*. at 330. The resolution did not involve the termination of a position, and the decision did not have prospective application beyond the plaintiff because the board thereafter created a similar new position and hired someone else to fill it.

There is no indication in the Board minutes that Kissner was dismissed or laid off because the Board no longer needed or wanted a 6th-grade math and science teacher. *See Id*. Unlike in *Bogan*, but analogous to *Canary*, the record reflects that the alleged action in this case did not have prospective implications that reached well beyond the particular occupant of the office. *Id*. at 330-331. Shortly after Kissner was terminated (by both layoff and dismissal), the District hired a teacher other than Kissner to fill the same position (6th-grade math and science). *See id*.; cf. *Rateree*, 852 F.2d at 950 (noting, in support of a finding that certain budget cuts were indeed legislative in nature, that "the plaintiffs' positions were eliminated altogether and no one was hired to replace them").

Here, the District is careful not to mention the board's decision to dismiss Kissner—only its decision to lay him off—because the dismissal decision is plainly administrative, not legislative, and thus completely undercuts its argument. But the layoff decision fairs no better because Kissner's position—teaching 6th-grade math and science—was not eliminated, only his employment. The District retained teachers to replace him in the identical position. "A job is not abolished under circumstances where the appointing authority simply transfers that job's duties to a new employee to perform." *In re Appeal of Woods*, 7 Ohio App.3d 226, 455 N.E.2d 13, 15 (1982). Although the District claims Kissner's job was eliminated due to budget considerations, it was neither targeted for budgetary reductions nor resulted in any. Exh. 8 (220:1-221:4, 223:7-

10

Pl.'s Opp'n To Motion For Summ. J.                                    Case No. 22-CV-00949-CRB

ER-73

224:2, 229:22-230:4, 238:13-15, 252:24-253:21, 257:10-12). In fact, the District has admitted that any reduction of 6th-grade math and science curricula could never be achieved. Exh. 10 (Vance Email to Fraser). Kissner was replaced in his position unrelated to budgetary needs. As such, his layoff was an ad hoc decision affecting him alone.

It is evident that the Board Defendants in the present case are not entitled to summary judgment on their claim of legislative immunity. Even "stripped of all considerations of intent and motive," the dismissal and layoff decisions in substance were not essentially and clearly legislative. Unlike the ordinance in *Bogan*, the District's resolutions proposed by Fraser and adopted by the Board to terminate Kissner did not "bear all the hallmarks of traditional legislation." *See Canary v. Osborn*, 211 F.3d at 330.

### C.     Because The District Has Not Met Its Burden Of Producing Evidence Of Retaliation, Plaintiff Has No Obligation To Produce Any Evidence Of Retaliation For His Protected Actions

Plaintiff alleges that his protected conduct caused the District to terminate him and that the District's stated reasons for his termination were pretextual. A triable issue exists as to whether the District violated Kissner's First Amendment right to engage in protected speech by terminating him in retaliation for that speech. Framing the issue more specifically, the question on summary judgment is whether a triable issue of fact exists that the District Defendants' reasons for terminating Kissner were mere pretext and unworthy of credence.

The party moving for summary judgment always bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The initial burden of production refers to the burden of producing evidence, or showing the absence of evidence, on the motion for summary judgment; the ultimate burden of persuasion can refer either to the burden of persuasion on the motion or to the burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Id.*

Here, the District has not met its burden of showing the absence of evidence demonstrating retaliation. It has offered only the conclusory decision of "a disinterested, three-member administrative panel" to show that "[p]laintiff can present no evidence that any of the panel members had a retaliatory motive to recommend plaintiff's termination." Motion, 25:22-25. This

---

11

1    argument fails, first, because an administrative law decision is not evidence. "The court must be

2    directed to 'specific, triable facts.' " *HiRel Connectors, Inc. v. U.S.,* CV01-11069DSFVBKX, 2006

3    WL 3618012, at *2 (C.D. Cal. Sept. 15, 2006), quoting *So. Cal. Gas Co. v. City of Santa Ana*, 336

4    F.3d 885, 889 (9th Cir.2003); *see id.,* quoting *British Airways Bd. v. Boeing Co*., 585 F.2d 946,

5    952 (9th Cir.1978), cert. denied, 440 U.S. 981 (1979) ("[L]egal memoranda and oral argument are

6    not evidence, and they cannot by themselves create a factual dispute sufficient to defeat a summary

7    judgment motion where no dispute otherwise exists.")

8        The District's argument fails as well for two additional reasons. First, it depends on a

9    peculiarly misplaced understanding of the Supreme Court's *Mount Healthy* decision suggesting

10   that the motives of administrative law adjudicators supersede those of the employer in the process

11   of dismissing an employee. *See* Motion, 25:9-27:8.[1] Such impenetrable reasoning would

12   impermissibly and somewhat preposterously place factfinders in the shoes of defendants. Nor did

13   *Mount Healthy* reach such a clearly unsound holding. As applicable to the present case, *Mount*

14   *Healthy* determined only that a school district will not run afoul of a teacher's constitutional rights

15   if, by a preponderance of the evidence, the district demonstrates that it would have terminated the

16   teacher even in the absence of protected conduct. No attempt to present such evidence has been

17   made because, unlike the *Mount Healthy* school district, the District has never claimed to have

18   terminated Kissner, in part or in whole, because of his protected actions. The *Mount Healthy*

19   analysis scrutinized a plaintiff's evidentiary burden at trial, not a non-moving party's burden on

20   summary judgment, where the school board's termination of a teacher based in part on his

21   protected actions was undisputed. The only question in *Mount Healthy* was whether the board

22   could terminate the teacher for reasons apart from his protected speech even though it had violated

23   his constitutional right.

24       The question in this case is not whether the District would have terminated Kissner <u>but for</u>

25   his protected conduct. Rather, the question is whether the District's stated reasons for terminating

26   Kissner were "false or pretextual" or whether evidence can show that the District "acted with

27   discriminatory animus" or whether evidence of each exists such that a reasonable trier of fact could

28   conclude the District intentionally discriminated. *Skinner v. Medivators, Inc*., 20-CV-06979-JSW,

---

[1] Plaintiff hereby objects to Defendants' Request for Judicial Notice, Exh. E, pp. 36-37, cited at
Motion, 26:10-11, 21, 24, 26-27 as irrelevant (Fed. R. Evid. 402; LR 7-3(a)) and as inadmissible
hearsay to prove the truth asserted therein (Fed. R. Evid. 802).

12

1  2022 WL 4544701, at *3 (N.D. Cal. Sept. 28, 2022); *Kannan v. Apple Inc.* 5:17-CV-07305-EJD,

2  2020 WL 6135994, at *3 (N.D. Cal. Oct. 19, 2020), aff'd, 20-17211, 2022 WL 3973918 (9th Cir.

3  Aug. 31, 2022). The District has not offered evidence negating Plaintiff's allegations that its

4  reasons were false or pretextual or that it did not act with discriminatory animus.[2] Nor has it

5  demonstrated that Kissner cannot show evidence of pretext or discriminatory animus.

6       In *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, *supra*, 210 F.3d, the Ninth

7  Circuit explained the burden-shifting requirement on summary judgment:

8          A moving party without the ultimate burden of persuasion at trial—usually, but not
           always, a defendant—has both the initial burden of production and the ultimate
9          burden of persuasion on a motion for summary judgment. In order to carry its
           burden of production, the moving party must either produce evidence negating an
10         essential element of the nonmoving party's claim or defense or show that the
           nonmoving party does not have enough evidence of an essential element to carry
11         its ultimate burden of persuasion at trial. In order to carry its ultimate burden of
           persuasion on the motion, the moving party must persuade the court that there is no
12         genuine issue of material fact.
13
14         If a moving party fails to carry its initial burden of production, the nonmoving party
15         has no obligation to produce anything, even if the nonmoving party would have the
           ultimate burden of persuasion at trial. In such a case, the nonmoving party may
16         defeat the motion for summary judgment without producing anything. If, however,
           a moving party carries its burden of production, the nonmoving party must produce
17         evidence to support its claim or defense. If the nonmoving party fails to produce
           enough evidence to create a genuine issue of material fact, the moving party wins
18         the motion for summary judgment.
19
20 *Id*. at 1102-03; *accord Guidry v. Marine Engineers' Beneficial Ass'n*, C 05-03960 CRB, 2007 WL

21 707511, at *6 (N.D. Cal. Mar. 6, 2007). (Emphasis added; citations omitted.)

22       The District has submitted no admissible evidence meeting its burden. It has relied

23 exclusively on the opinions expressed by an administrative law commission, which are,

24 themselves, not evidence, which do not cite to evidence, and which the District has not identified

25 evidence cited by the commission. The District has not satisfied its initial burden of either

26 producing evidence that negates an essential element of Plaintiff's claims which would entitle it

27 to a directed verdict if the evidence went uncontroverted at trial or showing that Plaintiff does not

28 have enough evidence of an essential element to carry his ultimate burden of persuasion at trial.

---

[2] Such evidence, were it to exist, might take the shape of an email to Kissner congratulating him
on his campaign efforts to defeat Measure N and expressing no hard feelings.

**Pl.'s Opp'n To Motion For Summ. J.**                    Case No. 22-CV-00949-CRB

Accordingly, Plaintiff has no obligation to produce anything and summary judgment must be denied.

### D. Even Though Plaintiff Has No Burden To Produce Evidence, Should The Court Feel Otherwise, Plaintiff Can Establish That The District Was More Likely Than Not Motivated To Terminate Him In Retaliation For His Protected Actions

Plaintiff would prefer to rest on this argument, but cannot risk the chance that the Court might find the District's erroneous reference to administrative decisions sufficient to meet its burden. Nevertheless, "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." *See Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002). On summary judgment, the degree of proof necessary to establish a prima facie case "is minimal and does not even rise to the level of a preponderance of the evidence." *See Schechner v. KPIX–TV*, 686 F.3d 1018, 1025 (9th Cir. 2012).

A case of employment discrimination and retaliation may be built on direct or circumstantial evidence, or both. *Morgan v. Regents of U. of Cal.*, 88 Cal. App. 4th 52, 67 (2000). A "plaintiff may establish pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id*. at 68 (cleaned up; citations omitted); *see also Zamora v. Security Industry Specialists, Inc.*, 71 Cal.App.5th 1, 34 (2021). "Proof that an employer's proffered reasons for adverse employment action are unworthy of credence may considerably assist a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons." *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 361 (2000). (Internal quotation marks omitted; citation omitted.) "For purposes of making a prima facie showing, the causal link element may be established by an inference derived from circumstantial evidence." *McRae v. Dept. of Corrections & Rehab.*, 142 Cal. App. 4th 377, 388 (2006). *Id*.

The U.S. Supreme Court has recognized that teachers must be free from retaliatory adverse employment actions by school boards when speaking as citizens on matters of public concern. *Pickering v. Board of Ed. of Tp. High School Dist. 205, Will County, Illinois*, 391 U.S. 563, 572 (1968). "Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." *Id*. at 571-572. Conforming to this principle, the rights of District employees

FREEDOM X
11500 OLYMPIC BLVD., SUITE 400
LOS ANGELES, CA 90064

14

Pl.'s Opp'n To Motion For Summ. J.                    Case No. 22-CV-00949-CRB

ER-77

1  are protected by the Loma Prieta Teacher's Association's Collective Bargaining Agreement. SAC,

2  ¶ 52, *id.*, Exh. 1). Under this agreement, the District is prohibited from retaliating against a teacher

3  over his protected speech. *Id.* at ¶ 53. California law also prohibits such retaliation in employment

4  generally. *See* Cal. Lab. Code §§ 1101-1102. The District is not likely to admit that it was primarily

5  motivated to terminate Kissner based on his protected actions. Thus, circumstantial evidence of

6  pretext is required. Evidence of pretext in this case includes, but is not limited to, the following:

7          1.       **Proximity To Protected Actions**: "A plaintiff can satisfy his or her initial burden

8  under the [*McDonnell-Douglas*] test by producing evidence of nothing more than the employer's

9  knowledge that the employee engaged in protected activities and the proximity in time between

10  the protected action and the allegedly retaliatory employment decision." *Id.*

11          Kissner participated in the campaign to defeat Measure N and notified the Board that he

12  sought a special election to fill a Board vacancy in December 2020 and January 2021. In February

13  2021, roughly one month after these activities and after the defeat of Measure N, the District

14  notified him of its intent to dismiss him. Statutorily, the District could not have notified Kissner

15  any later than March 2021 that it planned to lay him off. During the early months of 2021, and

16  having lost the revenue anticipated from Measure N, the District set about to formulate its

17  reduction in force needs. The revenue expected from the passage of Measure N was a critical factor

18  in developing a budget for the prospective school year. Exh. 8 (18:5-13) (Fraser: "[O]ur budget

19  advisory committee was guiding the Measure N parcel tax as a means of … revenue. And so when

20  we … were budgeting, we were budgeting in two different scenarios: One would be if Measure N

21  passed, and one would be if Measure N did not pass. Either way, we needed to make $100,000

22  budget cuts if Measure N were to pass, and approximately $400,000 in cuts were it to fail…. [B]oth

23  of those factors played into the need for layoffs.")

24          The Defendants knew that Kissner engaged in protected activities at the end of 2020. The

25  close proximity in time between Kissner's activities and the employment decisions raises a

26  reasonable inference, and therefore, a triable issue of fact that the District's proffered reasons are

27  unworthy of credence and therefore pretextual.

28          2.       **The Unprecedented Simultaneous Dismissal And Layoff**: The District dismissed

(for cause) and laid off (ostensibly for financial reasons) Kissner within a short few months of each

other. This fact creates a reasonable inference, and therefore, a triable issue of fact, that the

District's proffered reasons are unworthy of credence and therefore pretextual, because (1) Kissner

FREEDOM X
11500 OLYMPIC BLVD., SUITE 400
LOS ANGELES, CA 90064

15

**Pl.'s Opp'n To Motion For Summ. J.**                    Case No. 22-CV-00949-CRB

was tenured and held a permanent position, (2) Kissner had been employed for nine years, a lengthy stretch of time to suddenly be found unfit to teach and incapable of teaching 6th-grade math and science, (3) it is indisputable that prior to Kissner, no employee had ever been terminated through both the dismissal and layoff processes; and (4) it is indisputably unprecedented that an employee is dismissed and laid off within the same year. Indeed, the likelihood of such an unprecedented disruption of a permanent teacher's employment through both approaches to terminate his employment cannot help but yield to a deep suspicion that his termination was more likely than not motivated by retaliatory and discriminatory animus.

3.    **Amended Board Policy**: For the first time in 10 years (Exh. 27, 31:11-23 (District Opp. To Writ in Dismissal Case)), in early 2020 the District amended a Board policy addressing employee misconduct. Fraser proposed the new policy to the Board shortly after Kissner notified her of his intent to oppose the parcel tax measure she had recommended to the Board, Measure N. Using broad language that could not be expected to withstand constitutional scrutiny, the amended policy proscribes conduct in the kind of suspicious detail as to appear to be written to support unproven allegations against Kissner. Predictably, it became the sole policy basis for charges brought in 2021 against him, coincidentally just after the defeat of Measure N.

The language added to the amended board policy appears suspiciously tailored to apply to Kissner based on alleged misconduct—later proved to be unfounded—made around that time and which could trigger administrative action on the basis of Fraser's 2018 letter to Kissner warning that any "reports" of misconduct, whether or not substantiated, would have adverse employment consequences. The timing of Fraser's proposed amended Board policy raises a reasonable inference, and therefore, a triable issue of fact, as to whether Fraser sought to create a policy basis supporting Kissner's termination and whether the District's proffered reasons are unworthy of credence and therefore pretextual.

4.    **Reliance On Stale Allegations Of Misconduct**: The District relied upon a five-year-old accusation (2016) of misconduct, a three-year-old anonymous letter (early 2018), and a two-and-a-half-year-old report (late 2018) prepared in reaction to Kissner's opposition to the 2018 walkout and grading decision as bases for dismissal charges brought against him in 2021 conspicuously just after his protected political activity. By basing dismissal charges on belated allegations that had not resulted in disciplinary or other adverse employment action in the past, a

Pl.'s Opp'n To Motion For Summ. J.                    Case No. 22-CV-00949-CRB

1  reasonable inference, and therefore, a triable issue of fact, exists as to whether the 2021 allegations

2  used to justify Kissner's dismissal served as a pretextual basis for his termination.

3      5.    **Shifting Reasons For Layoff**: The District gave conflicting, contradictory, and

4  implausible reasons for Kissner's layoff, abandoning claims based on budget savings or declining

5  enrollment in favor of unclear claims of program benefits and potential future flexibility. Exh. 8

6  (23:21-24:18, 50:15-51:15, 120:18-122:4, 143:10-145:7).

7      E.    **Whether Plaintiff Has Suffered A Stigma-Plus Defamation Injury That
       Violates Procedural Due Process Presents A Triable Issue Of Fact**

8

9          1.    Introduction

10     The complaint alleges that the release of false allegations of grooming damaged Plaintiff's

11 professional reputation and employment. The evidence in this case demonstrates that Plaintiff was

12 deprived of property and liberty interests in employment and a liberty interest in his professional

13 reputation in violation of 42 U.S.C. § 1983.

14         2.    Plaintiff has properly alleged substantive due process claims against the
       District Defendants due to their arbitrary and wrongful conduct

15     The Due Process Clause was intended to secure an individual from an abuse of power by

16 government officials. *See Daniels v. Williams*, 474 U.S. 327, 330 (1986). "The touchstone of due

17 process is protection of the individual against arbitrary action of government." *Dent v. West*

18 *Virginia*, 129 U.S. 114, 123 (1889). The U.S. Supreme Court has identified three kinds of § 1983

19 claims that may be brought against the State under the Due Process Clause of the Fourteenth

20 Amendment. "First, the Clause incorporates many of the specific protections defined in the Bill of

21 Rights. A plaintiff may bring suit under § 1983 for state officials' violation of his rights to, e.g.,

22 freedom of speech or freedom from unreasonable searches and seizures." *Zinermon v. Burch*, 494

23 U.S. 113, 125 (1990). This is the category of due process claims the District correctly argues finds

24 in Plaintiff's First Amendment claim "an explicit textual source of constitutional protection."

25 Motion, 7:11-16, citing *Albright v. Oliver*, 510 U.S. 266, 273 (1994). But there is an additional

26 substantive due process category Plaintiff has sufficiently alleged.

27     "Second, the Due Process Clause contains a substantive component that bars certain

28 arbitrary, wrongful government actions "regardless of the fairness of the procedures used to

implement them." *Zinermon v. Burch*, 494 U.S. at 125, citing *Daniels v. Williams*, 474 U.S. at 331

("[B]y barring certain government actions regardless of the fairness of the procedures used to

implement them, [citation] it serves to prevent governmental power from being 'used for purposes

---

17

Pl.'s Opp'n To Motion For Summ. J.                          Case No. 22-CV-00949-CRB

of oppression.' "). This provides a basis for alleging a due process violation separate from and in addition to a due process violation where an explicit source of constitutional protection is found in a more specific amendment.

Regardless of the fairness of the procedures the District may have used to comply with the California Public Records Act, Defendants Fraser and Grier arbitrarily and wrongfully (1) included the unsubstantiated, unfounded grooming allegations in the Statement of Charges, (2) refused to withdraw the unsubstantiated, unfounded grooming allegations after Plaintiff demanded it to do so, and (3) released the unsubstantiated, unfounded grooming allegations to the public. These arbitrary and wrongful acts and omissions constitute a permissible due process claim.

   3.   Plaintiff has properly alleged facts demonstrating the District's violation of procedural due process

The third type of protection encompassed under the Due Process Clause is "a guarantee of fair procedure." *Id.* The court assesses procedural due process claims under § 1983 by searching whether the State deprived the plaintiff of a constitutional liberty interest, and if so, whether the deprivation's attendant procedures were constitutionally insufficient." *Endy v. County of Los Angeles*, 975 F.3d 757, 764 (9th Cir. 2020). "Due process … is a flexible concept that varies with the particular situation." *Zinermon v. Burch*, *supra*, 494 U.S. at 127. The court weighs several factors in determining what procedural protections the Constitution requires in a particular case: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, (3) the probable value, if any, of additional or substitute procedural safeguards; and (4) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id.*, citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). "Applying this test, the Court usually has held that the Constitution requires some kind of a hearing before the State deprives a person of liberty or property." *Id.*

The first two factors—Plaintiff's employment and his deprivation of it—are well established. As to the third factor, unutilized procedural safeguards were both available to the District and known to them. The most practical safeguard would have been to comply with Plaintiff's demand to withdraw the unfounded charges until such time as evidence could substantiate them and, if found, amend the charges at a later time. Prior to the publication of the PRA responses, Kissner's attorney demanded that the Defendants withdraw the defamatory allegations or face legal consequences ("Should these accusations remain in these proceedings or

18

1   otherwise find their way toward republication, we will not hesitate to hold the District and each

2   person involved accountable."). The District failed to respond to the demand. Plaintiff could not

3   have known that public records requests seeking the statement of charges against him in his

4   dismissal proceedings would be made or that the District would release the false information.

5   Without the knowledge of the records request, Plaintiff would not have known to file a reverse

6   PRA lawsuit to enjoin its release. And once the allegations were made public, a reverse PRA

7   lawsuit would have been futile. In short, no procedural safeguards protected Plaintiff from the

8   release of the allegations to the public.

9        Additionally, the District understood and recognized the danger of unleashing unfounded

10   allegations on the public and recognized a duty to grant Plaintiff an opportunity to challenge their

11   publication. *See* Exhs. 6 & 7 (Cover Letters to PRA Recipients). The District inconsistently told

12   the PRA requesting parties that it had determined their requests, "as written and submitted," did

13   not meet the requirement for a proper PRA request because they failed to identify records with

14   reasonable particularity, yet produced the records anyway. *Id*.

15        The District further advised that the requests would require potentially exempt information

16   to be disclosed, including (1) information that would not serve the public interest, (2) information

17   that implicates a person's liberty interest, (3) where there is pending litigation, (4) where the

18   records sought are in the form of preliminary drafts, and (5) where the records are protected by the

19   deliberative process privilege. *Id*. Any one of these rationales would have justified the District's

20   refusal to disclose the unfounded grooming allegations.

21        In addition, the grooming allegations were not "well-founded" and the District had no

22   reasonable cause to believe they were. *Id*., citing *Bakersfield City School Dist. v. Superior Court*,

23   118 Cal.App.4th 1041, 1044 (2004); *ERV, Inc. v. Superior Ct.*, 143 Cal.App.4th 742 (2006)

24   ("[R]ecords of complaints or investigations against a public employee can be disclosed only if "the

25   complaint is of a substantial nature and there is reasonable cause to believe the complaint or charge

26   of misconduct is well founded."). And in such a case, the District understood that its "decision to

27   release confidential documents under the PRA is reviewable by petition for writ of mandate in a

28   'reverse-PRA' lawsuit." *Id*., citing *Marken v. Santa Monica-Malibu Unified School Dist.* (2012)

  202 Cal.App.4th 250.

       Significantly, no post-deprivation remedy—such as a reverse-PRA lawsuit brought <u>after</u>

  publication or adjudication of the allegations in dismissal proceedings—would have protected

**Pl.'s Opp'n To Motion For Summ. J.**                    Case No. 22-CV-00949-CRB

FREEDOM X
11500 OLYMPIC BLVD., SUITE 400
LOS ANGELES, CA 90064

1   Plaintiff's liberty and property interest. *See Zinermon v. Burch*, *supra*, 494 U.S. at 127 (citing
2   cases) ("Applying this test, the Court usually has held that the Constitution requires some kind of
3   a hearing before the State deprives a person of liberty or property."); *id*., quoting *Cleveland Board*
4   *of Education v. Loudermill*, 470 U.S. 532, 542 (1985). "The root requirement of the Due Process
5   Clause is that an individual be given an opportunity for a hearing before he is deprived of any
6   significant protected interest." (emphasis added; cleaned up).)

7   Addressing the fourth factor, no administrative burden or hardship would have befallen the
8   District by implementing these safeguards. Indeed, the District was practiced in withholding
9   responses to PRA requests entirely. Exh. 24 (Kissner PRA Requests and Denials). Under the
10  circumstances, the District did not make available a tort remedy that could have adequately
11  redressed the loss to Plaintiff's reputation and given him the process he was due. The District
12  cannot escape § 1983 liability by characterizing its conduct as reasonable when it deprived Plaintiff
13  of pre-deprivation remedies demanded of it and known to it. The deprivation of Plaintiff's liberty
14  was predictable because it was obvious that publication of unfounded allegations of child
15  grooming was likely to seriously damage Plaintiff's standing and associations in the community
16  and employment prospects as a teacher.

17                  4.      Stigma-plus defamation implicates Plaintiff's liberty interest

18          "A liberty interest may be implicated 'where a person's good name, reputation, honor, or
19  integrity is at stake because of what the government is doing to him.' " *Id.*, quoting  *Wisconsin v.*
20  *Constantineau*, 400 U.S. 433, 437 (1971) ("Where a person's good name, reputation, honor, or
21  integrity is at stake because of what the government is doing to him, notice and an opportunity to
22  be heard are essential." (Emphasis added.).) "However, 'procedural due process protections apply
23  to reputational harm only when a plaintiff suffers stigma from governmental action plus alteration
24  or extinguishment of 'a right or status previously recognized by state law.' " *id.* citing *Humphries*
25  *v. County of Los Angeles*, 554 F.3d 1170, 1185 (9th Cir. 2008), as amended (Jan. 30, 2009), rev'd
26  and remanded sub nom. *Los Angeles County, Cal. v. Humphries*, 562 U.S. 29 (2010) (*Humphries*)
27  (quoting *Paul*, 424 U.S. at 711). "We have described this standard as the 'stigma-plus test.' " *Id.*;
28  *see also Hart v. Parks*, 450 F.3d 1059, 1070 (9th Cir. 2006).

        The stigma-plus test is used to determine whether state action violates an individual's
procedural due process rights. *Paul v. Davis*, 424 U.S. 693, 710, n. 5 (1976). To state a procedural
due process claim, a plaintiff must allege (1) a liberty or property interest protected by the

FREEDOM X
11500 OLYMPIC BLVD., SUITE 400
LOS ANGELES, CA 90064

20

**Pl.'s Opp'n To Motion For Summ. J.**                          Case No. 22-CV-00949-CRB

1   Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process. *Fikre*

2   *v. Fed. Bureau of Investigation*, 35 F.4th 762, 776 (9th Cir. 2022). Under this test, "a plaintiff who

3   has suffered reputational harm at the hands of the government may assert a cognizable liberty

4   interest for procedural due process purposes if the plaintiff "suffers stigma from governmental

5   action plus alteration or extinguishment of a right or status previously recognized by state law."

6   *Id.* (Cleaned up; citations omitted.)

7          "[An] injury to reputation standing alone does not violate the Due Process Clause of the

8   Fourteenth Amendment." *Wenger v. Monroe*, 282 F.3d 1068, 1074 (9th Cir. 2002), as amended on

9   denial of reh'g and reh'g en banc (Apr. 17, 2002), citing *Paul v. Davis*, 424 U.S. at 712; *see also*

10  *Siegert v. Gilley*, 500 U.S. 226, 234 (1991; *Peloza v. Capistrano Unif. Sch. Dist*., 37 F.3d 517, 523

11  (9th Cir.1994). "Rather, due process protections apply only if a plaintiff is subjected to 'stigma

12  plus'; i.e., if the state makes a charge against a plaintiff that might seriously damage his standing

13  and associations in the community, and 1) the accuracy of the charge is contested, 2) there is some

14  public disclosure of the charge, and 3) it is made in connection with the termination of employment

15  or the alteration of some right or status recognized by state law." *Wenger* at 1074, citing *Llamas*

16  *v. Butte Community College Dist*., 238 F.3d 1123, 1129 (9th Cir.2001) (cleaned up). Under the

17  *Wegner* test*,* the District's allegations of grooming against Plaintiff posed serious damage to his

18  standing and associations in the community. He contested the accuracy of the allegations and

19  demanded they be withdrawn. And the allegations were disclosed to the public in connection with

20  the termination of Kissner's employment.

21          *Humphries* is particularly apposite to the facts of the present case. There, parents who had

22  been arrested on charges of child abuse and felony torture, but subsequently found "factually

23  innocent" after charges were dismissed, brought a § 1983 action against state and county

24  defendants alleging that their continued listing in California's Child Abuse Central Index (CACI),

25  pursuant to the Child Abuse and Neglect Reporting Act (CANRA), violated due process. Although

26  two California courts had found that the Humphries were "factually innocent" and the charges "not

27  true," they were nevertheless classified as "substantiated" child abusers and placed on the CACI

28  index. *Id*. at 1175.

        On the "stigma" side of the "stigma-plus" requirement for determining a Due Process
violation, the court had no difficulty finding that being labeled a child abuser is "unquestionably
stigmatizing." *Id*. at 1186. Indeed:

Pl.'s Opp'n To Motion For Summ. J.                         Case No. 22-CV-00949-CRB

FREEDOM X
11500 OLYMPIC BLVD., SUITE 400
LOS ANGELES, CA 90064

We have observed that there is "[n]o doubt ... that being falsely named as a suspected child abuser on an official government index is defamatory." *Miller v. California*, 355 F.3d 1172, 1178 (9th Cir.2004); *see also Valmonte v. Bane*, 18 F.3d 992, 1000 (2d Cir.1994) (finding it beyond dispute that inclusion on a child abuse registry damages reputation by "branding" an individual as a child abuser). Indeed, "no conduct so unequivocally violates American ethics as ... sexual predation upon the most vulnerable members of our society." *Nicanor–Romero v. Mukasey*, 523 F.3d 992, 999 (9th Cir.2008) (citation omitted).

*Id*. (Emphasis added.) *see also Endy v. County of Los Angeles*, 975 F.3d at 764 ("An accusation of child sexual abuse, in particular, is far more damning to a person's reputation in our society than perhaps any other kind of accusation."); *Miller v. California*, 355 F.3d 1172, 1178 (9th Cir. 2004) ("No doubt the Millers raised a triable issue of fact that being falsely named as a suspected child abuser on an official government index is defamatory.") And, "[t]he Court has identified stigma on the basis of lesser accusations." *Humphries*, 554 F.3d at 1186 (citing cases).

In determining whether the Humphries had satisfied the "plus" criterion of the "stigma-plus" test for determining whether reputational harm qualifies as a liberty interest protected under the Due Process Clause, the court noted certain compelling factors that imposed a tangible burden on the Humphries' ability to obtain rights or status recognized by state law. *Id.* at 1187-88. For one, California offered no procedure to remove the Humphries' listing as suspected child abusers from the database, and thus no opportunity to clear their names. *Id*. at 1175-76. Additionally, it made the database available to a broad array of government agencies, employers, and law enforcement entities. *Id*. Finally, one parent was adversely affected in her ability to renew her teaching credentials. *Id*.

Kissner easily meets the "plus" standard under these factors. To start, analogous to the CACI database, the information contained in a PRA response is accessible to everyone, including potential employers. Second, the District contends that it had no procedure for removing the defamatory allegations from the Statement of Charges. That, of course, is a smokescreen. It could have redacted or withdrawn them in response to Plaintiff's demand. But it is caught in a nest of contradiction it can't escape from. If it commits to this rationale, it will have trouble explaining why its letter citing relevant law permitting it to withhold unfounded allegations misrepresented the truth. If it admits it could have redacted or withheld the allegations, it confesses to wrongdoing. Additionally, the District could have notified Plaintiff that it was planning to publish the allegations and given him an opportunity to challenge it prior to their publication in a reverse-PRA

22

Pl.'s Opp'n To Motion For Summ. J.          Case No. 22-CV-00949-CRB

ER-85

1  lawsuit.[3] And, finally, the allegations have predictably and adversely affected his employment

2  desirability.

3        Defendant Fraser testified contradictorily that she had no choice but to respond to the PRA

4  request. The District has asserted this rationale elsewhere relating to both Fraser's and Grier's

5  publications. Exh.  25 (District's Anti-SLAPP Motion) ("During the pendency of the termination

6  proceedings …, the District received two separate public records requests, in which members of

7  the public requested copies of the statements of charges against plaintiff. Because both the original

8  and amended statements of charges constituted public records, as defined by the Public Records

9  Act, the District had an affirmative statutory obligation to "make the records promptly available"

10  upon request. (Gov. Code, § 6253, subd. (b).) Accordingly, the Superintendent's office disclosed

11  the original and amended statements of charges, in response to the respective PRA requests.")

12  Thus, even while citing law in its responses to PRA requests acknowledging circumstances in

13  which disclosure is not required, the District inconsistently contends that, at least in Plaintiff's

14  case, it had no choice but to divulge the unfounded defamatory allegations to the public, making

15  them available to everyone.

16        Kissner has raised a triable issue as to whether the PRA release and failure to withdraw the

17  stigmatizing grooming charges deprived him of a constitutional liberty interest and therefore

18  violated his procedural Due Process rights.

19        **F.     Grier and Khandelwal Do Not Have Absolute Immunity**

20        The District erroneously contends that Defendants Grier and Khandelwal enjoy absolute

21  immunity because they had no hand in terminating Kissner. Grier was employed at the time he

22  released the response to the PRA request on July 6, 2021, and his signature is affixed to the letter

23  accompanying the released records. As successor to Fraser and as the administrator responsible

24  for implementing the layoff process, Grier failed to reappoint Kissner as required by law. Cal.

25  Educ. Code Ann. § 44956, subd. (a) provides that the District had a duty to reappoint Kissner to

26  his teaching position:

27           For the period of 39 months from the date of the termination, any employee who in
            the meantime has not attained the age of 65 years <u>shall have the preferred right to</u>
28           <u>reappointment</u>, in the order of original employment as determined by the board in

---

[3] Anticipating the District's reply argument, it is irrelevant whether the law requires it not. *See Mathews v. Eldridge, supra*, 424 U.S. at 335 ("the Constitution requires some kind of a hearing before the State deprives a person of liberty or property.").

Pl.'s Opp'n To Motion For Summ. J.                    Case No. 22-CV-00949-CRB

FREEDOM X
11500 OLYMPIC BLVD., SUITE 400
LOS ANGELES, CA 90064

accordance with Sections 44831 to 44855, inclusive, if the number of employees is increased or the discontinued service is reestablished, with no requirements that were not imposed upon other employees who continued in service; provided, that no probationary or other employee with less seniority shall be employed to render a service that the employee is certificated and competent to render.

Kissner had been teaching 6th-grade math and science for nine years and was competent and credentialed to continue teaching it. Grier was responsible for Kissner's reappointment when the District acquired unexpected funding and rescinded its budget and staff cuts for the 2021-2022 school year. Additionally, the 6th-grade math and science position remained the same and was neither reduced nor eliminated. For the 2021-2022 school year, Kissner was replaced by a teacher who lacked experience, specialized training, and prior experience teaching 6th-grade math or science. In the 2022-2023 school year, Grier replaced Kissner with two teachers. That teacher was issued an emergency substitute teaching permit and an intern credential within days prior to being hired and was clearly not more senior or more qualified than Kissner, and yet Grier still failed to reappoint Kissner. To this date, not more than 39 months has elapsed since Kissner's layoff, and Grier has the statutory obligation to reappoint Kissner, remove his layoff status, and provide him with backpay for the time of his rightful employment up until the date of his dismissal on December 7, 2021.

It is indisputable that Defendant Khandelwal, similar to Grier, has approved multiple personnel reports since Kissner's layoff, and has failed to reappoint Kissner to his rightful position. Additionally, Khandelwal was a member of the Board who voted to dismiss Kissner. Exh. 26 (Email to Dddtt's Counsel). Accordingly, there are triable issues regarding Grier's and Khandelwal's roles involving Kissner's layoff. Additionally, the District has not addressed whether Grier and Khandelwal are liable for Kissner's dismissal. Therefore, a triable issue exists regarding their role in Kissner's dismissal in addition to their role in his layoff.

### G. Whether Martin and Fraser Are Liable For Kissner's Layoff And Dismissal Presents A Triable Issue

The District argues that Martin and Fraser cannot be liable for the layoff decision because they were not Board members ("Because neither Martin nor Fraser had the power to adopt the layoff resolutions or the authority to rescind the resolutions following adoption by the Board, they cannot be liable for any constitutional claim arising from the Board's layoff decision."). Motion, 21:6-8. But the evidence shows that (1) the only board resolution purportedly relevant to Kissner's layoff (21-XIV) reducing four unspecified full-time positions was demonstrably unrelated to

24

1   Kissner's position, which was not considered for reduction, could not be reduced, and had no

2   connection to reduced staffing, and (2) that Fraser and Martin were in fact the architects of

3   Kissner's layoff ("Q: So in your capacity as a district superintendent, were you the person who

4   was primarily responsible for the layoff procedures and process? A: (Fraser) Yeah. My job would

5   be to make sure that we follow process with the assistance of clerical assistance, but, yes, that

6   would be my responsibility."). Exh. 8 (16:7-13). Martin affirmed his role in the layoff process

7   when he testified that Kissner was qualified and able to continue to teach in the 6th-grade core

8   math and science block, but having Kissner in that role wouldn't fit <u>his</u> "core vision" of the 6th-

9   grade model. Exh. 9 (53:5-8). Clearly, a triable issue exists as to Fraser's and Martin's

10  responsibility for the decision to lay off Kissner.

11        Additionally, the District has failed to address whether Martin and Fraser are liable for

12  Kissner's dismissal. Therefore, a triable issue exists regarding their role in Kissner's dismissal in

13  addition to their role in his layoff.

14  **IV.**    **STATEMENT OF NON-OPPOSITION**

15        Pursuant to L.R. 7-3(b), Plaintiff does not oppose Defendants' motion as to the Seventeenth

16  Cause of Action for Violation of the Fourteenth Amendment Equal Protection Clause and the

17  Eighteenth Cause of Action for Civil Rights Conspiracy.

18        Additionally, Plaintiff does not oppose dismissal of Defendants former Principal Billy

19  Martin or Board members Deana Arnold, Ben Abeln, Ron Bourque, Charlotte Khandelwal, or Erin

20  Asheghian as to Plaintiff's Third Cause of Action for Civil Rights Defamation <u>only</u>.

21  **V.**     **CONCLUSION**

22        For the foregoing reasons, Defendants have failed to show, as a matter of law, that they are

23  entitled to summary judgment on Plaintiff's claims or that there are no triable issues. Accordingly,

24  the Court is respectfully asked to deny their motion with the exception of those items stated in

25  Plaintiff's Statement of Non-Opposition.

26  Date: July 7, 2023          Respectfully submitted,

27                      FREEDOM X

28               By:  <u>/s/ *William J. Becker, Jr.*</u>
                         William J. Becker, Jr.



Above all, education.

# LOMA PRIETA
## •JOINT • UNION • SCHOOL • DISTRICT•

*23800 SUMMIT ROAD, Los Gatos California 95033*
*(408) 353-1101            FAX: (408) 353-8051*
*Corey Kidwell, Superintendent*

## Certificated Employment Offer

**Name** David Kissner                **Social Security No.** ▮▮▮▮▮
**Address:** ▮▮▮▮▮▮▮
**Home Phone Number:** ▮▮▮▮▮
**Email address:** ▮▮▮▮▮▮▮

You are offered employment as a certificated employee of the Loma Prieta Joint Union School District under the following terms and conditions:

**1. Governing Board Approval.** This offer is contingent upon approval by the Loma Prieta Joint Union School District Governing Board.

**2. Notice Of Classification.** If the Board approves this offer, you will be classified as a
☐ Permanent             ☐ Probationary (1st year)        ☐ Probationary (2nd year)

**X** Temporary certificated employee (see no. 3 below).    ☐ Probationary District Intern
                                                             (Education Code Section 44830.3)
                                            (An intern does not acquire tenure while serving on an internship credential.)

You are offered employment to serve as a ___6th Grade Core Math/Science Teacher___
                                                (Job Title/Description Of Duties)

**3. Temporary Classification.** If you are classified as a temporary certificated employee, this temporary position is created under the California Education Code provision checked below:

**X** 44920 (Temporary Leave Replacement)

**4. Term Of Employment.** The term of employment is:
      11/29/12              **to**    06/06/13
      (month-date-year to month-date-year)

Percentage of a full-time assignment: ___100%

**5. Compensation.** You shall be compensated in accordance with the salary schedule contained in the collective bargaining agreement between Loma Prieta Joint Union School District and Loma Prieta Teachers Association.
Salary schedule placement: Step: 4   Annual salary: $48,299.68

Page 144

2012-13 Employment Contract – Kissner
Page 2 of 3

**6. Credential/Permits/Authorization To Teach Requirements.**

a. This employment offer is contingent upon your possession, at the time services are to begin, of the following valid California credential(s) concerning the specified areas required by the District. You have represented that you possess the following California credential(s)/authorization required by the District.

| Type of credential/permit/authorization: | Expiration Date |
|---|---|
| Emergency Credential | 01/01/2014 |
| Preliminary Single Subject | 04/01/2018 |

b. You understand and agree that you will register each credential or authorization listed above and any additional credential or authorization you may later acquire with all appropriate agencies, including the County Superintendent of Schools. You agree to maintain and renew each credential/authorization and to take and pass all examinations or continuing education courses that may be required to renew each of your credentials/authorizations.

c. You understand that your continuing employment with the District requires maintaining each credential or authorization and that your failure to maintain any credential may be grounds for dismissal.

d. Other terms and conditions of employment regarding credentials, permits, and authorizations to teach:

**Possession of valid California Teaching Credential and NCLB compliance in assigned area(s). Official transcripts reflecting units for placement on salary schedule as indicated on this offer. Verification of teaching experience for placement on salary schedule as indicated on this offer.**

**7. CBEST And District-Prescribed Proficiency Test.**

You agree and understand that you must take and pass both CBEST and any District-prescribed proficiency test as a condition of continuing employment with the District.

**8. Other Terms And Conditions Of Employment.**

a. This employment offer and your terms and conditions of employment are subject to the laws of the State of California, the rules, regulations, and policies of the State Board of Education and the Loma Prieta Joint Union School District Governing Board and the collective bargaining agreement between the District and Loma Prieta Teachers Association.

b. The District may make any assignment authorized by your credentials.

**9. Termination of Contract/Release/Dismissal.**

**a. Release From Temporary Employment**

Regardless of the term of employment indicated in this offer you may be released from District employment as a temporary certificated employee at any time at the Governing Board's discretion pursuant to Education Code Section 44954.

**b. Termination Of Probationary Or Permanent Employment**

This offer and your employment with the District may be terminated for any reason authorized by law including, but not limited to:

Page 145

2012-13 Employment Contract – Kissner
Page 3 of 3

1. Resignation. The District Superintendent is authorized to receive and accept resignations, and the District may set the effective date at any time during the fiscal year.
2. Retirement.
3. Termination of probationary employment/non-reelection under Education Code Section 44929.21.
4. Layoff under Education Code Section 44955.
5. Dismissal under Education Code Section 44932 or 44948.3.
6. Failure to maintain a required credential/authorization or failure to pass either CBEST or a District-prescribed proficiency test.

I accept employment with the Loma Prieta Joint Union School District under the conditions outlined in this Offer.

Employee Name _David Kissner_
Please print

Employee _____     Date _3/25/13_
Signature

Superintendent _Corey Kidwell_
Please print

Superintendent _____     Date _12/12/12_
Signature

**Governing Board Action**
Approved - date _12/12/12_
Rejected - date _____

EXHIBIT 4



Above all, education.

# LOMA PRIETA
### •JOINT•UNION•SCHOOL•DISTRICT•

*23800 SUMMIT ROAD, Los Gatos California 95033*
*(408) 353-1101          FAX: (408) 353-8051*
*Corey Kidwell, Superintendent*

## Certificated Employment Offer

**Name**  David Kissner                **Social Security No.** ▮▮▮
**Address:** ▮▮▮
**Home Phone Number:** ▮▮▮
**Email address:** ▮▮▮

You are offered employment as a certificated employee of the Loma Prieta Joint Union School District under the following terms and conditions:

**1. Governing Board Approval.** This offer is contingent upon approval by the Loma Prieta Joint Union School District Governing Board.

**2. Notice Of Classification.** If the Board approves this offer, you will be classified as a
☐ Permanent          • **Probationary (1st year)**          ☐ Probationary (2nd year)

☐ Temporary certificated employee (see no. 3 below).          ☐ Probationary District Intern
   (Education Code Section 44830.3)          (An intern does not acquire tenure while serving on an internship credential.)

You are offered employment to serve as a   6ᵗʰ Grade Core Math/Science Teacher
                                          (Job Title/Description Of Duties)

**3. Temporary Classification.** If you are classified as a temporary certificated employee, this temporary position is created under the California Education Code provision checked below:

**4. Term Of Employment.** The term of employment is:
   08/14/13                    **to**    06/05/14
   (month-date-year to month-date-year)

Percentage of a full-time assignment:   100%

**5. Compensation.** You shall be compensated in accordance with the salary schedule contained in the collective bargaining agreement between Loma Prieta Joint Union School District and Loma Prieta Teachers Association.
Salary schedule placement: Step: 5   Annual salary: $50,436.82

2013-14 Employment Contract – Kissner
Page 2 of 3

**6. Credential/Permits/Authorization To Teach Requirements.**

    a. This employment offer is contingent upon your possession, at the time services are to begin, of the following valid California credential(s) concerning the specified areas required by the District. You have represented that you possess the following California credential(s)/authorization required by the District.

| Type of credential/permit/authorization: | Expiration Date |
|---|---|
| Emergency Credential | 01/01/2014 |
| Preliminary Single Subject | 04/01/2018 |

    b. You understand and agree that you will register each credential or authorization listed above and any additional credential or authorization you may later acquire with all appropriate agencies, including the County Superintendent of Schools. You agree to maintain and renew each credential/authorization and to take and pass all examinations or continuing education courses that may be required to renew each of your credentials/authorizations.

    c. You understand that your continuing employment with the District requires maintaining each credential or authorization and that your failure to maintain any credential may be grounds for dismissal.

    d. Other terms and conditions of employment regarding credentials, permits, and authorizations to teach:

**Possession of valid California Teaching Credential and NCLB compliance in assigned area(s). Official transcripts reflecting units for placement on salary schedule as indicated on this offer. Verification of teaching experience for placement on salary schedule as indicated on this offer.**

**7. CBEST And District-Prescribed Proficiency Test.**

    You agree and understand that you must take and pass both CBEST and any District-prescribed proficiency test as a condition of continuing employment with the District.

**8. Other Terms And Conditions Of Employment.**

    a. This employment offer and your terms and conditions of employment are subject to the laws of the State of California, the rules, regulations, and policies of the State Board of Education and the Loma Prieta Joint Union School District Governing Board and the collective bargaining agreement between the District and Loma Prieta Teachers Association.

    b. The District may make any assignment authorized by your credentials.

**9. Termination of Contract/Release/Dismissal.**

    **a. Release From Temporary Employment**

    Regardless of the term of employment indicated in this offer you may be released from District employment as a temporary certificated employee at any time at the Governing Board's discretion pursuant to Education Code Section 44954.

    **b. Termination Of Probationary Or Permanent Employment**

    This offer and your employment with the District may be terminated for any reason authorized by law including, but not limited to:

2013-14 Employment Contract – Kissner
Page 3 of 3

1. Resignation. The District Superintendent is authorized to receive and accept resignations, and the District may set the effective date at any time during the fiscal year.
2. Retirement.
3. Termination of probationary employment/non-reelection under Education Code Section 44929.21.
4. Layoff under Education Code Section 44955.
5. Dismissal under Education Code Section 44932 or 44948.3.
6. Failure to maintain a required credential/authorization or failure to pass either CBEST or a District-prescribed proficiency test.

I accept employment with the Loma Prieta Joint Union School District under the conditions outlined in this Offer.

Employee Name _____DAVID KISSNER_____
          Please print

Employee _____  Date _6/7/13_
          Signature

Superintendent _Corey Kidwell_
          Please print

Superintendent _____  Date _6/7/13_
          Signature

**Governing Board Action**
  Approved - date __06/12/13__
  Rejected - date _____

### LOMA PRIETA JOINT UNION ELEMENTARY SCHOOL DISTRICT
### RESOLUTION  No. 14-III

### RESOLUTION OF CONSENT TO TEACHING ASSIGNMENT

**WHEREAS,** the Loma Prieta Joint Union Elementary School District assigned Mr. David Kissner to teach for the 2013-2014 school year; and

**WHEREAS,** the above named employee holds a Single Subject Math Credential; and

**WHEREAS,** said teacher has consented to the assignment and has completed at least 6 upper division or 12 semester units in Science, in accordance with California Education Code Section 44256 (b), the above named employee is authorized to teach in the departmentalized setting with the current credential;

**NOW, THEREFORE, BE IT RESOLVED,** that the Board of Education of the Loma Prieta Joint Union Elementary School District authorizes Mr. David Kissner to teach Science in a departmentalized setting with a Single Subject Math Credential.

**PASSED AND ADOPTED** by the following vote of the Loma Prieta Joint Union Elementary School District Board of Education at its meeting of August 14, 2013.

AYES: 3
NOES: 0
ABSTAIN: 0
ABSENT: 2

Shannon Hickok, President of the Board of Trustees

I, Jennifer Straw, Vice President of the Board of Trustees of the Loma Prieta Joint Union Elementary School District in Santa Clara County, California, do hereby certify that the foregoing is a full, true and correct copy of a resolution adopted by the Board at a meeting thereof held at its regular place of meeting on the date shown above and by the vote above stated, which resolution is on file in the office of said Board.

Jennifer Straw, Vice President of the Board of Trustees
Dated: 14 August 2013        *Absent- signed by Secretary of the Board*
                                                         *by*

Marked for ID D1

A31

Loma Prieta Joint Union School District
23800 Summit Road
Los Gatos, CA. 95033

October 18, 2018

Dear David Kissner,

In a letter dated April 30, 2018, the District formally notified you that they had received an anonymous letter with allegations that you may have engaged in conduct that violates the District's policies and/or procedures with respect to your interactions with minors.

The District referred the issues noted in the anonymous letter to the Santa Cruz County Deputy Sheriff's Department for criminal investigation, which prompted the District to place you on paid administrative leave effective May 1, 2018.

The District further informed you that the anonymous letter allegations would be included as a separate issue in the Student Walkout investigation already underway. The independent investigator interviewed several witnesses, reviewed relevant documentation, and determined that there are facts that support some of the allegations in the anonymous letter. In addition, other significant concerns regarding your conduct with children arose through the investigative process.

The following represents a summary of the relevant investigative findings provided.

1]     It was determined that you knowingly, and admittedly, provided alcohol to a minor during a non-school sponsored camping trip.

*Though no criminal charges have been filed, and your employment status is not in jeopardy at this stage, your conduct, whether intended or not, has had a significant negative impact on students. Please be advised that any further report of providing alcohol to a minor will result in further corrective action up to and including criminal charges and/or possible termination of your employment.*

2]     It was determined that there are instances of your conduct with children that represent either a lack of professional boundaries or questionable teaching practices, as noted below.

- Maintaining professional boundaries in all forms of communication, technology-related or not, is vital to maintaining the public trust and appropriate professional relationships with students. Contacting students via private text message late in the evening is ill-advised.

- While it is true that sharing personal stories can help to establish connections with students, the content must be age-appropriate and must not cause any student to feel uncomfortable. Please be aware that stories and/or word problems of a graphic, gory, and/or violent nature may appeal to some students but may offend and frighten others and thus should be used judiciously.

- When a male student asked to use the restroom in your classroom, you admittedly stated that he would not be able to go to the bathroom but that you would give him a "small

*Board of Trustees:*
*Deana A. Arnold, President    Shannon Hickok, Vice-President*
*Ron Bourque, Member    Marco V. Menéndez, Member    Karrie Mills, Member*

A31

OFFICE OF ADMINISTRATIVE HEARINGS CLERK'S RECORD FOR OAH CASE NO. 2021050291
05/02/2023:22-cv-00949-CRB   Document 99-3   Filed 07/07/23   Page 2 of 2935 of 6434

Marked for ID D1

A32

binder clip" he could use on his penis instead, inferring that the boy had a small penis. This type of humor is inappropriate and has no place in a school setting. Generally speaking, the use of sarcasm with middle school age students can have significant, negative repercussions and is therefore ill-advised.

- In addition to the findings above, the anonymous letter referenced parental concerns described as "grooming" behavior on your part. Specifically, singling out a young person and taking him somewhere alone and away from the group and offering alcohol, asking youth about sex and/or sexual encounters, and posting images of youth on your personal website. Though you have acknowledged the above to be true, you offered that your actions have been misperceived by those reporting. The National Education Association (NEA) has published a list of common-sense pointers for avoiding false allegations which you may be wise to review and consider in your future interactions with youth to avoid similar issues in the future. (See attached)

*Please be advised that should there be future incidents wherein students are negatively impacted by your use of ill-advised classroom practices and/or protocols, further corrective action may result, up to and including possible termination of your employment.*

In addition, as you are aware, the investigation in this matter involved discussions with a number of members of our community, staff, and students, including yourself. Please be aware that the District will not tolerate any retaliation against you by any person for your participation in this investigation. Similarly, the District will not tolerate any retaliation by you against any person who also participated in this investigation.

With all of this said, the school year appears to be off to a good start and I remain committed to supporting you in seeing that this trend continues. If I can be of assistance to you in better understanding any of the areas discussed above, please let me know. In addition to the one source noted above, there are other publications that I can provide as a resource to you should you need additional information. Further, if you have any questions regarding any of these matters, feel free to ask me directly.

Sincerely,

Lisa Fraser
Superintendent

I have read and discussed the contents of this memo with my immediate supervisor.

_____  _____
Employee's Signature     Date

*Employee did not sign @ mtg. Pending* — L. Fraser 11/6/18

This document will be placed in your personnel file after ten days. You may prepare a response which will be attached to this memo.

A32

*006134*

Marked for ID D1

A34

28 October, 2018

From:   David Kissner, Teacher, CT English Middle School
To:     Lisa Fraser, Superintendent, Loma Prieta Joint Union School District
CC:     Board of Trustees, Loma Prieta Joint Union School District

Subject:   RESPONSE TO LETTER DATED 18 OCTOBER, 2018

Encl:     (1) Detailed response to letter, by paragraph

1. The following is submitted as a response to the letter which is to be placed in my file, dated 18 October, 2018, and as discussed with Lisa Fraser and Deana Arnold on October 3, and during a follow up conversation with Lisa on October 23rd.

2. The contents of this disciplinary letter are the result of a personal character attack perpetrated by anonymous cowards who sought retribution for my stance in the March 14th, 2018 walkout. I am surprised that the district would like to go on record here that it is giving credence to an anonymous letter full of false and unsubstantiated accusations. Does the timing of such allegations, the unprincipled broadening of the district's investigation, and now this disciplinary letter not show evidence of retaliation for my position during the school-sponsored political walkout?

This investigation was conducted without any regard to the stated scope (the walkout and the anonymous letter), and pursued lines of questioning that were completely irrelevant to the matters at hand. These issues included my classroom bathroom procedures, personal stories I have shared in class for years, and math and science problems I have used for years. In addition, the school district investigated recreational activities I conduct with youth and families outside of school, my faith and science-based beliefs about the origins of life, my Marine Corps career, and other completely irrelevant subjects.

This free-wheeling investigation of every aspect of my personal life and how I perform my professional responsibilities is the very definition of a witch-hunt – a campaign against a person holding unpopular views. It is both unethical and illegal to retaliate against an employee in this way.

It is telling that an investigation of this breadth failed to discover any noteworthy evidence of wrong-doing. As such, this letter makes note of a number of "significant concerns" which lack specific detail and describe situations that are completely innocuous, while implying that something nefarious is going on. It is disingenuous, and betrays an effort to lay the groundwork for future disciplinary action, seeing as none is possible from the walkout controversy.

3. I am saddened by the fact that the district leadership has apparently joined in the same nasty, personal, divisive political fray that consumes our nation in this era. A different view in a political discourse does not merit an invasive assault on a person's character and life. To use baseless accusations leveled by anonymous cowards in the heat of a political conflict as a pretense for a limitless investigation into a person's life and work is shameful. To then take the empty results of said investigation and craft a disciplinary letter that insinuates that there is some merit to the accusations is all the more shameful. To direct these attacks against someone who has proven over years to be a tireless servant of kids and families in the community is reprehensible.

David Kissner
Teacher, CT English Middle School

A34

Marked for ID D1

A35

Enclosure (1):   Detailed response to letter, by paragraph

1.  Paragraph 1. *"It was determined that you knowingly, and admittedly, provided alcohol to a minor during a non-school sponsored camping trip."* This is true. It is worth noting that this took place some years ago, and that when brought up at the time, I acknowledged it openly and honestly and it was dealt with appropriately. The matter was considered closed by all parties at the time. It is also worth noting that the incident involved a single sip of an alcoholic beverage as a toast after a significant outdoor achievement, with a high school aged person. It is also worth noting that these allegations were brought forward anonymously, over two years after the fact, in the immediate aftermath of a huge political conflict on campus and in our community where I was a central figure. It is further noting that the offense in question is the legal equivalent of a traffic ticket – at most - but that law enforcement agencies would generally decline to pursue such a minor issue.

While I acknowledge that my decision years ago to share a toast with a teenager was poorly considered, I must point out that this most certainly does not make me a villain or a threat to children. Emphatically, it does not make me a sexual predator as is implied elsewhere in this letter.

2.  Paragraph 2. *"Maintaining professional boundaries."* As is well known, I wear many hats in the community. I am not simply a teacher and coach for some students. I am active in the church and in youth ministry. I lead outdoor adventures for kids and families all the time. My family vacations with other families in the community who have or have had students in my class or at school. We go to each other's homes for meals. We worship and recreate together. There are appropriate boundaries and relationships in all of these contexts, which – while certainly outside of the norm for a simple classroom teacher – can be tough to define. Nonetheless, I can say with confidence that I work within these appropriate boundaries in these contexts.

This letter does not cite any specific conversation or instance of supposed failure to maintain appropriate boundaries, and so it is difficult to defend myself or to know exactly what is being referred to. However, the letter states that *"Contacting students via private text message late in the evening is ill-advised."* I am not in the habit of contacting students via text message. If the student is someone where I have a relationship established outside of school, it is possible that we would communicate via text message. If I were to be contacted in the late evening by a young person with a need, I may engage in conversation, depending on the context. I go out of my way to be a trusted adult that can be contacted in times of need, and aim to continue to do so. That is part of ministry. There is nothing wrong with this, and I intend to continue to be an ally for young people or their parents when they are struggling.

*"While it is true that sharing personal stories can help establish connections with students, the content must be age-appropriate and must not cause any student to feel uncomfortable."* I have shared the same set of stories, generally in the same order, every year that I have been employed by the district. My stories have been much shared by students to their families and siblings and have been the subject of overwhelming positive feedback. Yes, they help to establish connections with students. Yes, that connection results in greater engagement with the content and with school in general. My stories are age-appropriate and educational in themselves and I do not believe that they make any student feel overly uncomfortable. It is worth noting here again that this complaint comes from anonymous detractors in the immediate aftermath of a huge political conflict on campus and in our community where I was a central figure. It is further noting that the directive *"must not make any student feel uncomfortable"* is incredibly subjective and cannot be measured on any scale. It is also a sad reflection of our educational system, where educational leaders apparently want to avoid any topics that might make a student "uncomfortable." Topics in literature, history, pop-culture, science, government, current events, and politics cannot be touched without making some students uncomfortable. I cannot imagine that

A35

006137

Marked for ID D1

A36

educators, passionate about a rich, meaningful, and relevant education for their students, would ever insist that students be always "comfortable."

*"Word Problems."* I often write word problems for math and science classes that are uniquely edgy. They are not graphic. I have used many of the same problems for seven years. They are posted on my website publicly every day. They go home to parents on the tests and homework assignments. Board member's kids have been in my classes and taken the same assignments home. They are talked about often and have been mentioned in valedictorian addresses at graduation. They have also been the subject of much positive feedback from parents, who have commented about how their kids (and they) love the problems and that they engage with the math in a deeper and more enthusiastic way. I have never received a complaint. It is worth noting here again that this complaint comes from anonymous detractors in the immediate aftermath of a huge political conflict on campus and in our community where I was a central figure. Here again, there is no specific word problem described in this letter, and the broad suggestions could be interpreted very subjectively, making them of little value. I intend to use the same word problems that I have used for years now – quite openly – in my classes.

*"Inappropriate Humor."* The letter references a single instance in which a student asked to use the restroom and I offered him a small binder clip. There were no words – just subtle innuendo. It is worth noting that this student is someone who I have an extensive relationship with outside of class and was not intended – nor taken – personally. It is also worth noting that this student did not complain, but that the complaint was brought anonymously by non-involved detractors in the immediate aftermath of a huge political conflict on campus and in our community where I was a central figure. This one event most certainly does not establish a pattern of humor. Further, this subtle joke does not make me a villain, nor does it make me a sexual predator as is implied elsewhere in this letter. I would absolutely use this line again in a different context (not in the classroom) with any number of people, young or old. It is not a remarkable or particularly offensive joke.

*"The use of sarcasm with middle school aged students can have significant negative repercussions and is therefore ill-advised."* I am unclear in this letter if this comment is directly connected to the joke referenced above, or is general corrective guidance. Since sarcasm is generally defined as being a "sharp, bitter, or cutting expression or remark," and is "largely context dependent," I would say that the above humor was not sarcastic and that I am not sarcastic. I would not engage with a student in a sharp or bitter way. Perhaps ironic or witty would be a better way to describe my humor. Because there are no specific examples here of my inappropriate use of sarcasm, and since sarcasm is hard to define, this note is of limited value.

*"Grooming Behavior."* This is the most offensive paragraph in this letter. First of all, I find it to be insulting, cowardly, and dishonorable to verbally state that *the district* is not accusing me of anything, but to then refer in this letter to completely unsubstantiated "parental concerns" that accuse me of such. Any allegations of the sort are false and slanderous, and should not be mentioned or alluded to in this letter. If there is evidence to this point, it needs to be included here. Instead of evidence, this letter takes great pains to take completely innocuous behavior and throw a shadow of doubt on them.

I have never asked a youth about sex and/or sexual encounters. There have been many times when a young person has broached the subject with me, and I am happy to engage with them on that topic. I am in youth ministry - it comes up. It is worth noting that the curriculum that our own district uses to teach sex education encourages students to find a trusted adult – which explicitly might include a teacher – to discuss these difficult topics with. I have been that trusted adult for many, and I aim to continue to be just that. There is nothing here, and it should not be used in a paragraph about "grooming behavior" to "substantiate" that concern.

A36

006138

Marked for ID D1

A37

The comment referencing that I post images of youth on our ministry website is laughable and ridiculous, and has no place here. I have taken many hundreds of young people and families on trips all over the western US over the last 11 years. Multiple kids and parents take pictures and video. I compile and edit them into videos that commemorate the trips and are the central event for celebratory gatherings for families after trips and are available on youtube for the participants. There could not be anything more innocent about it. The fact that teenage boys are in the videos swimming without shirts on is the most normal thing you would expect from a video about a camping trip at lakes and hot springs. It is worth noting that our middle school makes twice annual trips to the beach, where almost all the middle school boys run around with their shirts off and the year book team takes pictures which are included in our year book. It is absurd to make an issue of this. The original version of this letter also mentioned that there was video of me "bracing" children who were shooting firearms, as potential evidence of "grooming behavior." This is equally absurd, as it is a common-sense safety issue to physically brace a young, new shooter handling a lethal weapon. This example, while removed from the current version of the letter after my objections, shows the lengths that are being gone through to paint a misleading picture of ill-intent.

The original letter says that *"While these examples have not risen to the level of criminal activity, they certainly have the potential of becoming problematic should these behaviors continue."* This is outrageous. Of course they have not risen to the level of criminal activity. They haven't risen to anything. But by framing this statement this way, it implies that somehow these examples are on a spectrum on the way toward criminal or unethical behavior. They are not. There will be other camping trips. I fully intend to create videos for the participants and their families. There will be water and swimming and there will be boys with shirts off. I fully intend to continue to introduce young people to firearms safety and marksmanship, as I have been trained professionally to do. I will absolutely brace them from behind when they shoot for the first time, because it is the safe and right thing to do. And there will be video – because there is nothing to hide. I absolutely intend to continue to be a safe, trusted adult that young people can talk with about any challenging topic, including sex. I make no apologies for it, and point to the district's own curriculum that advocates for it.

It is completely inappropriate for this letter to reference, in any way, completely unsubstantiated allegations of "grooming behavior." It also begs the question: if the district is concerned that I may be a threat to children and potentially engaging in "grooming behavior," why did the district bring me back to the classroom in May, with an investigation into said allegations still outstanding? Why does the district currently have me in the classroom? More to the point, why does the district have me employed as the wrestling coach, if they are concerned about me being a safety threat to kids? Coaching wrestling is physical, it involves physical contact with kids, and sometimes, I am the only adult in the gym. It would be reckless and grossly negligent for the district to have a person in that position where they have documented concerns of potential "grooming behavior." Just having that coach in place would be a lawsuit waiting to happen.

I cannot believe that anyone in a leadership role at this school district would allow me to continue in that role if there were real concerns that I was grooming children for inappropriate relationships. So then, why is this a subject of this disciplinary letter? It is a character smear and a set-up for future disciplinary action and should be removed in its entirety.

A37

006139

```
 1            BEFORE A COMMISSION ON PROFESSIONAL COMPETENCE
 2               LOMA PRIETA JOINT UNION SCHOOL DISTRICT
 3                       COUNTY OF SANTA CLARA
 4                       STATE OF CALIFORNIA
 5       _____
 6       In the Matter of:
 7       DAVID KISSNER,
 8       A permanent certificated employee,     Case No.
 9           v.                                  2021050291
10                    Respondent.
11       _____
12                    VIDEOCONFERENCE DEPOSITION OF
13                           LISA FRASER
14       DATE:           Monday, August 9, 2021
15       TIME:           9:29 a.m.
16       LOCATION:       Remote Proceeding
17                       Los Angeles, California 90017
18       REPORTED BY:    Nicole Beaudoin, Notary Public
19       JOB No.:        4729499
20
21
22
23
24
25
```

Page 1

```
 1    whatever their sexual questions or concerns, or things

 2    like that were, and that's what, I think, was reported

 3    in the investigation, and so that's -- I see that as

 4    being very different than sexual quote, misconduct, but

 5    it still may be outside the bounds of what a teacher

 6    should be doing at night.

 7         Q    I get that you want to explain yourself, but I

 8    just asked you a simple question, and for the record I

 9    need a simple answer, because if I file a motion in the

10    case, it's got to line up with my question.  All right?

11    So my question had to do with whether you have specific

12    personal knowledge based on evidence presented to you

13    that any text messages that Mr. Kissner ever wrote to a

14    minor child, had anything to do of a sexual nature;

15    isn't that true?

16         A    I don't have copies of the -- of what those

17    texts were.  No, I don't.

18         Q    Answer the question.  The question --

19         A    I did.

20         Q    Personal knowledge.

21         A    I don't have personal knowledge of the content

22    of those.

23         Q    Okay.  You don't have personal knowledge, do

24    you?

25         A    I do not.
```

Page 103

1          Q      And you weren't presented with any evidence.

2     Well, you'd have personal knowledge, if you were

3     presented, but you weren't presented with any evidence

4     that those text messages were improper, because they

5     contained something of a sexual nature; isn't that true?

6          A      Only what's based in the investigative report.

7          Q      Okay.  But you don't remember what the report

8     says; correct?

9          A      I would have to go back and re-read the

10    specifics, as I just said.

11         Q      Don't you think if there was something in the

12    report that said that it involved sexual misconduct, or

13    sexual text messaging, that you would have remembered

14    that?

15         A      Again, I did not -- I'm sorry, I misunderstood

16    your question.  I did not -- don't have any copies of

17    those text messages, nor do I have knowledge of there

18    being anything about sexual misconduct, but the

19    investigative report does mention some things about

20    inappropriate texting, and that's what I was

21    referencing.

22         Q      I'm going to skip to G-18.  What is grooming?

23         A      Well, I mean, I don't have a specific

24    definition right in front of me, but there's a lot of

25    literature and guidance out there around what grooming

Page 104

1    behaviors are, but generally speaking they are behaviors

2    that sometimes adults engage in, relative to minors, and

3    they can be very well documented in terms of, you know,

4    these are the behaviors you might see if an adult was

5    trying to groom a minor.

6         Q    Ms. Fraser, my client has already been laid

7    off.  The district is trying to terminate him

8    permanently for behavior that you are accusing him of.

9    And accusing a human being, especially a Christian like

10   Mr. Kissner, of grooming children, is a very, very

11   serious allegation.  You know that; right?  And you knew

12   that, when you signed these charges under penalty of

13   perjury.  True?

14        A    I'm aware that grooming behavior is harmful to

15   children, yes, I am.

16        Q    So whether you use the term --

17        A    And that it's serious.  Yes, I understand

18   that.

19        Q    When you used the term "grooming," what did

20   you mean?

21        A    The term "grooming" was used in the

22   investigative report and when I spoke with Mr. Kissner

23   about this topic, and he explained that he didn't feel

24   like, you know, that words, somehow that he wasn't sure

25   whether that was accurate or not accurate, I based it on

                                            Page 105

```
 1    what was in the report.  I provided him with information
 2    regarding how to avoid people making assumptions about
 3    grooming behavior, so I did provide him with that
 4    information, but I didn't use the word "grooming" and
 5    the word "grooming" was used in the investigative
 6    report, and it was included as such.
 7         Q    Ms. Fraser, do you not understand that when
 8    you sign charges against somebody, accusing them of
 9    improper behavior, that that's on you, not some
10    investigator?  That's you alleging those charges.  And
11    when you accused David Kissner of grooming, are you
12    testifying here today that you had no specific
13    understanding of the meaning of the word "grooming"?
14              MS. GEORGINO:  I object.  That misstates
15    her testimony.  She didn't say she didn't understand
16    what grooming behavior means, Bill.
17              THE WITNESS:  I completely understand
18    what grooming behavior is.
19    BY MR. BECKER:
20         Q    Okay.  You refer to potential grooming, not
21    actual grooming.  So, you're not accusing him of
22    actually grooming minor children, are you?
23              MS. GEORGINO:  With respect to G-18, are
24    you referring, or just in general, Bill?
25              MR. BECKER:  G-18.
```

Page 106

1    referenced here as a potential grooming behavior.

2        Q    The fact is, you don't have any factual basis

3    for making these allegations.  You were completely

4    dependent on whatever Ms. Elliot said in her report;

5    isn't that true?

6        A    Those are the facts that I have, yes.

7        Q    Those are all the facts, and you didn't bother

8    to question Ms. Elliot.  When somebody accuses you of

9    engaging in such a scurrilous act as sexual exploitation

10    of children, which is what grooming is, you never

11    bothered to ask her, where's the evidence for that, I

12    feel uncomfortable signing a charging statement on that?

13        A    No, I did not talk to the investigator, nor

14    would I equate grooming behavior with sexual

15    exploitation.  I think those are different terms, but

16    that's beside the point.  But no, I did not talk with

17    Patricia Elliot, the investigator.

18        Q    If I went down to the police department right

19    now -- this is hypothetical -- I went down to the police

20    station, I filed a report against you for rape, wouldn't

21    you want to know where the evidence is?

22        A    Of course.

23        Q    And wouldn't you be just a little ticked off

24    that somebody made that allegation against you with no

25    evidence?

Page 110

1      A    I don't know.  I never met her.  I based it on

2    the investigative report.  I was not in the district at

3    the time that the report was being conducted.  I

4    received the report when I was hired.  I read through

5    it, and I assume it was a factual report, based on the

6    evidence that she collected.  So, that's what I know.

7      Q    Now, 4-G-18, on Bates stamp 36, does not

8    specify the statutory cause for dismissal that it

9    purportedly corresponds to; isn't that right?

10     A    That's correct.

11     Q    And isn't it true that Mr. Kissner was,

12   therefore, not on notice as to which of the statutory

13   causes for dismissal you were alleging he violated?

14     A    Not which, but any one of the five, based on

15   the statute of dismissal charges.

16     Q    He could just pick or choose any of the five;

17   right, whatever he assumed it was?

18     A    That would be his prerogative.

19     Q    Now, you're aware, aren't you, that the charge

20   of grooming actually began with an anonymous letter sent

21   to the district; right?

22     A    That's referenced in the investigative charge,

23   yes.

24     Q    And, in fact, that's the only reference to

25   grooming in the investigative report to the anonymous

Page 114

1    letter; isn't that right?

2        A    I believe that's accurate.

3        Q    And you did read the investigative report?

4        A    Yes, I did.

5        Q    Front to back; right?

6        A    Yes, I did.

7        Q    And one of the issues in that report, and I

8    should probably bring it in and have it admitted as

9    evidence --

10            MR. BECKER:  Jeremiah, would you mind

11   doing that, and once you have the number of the exhibit,

12   we'll identify it.

13            MS. GEORGINO:  It's 12:30 now, so do you

14   anticipate being able to break for lunch at some point.

15   I'm getting a little, sorry, hungry.

16            MR. BECKER:  It is 12:30.  Give me some

17   questions here, we'll break for -- Madam Reporter, we've

18   got a lot to go through, and we started late.  Can we

19   make a short lunch, like I mean, 15 minutes even?

20            REPORTER:  I'm good for whatever you guys

21   need.

22            MR. BECKER:  Let me finish this line of

23   questions, and then we'll take a 15-minute lunch break.

24            MS. GEORGINO:  I need more than 15.

25   Sorry.

Page 115

```
 1        A    No.
 2        Q    So for all you know, this version of the facts
 3   could have been modified, had a final report been
 4   issued; right?
 5        A    I operated on the information I was given,
 6   which is that this was the report.
 7        Q    You assumed this was a final draft?
 8        A    I was told it was a final draft.
 9        Q    By whom?
10        A    By legal counsel that provided it.
11        Q    Now, I mentioned to you that the statement of
12   grooming appears just once in this report, in a
13   reference to the anonymous letter that was received by
14   the district.  I'm looking now at Respondent's 1646.  Do
15   you see that?
16        A    I see 1646.  What would you -- you're asking
17   me to look at --
18        Q    -- confidential draft is; right?  Where the
19   "C" is on confidential draft is, it says --
20        A    Yes.
21        Q    "I have never heard of Kissner physically
22   touching a boy, but the acts that he has done are
23   clearly 'grooming.'"  You see that?
24        A    Yes.
25        Q    And you're aware of the fact that the word is
```

                                          Page 121

```
 1     not used again in the report; correct?
 2                 MS. GEORGINO:  I'm going to object.  The
 3     document speaks for itself, and --
 4                 MR. BECKER:  She read the report back to
 5     front -- front to back.
 6                 MS. GEORGINO:  She doesn't know if a 600
 7     and something page report that she's even testified that
 8     she reviewed, you know, she hasn't reviewed in the past
 9     week --
10                 MR. BECKER:  This is not an objection.
11                 MS. GEORGINO:  -- asked.  I mean, this is
12     ridiculous to ask her --
13                 MR. BECKER:  She signed the charges.  She
14     signed the charges.
15                 MS. GEORGINO:  If the document says
16     "grooming" there or not, is -- we can refer to the
17     document and know that.  She doesn't need to testify as
18     to what the document does or doesn't say.
19                 MR. GRAHAM:  But Amanda, she can't
20     testify as to her awareness, and that's what Bill --
21                 MS. GEORGINO:  She can testify if she
22     knows of it.  He didn't ask that.  He did not ask that.
23                 MR. GRAHAM:  He did.  He asked --
24                 MS. GEORGINO:  Did she know if the
25     document has the word "grooming" in it more than once?
```

Page 122

1    You can ask her that.  Does the document -- there's a

2    difference between those two statements.

3                    MR. GRAHAM:  And that was his question,

4    Amanda.  He was asking her if she was aware.

5                    MS. GEORGINO:  Then I misheard.  I did

6    not hear that to be the question.  I heard "Does the

7    document contain the word 'grooming' in it more than

8    once?"  I apologize if I misheard him.

9                    THE WITNESS:  I don't recall if it does

10   or doesn't.

11   BY MR. BECKER:

12       Q    Well, if I represented to you that it doesn't,

13   and that the only reference to it is cited in quoting an

14   anonymous letter, that draws that opinion, on what basis

15   then would you have accused him of grooming as part of

16   the charges against him, apart from that?

17       A    I've already answered that I based the charges

18   based on the investigative report.

19       Q    Let me just draw your attention --

20       A    It says "potential grooming behaviors" and

21   then it cites some specific potential grooming behaviors

22   that were cited in the investigative report.  Beyond

23   that, I don't recall whatever references were in the

24   investigative report.

25       Q    After the break we'll try to get into that, if

                                        Page  123

1   behavior, your answer is yes, regardless of whether

2   alcohol is involved; right?

3        A    It could be, yes.

4        Q    And Mr. Kissner, you're aware, has these

5   mountain retreats, these Christian mountain retreats,

6   where he and other adults host young children during the

7   summer months.  You're aware of that; correct?

8        A    Yes.

9        Q    All right.  So, taking out the alcohol issue,

10   is it your contention that Mr. Kissner, if he's alone

11   with a minor at any time, is committing an act of

12   grooming?

13        A    Well, first of all, it's potential grooming,

14   and no, I wouldn't say that that in and of itself would

15   -- would be potential grooming behavior, but coupled

16   with the other things, I would definitely say it would

17   be ill-advised, which is exactly what I wrote in his

18   letter of corrective action, that these behaviors are

19   ill-advised.  So, that you can avoid -- such that you

20   can avoid any allegations in the future of quote,

21   unquote, potential grooming, so I did have that

22   conversation and did provide that information to Mr.

23   Kissner.

24        Q    Are you familiar of any other time that Mr.

25   Kissner singled out a minor and was alone with a minor

Page 135

1   before filing the Statement of Charges?

2      A    I don't have evidence that I'm prepared to

3   offer, no.

4      Q    Do you know who Ann Harrington is?

5      A    Yes.

6      Q    Who is she?

7      A    She was a paraeducator that -- formerly

8   employed by the district.

9      Q    Did she have anything to do with sitting in

10   Mr. Kissner's classes?

11      A    I don't know. Potentially she could have been

12   sitting in there to assist a student, in one of Mr.

13   Kissner's classes. That wouldn't be uncommon.

14      Q    And you're not aware of the fact that she

15   regularly sat in his classes; correct?

16      A    I don't know what level of regularity, but I

17   know that it's probably not -- there probably were

18   occasions, when she was assigned to his classroom, yes.

19      Q    Are you aware that the investigator

20   interviewed her?

21      A    I don't recall.

22      Q    Well, it says so in the report.

23      A    Okay, but I don't recall.

24      Q    And last night she produced an audio tape of

25   her interview with Ann Harrington. You don't have any

Page 136

1    questions, please, Bill.  Let's move on with questions,

2    please.  Thank you.

3              THE WITNESS:  I just don't care to

4    speculate.

5              MR. BECKER:  Mm-hmm.

6              THE WITNESS:  Thank you.

7    BY MR. BECKER:

8        Q    So we'll skip past offering alcohol.  We know

9    that you think that's potential grooming.  Asking about

10   sex and sexual encounters, what evidence do you have

11   that Mr. Kissner engaged at any time in asking minors

12   about sex or sexual encounters?

13       A    Just the evidence that has been provided in

14   the investigation, as I said.

15       Q    What evidence?

16       A    The investigative report.

17       Q    What evidence?  I know there's a report but

18   there's no evidence in the report.

19       A    Whatever is included in the investigative

20   report is what I base that statement on.

21       Q    You don't remember whether there's evidence of

22   asking about sex or sexual encounters anywhere in the

23   report, do you?

24       A    I believe there was commentary about that in

25   the investigative report.  I also had a conversation

                                        Page 140

```
 1    with Mr. Kissner about it, wherein --

 2        Q    And what did he tell you?

 3        A    He shared that he viewed his role as being a

 4    dual role, and that he was a teacher, but he was also a

 5    youth minister, and that he thought it was okay and

 6    appropriate to talk to kids about when they asked about

 7    sex and sexual encounters in that role, and that he

 8    intended to continue to do so, if he felt it was helpful

 9    to kids.

10        Q    So, he expressed that he would engage in

11    talking to minors about sex and sexual encounters in his

12    role as a religious mentor; is that right?

13        A    Correct.

14        Q    And you believe that's an act of potential

15    grooming behavior?

16        A    I didn't say that.

17        Q    But that's what you're saying in the charge,

18    4-G-18.

19        A    No, I said that that's what Mr. Kissner said

20    when I had the conversation with him about that

21    particular item.

22        Q    So you don't know really what was ever said,

23    if it was said, about sex or sexual encounters with

24    minors; right?

25        A    No, I don't.  I wasn't there.
```

Page 141

1      Q      And posting images of youth partially

2    unclothed on the internet, what's your evidence that Mr.

3    Kissner engaged in potential grooming behavior by

4    posting images of youth partially unclothed, on the

5    internet?

6      A      I believe that the images that were referenced

7    during that time of the investigative report or with the

8    anonymous letter, had to do with images of kids who -- I

9    don't know if they were in bathing suits or whatever

10   they were in, and being taught how to shoot a gun or

11   something, and they were posted on an internet page, and

12   thought that was inappropriate, and subsequently Mr.

13   Kissner took them down.

14     Q      Did you ever see those pictures?

15     A      No, I did not.

16     Q      Did you ever see any evidence of those

17   pictures?

18     A      I can't recall.

19     Q      Did you -- being aware that Mr. Kissner hosts

20   minors on Mountain Retreats over the summer months,

21   where children swim in lakes in their bathing suits, and

22   that's what those pictures or images were on the

23   internet, you believe that the posting of children

24   swimming in their swimming wear is potential grooming

25   behavior; is that right?

Page 142

1     A    I didn't say I believed that.  I said that I

2   presented the evidence that was presented -- the

3   investigation that was presented to me was in reference

4   to that, and in conversation with Mr. Kissner, he

5   explained what the images were and made a choice to take

6   them down.  That's what I said.

7     Q    I know what you said.  It doesn't answer the

8   question.  The question is, posting images of youth in

9   their swim trunks, swimming at a mountain retreat in the

10   summertime --

11     A    Mm-hmm.

12     Q    -- on the internet in your view amounts to

13   potential grooming behavior; is that true?

14     A    No, I don't think that's necessarily adamantly

15   true.  But I think it could be perceived as a grooming

16   behavior, but I personally wouldn't say in and of itself

17   that that would be evidence of grooming behavior, but in

18   combination with some of the other things that were

19   reported, it potentially could.

20     Q    I don't remember if you defined the word

21   "grooming."  If you did, it was not something that I

22   remember, so do you have a definition of the word

23   "grooming"?

24     A    I don't have a personal definition of the word

25   "grooming," but I know that there are a number of

Page 143

1      different articles and different things that you could

2      read, where it would itemize certain behaviors, even

3      complete workshops, on how to identify grooming

4      behaviors, and there are a lot of different potential

5      behaviors that could be perceived as grooming,

6      individually or collectively.  That's what I know.

7          Q    So your charge is really just based on the use

8      of the word by an anonymous author, that the

9      investigator quoted, and what you understand to be

10     incidents describing these categories in Paragraph 4-G-

11     18?

12         A    And Mr. Kissner acknowledges singling out a

13     minor and offering alcohol in an isolated setting, as

14     well, I believe within the investigative report.

15         Q    One time; right?

16         A    I've got to go back and read it, but I know

17     for sure at least one time.

18         Q    Yeah.

19         A    Yeah.

20         Q    And that's grooming?

21         A    Potential grooming.

22         Q    All right.  Let's move on to No. 5.  5-A says

23     that you're charging Mr. Kissner with having "made

24     inappropriate personal comments to students, minors,

25     about death and violence, including stories in class

Page 144

```
 1          BEFORE A COMMISSION ON PROFESSIONAL COMPETENCE

 2             LOMA PRIETA JOINT UNION SCHOOL DISTRICT

 3          COUNTY OF SANTA CLARA - STATE OF CALIFORNIA

 4     _____

 5     In the Matter of:

 6

 7     David Kissner,                      Case No.

 8     A permanent certificated employee,     2021050291

 9          Respondent.

10     _____

11                    VIDEOCONFERENCE DEPOSITION OF

12                      PATRICIA ELLIOT

13     DATE:          Wednesday, August 11, 2021

14     TIME:          9:02 a.m.

15     LOCATION:      Remote Proceeding

16                    Los Angeles, CA 90017

17     REPORTED BY:   Nicole Beaudoin, Notary Public

18     JOB No.:       4731126

19

20

21

22

23

24

25

                                          Page 1
```

 1    information, and so the investigation confirmed that, on

 2    at least one occasion, Mr. Kissner was alone with a, I

 3    believe, at the time, 15-year-old boy and supplied him

 4    alcohol.

 5              There were reports -- and then, there was a

 6    second boy who claimed that Mr. Kissner also provided

 7    him alcohol when the two were alone on a camping trip.

 8    The first one, Mr. Kissner acknowledged -- admitted to.

 9    The second one, he denies.  In the second case, the boy

10    took, as I was told by the -- the boy's father, he took

11    a lie detector test and passed it.  Mr. Kissner refused

12    to take a lie detector test on that issue.

13              The factual conclusions of that whole -- whole

14    issue, I would have to look at, double-check, to see how

15    that all was described, but so in terms of answering

16    your question, could providing alcohol to young boys be

17    considered grooming?  It -- it could by that

18    definition -- lowering inhibitions, et cetera.

19    Presumably, alcohol, especially with a young child,

20    would do that.

21         Q    Well, you didn?t hear the definition

22    accurately.

23         A    The definition of grooming that you just read

24    me?

25         Q    Yes, because it doesn't say lowering the

                                              Page 154

1    child's inhibitions.  It says lowering the child's

2    inhibitions with the objective of sexual abuse.  Did you

3    find evidence that Mr. Kissner engaged in conduct to

4    lower the child's inhibitions with the objective of

5    sexual abuse?

6         A    I did not find -- with, again, the caveat that

7    I -- I didn't feel I had all of the information that was

8    available, I did not find evidence of sexual abuse.

9         Q    When you don't have evidence of sexual abuse,

10   you don't have evidence of sexual abuse.  Right?

11        A    That's correct.

12        Q    Okay.  So you didn't find evidence of sexual

13   abuse.  That's a simple answer.  Right?

14        A    It's the simple answer if I feel like -- if --

15   if I was able to say I had access to all the relevant

16   information.  I am not able to say that.

17        Q    Right.  You can't --

18        A    Insufficient -- it's an insufficient evidence

19   finding as opposed to a not confirmed.

20        Q    When you reach an acquittal, it's an

21   acquittal.  When you reach a verdict of guilt, it's

22   guilt.  There's no questioning what evidence didn't come

23   into the case.  Bob Mueller may be able to get away with

24   that explanation --

25                    MR. BOCK:  I'm going to object.  You're

Page 155

1    want to make sure that the witness understands the

2    question now, which I believe she does.

3    BY MR. BECKER:

4        Q    And that is that, by the definition that I

5    gave you, did you come to a conclusion using that

6    definition whether Mr. Kissner was guilty of child

7    grooming or, I should put it to you this way, that there

8    was relevant evidence of child grooming?

9        A    I did not specifically address the issue of

10   grooming either in your definition or elsewhere.  I

11   gathered information, and I found facts relevant to

12   activities that Mr. Kissner engaged in, and those

13   include that he provided alcohol to --

14       Q   Ma'am, I'm interrupting you, please.

15                  MR. BECKER:  I'll move to strike the

16   answer.

17   BY MR. BECKER:

18       Q    Did you conclude that there were relevant

19   factual findings, under the definition of child grooming

20   that I gave you, that Mr. Kissner engaged in conduct

21   that attempted to lower the child's inhibitions with the

22   objective of sexual abuse?

23                  MR. BOCK:  Once again, that's

24   argumentative.

25                  THE WITNESS:  I did not make a specific

Page 161

1    finding on grooming.

2    BY MR. BECKER:

3        Q    So the answer is no?

4        A    I did not make a specific finding on grooming.

5        Q    Is that yes or no?

6             MR. BOCK:  Asked and answered.

7    BY MR. BECKER:

8        Q    You don't know?

9        A    I did not make a specific finding on grooming.

10   That's what I understand you were asking me about.

11   That's my answer.

12       Q    I asked you a yes or no question, and I'd like

13   the record to reflect yes or no.

14            MR. BOCK:  Now, you're being harassing.

15            THE WITNESS:  The answer is: I did not

16   make a specific finding on grooming, no.

17   BY MR. BECKER:

18       Q    Thank you.  Now, you have a different

19   understanding of the term grooming.  Isn't that correct?

20       A    Different from whom?

21       Q    The Wikipedia definition.

22       A    I -- I'm not -- I wasn't aware of the

23   Wikipedia definition.  I was and am generally aware of

24   the term grooming as it relates to abuse of another

25   person.

                                        Page 162

1      Q    Okay.  And did you look into when those

2  wrestling incidents occurred in the classroom and what

3  the context or circumstances were?

4      A    Other than receiving the report, no.

5      Q    And you got that information from one of the

6  walkout students.  Isn't that right?

7      A    I don't recall.

8      Q    Did you confirm -- or I should say, did you

9  develop any confirmed evidence that Mr. Kissner had ever

10  improperly touched a boy?

11      A    I did not confirm any allegation of that sort.

12      Q    Did anybody ever complain to the school

13  district that he was improperly touching boys?

14      A    Other than the anonymous letter?

15      Q    Yes.  Well, that doesn't even -- it says,

16  "I've never heard of him."

17      A    Right.  Right.  Well, and I guess I was going

18  to say the email that we looked at earlier.

19      Q    Which was merely --

20      A    Makes a difference of that, but no, I've never

21  confirmed any -- any information like that.

22      Q    Right.  So there's been no evidence developed

23  that he improperly touches boys.  Right?

24      A    Not to my knowledge.

25      Q    Okay.  The anonymous letter writes, "Now that

Page 173

1    you have been put on notice of this person in your

2    employ, you must do your due diligence to protect your

3    students from a potential predator."  Did you develop

4    any evidence to establish that Mr. Kissner is either a

5    predator or a potential predator?

6        A    I don't -- I don't know what "a potential

7    predator" means.  The evidence that I uncovered was that

8    he provided alcohol on one confirmed occasion and one

9    likely occasion, a second likely occasion, that he texts

10   late at night with boys, and sometimes had conversations

11   with boys about their sexual activity.

12       Q    So you concluded that he's a predator?

13       A    I did not.

14       Q    And you said you don't know what a potential

15   predator is, so you drew no conclusion on that

16   allegation.  Right?

17       A    I did not.

18       Q    Why didn't you state in the report, in your

19   factual conclusions, that your investigation failed to

20   turn up any evidence that Kissner was either an actual

21   or potential predator?

22       A    I -- I was focused on the facts, not -- not

23   identifying, specifically, a name of something like

24   that.  I wasn't focused on, you know, a definition of

25   predator or grooming or anything like that.  I was

Page 174

## [95033talk] Request for public records pursuant to PRA

From:  dan dale (danieldale95033@gmail.com)

To:    95033talk@groups.io

Date:  Friday, April 16, 2021, 11:06 AM PDT

Sean said: Please post your request and respond from school. This is the ultimate transparency.

Experiment proven. Please see below. Sean - what say you now? Ready to back down from your claims or will you pivot to a new one (we all know the answer. It is called obfuscation. Change the subject. Do something called whataboutism).

As to people who said that I was over the line. I quote - The accusations of alcohol and other misconduct because the writer heard it are of concern.   No citations.  Is that slander?

No attorney here either but here is what I read: Slander is the oral communication of false statements that are harmful to a person's reputation. If the statements are proven to be true, it is a complete defense to a charge of slander. Oral opinions that don't contain statements of fact don't constitute slander.

Citations and receipts are in the attached. I will wait for the apologies.

---------- Forwarded message ---------
From: **e.bevans@loma.k12.ca.us** <e.bevans@loma.k12.ca.us>
Date: Fri, Apr 16, 2021 at 10:43 AM
Subject: Re: Request for public records pursuant to PRA
To: dan dale <danieldale95033@gmail.com>


Good morning Mr. Dale,


Attached please find the response to your public records request.  Please do not hesitate to contact me with any questions you may have.


Sincerely,

Eileen Bevans-Franks

Administrative Assistant to the Superintendent

Loma Prieta Joint Union School District

23800 Summit Road

Los Gatos, CA  95033

408/353-1101 – p

408/353-8051 - f

Exhibit 0030

RESP00031    004298

**From:** dan dale <danieldale95033@gmail.com>
**Date:** Friday, April 16, 2021 at 9:49 AM
**To:** Eileen Bevans-Franks <e.bevans@loma.k12.ca.us>
**Subject:** Request for public records pursuant to PRA

Hello Eileen-

Pursuant to the California Public Requests Act, I am requesting the charges for Mr. Kissner's dismissal. I understand you can share with me non-exempt, non-privileged, disclosable records.

Thank you,

Daniel Dale

Attachments:

- Dale PRA April 2021.pdf

---

Groups.io Links:

You receive all messages sent to this group.

View/Reply Online (#112569) | Reply To Group | Reply To Sender | Mute This Topic | New Topic

Moderator reminders:
Please read the FAQ! It is at https://groups.io/g/95033talk/wiki/95033talk-FAQ
Search archives at groups.io; directions are in the FAQ's
Questions? Email the moderators at 95033talk+owner@groups.io
Be polite and civil and on-topic. Thank you!

Your Subscription | Contact Group Owner | Unsubscribe [Stacylynhall@yahoo.com]

RESP00031   004299



*23800 Summit Road, Los Gatos California 95033*
*Phone: (408) 353-1101    Fax: (408) 353-8051*
*www.loma.k12.ca.us*
*Lisa Fraser, Superintendent*
*Dr. Billy Martin, Principal*

April 16, 2021

Via Email Only

Dan Dale
Danieldale95033@gmail.com

Re:      April 16th Records Request to Loma Prieta Joint Union School District

Dear Mr. Dale:

This correspondence is in response to your April 16, 2021 email request for records to the Loma Prieta Joint Union School District ("District"). The District interprets your request to be a request for public records pursuant to the California Public Records Act ("PRA"; Govt. Code section 6250 *et seq*.).

The PRA requires a school district to provide non-privileged, non-exempt documents in response to a request that reasonably identifies a public record or records within its possession. Additionally, the Government Code exempts certain categories of records from disclosure under the PRA and some of those exemptions may apply directly to your requests. (*See e.g.*, Gov. Code §§ 6254, 6255; Evid. Code, §§ 954; 1040(b)(2).) To the extent that the records you have requested fall within any of the categories covered by one or more of the exemptions, the District cannot produce those records. Government Code section 6255 also allows a government agency to withhold records if it can demonstrate that, on the facts of a particular case, the public interest served by withholding the records clearly outweighs the public interest served by disclosure.

The District responds to your request as follows:

**Your Request:**

"I am requesting the charges for Mr. Kissner's dismissal."

**Response to Your Request:**

The District has determined that your request, as written and submitted, does not meet the requirement for a proper PRA request in that it fails to identify records with reasonable

**Exhibit 0031**

*Board of Trustees:*
*Deana A. Arnold, President    Ron Bourque, Vice-President*
*Ben Abeln, Member    Erin Asheghian, Member    Charlotte Boisvert-Khandelwal*

particularity. Government Code section 6253(b). Moreover, the request is objected to on the grounds that it would require potential information to be disclosed which is exempt from the PRA based on: personnel, medical, or similar files, the disclosure of which would constitute an unwarranted invasion of personal privacy, attorney client privilege and attorney work product. Government Code section 6254(c).

Specifically, under Government Code section 6255, a public entity may withhold a record if, based on the facts of the particular case, the public interest served by not disclosing the record clearly outweighs the public interest served by disclosing the record. Additionally, the California Government Code excludes from disclosure other records, including "[r]ecords, the disclosure of which is exempted or prohibited pursuant to federal or state law, including, but not limited to, provisions of the Evidence Code relating to privilege." (Gov. Code § 6254(k).) In this regard, Article I, Section 1 of the California Constitution provides that:

> All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and *obtaining safety*, happiness, *and privacy*. (Emphasis added.)
>
> (*See also, New York Times v. Superior Court* (1990) 218 Cal.App.3d 1579.)

The District is not able to produce records that are exempt from disclosure under the PRA and/or state and federal law. Documents potentially responsive to your request may be exempt from production under the PRA's pending litigation, preliminary drafts, attorney-client privilege, attorney work product privilege, and/or deliberative process privilege exemptions. (*See e.g.*, Gov. Code §§ 6254 and 6255.) Additionally, the District cannot disclose information that is likely to allow identification of students in violation of the federal Family Educational Rights and Privacy Act ("FERPA") and corresponding California state law. (*See e.g.*, Gov. Code §§ 6254(k), 20 U.S.C. 1232g, and Ed. Code § 49076.) Furthermore, the District is not able to disclose records which may constitute an unwarranted invasion of personal privacy and employee privacy. (*See e.g.*, Gov. Code §§ 6254 (c) and 6255, *see also*, Cal. Const. Art. 1, §§ 1 and 3.)

Further, the California Court of Appeals held that records of complaints or investigations against a public employee can be disclosed only if "the complaint is of a substantial nature and there is reasonable cause to believe the complaint or charge of misconduct is well-founded." (See, *Bakersfield City School Dist. v. Superior Court* (2004) 118 Cal.App.4th 1041 at 1044; see also, *BRV, Inc. v. Superior Ct.* (2006) 143 Cal.App.4th 742.) However, in such instances, a public agency's decision to release confidential documents under the PRA is reviewable by petition for writ of mandate in a "reverse-PRA" lawsuit. (See, *Marken v. Santa Monica-Malibu Unified School Dist.* (2012) 202 Cal.App.4th 1250.)

Without waiving the aforementioned objections, the District has determined it possesses records responsive, at least in part, to your requests and is providing you with a copy of the non-exempt, non-privileged, disclosable records responsive to your request, enclosed herein.

As stated above, the District is unable to produce privileged document(s) or information encompassed by an exemption under the PRA or any state or federal law. (*See e.g.*, Gov. Code §§ 6254 and 6255.) Accordingly, the District will segregate and/or redact privileged and/or exempt information as needed. To the extent the District inadvertently produces any privileged document that is encompassed by an exemption under the PRA or any state or federal law, such a production is not intended to be a waiver of any privilege or any right to withhold such documents or documents of a similar nature. The District reserves the right to amend or supplement this response upon discovery of additional responsive documents. As such, the District will notify you should it need to amend its response.

The District is aware of its obligation under Government Code section 6253.1 to assist you in making more focused and effective requests that reasonably describe an identifiable record or records. If, after reviewing this letter, you have any further questions or concerns, please contact me directly.

Sincerely,

Lisa Fraser
Superintendent


Encl: Notice of Proposed Intent to Dismiss with Statement of Charges





*23800 Summit Road, Los Gatos California 95033*
*Phone: (408) 353-1101    Fax: (408) 353-8051*
*www.loma.k12.ca.us*
*Dr. Kevin Grier, Superintendent*
*Dr. Billy Martin, Principal*

July 6, 2021

Via Email Only (allanh@kallisti.com)

Allan Hessenflow

Re:     CPRA request

Dear Mr. Hessenflow:

This correspondence is in response to your June17, 2021 request for records submitted to the Loma Prieta Joint Union School District ("District"). The District interprets your request to be a request for public records pursuant to the California Public Records Act ("PRA"; Govt. Code section 6250 *et seq.*). Thank you for your clarification email on June 29, 2021 wherein you detailed that you were requesting copies of "new or amended dismissal charges [related to David Kissner] since the February 12, 2021 dismissal letter and statement of charges."

The PRA requires a school district to provide non-privileged, non-exempt documents in response to a request that reasonably identifies a public record or records within its possession. Additionally, the Government Code exempts certain categories of records from disclosure under the PRA and some of those exemptions may apply directly to your requests. (*See e.g.*, Gov. Code §§ 6254, 6255; Evid. Code, §§ 954; 1040(b)(2).) To the extent that the records you have requested fall within any of the categories covered by one or more of the exemptions, the District will not produce those records. Government Code section 6255 also allows a government agency to withhold records if it can demonstrate that, on the facts of a particular case, the public interest served by withholding the records clearly outweighs the public interest served by disclosure.

The District has determined that your request is objected to on the grounds that it may require information to be disclosed which is exempt from the PRA based on: personnel, medical, or similar files, the disclosure of which would constitute an unwarranted invasion of personal privacy, attorney client privilege and attorney work product. Government Code section 6254(c).

Specifically, under Government Code section 6255, a public entity may withhold a record if, based on the facts of the particular case, the public interest served by not disclosing the record clearly outweighs the public interest served by disclosing the record. Additionally, the California Government Code excludes from disclosure other records, including "[r]ecords, the disclosure of

*Board of Trustees:*
*Deana A. Arnold, President   Ron Bourque, Vice-President*
*Ben Abeln, Member   Erin Asheghian, Member   Charlotte Boisvert-Khandelwal*

which is exempted or prohibited pursuant to federal or state law, including, but not limited to, provisions of the Evidence Code relating to privilege." (Gov. Code § 6254(k).)  In this regard, Article I, Section 1 of the California Constitution provides that:

> All people are by nature free and independent and have inalienable rights.  Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and *obtaining safety*, happiness, *and privacy*.  (Emphasis added.)

> (*See also, New York Times v. Superior Court* (1990) 218 Cal.App.3d 1579.)

The District will not produce records that are exempt from disclosure under the PRA and/or state and federal law.  Documents potentially responsive to your request may be exempt from production under the PRA's pending litigation, preliminary drafts, attorney-client privilege, attorney work product privilege, and/or deliberative process privilege exemptions. (*See e.g.*, Gov. Code §§ 6254 and 6255.)  Additionally, the District will not disclose information that is likely to allow identification of students in violation of the federal Family Educational Rights and Privacy Act ("FERPA") and corresponding California state law. (*See e.g.*, Gov. Code §§ 6254(k), 20 U.S.C. 1232g, and Ed. Code § 49076.)  Furthermore, the District will not disclose records which may constitute an unwarranted invasion of personal privacy and employee privacy. (*See e.g.*, Gov. Code §§ 6254 (c) and 6255, *see also*, Cal. Const. Art. 1, §§ 1 and 3.)

Further, the California Court of Appeals held that records of complaints or investigations against a public employee can be disclosed only if "the complaint is of a substantial nature and there is reasonable cause to believe the complaint or charge of misconduct is well-founded." (See, *Bakersfield City School Dist. v. Superior Court* (2004) 118 Cal.App.4th 1041 at 1044; see also, *BRV, Inc. v. Superior Ct.* (2006) 143 Cal.App.4th 742.)  However, in such instances, a public agency's decision to release confidential documents under the PRA is reviewable by petition for writ of mandate in a "reverse-PRA" lawsuit. (See, *Marken v. Santa Monica-Malibu Unified School Dist.* (2012) 202 Cal.App.4th 1250.)

Notwithstanding and without waiving the aforementioned objections, the District has determined it is in possession of records responsive, at least in part, to your request and is providing you with a copy of the non-exempt, non-privileged, disclosable records responsive to your request herein.

As stated above, the District will not produce privileged document(s) or information encompassed by an exemption under the PRA or any state or federal law. (*See e.g.*, Gov. Code §§ 6254 and 6255.)  Accordingly, the District will segregate and/or redact privileged and/or exempt information as needed.  To the extent the District inadvertently produces any privileged document that is encompassed by an exemption under the PRA or any state or federal law, such a production is not intended to be a waiver of any privilege or any right to withhold such documents or documents of a similar nature.  The District reserves the right to amend or supplement this response upon discovery of additional responsive documents.  As such, the District will notify you should it need to amend its response.

The District is aware of its obligation under Government Code section 6253.1 to assist you in making more focused and effective requests that reasonably describe an identifiable record or

RESP00034   004328

records.  If, after reviewing this letter, you have any further questions or concerns, please contact me directly.

Sincerely,

Kevin Grier
Superintendent


Enclosure

RESP00034  004329

BEFORE THE
BOARD OF TRUSTEES OF THE
LOMA PRIETA JOINT UNION SCHOOL DISTRICT
COUNTY OF CONTRA COSTA, STATE OF CALIFORNIA
DANETTE BROWN, ADMINISTRATIVE LAW JUDGE

In the Matter of the District's
Reduction in Force of

DAVID KISSNER,

Respondent.

OAH NO. 2021040076

Volume I

VIDEOCONFERENCE TRANSCRIPT OF PROCEEDINGS

MONDAY, APRIL 26, 2021

9:05 A.M.

# CERTIFIED COPY


Peranich Reporting
Court Reporters

5241 E. SANTA ANA CYN. RD., #100
ANAHEIM HILLS, CA 92807
Phone: 714-637-3774
Fax: 714-637-3023

REPORTER:

TRACY A. TERKEURST, CSR #8180

1     principal who serves both sites, Dr. Billy Martin.  We

2     have a director of facilities -- maintenance and

3     facilities operations; we have a director of

4     transportation; and we have -- another person on our

5     cabinet runs our after-school program; and then we have

6     a director of student support and special education.

7          Q    Great.  Thank you.

8               So in your capacity as a district

9     superintendent, were you the person who was primarily

10    responsible for the layoff procedures and process?

11         A    Yeah.  My job would be to make sure that we

12    follow process with the assistance of clerical

13    assistance, but, yes, that would be my responsibility.

14         Q    Okay.  So at some point during the 2020-2021

15    school year, so the current school year, did the

16    district determine that it needed to reduce the number

17    of certificated employees for next year, the 2021-2022

18    school year?

19         A    Yes, we did.

20         Q    Okay.  And why was that?

21         A    Well, we've been experiencing issues with

22    declining enrollment and also issues with budget -- need

23    for budget reductions.  When I came on board, I

24    inherited a budget that had been -- where there had been

25    some deficit spending, and so in our strategic plan, we

1     set out to balance the budget and maintain a 12 percent

2     reserve, and that actually started prior to this school

3     year.

4          Q    So the district has budget plans, I assume?

5          A    Correct.  I've been making budget plans for

6     quite some time.

7          Q    Officially, do you have a three-year budget

8     projection?

9          A    Yes.  That is required, to do a multiyear --

10    multiyear budget.

11         Q    So what process did you start when you

12    realized that due to, you said, declining enrollment and

13    some budget shortfalls, in determining how the district

14    would cut funds from its budget?

15         A    Okay.  That's a great question.

16              So in January of 2020, so that would have been

17    in my second year after studying the budget, I

18    implemented a superintendent's budget advisory committee

19    with the sole purpose of looking at our budget and what

20    we could do to meet the -- balance the budget while

21    still maintaining a 12 percent reserve.  And so I

22    started that in January.

23              In May of 2020, June of 2020, is when we began

24    talking more deliberately about the need for not just

25    budget reductions, but we are experiencing enrollment

1    decline, and so my CBO notified me that, particularly at

2    the middle school, we would be needing to make at least

3    at 1.2 FTE reduction in the '21-'22 school year.  So

4    I've been planning for that for quite some time.

5          In addition, we -- our budget advisory

6    committee was guiding the Measure N parcel tax as a

7    means of not having to -- as a means of revenue.  And so

8    when we -- when we were budgeting, we were budgeting in

9    two different scenarios:  One would be if Measure N

10   passed, and one would be if Measure N did not pass.

11   Either way, we needed to make $100,000 budget cuts if

12   Measure N were to pass, and approximately $400,000 in

13   cuts were it to fail.

14          I should note that that -- those budget cuts

15   were above and beyond the need for a 1.2 FTE reduction

16   at C.T. English Middle School due to enrollment decline.

17   So both of those factors played into the need for

18   layoffs.

19       Q   And what percentage of the district's budget

20   is allocated to personnel costs?

21       A   Approximately 5 percent.  Cathy can give you

22   the exact -- you know, exact amount, but generally

23   speaking, about 85 percent of your budget is, you know,

24   general fund.

25       Q   Do you know the approximate amount of the

```
 1         A    Well, we need those services in order to meet
 2    the needs of our special ed population, and with the
 3    multiple-subject teaching credential, we needed to
 4    include that particular kind of service so that we
 5    could -- that we would have multiple-subject teachers
 6    available for core programming.
 7         Q    Great.
 8              And these reductions, the 4.0 reduction,
 9    FTE reduction was for Loma Elementary and for
10    C.T. English; correct?
11         A    Correct.  Those were districtwide, yes.
12         MS. GEORGINO:  Your Honor, I would like to move
13    that Exhibit 1 be entered into evidence.
14         MR. BECKER:  No objection.
15         ADMINISTRATIVE LAW JUDGE:  Exhibit 1 is admitted.
16              (Complainant's Exhibit No. 1 was
17              received in evidence by the Administrative
18              Law Judge.)
19         MS. GEORGINO:  Thank you.
20    BY MS. GEORGINO:
21         Q    Now, we talked about the need to reduce a 1.2
22    FTE from C.T. middle school because of a decline in
23    enrollment; correct?
24         A    Yes.
25         Q    And how did you determine what services in
```

1    that regard you needed to reduce?

2        A    Well, it's a little bit trickier with the

3    middle school master schedule, but what we determined is

4    that in order to make the cuts, that we needed to change

5    our sixth-grade programming to be more flexible, and

6    that was for this coming year and also for the

7    long-term.

8            By shifting to core programming, we believe

9    that -- and filling that with the multiple-subject

10   credential, we believe that we could, in the long-term,

11   if we had the need to go to a self-contained classroom

12   or if we couldn't restore the electives through the

13   budget cuts, that we would have more flexibility in

14   doing that in a sixth-grade core program.

15           It had -- there had been a precedent for that

16   in years past.  There's research to support that that

17   can be a good programing for sixth grade, and we believe

18   that that would be an important thing to do.

19           In addition, we moved all of our

20   single-subject teachers to teach two seventh, two eighth

21   grade, and a fifth section in a single-subject model for

22   the upper grades.

23           In addition, we did a reduction in force

24   for -- our P.E. teacher was teaching two sixth-grade

25   science sections, so she was reduced to .4, and we also

1    you recognize that document, Lisa?

2         A    Yes, I do.

3         Q    And what is that?

4         A    That is a notice of reduction in force

5    hearing.  It's to David acknowledging that -- that we

6    would hold this hearing.

7         MS. GEORGINO:  Okay.  Your Honor, I would like to

8    request that Exhibit 6 and 9 be admitted into evidence.

9         MR. BECKER:  No objection.

10        ADMINISTRATIVE LAW JUDGE:  6 and 9 are admitted.

11             (Complainant's Exhibit No. 6 and 9

12             were received in evidence by the

13             Administrative Law Judge.)

14   BY MS. GEORGINO:

15        Q    Okay.  So, Lisa, we talked earlier about this

16   transition from -- the district changing next year from

17   a sixth-grade single-subject program to a core program.

18        A    Correct.

19        Q    And can you explain to us how that decision

20   was impacted or effected by the 1.2 FTE reduction you

21   needed from the elimination of an eighth-grade class?

22        A    Yes.  My CBO had let me know early on in the

23   budget reduction process that in addition to the

24   $400,000 in cuts that we would have to be making for the

25   next school year, that we would, in addition, need to

 1    reduce a 1.2 full-time equivalent at the middle school

 2    due to declining enrollment.

 3         And so, consequently, we looked at what would

 4    be -- what could we do that would bring -- you know,

 5    bring our number of sections down accordingly, and plan

 6    programmatically for this year and for the future.  As I

 7    mentioned, we were anticipating budget cuts again in the

 8    following year, and so we are trying to build a program

 9    that is as flexible as possible, but also one that where

10    we could address ongoing budget concerns.

11         And so -- so we began talking about the

12    potential of a shift in program in the budget advisory

13    committee, and we found that this probably will be in

14    the best interest of kids in the program both next year

15    and potentially in the years to come.

16    Q    And why -- when you reduced -- when you got

17    rid of the eighth-grade class, that meant what

18    reductions did you have in offerings in terms of FTE?

19    Can you go through that with us?

20    A    Can you ask that again?

21    Q    Yes.  I'll ask it in a different way.

22         So when you eliminate the one section of

23    eighth grade --

24    A    Yes.

25    Q    -- that means -- is it correct that you have

1       A    What I can tell you definitively is the

2    difference between this year's programming in sixth

3    grade and what is planned for next year, if that would

4    be helpful.

5       Q    Okay.   What is the specific class changes that

6    are different next year?   So what electives are being

7    offered next year?

8       A    The class changes is that the two teachers

9    will be teaching English and history, and math and

10    science, and they'll be incorporating what we used to

11    call is a boot camp or exploratory.   They -- in the

12    past, they would have been able to choose between music

13    and art, and they would have a P.E. class alternating.

14       So this coming year, due to budget cuts, they

15    won't have a choice.   Their only choice will be pullout

16    music, much like it is in fifth grade this year, so that

17    is a change in programming.

18       Q    So that change in programming is entirely in

19    the electives -- music, art -- that's where the change

20    really takes place; correct?

21       A    And the fact that it's a core program, not a

22    departmentalized single-subject program in sixth grade.

23       Q    We talked about that, and that just means that

24    there's one teacher teaching math and science and

25    another teaching English and social studies; correct?

Case 3:22-cv-00949-CRB   Document 99-9   Filed 07/07/23   Page 10 of 27

```
 1        A    Correct.  But it also gives us a tremendous

 2    amount of flexibility as we are anticipating the needs

 3    next year and moving into the future to have

 4    multiple-subject teachers in sixth grade.

 5        Q    Yeah.  And that's projecting out into the

 6    future, not specifically next year; correct?

 7        A    No.  It is specific to next year and moving

 8    forward.  Having that flexibility is very helpful.

 9        Q    And that's what I'm trying to dig into:  What

10    is the programming change for next year?  And it sounds

11    like next year is the same as this year other than for

12    electives; correct?

13        A    No.  They are not rotating to four different

14    teachers for their academics.  They are in more of a

15    self -- more in a core program.  We felt it was

16    important -- I mean, part of the logic behind that is A,

17    we needed flexibility; B, we're coming out of COVID, and

18    we felt like there would be some benefit to kids to be

19    in a more humanities core, math/science core with one

20    teacher, which is very common in middle schools.

21             In other middle schools that I've worked in,

22    when you're trying to ease kids into the middle school

23    setting, it's very common to have a core program in

24    sixth grade, and that's what we were trying to create.

25    That's what we were creating.  For --
```

```
1          Q    Thank you --
2          (Reporter interruption for clarification.)
3          THE WITNESS:  That's what we have created for next
4     year to best meet the needs of kids.
5     BY MR. GRAHAM:
6          Q    And have you -- are you intending to hire a
7     teacher to teach that sixth-grade science and math core?
8          A    No, I don't anticipate hiring.  I anticipate
9     using existing staff.
10         Q    Is there any teacher in the district junior to
11    Mr. Kissner who has more experience teaching sixth-grade
12    science and math?
13         A    Say that again.
14         Q    Is there any teacher in the district junior to
15    Mr. Kissner who has more experience than him in teaching
16    sixth-grade science and math?
17         A    Yes.
18         MS. GEORGINO:  So -- okay.  Sorry.
19         THE WITNESS:  Yes.
20    BY MR. GRAHAM:
21         Q    Okay.  And who is that person?
22         A    Well, one would be Michele Ignoffo who has a
23    science credential and is senior to Mr. Kissner.
24         Q    Is Michelle Ignoffo junior to Mr. Kissner?
25         A    No.
```

```
 1      wanted this question asked, so -- it wasn't.

 2             So do you understand the question?

 3           ADMINISTRATIVE LAW JUDGE:  I'm going to overrule

 4      the objection.

 5           THE WITNESS:  Can you restate the question?

 6           MR. BECKER:  Can you reread it, Madam Reporter?  Or

 7      read it.

 8             (The record was read by the

 9             reporter as follows:

10             "Q   Ms. Fraser, does the district have a

11             specific need for a math/science core

12             teacher as opposed to just a certificated

13             math teacher who also teaches science?")

14           THE WITNESS:  Yes.  We have a need for a

15      multiple-subject credentialed teacher to teach math and

16      science in a core program that's planned for the '21-'22

17      school year.

18      BY MR. BECKER:

19           Q   What is the basis of that specific need?

20           A   The basis for the need?

21           Q   Yes.

22           A   The basis for the need for core programming?

23           Q   Yes.

24           A   We have a desire to better meet the needs --

25      it's based upon the needs of kids.  That's how I
```

1    schedule everything in our schools, is what's going to

2    best serve the needs and interests of kids.  And we have

3    to make some budget cuts and also shifting that

4    programming coming back from COVID-19 gives us more

5    flexibility for the future.

6            My fear was for the future that if we kept

7    having declining enrollment, we would have issues, as I

8    mentioned earlier today, where we would have to hire

9    part time people to fill a program, which is not good

10   for kids.

11           I think that multiple-subject teachers are

12   trained in a more self-contained model to meet the

13   social-emotional needs of kids.  They won't have to

14   rotate as often.  There's a lot of research to support

15   that that's a great bridge in sixth grade coming from

16   fifth grade into the upper grades in a middle school.

17   It's not unprecedented.

18           I've worked with core programs in my other --

19   in some of my other administrative assignments, and they

20   work very well for kids.  And my job is to make sure

21   that we're setting them up for success in spite of the

22   fact that we're having to make cuts, and so we felt that

23   this would be the best way to do that.

24           It also allowed us the flexibility if for some

25   reason we could add back any kinds of pullout programs

1    for kids, we could add that back without having to

2    disrupt the entire master schedule.

3         So there were a variety of different reasons

4    for why we did that, Mr. Becker, all of that -- all of

5    which were seen through the lens of what's in the best

6    interest of kids and our programming moving forward.  So

7    I hope that helps to clarify.

8         Q    Thank you.

9         Is it in the best interest of students to be

10   taught math by somebody with a general multiple-subject

11   credential than somebody who is certificated in math?

12        A    I think that you could make the case either

13   way, depending on who the individual is that's teaching

14   the class.  There are multiple-subject credentialed

15   teachers for whom they have a number of units in -- you

16   know, in a content area where that's their particular

17   strength.  That's the case in our fifth grade

18   programming now.

19        So, yes, I think that we can place a highly

20   qualified math/science core teacher in sixth grade and

21   have that be a successful program for kids.

22        Q    Is there anybody teaching math in the fifth

23   grade currently that is solely certificated for math?

24   They're all multiple-subject teachers; correct?

25        A    They are all multiple, uh-huh.

```
 1      BY MR. GRAHAM:
 2          Q   Okay.  And --
 3          A   It's confusing.
 4          Q   I know, it's very confusing.
 5              But I guess my question and the primary
 6      question here is, prior to this change, sixth grade
 7      programming has required 2.0 FTE; correct?
 8          A   This year?
 9          Q   Yes.
10          A   This year, we have 2.4 FTE teaching sixth
11      grade.
12          Q   Okay.  And exactly how does that work?  What
13      courses are those?
14          A   Well, I don't have the master schedule in
15      front of me, but the way I always looked at it is there
16      is six periods a day, the kids are in every one of those
17      periods, there is a sixth grade teacher with them, and a
18      1.0 FTE teacher teaches five sections.  So six periods a
19      day is 1.2 FTE, and we have two groups of six graders
20      moving through during every period, so 1.2 times 2, 2.4
21      FTE, currently.
22          Q   Got it.  Understand.
23              But focusing on the sixth-grade core change
24      here, what this graph tells me, and I want to make sure
25      it's correct, is that there's -- the change to
```

```
 1    sixth-grade core doesn't realize any net change in the

 2    FTE required.  And that's what I believe the 0 at the

 3    bottom of the column represents.

 4         A    Yep.  Yes, I agree.

 5         Q    Okay.  So I want to go now to Exhibit E, and I

 6    want to bring your attention to page 7.

 7         A    The results of 400,000 staff --

 8         Q    Yes.

 9         A    Okay.

10         Q    Can you explain to me what scenario this was

11    intended to plan for or what this graph -- sorry.  Let

12    me withdraw that question.

13              Can you explain to me what this graph shows?

14         A    I have to go back up and look.  Are these all

15    from the same date?

16         Q    This is a different one from the last one I

17    showed you.  It's another budget advisory agenda, and we

18    are looking at Exhibit E again.

19         MS. GEORGINO:  Jeremiah, are you on B42 or B43?

20         MR. GRAHAM:  I am on B43.

21         MS. GEORGINO:  Okay.  So it's like a table, not

22    really a graph?

23         MR. GRAHAM:  You're correct.

24         MS. GEORGINO:  Okay.  Sorry, I just wanted to

25    clarify I was on the right page.  Thank you.
```

1          MR. GRAHAM:  Thank you.

2          THE WITNESS:  I believe this was the rank pulled

3     together after the budget advisory committee had

4     discussed the different possible reductions in light of,

5     you know, what's best for the students and what's best

6     for the -- their success academically and everything

7     with -- we had some, you know, some framework for

8     prioritizing those.

9              And a parent on the committee put together

10    this list and then ranked them by that total number --

11    that number of votes, columns, so your circled items

12    down at the bottom were -- had a low priority ranking

13    for cuts.

14    BY MR. GRAHAM:

15         Q    Okay.  And those -- there is that two elective

16    sections at CT that we discussed in the previous agenda;

17    correct?

18         A    Uh-huh.

19         Q    And that's where the reduction in sixth grade

20    programming is, is in electives; correct?

21         A    Uh-huh.

22         Q    And there is no reduction in the core classes

23    being offered?

24         MS. GEORGINO:  Objection to the term "core."  If

25    you could maybe use a more descriptive term than "core,"

1    maybe math, science.  You know what I mean?

2         MR. GRAHAM:  Yes.  I think everyone knows what I'm

3    referring to, but --

4         MS. GEORGINO:  Cathy wasn't here for our earlier

5    discussions, so I'm not sure if she's --

6    BY MR. GRAHAM:

7         Q    Yeah.  So defining core as math, English

8    language instruction, science and social studies.

9         A    Okay.

10        Q    There is no reduction in core classes or core

11   education with a reduction in electives; correct?

12        A    Correct.

13        Q    I want to draw your attention to Exhibit G,

14   and I want to go to page 14, which I believe you are

15   going to have to reorient.

16        A    Okay.

17        Q    Okay.

18        A    B66.

19        Q    That is correct, B66.  And here there's,

20   again, a list of proposed cuts; correct?

21        A    Yes.

22        Q    And there again is the reduction of two

23   elective sections; correct?

24        A    Yes.

25        Q    But a reduction in elective sections doesn't

```
1     affect core programming for sixth grade, does it?

2          A    No, not that item.

3          Q    All right.  Now, I want to draw your attention

4     to Exhibit H.

5          A    Okay.

6          Q    Specifically to page 11.

7          A    Okay.  And --

8          Q    There is that same line item with the expected

9     cost savings of $32,000; correct?

10         A    Yes.

11         Q    Okay.  And then I want to take you to Exhibit

12    I.

13         A    Okay.

14         Q    Specifically to page 9.

15         A    9.  Okay.

16         Q    Okay.  And that line item suddenly gets much

17    bigger, doesn't it?

18         A    The description, you mean?

19         Q    Yes.

20         A    Yes.

21         Q    The cost savings are the same; correct?

22         A    Uh-huh.

23         Q    But the description of that line item suddenly

24    grows; right?

25         A    Uh-huh.
```

1   was no reference to sixth grade programming that I could

2   see.  And then after Measure N was defeated, I saw that

3   added, and I showed that to you, but then here, shortly

4   after dismissal charges were made against Mr. Kissner,

5   that language disappeared again.  Can you explain to me

6   the disappearance of that language?

7       MS. GEORGINO:  I'm going to object -- sorry,

8   Cathy, excuse me for a second.

9          I'm going to object as to the term -- you used

10   "removal," Jeremiah?  The term removal?

11      MR. GRAHAM:  Are you asking me a question or

12   making --

13      MS. GEORGINO:  No.  I'm making sure I'm saying the

14   right word.  I'm going to object as to the

15   characterization of the document.

16      MR. BECKER:  Maybe omission, absence.

17      MS. GEORGINO:  Okay.  Those are both better words.

18   I would not object to the use of either of those.

19      MR. GRAHAM:  Okay.  I substitute omission into my

20   question.

21   BY MR. GRAHAM:

22      Q   So can you explain to me the omission of that

23   line item from your presentation in February?

24      A   At the time, I left it off because I had

25   already looked at that fact that the -- we were not

1    going to save any FTE in the change to a six-grade core

2    programming.  So I left that line off of the budget

3    reduction list that was presented in February to the

4    Board.

5         Q   Now I want to take you to Exhibit R.

6         A   Uh-huh.  Yes, I'm there.

7         Q   And is this an e-mail that you wrote?

8         A   Yes.

9         Q   And it references -- if you see five bold

10   words down, it says, "Attachments.  Potential budget

11   reductions.docx.  Do you see that?

12        A   Yes.

13        Q   Do you remember attaching that document?

14        A   I think so.  I don't remember exactly what the

15   document looks like.

16        Q   Okay.  And I'm going to take you to it now.

17   Can you go to Exhibit S?

18        A   This was back in September?

19        Q   Yes.  If we look at Exhibit R, it does say

20   September 26, so --

21        A   Okay.

22        Q   Now I want to take you to page 2.  And it's

23   the first full paragraph that's three lines, so I should

24   say it's the fifth paragraph but it's the biggest

25   paragraph there.  You wrote this; correct?

1    they're following the same bell schedule when they go to

2    a core programming.  So, like, I don't know when they

3    combine -- when one teacher teaches science and math, do

4    they have one of those in second period and one of those

5    in third period and the bells ring the same?  I'm not

6    sure, but I know -- yeah.

7         Q    So would it be less than 2.4 FTE next year?

8         A    The last I heard after the discussion of

9    pulling a music -- .2 music over from Loma from the

10   elementary school, it was going to be still 2.4 FTE

11   teaching for sixth grade for next year.

12        Q    Got it.

13             So there is no change in the amount of

14   instruction needed for sixth grade?

15        A    Not in the FTE, correct.

16        Q    Okay.  Now, I want to ask you one more

17   question about what we looked at previously in Exhibit

18   Q -- sorry, not Exhibit Q.  Let me get my bearings.

19   Exhibit S.

20             So do you remember we were talking about, you

21   know, teacher cost, cheaper teachers, average teachers?

22        A    Yes.

23        Q    When you're describing here, you're describing

24   what you are expecting the salaries of the teachers who

25   are going to be laid off as a result of that 1.2 FTE

```
1          Q   So even in that scenario, we would have 2.4
2     FTE next year?
3          MS. GEORGINO:  Objection as to what scenario you're
4     referring to.  I'm getting a little confused here,
5     Counselor.  Sorry.
6          MR. GRAHAM:  I know it's confusing --
7          MS. GEORGINO:  I'm trying really hard not to
8     object, but --
9          MR. GRAHAM:  I'll try to catch you up to speed.  So
10     the scenario is what we've just been talking about where
11     a teacher is teaching six periods instead of the normal
12     five periods with a rest break or a preparation period.
13          MS. GEORGINO:  Correct.  But I think that it's
14     important to distinguish here, and Cathy had mentioned
15     this a little earlier, a fifth-grade teacher teaching
16     six grade -- six sections a whole day is different than
17     a middle school teacher single-subject teacher teaching
18     six sections.  So I think --
19          THE WITNESS:  Yes.
20          MS. GEORGINO:  -- it's important, again, to clarify
21     what you're asking.  If you're asking it what type of
22     program, I guess is the --
23     BY MR. GRAHAM:
24          Q   Okay.  So, Cathy, I'm referring to the type of
25     program that is in place now at sixth-grade level.
```

1    I'm -- not a speculative program, the program that is in

2    place, now, and my understanding is that's 2.4 FTE;

3    correct?

4          A   Yes.

5          Q   The program that is going to be in place next

6    year is 2.4 FTE; correct?

7          A   Yes.

8          Q   And the numbers are then derived from the

9    $12,000 whether it's -- the savings are derived from a

10   net reduction of 0 FTE; correct?

11         A   Yes.

12         Q   And my question is --

13         A   32,000 was derived from thinking that we were

14   going to have 2.0 FTE in sixth grade next year.

15         Q   So those savings are not realized --

16         A   Correct.

17         Q   -- by a change in sixth-grade programming?

18         A   Correct.

19         Q   So there is no net budget benefit to the

20   change in sixth-grade programming?

21         A   That's true.

22         MR. GRAHAM:  Bill, did you have any other questions

23   for Cathy?

24         MR. BECKER:  I think that's a good note to leave it

25   on.

```
 1    BY MR. GRAHAM:
 2        Q    Okay.  So, Cathy, I'm going to have to relay
 3    the foundation I already laid.  We've been talking a
 4    long time about sixth grade cost savings, and in every
 5    way we shape it, the net FTE is 0; correct?
 6        A    For sixth grade, yes.
 7        Q    Yes.  If we look at sixth grade, the net FTE
 8    is 0; correct?
 9        A    Yes.
10        Q    So there is no cost savings realized by any
11    change in programming at sixth-grade level?
12        A    Correct.
13        Q    And so my question with that foundation being
14    laid is why does the line item say sixth grade?
15        A    I think there was -- well -- there was a
16    desire by the budget advisory committee to keep the list
17    consistent after a certain point at least in the fall.
18        Q    Was that when Measure N was defeated?
19        A    No.  I don't -- I don't think that had
20    anything to do with -- well --
21        Q    Because, if you recollect, we went through
22    September, October, November, December, sixth grade
23    wasn't even mentioned.  Then suddenly Measure N is
24    defeated and it pops up.  So I'm asking you why sixth
25    grade suddenly popped up when there is no cost savings
```

1         MS. GEORGINO:  Lisa --

2         MR. BECKER:  It's a yes-or-no question.

3         MR. GRAHAM:  Bill, maybe I can rephrase it in a

4    different way that would be helpful here, because I do

5    see, Lisa, that you are trying to respond, and I think

6    the thrust of the question got lost.

7         THE WITNESS:  Okay.

8    BY MR. GRAHAM:

9         Q   I'm asking no longer as your role in your --

10   in your capacity as superintendent or what the district

11   is doing, I'm asking if you personally did anything to

12   campaign or try to persuade the public to adopt

13   Measure N.

14        A   No.  I did not campaign.

15        Q   Did you attend any rallies in support of

16   Measure N?

17        A   The guidelines are -- well, there weren't

18   any -- first of all, we were in COVID, so it was a very

19   different, you know, parcel tax.  But, in fact, if

20   you're on your own time, you can support a parcel tax,

21   so I believe the only thing I participated in is the

22   Summit Store had an afternoon during the campaign where

23   teachers held "Yes on N" signs, and I did participate on

24   my own time off campus.

25        Q   Okay.

1       A    If that is the question, yes.

2       Q    That does answer the question.

3            Now, are you aware that Mr. Kissner opposed

4  Measure N?

5       A    Yeah.  He made that very clear that that was

6  his intention was to be -- to promote opposition.

7       Q    Okay.  And did you ever see -- well, I'm not

8  going to -- I'm not going to go there.  I think that

9  that settles that issue about what side of Measure N

10  everyone is on.  But what I want to ask now is when did

11  you find out Measure N was defeated?

12       A    Well, it was a November election, so it was --

13  actually took a while after -- I don't remember,

14  honestly, Mr. Graham, how long that was.  But I know

15  that there was a period of time that we were waiting.

16  So somewhere between probably mid-November and the 1st

17  of December, if I recall.

18       MR. BECKER:  Your Honor, may I?

19       THE WITNESS:  We --

20       MR. BECKER:  Excuse me.  Sorry to interrupt.  May I

21  have a moment with counsel and speak to him, please?

22       ADMINISTRATIVE LAW JUDGE:  Okay.  We're off the

23  record.

24            (A recess was taken.)

25       ADMINISTRATIVE LAW JUDGE:  So let's go ahead and

**BEFORE THE BOARD OF TRUSTEES OF THE**
**LOMA PRIETA JOINT UNION SCHOOL DISTRICT**
**COUNTY OF CONTRA COSTA, STATE OF CALIFORNIA**
**DANETTE BROWN, ADMINISTRATIVE LAW JUDGE**

In the Matter of the District's
Reduction in Force of:
    DAVID KISSNER,

           Respondent.

OAH No.   2021040076

Volume II

**VIDEOCONFERENCE TRANSCRIPT OF PROCEEDINGS**

**TUESDAY, APRIL 27, 2021**

**8:35 A.M.**

# CERTIFIED
# COPY



Peranich Reporting
Court Reporters

**5241 E. SANTA ANA CYN. RD., #100**

**ANAHEIM HILLS, CA 92807**

**Phone:  714-637-3774**

**Fax:  714-637-3023**

REPORTER:

CAROLYN L. AUER, CSR #9891

1   subjects next year, correct?

2        A    Not promised.  I don't know if she will be

3   teaching it next year or not.

4        Q    Okay.  Do you expect her to teach those subjects

5   next year?

6        A    It depends on what's available for her to teach.

7   Right now I have two positions in 6th grade that require

8   the multiple subject credential, and I don't know precisely

9   who will be teaching that as of this moment.  I have ideas.

10  Ms. Dudley is one of those that could do it.

11       Q    Okay.  So I -- it sounds like 6th grade

12  curriculum is just in flux in terms of who's teaching

13  and --

14       A    No, the curriculum is not in flux, who's teaching

15  it is.

16       Q    Okay.  Now, this year, if we focus down, and it

17  looks like in 6th grade there is two sections of English,

18  two sections of history, two sections of science, and two

19  sections of math being taught this year, correct?

20       A    Correct.

21       Q    And next year there's going to be two sections of

22  English, two sections of history, two sections of math, and

23  two sections of science taught, correct?

24       A    In 6th grade?

25       Q    Yes.

1  including social/emotional, you know, writing in their

2  content areas, they can teach PE, when necessary.  Like,

3  there's many things that the multiple subject expert can

4  teach that a single subject person cannot.

5       Q    But he could teach 6th grade math and science in

6  that core block, correct?

7       A    Yes, he could, but it would not -- it would not

8  support my core vision of the 6th grade model.

9       Q    Okay.  And what junior teacher on the seniority

10 list are you expecting to teach 6th grade math and science

11 next year?

12      A    There are many options, so it's premature to tell

13 you which one it's going to be.

14      Q    Name some of the options.

15      A    It could be any of the multiple subject

16 credential holders.

17      Q    And you have no idea yet who you're going to

18 place in that position?

19      A    Oh, I have seven options that I'm toying with

20 that may or may not come to fruition when it actually --

21 the schedule is published.

22      Q    Can you identify those seven options?

23      A    Sure.  Ms. Grant-Richards, Ms. --

24      Q    Hold on.  Let's go slowly through this.

25           Ms. Grant-Richards, she is 6th senior.  And what

1      A    Again, I don't know what her career has been.

2      Q    But you don't know of her having any experience

3  teaching either of those subjects?

4      MS. GEORGINO:  Objection.  Asked and answered.

5      THE COURT:  Sustained.

6  BY MR. GRAHAM:

7      Q    Okay.  And moving on, who else on the seniority

8  list is someone you're considering?

9      A    I'm also considering Ms. Van Zante.

10     Q    And what is her rank on the seniority list?

11     A    Her rank is number 15.

12     Q    Okay.  I see her.

13          And does she have any -- what's she teaching

14  currently?

15     A    She currently teaches third grade.

16     Q    Does she have any experience teaching 6th grade

17  math?

18     A    I do not know the answer to that.

19     Q    But you're considering her for a position

20  teaching 6th grade math, and you don't know if she has any

21  experience teaching it, correct?

22     A    Correct.  This is about her licensing.  But if

23  she is credentialed to teach the position, I would ask her

24  to teach.

25     Q    Okay.  And do you know of her having any

```
1    experience teaching 6th grade science?
2         A    No, but it's irrelevant in that she holds the
3    licensing to teach what I would ask her to teach.
4         Q    Okay.  And who else on this list -- you said
5    seven, and I think we've talked about three so far.  Who's
6    the fourth?
7         A    Ms. Dudley.
8         Q    Okay.  And she is subject to the layoff notices,
9    correct?
10        A    That's correct.
11        Q    And so would that be a rehiring?
12        A    No, just because she's subject to layoff doesn't
13   mean it's actually happened yet, so -- and I don't know the
14   answer to that, if the layoff has actually happened.  So if
15   she's available, she's somebody that I could consider to
16   take the 6th grade position.
17        Q    And has she had any experience teaching 6th grade
18   science?
19        A    Not to my knowledge.  And, again, she is
20   credentialed for the position I would put her in.
21        Q    And does she have any experience teaching 6th
22   grade math?
23        A    Same answer.  I don't know, but she is
24   credentialed to teach math at the 6th grade level in this
25   model.
```

1   chaired the Yes on N campaign and is now sitting on the

2   board making the decisions about the budget cuts, about the

3   dismissals, et cetera, layoffs.

4       Q    Do you believe Mr. Abeln should be recused from

5   deciding your fate on this reduction in force matter?

6       A    If it was up to me, absolutely, yes.

7       Q    Are there any other board members you believe

8   might have -- might feel the same way as Abeln?

9       A    Well, to be honest, all of them, quite

10  truthfully.  We have a five-member board.  It dropped down

11  to four for a part of this year that we can talk about

12  later.  But the board was unanimous in its supporting the

13  resolution to go after a new parcel tax.  They have

14  actively campaigned, as I've mentioned.  It was a very

15  emotional and heated campaign on the mountain here, in our

16  community.  And I would say that every board member is

17  interested in seeing me go away.

18      Q    Now, Measure N was campaigned in the fall of

19  2020, correct?

20      A    Correct.  Basically, August through November 3rd,

21  which is when the election was.

22      Q    And I think we had testimony from I want to say

23  it was from Vance, Cathy Vance, that the budget advisory

24  committee notes didn't -- didn't mention any 6th grade cuts

25  at any time prior to the end of the year, right?

Case 3:22-cv-00949-CRB   Document 99-11   Filed 07/07/23   Page 1 of 3

**Admitted Q**

B1279

**c.vance@loma.k12.ca.us**

| | |
|---|---|
| From: | c.vance@loma.k12.ca.us |
| Sent: | Wednesday, February 3, 2021 5:59 PM |
| To: | Lisa Fraser |
| Subject: | Another Look at FTE at CT |
| Attachments: | Certificated FTE Proposed 21-22.xlsx |

Hi Lisa,

I am preparing the certificated position file for 21-22, and I'm still not able to reconcile the budget cuts with the draft schedule we talked about last week. I think it's because the 9.0 FTE we had as our 20-21 baseline INCLUDED the CT teacher leader .2 FTE. We should be looking at reducing the 9.0 FTE at CT by -1.2 (due to enrollment decline) - .2 teacher leader - .4 electives = -1.8 FTE reduction. 9.0 FTE – 1.8 = 7.2 FTE. This is what I'm looking for, but every way I look at it I see 7.8 FTE for next year. I know that .2 FTE is moving from Loma to CT. That still leaves .4 FTE reduction that was proposed that we won't realize. (None of this includes SPED.)

The attached might make it clearer. It did to me because my brain works in spreadsheets! So, if we want to stick with the schedule at CT that we discussed last week, we need to let the Board know that the .4 reduction in electives that we proposed on our January list of budget cuts can't be realized. (The spreadsheet doesn't print out nicely. I can print it out tomorrow.)

The bottom-line impact of this will be softened by the increased property tax projections I'm putting in. (Everything else being equal, which it never is.)

I'll be in the office tomorrow and it might be easier to discuss. I haven't shared this with Billy yet.

Cathy Vance, Chief Business Official
Loma Prieta JUESD
23800 Summit Rd
Los Gatos, CA 95033
408-353-1101 ext 5502

949

Page 183

1

**Certificated Staffing**

| | | | # sections 20-21 | 20-21 FTE | Proposed Reductions Declining Enrollment | Proposed Reductions Loss of Funding | 6th Grade Core | 21-22 FTE |
|---|---|---|---|---|---|---|---|---|
| **Gen Ed Teaching** | **Loma** | Self-contained Classrooms | | 12.0 | | -2.0 | | 10.0 |
| | CTE | ELA | 7 | 1.4 | -0.2 | | -0.4 | 1.2 |
| | CTE | Soc Studies | 7 | 1.4 | -0.2 | | -0.4 | 1.2 |
| | CTE | Math | 8 | 1.6 | -0.2 | | -0.4 | 1.4 |
| | CTE | Science | 7 | 1.4 | -0.2 | | -0.4 | 1.2 |
| | CTE | PE | 3 | 0.6 | | | | 0.6 |
| | CTE | Art | 3 | 0.6 | | -0.2 | -0.4 | 0.2 |
| | CTE | Music | 2 | 0.4 | | 0.2 | 2.0 | 0.6 |
| | CTE | Spanish | 2 | 0.4 | | | | 0.4 |
| | CTE | Electives | 5 | 1.0 | -0.4 | | | 0.6 |
| | CTE | 6th Self Contained | 1 | 0.2 | | -0.2 | -0.4 | 0.0 |
| | CTE | Teacher Leader CT | | | | | 0.0 | 0.0 |
| | CTE | Total Gen Ed at CT | | 9.0 | -1.2 | -0.4 | 0.0 | 7.4 |
| **Other Teaching** | Loma | Reading Intervention Loma | | 0.5 | | | | 0.5 |
| | Loma | Science Pullout Loma | | 0.6 | | -0.6 | | 0.0 |
| | Loma | PE Pullout Loma | | 1.0 | | | | 1.0 |
| | Loma | Music Pullout Loma | | 0.6 | | -0.2 | | |
| | | Total Other Teaching | | 2.7 | 0.0 | -0.8 | | |
| **Spec Ed Teaching** | Loma | Loma RSP | | 1.0 | | | | 1.0 |
| | CTE | CTE RSP | | 1.0 | | | | 1.0 |
| | CTE | SDC | | 1.0 | | | | 1.0 |
| | District | Speech Therapist | | 1.0 | | | | 1.0 |
| | | Total SPED Certificated | | 4.0 | 0.0 | 0.0 | | 4.0 |
| **Special Education Program & Services** | District | School Psychologist | | 0.4 | | | | 0.4 |
| **Total Certificated** | | | | 28.1 | -1.2 | -3.2 | | 23.7 |

Annotations:
- 2 Music- 1 section moved from Loma pullout
- We can't get to 7.4 with the CT schedule we discussed. See bottom of worksheet.
- 2 music pullout moved to CT



09Ɛ

B12280


Admitted Q

951



**Certificated Staffing**

**Certificated FTE From Budget Cuts List Presented to Board**

| | | Proposed Reductions Declining Enrollment | Proposed Reductions Loss of Funding | 6th Grade Core | 21-22 FTE |
|---|---|---|---|---|---|
| # sections 20-21 | 20-21 FTE | | | | |

Loss of 2 FTE Loma — -2.0
Loss of K-5 Pullout Science — -0.6
Loss of Teacher Leader at CTE — -0.2
Loss of 1.2 FTE due to enrollment decline — -1.2
Loss of two elective sections at CTE — -0.4
Total FTE Reduction we're looking for: — -4.4

-4.4 from both declining enrollment and lack of funding

**21-22 schedule at CT we discussed late January**

| | | # sections 21-22 | | | FTE 21-22 |
|---|---|---|---|---|---|
| CTE | ELA | 4 | | | 0.8 |
| CTE | Soc Studies | 4 | | | 0.8 |
| CTE | Math | 5 | | | 1.0 |
| CTE | Science | 4 | | | 0.8 |
| CTE | PE | 3 | | | 0.6 |
| CTE | Art | 2 | | | 0.4 |
| CTE | Music | 3 | | | 0.6 |
| CTE | 6th grade pullout to allow fc | 1 | | | 0.2 |
| CTE | Electives | 3 | | | 0.6 |
| CTE | 2 core 6th grades | | | | 2.0 |
| CTE | Total | | | | 7.8 |

.2 for pushin to 6th grade so one period a day of Spanish can be offered

Admitted Q

## LOMA PRIETA JOINT UNION ELEMENTARY SCHOOL DISTRICT

### RESOLUTION No. 21-XIV

### REDUCTION OR ELIMINATION OF PARTICULAR KINDS OF SERVICE

WHEREAS, the Superintendent of the Loma Prieta Joint Union Elementary School District has recommended to the Board of Trustees that the District reduce or eliminate particular kinds of service(s) no later than the beginning of the 2021-22 school year; and

WHEREAS, the Board of Trustees is required by law under California Education Code section 44949 and 44955 to take action and give notice to all certificated employees affected by any decision to reduce or to eliminate particular kinds of services prior to March 15.

**NOW, THEREFORE, BE IT RESOLVED THAT:**

A.      The Board of Trustees of the Loma Prieta Joint Union Elementary School District hereby determines to reduce or eliminate the following particular kinds of service of the District no later than the beginning of the 2021-22 school year:

      4.0 FTE grades K-8 Classroom Teaching

B.      The Board of Trustees has determined to retain the following particular kinds of service:

    1.  Mild to Moderate and Moderate to Severe Special Education Services
    2.  Language, Speech and Hearing Special Education Services
    3.  Resource Specialist Special Education Services
    4.  Multiple Subject Teaching Credential

C.      Because of the above-listed elimination and reduction of particular kinds of service, it will be necessary to reduce or to terminate, at the end of the 2020-21 school year, the employment of certain certificated employees of the District as a result of this reduction of service.

D.      The Board has considered anticipated certificated employee attrition (resignation, retirement, non-reelection, temporary teacher release, etc.). Nevertheless, it is still necessary to terminate the above referenced certificated positions.

E.      The Superintendent or designee is directed to send appropriate notices to all employees affected by the above-listed reduction and elimination of particular kinds of services in accordance with the provisions of the California Education Code and to afford the employees all rights to which they are entitled under the law and, if applicable, the Collective Bargaining Agreement.

**ER-172**

**LOMA PRIETA JOINT UNION ELEMENTARY SCHOOL DISTRICT**
**RESOLUTION No. 21-XIV**
**REDUCTION OR ELIMINATION OF PARTICULAR KINDS OF SERVICE**
Page 2 of 2

Adopted by the Loma Prieta Joint Union Elementary School District Board of Trustees on March 10, 2021, by the following vote:

AYES: 4
NOES: 0
ABSENT: 0
ABSTENTIONS: 0

Deana Arnold, Board President
March 10, 2021



**Loma Prieta**
JOINT UNION SCHOOL DISTRICT

*23800 Summit Road, Los Gatos California 95033*
*Phone: (408) 353-1101   Fax: (408) 353-8051*
*www.loma.k12.ca.us*
*Lisa Fraser, Superintendent*
*Dr. Billy Martin, Principal*

March 12, 2021

David Kissner
25059 Skyland Road
Los Gatos, CA. 95033

Re:   Notice of Intent to Layoff

Dear David:

It is with regret that I, as Superintendent, provide you with this layoff notice. Unfortunately, I found it necessary to recommend, and the Board of Education approved, a certificated employee layoff for the 2021-2022 school year that affects your employment. Please be assured that this layoff is not indicative of your abilities or performance. The reduction in particular kinds of certificated services relates solely to the welfare of the District's schools and students, given the economic realities of the District.

Specifically, on March 10, 2021, the Governing Board approved the reduction of particular kinds of services at the conclusion of the 2020-2021 school year. A copy of the Board Resolution is attached here for your convenience.

Please be assured that your receipt of this notice is not based on your performance or abilities but is based on your seniority with the District. There is no probationary or permanent certificated employee with less seniority retained who is rendering service for which you are credentialed and competent to render.

You may request a hearing to determine whether there is cause for not re-employing you for the 2021-2022 school year. A request for a hearing must be made in writing and received by me personally or by mail at the address below on or before 4:00 p.m., March 22, 2021.

Lisa Fraser
Superintendent
23800 Summit Road
Los Gatos, CA. 95033

*Board of Trustees:*
*Deana A. Arnold, President   Ron Bourque, Vice-President*
*Ben Abeln, Member   Erin Asheghian, Member*

If you fail to request a hearing on or before the date specified above, your failure to do so shall constitute a waiver of your right to a hearing. Attached is a request for a hearing form and copies of Education Code sections 44949 and 44955.

Your name will be placed on a 39-month reemployment list, and when openings arise, teachers affected by this reduction in force will be recalled in seniority order to fill openings in positions for which they are credentialed and competent to serve.

If you have any questions, please contact your local association representative or the personnel office. I appreciate everything you do for the students of our District, and thank you for your service.

Sincerely,

Lisa Fraser
Superintendent

Enclosures:   California Education Code Sections 44949 and 44955
              Request for Hearing Form
              Board Resolution - PKS
              Board Resolution - Tie Breaking Criteria



# C. T. English Middle School

SIGN IN

HOME ABOUT US PROGRAMS FOR PARENTS TEACHERS PARTNERS COVID-19 CALENDAR

CONTACT CALENDAR WED. NEWS QUESTIONS

## About Mrs. Van Zante

Hello! I am very pleased to be entering my seventh year as a teacher in this wonderful district! The transition over to being a teacher at CT English is one that I am extremely excited about. This is an incredible school which is made possible by staff, students, and parents. I am honored to be a part of it. I look forward to getting to know your kiddos as we explore 6th grade together!

**6th grade Math, Science, and Exploratory**

**Room #9**

**Email: a.vanzante@lpjusd.us**

Van Zante, Annie

- Welcome
- Back-to-School Night Information
- Class Syllabus

1  Golnar J. Fozi (Cal. Bar No. 167674)
   Daniel S. Modafferi (Cal. Bar No. 294510)
2  Fozi Dwork & Modafferi, LLP
   5942 Priestly Drive, Suite 100
3  Carlsbad, California 92008
   Tel: (760) 444-0039; Fax: (760) 444-0130
4  Email:   gfozi@fdmattorneys.com
           dmodafferi@fdmattorneys.com
5
   Attorneys for Defendants,
6  Lisa Fraser, Kevin Grier, Billy Martin, Deana
   Arnold, Ben Abeln, Ron Bourque, Charlotte
7  Khandelwal, and Erin Asheghian

8              **UNITED STATES DISTRICT COURT**

9             **NORTHERN DISTRICT OF CALIFORNIA**

10

11  DAVID M. KISSNER,                   **Case No.: 3:22-cv-00949-CRB**
                                        **Assigned to: Hon. Charles R. Breyer**
12          Plaintiff,
                                        **DEFENDANT BILLY MARTIN'S**
13       v.                             **SUPPLEMENTAL RESPONSES TO**
                                        **PLAINTIFF DAVID KISSNER'S**
14  LOMA PRIETA JOINT UNION             **INTERROGATORIES, SET ONE**
    SCHOOL DISTRICT, et al.,
15                                      **Case Filed: February 16, 2022**
            Defendants.                 **Trial Date: None Set**
16

17  PROPOUNDING PARTY:     Plaintiff, David Kissner

18  RESPONDING PARTY:      Defendant, Billy Martin

19  SET NUMBER:            One

20        **SUPPLEMENTAL RESPONSES TO INTERROGATORIES**

21  **Interrogatory No. 4:**

22       Explain what you were informed and believe to be the basis for Propounding

23  Party's layoff.

24  **Response to Interrogatory No. 4:**

25       Objection. Legislative privilege. Closed session privilege. This interrogatory is

26  not relevant to any party's claim or defense in this case. (FRCP 26(b)(1).) Lack of

27  personal knowledge. Privacy. Third party privacy. Attorney-client privilege.

28  ///

                                    1

1  **Supplemental Response to Interrogatory No. 4:**

2    Objection. Legislative privilege. Closed session privilege. This interrogatory is

3  not relevant to any party's claim or defense in this case. (FRCP 26(b)(1).) Lack of

4  personal knowledge. Privacy. Third party privacy. Attorney-client privilege. Subject

5  to, and without waiving, the foregoing objections, responding party responds as

6  follows:

7    Responding party cannot speak for the mental processes or motivations of

8  Board members, as to do so would require speculation and could violate the legislative

9  privilege and/or closed session privilege. To the extent responding party has his own

10  understanding as to the reasons plaintiff was laid off, responding party is informed

11  and believes that the reduction in force was recommended by the Budget Advisory

12  Committee, following extensive review and consideration of input.

13  **Interrogatory No. 5:**

14    Explain why the District subjected Kelli Cole to a Reduction in Force and hired

15  Nick Morris for the 2021-2022 school year.

16  **Response to Interrogatory No. 5:**

17    Objection. Compound. Legislative privilege. Closed session privilege. This

18  interrogatory is not relevant to any party's claim or defense in this case. (FRCP

19  26(b)(1).) Lack of personal knowledge. Privacy. Third party privacy. Assumes facts.

20  **Supplemental Response to Interrogatory No. 5:**

21    Objection. Compound. Legislative privilege. Closed session privilege. This

22  interrogatory is not relevant to any party's claim or defense in this case. (FRCP

23  26(b)(1).) Lack of personal knowledge. Privacy. Third party privacy. Assumes facts.

24  Subject to, and without waiving, the foregoing objections, responding party responds

25  as follows:

26    Ms. Cole ultimately was not subjected to a reduction in force. Ms. Cole

27  voluntarily separated from the school district for personal reasons. Mr. Morris had

28  previously served as a long-term substitute teacher for the elementary school, and

1  when a position became available for a full-time elementary school teacher, Mr.
2  Morris was hired for that position.

3  **Interrogatory No. 6:**

4       Explain the criteria you used to select Annie Van Zante to teach 6th grade math
5  and science for the 2021-2022 school year.

6  **Response to Interrogatory No. 6:**

7       Objection. Legislative privilege. Closed session privilege. This interrogatory is
8  not relevant to any party's claim or defense in this case. (FRCP 26(b)(1).) Lack of
9  personal knowledge. Privacy. Third party privacy. Assumes facts.

10  **Supplemental Response to Interrogatory No. 6:**

11       Objection. Legislative privilege. Closed session privilege. This interrogatory is
12  not relevant to any party's claim or defense in this case. (FRCP 26(b)(1).) Lack of
13  personal knowledge. Privacy. Third party privacy. Assumes facts. Subject to, and
14  without waiving, the foregoing objections, responding party responds as follows:

15       Responding party cannot reasonably recall every criterion used to select a given
16  teacher for a given position. Generally, responding party recalls that Ms. Van Zante
17  requested that she be assigned to teach 6th grade math and science for the 2021-2022
18  school year, and she had a multi-subject credential, which permitted her to do so.

19  **Interrogatory No. 7:**

20       Explain the criteria you used to select Adelia Rowland and Michelle Ignoffo to
21  teach 6th grade math and science for the 2022-2023 school year.

22  **Response to Interrogatory No. 7:**

23       Objection. Compound. Legislative privilege. Closed session privilege. This
24  interrogatory is not relevant to any party's claim or defense in this case. (FRCP
25  26(b)(1).) Lack of personal knowledge. Privacy. Third party privacy. Assumes facts.

26  **Supplemental Response to Interrogatory No. 7:**

27       Objection. Compound. Legislative privilege. Closed session privilege. This
28  interrogatory is not relevant to any party's claim or defense in this case. (FRCP

3

1   26(b)(1).) Lack of personal knowledge. Privacy. Third party privacy. Assumes facts.

2   Subject to, and without waiving, the foregoing objections, responding party responds

3   as follows:

4          Responding party has made a good faith and reasonable inquiry in an effort to

5   obtain responsive information, however, the information known or reasonably

6   obtainable by responding party is insufficient to permit responding party to respond

7   to the interrogatory, as responding party was no longer serving as Principal in the

8   2022-2023 school year.

9   **Interrogatory No. 8:**

10         Explain why the District hired an intern to teach 6th grade math and science for

11  the 2022-2023 school year.

12  **Response to Interrogatory No. 8:**

13         Objection. Legislative privilege. Closed session privilege. This interrogatory is

14  not relevant to any party's claim or defense in this case. (FRCP 26(b)(1).) Lack of

15  personal knowledge. Privacy. Third party privacy. Assumes facts.

16  **Supplemental Response to Interrogatory No. 8:**

17         Objection. Legislative privilege. Closed session privilege. This interrogatory is

18  not relevant to any party's claim or defense in this case. (FRCP 26(b)(1).) Lack of

19  personal knowledge. Privacy. Third party privacy. Assumes facts. Subject to, and

20  without waiving, the foregoing objections, responding party responds as follows:

21         Responding party has made a good faith and reasonable inquiry in an effort to

22  obtain responsive information, however, the information known or reasonably

23  obtainable by responding party is insufficient to permit responding party to respond

24  to the interrogatory, as responding party was no longer serving as Principal in the

25  2022-2023 school year.

26  **Interrogatory No. 9:**

27         Do you contend that all 6th grade students remained with the same section of

28  fellow students throughout their core classes (math, science, language arts, and social

4

1   studies) in 2021-2022?

2   **Response to Interrogatory No. 9:**

3        Objection. This interrogatory is not relevant to any party's claim or defense in

4   this case. (FRCP 26(b)(1).) Lack of personal knowledge. Privacy. Third party privacy.

5   **Supplemental Response to Interrogatory No. 9:**

6        Objection. This interrogatory is not relevant to any party's claim or defense in

7   this case. (FRCP 26(b)(1).) Lack of personal knowledge. Privacy. Third party privacy.

8   Subject to, and without waiving, the foregoing objections, responding party responds

9   as follows:

10       The interrogatory mischaracterizes the nature of the core classroom model the

11  school district used at the 6th grade level for the 2021-2022 school year. The school

12  district did, in fact, use a core classroom model for that school year. It involved one

13  teacher teaching 6th grade math and science classes and a second teacher teaching

14  language arts and social studies classes.

15  **Interrogatory No. 10:**

16       Do you contend that all 6th grade students remained with the same section of

17  fellow students throughout their core classes (math, science, language arts, and social

18  studies) in 2022-2023?

19  **Response to Interrogatory No. 10:**

20       Objection. This interrogatory is not relevant to any party's claim or defense in

21  this case. (FRCP 26(b)(1).) Lack of personal knowledge. Privacy. Third party privacy.

22  **Supplemental Response to Interrogatory No. 10:**

23       Objection. This interrogatory is not relevant to any party's claim or defense in

24  this case. (FRCP 26(b)(1).) Lack of personal knowledge. Privacy. Third party privacy.

25  Subject to, and without waiving, the foregoing objections, responding party responds

26  as follows:

27       Responding party has made a good faith and reasonable inquiry in an effort to

28  obtain responsive information, however, the information known or reasonably

1    obtainable by responding party is insufficient to permit responding party to respond
2    to the interrogatory, as responding party was no longer serving as Principal in the
3    2022-2023 school year.

4    Dated: June 26, 2023                          Fozi Dwork & Modafferi, LLP

5

6                                        By:    /s/ Daniel S. Modafferi
7                                               Golnar J. Fozi
                                                Daniel S. Modafferi
8                                               Attorney for Defendants,
                                                Lisa Fraser, Kevin Grier, Billy Martin,
                                                Deana Arnold, Ben Abeln, Ron Bourque,
9                                               Charlotte Khandelwal, and Erin
10                                              Asheghian

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

6

3:22-cv-00949-CRB

**ER-182**

1   Re:   *David M. Kissner v. Loma Prieta Joint Union School District, et al.*
2         U.S. District Court Case No. 3:22-cv-00949-CRB

3                                    **VERIFICATION**

4         I, Billy Martin, declare that:

5         I am a defendant in the above-entitled matter;

6         I have read the foregoing Defendant Billy Martin's Supplemental Responses to

7   Plaintiff David Kissner's Interrogatories, Set One;

8         The responses contained in these documents are based upon my own personal

9   knowledge and/or information that has been supplied by my counsel or other agents

10  and/or compiled from available documents and is therefore provided as required by

11  law;

12        The responses in said documents are true, except as to the matters which were

13  provided by my attorneys or other agents or compiled from available documents,

14  including all contentions and opinions, and, as to those matters, I am informed and

15  believe that the responses based upon such information are true.

16        I declare under penalty of perjury under the laws of the United States of

17  America that the foregoing is true and correct to the best of my knowledge and belief.

18        Executed June 26 , 2023, in Santa Clara            , California.

19

20                                    _____

21                                    Billy Martin, Defendant

22

23

24

25

26

27

28

                                          7

Declaration of Service

I, the undersigned, declare: That I am over the age of eighteen years and not a party to the case; I am employed in, and am a resident of, the County of San Diego, California, where the service occurred; and my business address is: 5942 Priestly Drive, Suite 100, Carlsbad, California 92008.

On June 26, 2023, I served the following documents: **DEFENDANT BILLY MARTIN'S SUPPLEMENTAL RESPONSES TO PLAINTIFF DAVID KISSNER'S INTERROGATORIES, SET ONE; DECLARATION OF SERVICE**, in the following manner:

☐          By personally delivering copies to the person served.

☐          By placing a copy in a separate envelope, with postage fully prepaid, for each addressee named below and depositing each in the U.S. Mail at Carlsbad, California.

☒          By electronic service, in accordance with the Federal Rules of Civil Procedure and the rules governing the electronic service of documents in the United States District Court for the Northern District of California, as to the following parties:

William J. Becker, Jr.
Freedom X
11500 Olympic Boulevard, Suite 400
Los Angeles, California 90064
Email:  freedomxlaw@gmail.com
Counsel for Plaintiff, David M. Kissner

I declare under penalty of perjury, pursuant to the laws of the United States of America and the State of California, that the foregoing is true and correct. Executed June 26, 2023, in Carlsbad, California.

By: /s/ Daniel S. Modafferi
Email: *dmodafferi@fdmattorneys.com*

3:22-cv-00949-CRB

LOMA PRIETA JOINT UNION SCHOOL DISTRICT

TITLE: _____ Approve Personnel Report _____

BOARD MEETING OF: ____ June 16, 2021 _____

ACTION: _____ CONSENT: _____ X ____ INFORMATION: _____

SIGNATURE REQUIRED: _____ ORIGINAL ATTACHED: _____ X ____

**BACKGROUND:**

Attached is the Personnel Report for June 2021.

**FISCAL IMPLICATIONS:**

                                                (FISCAL VERIFICATION): _____

**RECOMMENDATION:**

Approve Personnel Report number 06/16/21.

Presented by:

_____
Lisa Fraser
Superintendent

8.1 encl. # 11

LOMA PRIETA JUESD                                  June 16, 2021

## PERSONNEL REPORT NO. 06/16/21

### CERTIFICATED EMPLOYMENT

| | | |
|---|---|---|
| Benson, Sylvia | Translations and Engagement For EL Families/NTE $10,000 | 08/12/21-06/02/22 |
| Bowen, Michelle | LPS/3rd Grade 0.5 FTE Personal Leave | 08/09/21-06/02/22 |
| Callaghan, Andrea | LPS/3rd Grade 0.5 FTE/Temporary Shared contract with M. Bowen | 08/09/21-06/02/22 |
| DePiazza, Elizabeth | LPS/1st Grade 1.0 FTE/Permanent | 08/09/21-06/02/22 |
| Dudley, Melanie | CTE/6th Grade ELA/Social Studies/1.0 FTE Temporary | 08/09/21-06/02/22 |
| Farwell, Joseph | ESY Teacher 19 Days/Temporary | 06/14/21-07/09/21 |
| Grier, Kevin | Superintendent | 07/01/21-06/30/24 |
| Lanovaz, Nancy | CTE Athletic Director $10,000 Stipend | 07/01/21-06/30/22 |
| Martin, Billy | Principal 1.0 FTE | 07/01/21-06/30/22 |
| Morris, Donald | LPS/3rd Grade 1.0F FTE/Temporary | 08/09/21-06/02/22 |
| O'Dea, Helen | CTE Art/0.6 FTE Temporary | 08/09/21-06/02/22 |
| Rocabado, Jennifer | LPS/CTE School Psychologist 0.4 FTE/Permanent | 08/12/21-06/02/22 |

Page 206

| Zanotto, Kendra | LPS/4th Grade<br>1.0 FTE/Temporary | 08/09/21-06/02/22 |

**FINALIZE REDUCTION IN FORCE**

| Cole, Kelli | LPS/5th Grade<br>1.0 FTE | 06/04/21 |
| Kissner, David | CTE/6, 7 & 8th Grade<br>Math/Science/1.0 FTE | 06/04/21 |
| Lanovaz, Nancy | CTE/6, 7 & 8th Grade<br>Science/0.4 FTE | 06/04/21 |

**RETIREMENT**

| Fraser, Lisa | Superintendent | 07/01/21 |

**CLASSIFIED EMPLOYMENT**

| Ammirati, Sharon | Library Technician<br>CTE/0.487 FTE | 07/01/21-06/30/22 |
| Arnold, Zoe | Day care 1<br>Hourly | 06/17/21 |
| Bevans-Franks, Eileen | Admin. Assistant to the Superintendent<br>1.0 FTE | 07/01/20-12/31/21 |
| Chapa, Andreea | Health and Safety Clerk<br>0.5 FTE | 08/11/21/-06/02/22 |
| Chapa, Andreea | Day care 1<br>Hourly | 08/12/21-06/02/22 |
| Epperly, Tiffany | ESY Paraeducator 1<br>19 Days | 06/14/21-07/09/21 |
| Fichthorn, Nicole | Webmaster<br>$5,000 Stipend | 07/01/21-06/30/22 |
| Fichthorn, Nicole | Library Technician<br>LPS/0.45 FTE | 07/01/21-06/30/22 |

| Freiri, Bridget | Day Care Director<br>1.0 FTE | 07/01/21-06/30/22 |
| Gillot, Akiko | Paraeducator 1<br>LPS/0.725 | 08/12/21-06/02/22 |
| Grabeel, Jodene | Payroll/Personnel Specialist<br>Hourly | 07/01/21-06/30/22 |
| Harville, Paul | Director of Facilities and Maintenance<br>1.0 FTE | 07/01/21-06/30/22 |
| Kinsella, Jette | Payroll/Personnel Specialist<br>0.80 FTE | 07/01/21-06/30/22 |
| Levenhagen, T.J. | Computer/Electronics Technician<br>0.5 FTE | 08/09/21-06/03/22 |
| Ljepava, Staci | Director of Special Education and<br>Student Services<br>1.0 FTE | 07/01/21-06/30/22 |
| Miller, Nicholas | Day care 1<br>Hourly | 06/17/21 |
| Smrt, Patty | Director of Transportation<br>1.0 FTE | 07/01/21-06/30/22 |
| Vance, Cathy | Chief Business Official<br>1.0 FTE | 07/01/21-06/30/22 |

**INDEPENDENT CONTRACTORS**

| Easwara, Christa | Occupational Therapist<br>NTE $1,000 | 06/14/21-07/09/21 |
| Gomez-Batrez, Adrienne | Speech/Language Pathologist<br>$125/hour - NTE $5,000* | 04/06/21-07/09/21 |
| Helsing, Kelly | School Psychologist/<br>Clinical Intern/NTE $10,000 | 07/01/21-06/30/22 |

*Increase of $3,000 to support speech services during ESY

Page 208

**LOMA PRIETA JOINT UNION ELEMENTARY SCHOOL DISTRICT**
**REGULAR BOARD MEETING**
June 16, 2021
Loma Prieta Elementary School Forum

BOARD MEMBERS:
Deana Arnold
Ron Bourque
Ben Abeln
Erin Asheghian
Charlotte Khandelwal

BOARD MEMBERS ABSENT:      None

SECRETARY PRESENT:      Lisa Fraser

ROLL CALL TO ORDER:      6:00 p.m.

**Approval of Agenda**                                      Approved 5-0
A **MOTION** was made by Ms. Asheghian and seconded by Mr. Abeln to approve the
agenda as presented.
**Public Concerns** – None
**Closed Session Report** – Ms. Arnold reported the Board addressed a public employee
discipline/dismissal/release/resignation issue in closed session and is unable to comment
on the matter at this time.  She reported the Board completed their final performance
evaluation of Superintendent Lisa Fraser and discussed CTALP and CSEA negotiations
with lead negotiator, Lisa Fraser.
**Written Correspondence** – None.
**Public Comment** – None.

**CONSENT ITEMS**                                      Approved 5-0
A **MOTION** was made by Ms. Khandelwal and seconded by Mr. Abeln to approve the
consent items including personnel report number 06/16/21; open purchase orders from
July 1, 2020 through May 31, 2021, in the encumbered amount of $959,751.66,
liquidated amount of $633,889.74, with a balance of $325,861.92; warrants for the month
of May in the amount of $132,390.82; adoption of resolution #21-XXIX in appreciation
of the service of Superintendent Lisa Fraser; approval of employment contracts for K-8
Principal, CBO, Daycare Director, Director of Facilities and Maintenance, Director of
Student Services/Special Education, Director of Transportation, Payroll/Personnel
Specialist, and Administrative Assistant to the Superintendent; approval of an annual
legal services agreement with Santa Clara County Counsel; approval of an MOU for
small school district support services between the Santa Clara County Office of
Education and the District; approval of an agreement for a 1% off-salary schedule stipend
to management, confidential and administrative staff; ratification of a contract with
Sound and Signal in the amount of $25,950 that will be funded through the second
issuance of Measure R bond funds; and approval of an amendment to the 2020-21 K-8
Principal employment contract.

8.4  Encl. #9

Page 172

6/30/21



## 2021-22 Adopted Budget
### June 16, 2021

Summary of General Fund

2021-22 Projected Revenues and Expenditure Assumptions
- Enrollment Projections
- Unrestricted State Revenues
  - Local Control Funding Formula (LCFF)
  - Property Taxes
  - Continuing Basic Aid Status
- Unrestricted Local Revenues
- Special Education Revenues
- Federal, State and Local Restricted Revenues
- Expenditure Assumptions
- 21-22 On-Going Budget Reductions
- Temporary Restoration
- Fund Balances & Reserves
- Summary of Changes and SACS Categories

1

---

### Summary of General Fund

|  | 2020-21 Projected | 2021-22 Projected | 2022-23 Projected | 2023-24 Projected |
|---|---|---|---|---|
| Total Revenues | $7,534,929 | $7,520,798 | $7,122,017 | $7,262,453 |
| Total Expenses & Uses | 7,873,165 | 7,693,742 | 7,336,679 | 7,151,607 |
| Net | (338,236) | (202,454) | (0) | 110,846 |
| Budget Reductions (*) |  |  | (214,662) |  |
| Ending Balance | 1,549,019 | 1,346,565 | 1,346,565 | 1,457,411 |
| Unassigned Balance | 867,127 | 920,315 | 979,264 | 1,096,825 |
| Unrestricted Reserves | 11.0% | 11.9% | 13.7% | 15.3% |

Multi-year projections are not forecasts or predictions. The assumptions used to project revenues and expenses are described in this presentation. Projections are expected to change as various factors change.

* Ongoing budget reductions were implemented in the 2021-22 budget. Some of the cuts have been restored with LPEF and COVID relief funding, for one year only. Deeper ongoing budget cuts are necessary in 2022-23 to meet financial sustainability goals by the end of 2022-23.

2

2

**Expenditure Assumptions**
**Certificated Positions**

Staffing costs are planned using "fulltime equivalents." These staffing assumptions are built into the MYP in the certificated salaries and benefits expense categories.

| | 2019-20 | | 2020-21 | | 2021-22   (1) | | 2022-23  (2) | |
|---|---|---|---|---|---|---|---|---|
| | On-Going | Temp | On-Going | Temp | On-Going | Temp | On-Going | Temp |
| Lorna Teaching | 12.0 | 2.7 | 12.0 | 2.7 | 12.0 | 2.7 | 10.0 | 2.1 |
| Budget Cuts | | | | | -2.0 | -0.6 | | |
| Temp Restored LPEF | | | | | | +2.6 | | |
| CT Teaching | 9.2 | 1.4 | 8.4 | .6 | 7.2 | .6 | 7.2 | .4 |
| Budget Cuts | | | | | | -.2 | | |
| Temp COVID | | | | | | +.8 | | |
| Temp LPEF | | | | | | +.2 | | |
| Special Ed | 4.4 | 0.0 | 4.4 | 0.0 | 4.4 | 0.0 | 4.4 | 0.0 |
| Total Teachers | 29.7 | | 28.1 | | 27.7 | | 24.1 | |
| Administrators | 3.0 | | 3.0 | | 3.0 | | 3.0 | |

(1) The on-going certificated staffing in 2021-22 and 2022-23 has been reduced to show identified budget reductions. The temporary positions have been increased to show restored and new positions funded by LPEF and AB 86 grants.
(2) Further cuts are necessary in 2022-23 to balance the budget and maintain a 12% reserve. These have not been identified yet and may impact the certificated staffing in 22-23.

In addition, there are budgets for substitute teachers, professional development days, and teacher release days for curriculum and assessment planning to enhance and measure student success, as described in the Local-Control Accountability Plan.       23

23

**Expenditure Assumptions**
**Classified Positions**

Staffing costs are planned using "fulltime equivalents."

| | 2020-21 | 2021-22 (after reductions) | 2021-22 restoration & COVID grants (one-year) |
|---|---|---|---|
| School Offices (School Secretaries, Health Clerk, Library Clerks, Youth Leaders) | 5.063 | 4.113 | +0.95 |
| Paraeducators | 6.541 | 5.840 | +1.45 |
| Maintenance & Operations | 3.0 | 3.0 | |
| Technology | 1.5 | 1.0 | +0.50 |
| Business Office | 0.3 | 0.3 | |
| Bus Drivers | 1.125 | 1.125 | |
| Total Classified | 17.529 | 15.378 | |
| Management & Confidential | 5.8 | 5.8 | |
| Total | 23.329 | 21.178 | 24.078 |

In addition, there are budgets for substitutes, temporary hourly help, and after school care. Further cuts are necessary in 2022-23 and may impact the classified staffing.       24

24

**ER-191**

6/30/21

---

**Expenditure Assumptions (cont)**

*Ongoing reduction of library books and contracted services in technology support, maintenance and operations and districtwide consultants effective 2021-22.*

Some one-time grants are not included in the 21-22 projections. These include Top Hat and the Lions Club grant. They will be incorporated into a budget revision when they are awarded.

Carryover balances from 19-20 grants such as REAP and the Low Performing Students Block Grant have been carried over in 20-21. At this time, no carryovers are projected into 21-22. There may be significant carry overs of COVID relief grants from 20-21 to 21-22. Unspent balances inflate the fund balance as of 6/30/21. When the carryovers are budgeted, the fund balances are reduced again.

27

---

27

---

## On-Going Budget Reductions 2021-22

| Program/Position | Reduction Realized Unrest & Rest GF | Certificated FTE | Classified FTE |
|---|---|---|---|
| Loma Science | | -0.6 | |
| Teacher Leader @ CTE .2 FTE | | -0.2 | |
| Teacher Leader stipends | | | |
| Teaching FTE Reduction @ Loma (to 10 gen ed classrooms) | | -2.0 | |
| Total Certificated | $260,288 | | |
| Part-time library clerk | | | -0.45 |
| Youth Leader supporting kindergarten | | | -0.5 |
| Reduce paraeducators to 29 hrs/week | | | -0.2 |
| Summer Custodial hourly reduction | | | |
| General Education Paraeducator | | | -0.5 |
| Technology Support - reduction by 50% | | | -0.5 |
| Total Classified | $110,638 | | |
| 1% Rollback of Salary & benefits admin/conf/mngt | $13,058 | | |
| Instructional materials reduce $10/student | $5,000 | | |
| Library budget | $5,400 | | |
| Contracted Services Tech | $10,000 | | |
| Contracted Services M&O | $7,000 | | |
| Consultants in DO | $5,000 | | |
| | 416,383 | -2.8 | -2.15 |
| Retain $25K contribution previously made to Def Maint Fd 140 | 25,000 | | |
| Total Reduction to meet $428K target | 441,383 | | |
| -1.2 FTE reduction due to declining enrollment at CT | 110,651 | -1.2 | |
| | 552,034 | | |
| Total FTE Reduced | | -4.0 | -2.15 |

28

---

Page 175

**ER-192**

```
 1            BEFORE A COMMISSION ON PROFESSIONAL COMPETENCE

 2            LOMA PRIETA JOINT UNION SCHOOL DISTRICT

 3                     COUNTY OF SANTA CLARA

 4                     STATE OF CALIFORNIA

 5         JULIET E. COX, ADMINISTRATIVE LAW JUDGE

 6

 7

 8

 9  In the Matter of:          )
                               )
10  David Kissner,             )
    A Permanent Certificated   )
11  Employee,                  )
                               )  OAH No. 2021050291
12            Respondent.      )
                               )  VOLUME VII
13                             )
                               )
14                             )

15

16            TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS,

17       taken remotely via Microsoft Teams, commencing

18       at 9:00 a.m. and adjourning at 4:41 p.m., on

19       Wednesday, October 13, 2021, heard before

20       JULIET E. COX, Administrative Law Judge, and a

21       Commission on Professional Competence, reported

22       by Marie M. Mellgren, CSR No. 9442, a Certified

23       Shorthand Reporter in and for the State of

24       California.

25
```

**PERANICH REPORTING, INC.**      **(800) 956-4784**                    **(714) 637-3774**

```
 1  BY MR. BECKER:
 2      Q.   So were there other factors that lead you to
 3  believe that the District is retaliating against you?
 4      A.   Yes.
 5           Starting with the timing of everything that
 6  occurred since I notified Ms. Fraser of my intent to
 7  campaign against the tax measure.
 8           I'll highlight again that I had no discipline
 9  issues.  I had no parent complaints about my
10  professional practice prior to this time.
11           And I notified Ms. Fraser in December of
12  2019.  And what happened immediately after that was
13  that -- first of all, Ms. Fraser sat on some allegation
14  regarding Student J.C. for five months.  And that was
15  during that time.
16      Q.   Can I just direct you to that exhibit?
17           Well, okay.  So there were allegations about
18  D.C.
19           At what period of time in 2020?
20      A.   It was early No- -- it was November of 2019,
21  actually, that she became aware.  Now I wasn't aware
22  because she didn't tell me.
23           But she became aware, according to her own
24  statement, her own letter, in early November of 2019.
25           Then in December, I told her I'm going to
```

OFFICE OF ADMINISTRATIVE HEARINGS CLERK'S RECORD FOR OAH CASE NO. 2021050291

Admitted R23

B248

| Board Members | Superintendent |
|---|---|
| Deana Arnold, President | Lisa Fraser |
| Kerrie Mills, Vice-President | |
| Ben Abeln, Member | |
| Ron Bourque, Member | |
| Alexandra Hall, Member | |



**REGULAR BOARD MEETING – BOARD OF TRUSTEES**
**February 12, 2020 – Wednesday**
**23800 Summit Road – Loma Prieta Elementary School Forum**

**Mission Statement:**
Loma Prieta Joint Union School District, a partnership of schools, parents and community, is committed to providing each student with optimal learning opportunities in a safe, stimulating and supportive environment so that each student can reach their full academic and social potential.

*We welcome you to this meeting. The public may ask questions relevant to agenda items at the time those are under consideration. While not required, we would appreciate it if you would identify yourself with your name and address when addressing the Board. Complete a red Public Comment Card to address the Board during this board meeting. Complete a green Public Comment Card to request a written response from the board. Fifteen minutes are allowed for the Public to address the Board on an item that is not on the agenda during the opportunity for Public Comment. Speakers are asked to limit remarks to three minutes. The Board will take no action at this time. The Board may put the issue on a future agenda for more discussion and/or action, or may refer the issue to the administration for follow-up.

**AGENDA**

1. **CALL TO ORDER** – 6:00 p.m.
   1.1     Roll Call
   1.2     Approval of Agenda
   1.3     Public Concerns (An opportunity for the public to comment or address the Board on issues to be discussed in Closed Session)

2. **RECESS TO CLOSED SESSION** – Personnel, Negotiations, Legal Matters
   (Pursuant to Gov't Code Section 54954.2, closed sessions are not open to the public and may only be held for negotiations discussion, employment or dismissal of an employee, disciplinary matters relative to student(s) or employee(s), meeting with legal counsel on pending or anticipated litigation, emergency situations and other exceptions as provided by the law, including Government Code sections 54957 and 54957.6.)
   2.1      Conference with Legal Counsel - Anticipated Litigation

3. **OPEN REGULAR SESSION CALL TO ORDER** – 7:00 p.m.
   3.1     Flag Salute
   3.2     Correspondence – Written
   3.3     Public Comment (see above*)
   3.4     Closed Session Report
   3.5     Approve Consent Items

4. **RECOGNITION**
   4.1     Student Leadership:  CT English ASB Officers - Rachel Stephens, Alexis Dorn, Avelene Celinski, Helena Cramer, Anna Maria Malkos, Holly Hulewat (Advisor); Loma Prieta Student Council Officers – Shyla Werdebaugh, Sophie Riese, Grace Murray, Payton Steffen, Lisa Sullivan (Advisor).

5. **REPORTS**
   5.1     Board of Trustees
   5.2     Staff:        - Lisa Fraser          - District business, organizations and accomplishments
                          - Karren Zook          - School business, organizations and accomplishments
                          - Cathy Vance          - District and State Budget update
                          - Paul Harville        - Facilities and maintenance update
   5.3     LPTA:         - Kat Ray              - Teachers Association update
   5.4     CSEA:         - April Fulton         - Classified Employees Association update
   5.5     LPEF:         - Diane Tosetti        - Education Fund update
   5.6     Building Blocks: - Nicole Gomez       - Preschool update

B248

007447

Admitted R23

B249

**6.    DISCUSSIONS/ACTION ITEMS**

6.1    Discuss Results of Special Education Program Survey                                encl. # 1
       Following a study of the District special education program, representatives of School Services of California
       will present the results of their survey.

6.2    Discuss/Approve Fire Safe Council Fire Protection Project                          encl. # 2
       Staff will provide an overview of the Fire Safe Council plan for Loma Prieta school properties as designed by the
       Loma Prieta Fire Safe public roads community project, which would make a shaded fuel break along Summit
       Road.

6.3    Budget Advisory Committee Update
       Staff will present the outcomes following the January monthly meeting of the Superintendent's Budget
       Advisory Committee.

6.4    Review/Approve 2019-20 Certificated Seniority List                                 encl. # 3
       Staff will present the certificated seniority list delineating years of service, credentials, etc.

6.5    Discuss/Adopt Res. #20-XIII – Establishment of Criteria for Order of Certificated Layoff   encl. # 4
       and Reemployment for Employees with Equal Seniority
       The Board may adopt a resolution outlining the process of identifying layoff "tie-breaker criteria" in the event
       of a reduction of service.  This is an annual formality followed in case of an unforeseen event, which would
       require the reduction of a particular kind of service.  This process establishes the layoff criteria to be used if
       necessary.

6.6    Discuss 20-2021Transitional Kindergarten Program
       Staff will present options for consideration for the Transitional Kindergarten program in the next school year.
       The Scotts Valley Unified School District program has been supporting Loma students for the last four years.
       Fiscal and instructional implications will be discussed.  Staff will be seeking direction from the Board as next
       year's instructional plan is finalized.

6.7    Discuss/Adopt Revised Board Policy 4119.21, 4219.21, 4319.21 – Professional Standards   encl. # 5
       The Board will review the current board policy to align with current California School Boards Association board
       Policy.

6.8    Discuss/Adopt Exhibit 4119.21 – Professional Standards Code of Ethics               encl. # 6
       In accordance with Board Bylaw 9310, this Exhibit is presented for Board adoption.

6.9    Discuss/Approve Comprehensive Safety Plan                                          encl. # 7
       The Superintendent will provide a draft framework of the updated Comprehensive District Safety Plan.

6.10   Discuss Proposition 39 California Clean Energy Jobs Act Summary of Project Costs    encl. # 8
       Staff will present expenses incurred during the District participation in the clean energy program.

---

Action on all "Consent Agenda" items will be acted upon in one motion unless a Board Member or the Superintendent
requests that any such items be removed from the Consent Agenda for discussion by Trustees or any interested party.

---

**7.    CONSENT SESSION**

7.1    Approve Personnel Report                                                           encl. # 9
       (Resignations, Hiring, Consultants, Independent Contractors, Hourly Projects)

7.2    Approve Warrants – January 2020                                                    encl. # 10

7.3    Approve Open Purchase Orders – July 1, 2019 Through January 31, 2020               encl. # 11

7.4    Approve Minutes – December 11, 2019 Regular Board Meeting                          encl. # 12

7.5    Approve Minutes – January 15, 2020 Regular Board Meeting                           encl. # 13

7.6    Certify Corrective Action to 2018-19 Audit Findings                               encl. # 14

7.7    Approve Agreement with Clifford Moss LLC                                           encl. # 15
       The Measure H special parcel tax assessment expires at the end of the 2020-21 school year.  Revenues from this
       parcel tax are used to maintain outstanding core academic education programs, retain highly qualified teachers and
       prepare our students for a rigorous high school experience.  Administration would like to ask the feasibility of
       renewing this special assessment.  Clifford Moss LLC has effectively supported the District through previous
       strategic assessment, communications and planning services.  This contract is a flat rate amount of $25,000 to
       provide services leading up to a Board resolution for a ballot measure.

7.8    Ratify TK Program MOU between Scotts Valley Unified School District and LPJUSD      encl. # 16

7.9    Accept Donations                                                                  encl. # 17

7.10   Approve Contract with Paul Mooney Inspection Services                              encl. # 18
       The track and field project requires oversight from the Division of the State Architect and requires a DSA
       inspector of record.  This contract, with an estimated total cost of $32,000, will be supported by the Measure R
       bond.

B249

007448

**Admitted R23**

B250

| | | | |
|---|---|---|---|
| 7.11 | <u>First Reading/Adopt Board Policy 3515.7 – Firearms on School Grounds</u> | | encl. # 19 |
| | This policy is referred to in revised BP 4119.21. | | |
| 7.12 | <u>First Reading/Adopt Board Policy 4158, 4258, 4358 – Employee Security</u> | | encl. # 20 |
| | This policy is referred to in revised BP 4119.21. | | |
| 7.13 | <u>First Reading/Adopt Board Policy 5131.2 - Bullying</u> | | encl. # 21 |
| | This policy is referred to in revised BP 4119.21. | | |
| 7.14 | <u>First Reading/Adopt Board Policy 3513.4 – Drug and Alcohol Free Schools</u> | | encl. # 22 |
| | This policy is referred to in revised BP 4119.21. | | |
| 7.15 | <u>First Reading/Adopt Board Policy 4112.41, 4212.41, 4312.41 – Employee Security</u> | | encl. # 23 |
| | This policy is referred to in revised BP 4119.21. | | |
| 7.16 | <u>First Reading/Adopt Board Policy 4119.22 – Dress and Grooming</u> | | encl. # 24 |
| | This policy is referred to in revised BP 4119.21. | | |
| 7.17 | <u>First Reading/Adopt Administrative Regulation 4117.7, 4317.7 – Employment Status Reports</u> | | encl. # 25 |
| | This policy is referred to in revised BP 4119.21. | | |
| 7.18 | <u>First Reading/Adopt Board Policy 0460 – Local Control And Accountability Plan</u> | | encl. # 26 |
| | This policy is referred to in BP 5131.2 above. | | |

**8.     FUTURE MEETING DATES**

| | | | |
|---|---|---|---|
| 8.1 | Wednesday, February 26, 2020 | 6:30 p.m. – Budget Study Session | Forum |
| 8.2 | Wednesday, March 11, 2020 | 7:00 p.m. – Regular Session | Forum |
| 8.3 | Wednesday, April 15, 2020 | 7:00 p.m. – Regular Session | Forum |
| 8.4 | Wednesday, May 6, 2020 | 6:30 p.m. – Budget Study Session | Forum |
| 8.5 | Wednesday, June 17, 2020 | 7:00 p.m. – Regular Session | Forum |
| 8.6 | Wednesday, August 19, 2020 | 7:00 p.m. – Regular Session | Forum |

**9.     ADJOURNMENT**

Individuals requiring special accommodations (American Sign Language interpreter, accessible seating, documentation in accessible formats, etc.) should contact the Superintendent's Office at least two working days before the meeting date.

B250

007449

05/02/2023 22-cv-00949-CRB   Document 99-19   Filed 07/07/23   Page 52 of 6434   Page 5251

B251

Admitted R24

LOMA PRIETA JOINT UNION ELEMENTARY SCHOOL DISTRICT
REGULAR BOARD MEETING
February 12, 2020
Loma Prieta Elementary School Forum

BOARD MEMBERS:
Deana Arnold
Kerrie Mills
Ben Abeln
Ron Bourque
Alex Hall

BOARD MEMBERS ABSENT:     None

SECRETARY PRESENT:        Lisa Fraser

ROLL CALL TO ORDER:       6:30 p.m.

**Approval of Agenda**                              **Approved 5-0**
A **MOTION** was made by Mr. Abeln and seconded by Ms. Mills to modify the agenda
moving items 7.1, 7.4 and 7.7 from Consent to Discussion/Action.
A **MOTION** was made by Mr. Abeln and seconded by Ms. Mills to approve the agenda
as modified.                                        **Approved 5-0**

**Public Concerns** – None

**Recess to Closed Session**

**CONVENE REGULAR SESSION** – 7:00 p.m.

**Written Correspondence** – Ms. Mills read a letter from the Santa Clara County Office
of Education regarding the positive certification of the Loma Prieta Joint Union School
District 2019-2020 First Interim Report.  The letter is attached.

**Public Comment** – None

**Closed Session Report** – Ms. Arnold reported the Board discussed an anticipated
litigation item.  No action was taken.

**CONSENT ITEMS**                                   **Approved 5-0**
A **MOTION** was made by Mr. Bourque and seconded by Ms. Hall to approve the
consent items including Personnel Report 02/12/20; warrants for the month of January in
the amount of $357,486.06; open purchase orders from July 1, 2019 through January 31,
2020, in the encumbered amount of $1,458,295.90, liquidated amount of $792,059.20,
with a balance of $666,236.70; meeting minutes from the December 11, 2019 and
January 15, 2020 board meetings; certification of corrective action to the 2018-19 audit
findings; approval of an agreement, in the amount of $25,000, for a feasibility study of

B251

7.4 encl. #8

**Admitted R24**

B252

the renewal of a parcel tax; ratification of an MOU between Scotts Valley Unified School
District and LPJUSD to allow District students to attend Scotts Valley Schools for TK;
accept donations of $470.88 from Mountain Bible Church and $17.90 from the Kiwanis
Club of San Jose; approve a contract with Paul Mooney Inspection Services for
inspection of the track and field project as required by the DSA in the estimated amount
of $32000 which will be supported by the Measure R bond funds; adoption of Board
Policy 3515.7; adoption of Board Policy 4158, 4258, 4358; adoption of Board Policy
5131.2; adoption of Board Policy 3513.4; adoption of Board Policy 4112.41, 4212.41,
4312.41; adoption of Board Policy 4119.22; adoption of Administrative Regulation
4117.7, 4317.7; and adoption of Board Policy 0460.

**RECOGNITION**
**Student Leadership: Rachel Stephens, Alexis Dorn, Avelene Celinski, Helena**
**Cramer, Anna Maria Malkos, and CT English ASB Advisor, Holly Hulewat; Shyla**
**Werdebauth, sophie Riese, Grace Murray, Payton Steffen, and Loma Prieta Student**
**Council Advisor, Lisa Sullivan**
Ms. Fraser expressed her appreciation for the opportunity to acknowledge and celebrate
these student leaders for stepping up and giving their own time to make a difference at
their schools. Working with their advisors, "these students make things happen", she
said. Ms. Fraser read Ms. Hulewat's statement, "Thank you to the board for recognizing
the student council officers of the 2019-20 school year! I have been so impressed by the
spirit and dedication that our student council officers have shown. Our 6th grade officers,
Alexis and Anna Maria, have been active members of student council since they began
middle school last August, and I am impressed with their initiative to elevate the CT
student experience upon arrival! Avelene and Helena, our 7th grade officers are always
organized and thoughtful at our meetings. Lastly, Rachel has been a role model for her
younger officers as well as the whole student body with her positivity, diligence, and
leadership. Thank you all for your hard work!"

**REPORTS**
**Board of Trustees** – Mr. Abeln reported the golf tournament preparation is underway
with a full launch of ticket sales to begin within the next day. He stated offers for
sponsorships and donations of auction items are robust. Mr. Abeln stated he expects the
tournament to sell out ths year. Mr. Bourque reported his attendance at the budget
advisory committee meeting. He stated the Committee is comprised of 15 members,
which is a lot of people to be providing advice. Mr. Bourque reported the Committee
will work with the community to let them know how and what the District is spending in
terms of managing spending. Mr. Bourque reported his attendance at a recent School Site
Council meeting, which he stated is made of a good group of community and staff
members. Ms. Hall reported the Loma Prieta Museum organization is due to have an
event on March 26 focused on early settlers of the mountain. She encouraged the student
body to attend and learn about the early settlers of their community. The event is
sponsored by the Loma Prieta Community Foundation. Ms. Mills reported her
attendance at a recent Santa Clara County School Boards Association meeting where Dr.
Dewan gave a State of the County presentation. Ms. Mills stated the results of the
presentation indicate the County does above and beyond what the State does reporting

B252

007451

Admitted R24

**B253**

better student results than the State averages. She reported another topic of the meeting
was the upcoming Census.

**Superintendent** (Ms. Fraser) – Ms. Fraser reported a successful Lighting for Literacy
event attended by 4th and 5th grade students after school. She stated Mr. Kinsella and a
great group of kids engineered and assembled light boxes for kids around the world. Ms.
Fraser stated she has submitted an article to be published in the March Mountain Network
News issue which provides a Measure R update on projects completed, those in the
planning stages and those underway. She reported she will attend a March 2, 2020,
Daughters of the Revolution luncheon where she has been invited to speak about Project
Cornerstone. Ms. Fraser reported there will be a videographer from Project Cornerstone
on campus to capture cameo appearances to use at Asset Champions breakfast in March.
Ms. Fraser thanked the IT staff, Ms. Bourque, Ms. Zook and Ms. Ljepava for all their
work in preparation for CAASPP testing. Ms. Fraser also gave a shoutout to the group of
adult volunteers who will be chaperoning the seventh graders on their trip to Yosemite.

**Principal** (Ms. Zook) – Ms. Zook reported Loma Prieta Elementary students and staff are
gearing up for the talent show on February 28, 2020. She stated the teachers are doing
the end of trimester preparations for report cards and optional parent/teacher conferences.
Ms. Zook reported members of the Los Gatos High School faculty were on the CT
English campus last week to meet with eighth grade students. She stated it is spirit week
at CT English. Mr. Arias introduced the new "CT Cup" student challenge. She said
grade levels will competing against one another to earn points. Ms. Zook reported at the
last School Site Council meeting the committee members discussed upcoming Screangers
screenings. She said CT English students will watch Screenagers in PE class. Ms. Zook
reported CT English teachers are working to prepare Project Cornerstone curriculum for
CT English students in a pilot program this year and full delivery of curriculum in the
new school year.

**CBO** (Ms. Vance) – No report.

**Director of Facilities and Maintenance** (Mr. Harville) – Mr. Harville reported his
attendance at an emergency managers meeting at the Santa Clara County Office of
Education where the main topic discussed was school-wide disinfection. While at the
meeting, Mr. Harville met facilities managers from other districts in Santa Clara County.
He stated his staff are prepared for an outbreak of illness. Mr. Harville reported two
community members, Alex Leman and Kevin Epperly have volunteered to repair the
damaged area of the gazebo roof on the North Campus. The goal will be to complete the
repairs before the month of April. He stated the track and field project is moving along
well. He has reviewed the bid documents and sent them off to the architect. Mr. Harville
anticipates beginning the target advertising period of 3 weeks on February 17th with a bid
delivery due date of March 31, 2020. He stated he hopes to deliver a contract for the
track and field to the Board of Trustees for approval at April board meeting.

To Ms. Arnold's question, Mr. Harville stated, all required paperwork for the walkway
and new building has been submitted to the DSA for approval, but final approval has not
yet occurred.

**LPTA** (Ms. Ray) – Ms. DePiazza stated a new representative is replacing Ms. Vieler and
reported Ms. Ray attended the State Council in January. Ms. DePiazza stated LPTA is
looking forward to negotiating with the District in the Spring.

**CSEA** (Ms. Fulton) – Ms. Bourque stated the membership ratified the Youth Leader 1
and Youth Leader 2 job descriptions at their recent meeting.

**B253**

Case: 24-1261, 05/22/2024, DktEntry: 7.3, Page 164 of 251    (164 of 251)

OFFICE OF ADMINISTRATIVE HEARINGS CLERK'S RECORD FOR OAH CASE NO. 2021050291
Case 3:22-cv-00949-CRB    Document 99-19    Filed 07/07/23    Page 52 of 254 of 6434

Admitted R24

B254

**LPEF (Mr. Riese)** – No report.
**Building Blocks Preschool (Ms. Gomez)** – Ms. Gomez reported an Open House event was held recently and was well attended. She stated TK eligible families were given information regarding IDT attendance opportunities in the Scotts Valley Unified School District.

## DISCUSSION/ACTION ITEMS
**Discuss Results of Special Education Program Survey**
Ms. Garcia, Director of Management Consulting Services of School Services of California, presented information following their special education study conducted late in 2019. She stated her presentation provides a summary of the report the Board of Trustees received earlier in the year.

To Ms. Hall's question, Ms. Garcia responded that the State may change funding/provide more resources to schools for special education services next year. She stated last year there was some additional funding in the budget and any additional funding being provided this year will go through the SELPA, which could affect how much the District sees. Ms. Garcia stated, ultimately, funds will not cover the full costs of education.

Mr. Bourque expressed his appreciation for the report. He noted all the recommendation if taken at face value will add costs and the District is already spending more that the average. He would like to see recommendations on how to cut costs and make the program more effective. Ms. Garcia stated policies, programs and early intervention can be helpful to reduce expenses, but stated many areas cannot be cut due to Federal law. She stated certain criteria allows for less spending, but cuts cannot come to the "maintenance of effort". Mr. Bourque stated it appears the policy is set up to ensure an increasing amount of money is being spend on special education. Ms. Garcia agreed and stated the Federal government would argue they don't want to set up a system where districts aren't providing services to students. The government doesn't want you to spend more and don't want to encentivize districts to spend less. Ms. Garcia offered offered templates on special education policies. Ms. Garcia stated if you have procedures and efficiencies to bring down the costs, over time you're not going to see your special education costs increase.

Ms. Dorn stated that as a teacher and parent she has seen how things are being streamlined and feels support from the District for students.

Ms. Ljepava thanked Ms. Garcia for the effort put into the study. She sataed the information shared as a result of their work is not a surprise to her and she welcomes the opportunity for change and growth in order to continue to move forward to do the best for kids. Ms. Ljepava stated she hopes to make changes that result in keeping District students on our campuses.

Ms. Vance expressed her surprise by the comparative data included in the report. From the data, she realized the majority of public school districts in California are in the same financial boat.

Ms. Zook expressed her surprise by the data indicating the volume of students in special education for speech services. She expressed her interest to learn how early intervention could lower the special education population.

Ms. Garcia's presentation is attached.

**DiscussApprove FireSafe Council Fire Protection Project**      Approved 5-0

B254

007453

Admitted R24

**B255**

Mr. Harville presented a plan generated by Mr. Lopp, Santa Cruz Mountain Alliance, and Mr. Call, Hazardous Fuel Reduction Program Manager of the Santa Clara County FireSafe Council. The two phase plan is an effort to demonstrate the creation of a safe road route to evacuate in the event of a wild fire. It is their hope to use the school district land adjacent to Summit Road as a front runner in this demonstration. The first phase of the plan includes an area along Summit Road south including the frog pond. The second phase includes the area adjacent to the north side of Summit Road and the green belt behind the amphitheater. The FireSafe Council has offered a $20,000 grant and requested a 10% matching grant from the District, or $2,000. During conversations with Mr. Call, it was stated that if the District provided the requested $2,000, it is imparitive the phase 1 work is completed.

To Mr. Bourque's question, Mr. Harville stated the plan is aimed at fuel reduction. FireSafe and CalFire working together will take out any fire fuel less that 8 inches in diameter and 15 to 20 feet tall. Larger trees will be limbed. Scotch broom and coyote brush will be removed. In the area around the pond, CalFire would like to remove trees to a 5 – 10 foot spacing and anything that is 8 inches in diameter as well as ladder fuel in an effort to build a clear line of sight to the road from the District parking lot.

To Ms. Arnold's question, Mr. Harville stated the District is not funding clearing of any land that is not District property.

Mr. Harville stated an environmental impact study will be required.

To Ms. Hall's question, Mr. Harville stated there will be an ongoing costs to maintain the areas cleared. He stated any areas where the District's large mower can be driven is easy to maintain at a low cost.

To Ms. Arnold's question, Mr. Harville stated the FireSafe Council has great concern regarding the fire threat in the tree farm. They anticipate that a fire in the area would be 1.5 times as high as the tree leaving them with a real fear of some particular areas.

Mr. Abeln stated he walked the property with Mr. Lopp, Mr. Call, Ms. Fraser and others. He shared his amazement with how many trees should come down and expressed his belief that this project is llttle cost to the District. He said the FireSafe Council has a bigger project long-term, but this section of Summit Road is a good place to start.

Mr. Harville stated the large dead trees adjacent to Summit Road will be taken out, which he views as a huge help.

Ms. Fraser stated she and Mr. Harville have talked about the project extensively. She thanked Mr. Lopp and the other folks working on the project and expressed her appreciation that they've allowed she and Paul to ask their questions, which have been adequately addressed.

Mr. Lopp stated they are working on a 2 year plan to reduce fire fuel along Summit and Highland to Mt. Bache and all the way down San Jose-Soquel Road to the end of the canyon.

To Ms. Jones-Turkalj's question, Mr. Harville stated an environmental impact report will be conducted. He does not believe the frog pond will be negatively affected nor create any stumbling blocks relative to clearing fire fuels.

A **MOTION** was made by Mr. Abeln and seconded by Mr. Bourque to approve the FireSafe Council Fire Protection plan as presented.

**Budget Advisory Committee Update**

Ms. Fraser provided an update stating during the first meeting on January 27th, committee members laid the groundwork for different types of school finance and Ms. Vance

**B255**

007454

Admitted R24

B256

presented her "School Finance 101" information.  The meeting was used to frontload information so future meetings can be more effective.  Ms. Fraser stated an RFP for parcel tax consultant is included in the evenings board meeting agenda.  She is planning to invite the consultant to come to next budget advisory meeting to present to the commitee.  Ms. Fraser stated  the Loma Prieta Future Fund has received another $25,000 donation to the endowment and there are some pledges that haven't hit the account yet.  Many of the donations received have corporate matches.  The Loma Prieta Future Fund balance sits at about $150,000 balance.

**Review/Approve 2019-20 Certificated Seniority List**                    Approved 5-0

Ms. Fraser stated the seniority list is presented annually.  The list delineates years of service by our certificated staff members.

To Mr. Bourque's question, Ms. Fraser stated HR staff remind teacher to renew with their credential is approaching expiration.

A **MOTION** was made by Ms. Hall and seconded by Mr. Abeln to approve the 2019-20 certificated seniority list as presented.

**Discuss/Adopt Res. #20-XIII – Establishment of Criteria for Order of Certificated**
**Layoff and Reemployment for Employees with Equal Seniority**          Approved 5-0

Ms. Fraser explained the resolution is an annual document used to assist in determining a tie breaker should a layoff be necessary and teachers had the same seniority.

A **MOTION** was made by Ms. Mills and seconded by Ms. Hall to adopt resolution #20-XIII as presented.

**Discuss 2020-21 Transitional Kindergarten Program**

Ms. Fraser stated she is working to keep as many options open for members of the District community as possible.  She stated the Scotts Valley Unified superintendent has given the District a very pared down MOU in order to allow our TK students to attend their schools via an IDT.  One difference in the agreement as compared to agreements of the past involves their desire to reserve the right to exclude District TK students if their program needs the space and they cannot guarantee which school students will attend: Brook Knoll or Vine Hill.  Ms. Fraser stated she has also reached out to Soquel Union and no MOU has yet been signed, but Superintendent Turnbull has indicated that they are willing to take District TK students.  Ms. Fraser stated she is encouraging him to enter into individual IDTs and skip the MOU agreement.

**Discuss/Adopt Revised Board Policy 4119.21, 4219.21, 4319.21 – Professional**
**Standards**                                                        Approved 5-0

Ms. Fraser explained she is working to to bring District policies up to date looking at some policies more than others as needed.  She stated a policy that is in need of an update is professional standards.  The policy presented has been revised to reflect CSBA recommended policy.  Some policies cited in 4119.21, et all did not exist in the District.  Others are mandated policies.  In support of 4119.21 et al, there are about eight policies in the consent section that are needed to support this policy.  She stated she has reached out to LPTA to provide a heads-up relative to these policies.  Some policies changes are semantical and some changes include sections that are drastically different.  Examples she shared were: staff conduct with students in the new policy is much more detailed with clear descriptors, a new section includes the requirement to notify employees of electroniic files, a new section talks about how you report misconduct and that misconduct must be promptly reported, if an employee observes or has evidence of another employee, employee has an obligation to report, prohibiting retaliation, and

B256

007455

Admitted R24

B257

notifying the CTC any time there has been an employee change of status, which is the law.

To Ms. Jones-Turkalj's question, Ms. Fraser stated the bullying policy was mandated about one year ago. The District did have bullying in some policies, but did not have a bullying policy. In some areas, the District is out of compliance with the most recent update done in 2012.

A **MOTION** was made by Mr. Abeln and seconded by Ms. Mills to adopt revised board policy 4119.21, 4219.21, 4319.21 – Professional Standards as presented.

**Discuss/Adopt Exhibit 4119.1 – Professional Standards Code of Ethics**                                                      Approved 5-0

Mr. Fraser explained revised board policy 4119.21, et al, also referenced a code of ethics, which the District did not have. The CSBA sample followed was generated by the NEA. Mr. Bourque commented on the language, "In fulfillment of the obligation to the student, the educator: Shall not unreasonably"… How do you define "unreasonable"? Ms. Arnold stated she believes part of the problem is that every situation is different. Using a detailed description is a benefit, but it can also be a detriment. Ms. Fraser stated she believes the Code is working to give educators the ability to use their professional judgement to do what's reasonable. Ms. Arnold stated the Code does point out the important parts.

A **MOTION** was made by Mr. Bourque and seconded by Ms. Hall to adopt the Professional Standards Code of Ethics as presented.

**Discuss/Approve Comprehensive Safety Plan**                           Approved 5-0

Ms. Fraser explained the Plan is a work in progress. It is a huge document. To complete in one sitting is very difficult. Small district can have one plan rather than a plan for each school, as required by larger districts.. She presented the start of a template with every requirement stated that can be addressed one step at a time. Ms. Fraser explained the requirement is approval of the Plan before March 1. She can bring updates to the Board for approval as each section is completed.

Mr. Bourque complimented Ms. Fraser stating he appreciates that she did a darn good job to create the document and get community input.

A **MOTION** to approve the draft Comprehensive Plan framework was made by Ms. Hall and seconded by Ms. Mills.

**Discuss Proposition 39 California Clean Energy Jobs Act Summary of Project Costs**

Ms. Vance reviewed the summary of projects provided in the board packet. She stated in a few months, the District will receive a report on energy savings.

It was determined that due to the new construction following the fire, a one to one comparison of energy expenses cannot be made.

**Discuss/Approve Personnel Report**                                    Approved 5-0

A correction was made to change the job title from Paraeducator 2 to Youth Leader 2.

A **MOTION** was made by Ms. Hall and seconded by Mr. Bourque to approve the February 12, 2020 personnel report as corrected.

**Discuss/Approve Minutes -December 11, 2019**                          Approved 5-0

A correction was made to the item "DiscussAdopt Revision to the Management, Confidential and Supervisory Salary Schedule" to indicate it was Ms. Arnold who stated it has been a long-held priority of the Board to include management when the teachers receive a raise.

B257

007456

Admitted R24

B258

A **MOTION** was made by Ms. Mills and seconded by Ms. Hall to approve the December 11, 2019 board meeting minutes as corrected.

**Approve Agreement with Clifford Moss**                                      **Approved 5-0**

Ms. Fraser explained Clifford Moss is a parcel tax consultant. Following review, it was felt the contract language lacked specificity possibly leading to circumstances where, if other costs were incurred, the District would be obligated to pay them. Clifford Moss was more than happy to reword the contract phrase to read, "with preapproval by the client".

**ADJOURNMENT** – 9:03 p.m.

Submitted by:

Lisa Fraser
03/2020

B258

*007457*

Marked for ID D6

**A992**

Loma Prieta Jt Un SD | BP 4119.21  Personnel

**Professional Standards**

The Board of Trustees expects district employees to maintain the highest ethical standards, exhibit professional behavior, follow district policies and regulations, and abide by state and federal laws. Employee conduct should enhance the integrity of the district and advance the goals of the district's educational programs. Each employee should make a commitment to acquire the knowledge and skills necessary to fulfill his/her responsibilities and should focus on his/her contribution to the learning and achievement of district students.

(cf. 0200 - Goals for the School District)

(cf. 4112.2 - Certification)

(cf. 4119.1/4219.1/4319.1 - Civil and Legal Rights)

(cf. 4131 - Staff Development)

(cf. 4231 - Staff Development)

(cf. 4331 - Staff Development)

The Board encourages district employees to accept as guiding principles the professional standards and codes of ethics adopted by educational or professional associations to which they may belong.

(cf. 2111 - Superintendent Governance Standards)

(cf. 9005 - Governance Standards)

Staff Conduct with Students

The Board expects all employees to exercise good judgment and maintain professional standards and boundaries when interacting with students both on and off school property. Inappropriate employee conduct shall include, but not be limited to, engaging in harassing or discriminatory behavior; engaging in inappropriate socialization or fraternization with a student; soliciting, encouraging, or establishing an inappropriate written, verbal, or physical relationship with a student; furnishing tobacco, alcohol, or other illegal or unauthorized substances to a student; or engaging in child abuse.

(cf. 0410 - Nondiscrimination in District Programs and Activities)

(cf. 4040 - Employee Use of Technology)

(cf. 5131 - Conduct)

(cf. 6163.4 - Student Use of Technology)

An employee who observes or has evidence of inappropriate conduct between another employee and a

**A992**

*007089*

Marked for ID D6

A993

GAMUT Online : Loma Prieta Jt Un SD : Professional Standards BP  4119.21                    12/26/20, 2:26 PM

student shall immediately report such conduct to the principal or Superintendent or designee. An employee who has knowledge of or suspects child abuse shall file a report pursuant to the district's child abuse reporting procedures as detailed in AR 5141.4 - Child Abuse Prevention and Reporting.

(cf. 5141.4 - Child Abuse Prevention and Reporting)

Any employee who is found to have engaged in inappropriate conduct with a student in violation of the law or this policy shall be subject to disciplinary action.

(cf. 4118 - Suspension/Disciplinary Action)

(cf. 4218 - Dismissal/Suspension/Disciplinary Action)

Legal Reference:

EDUCATION CODE

200-262.4 Prohibition of discrimination on the basis of sex

PENAL CODE

11164-11174.4 Child Abuse and Neglect Reporting Act

CODE OF REGULATIONS, TITLE 5

80331-80338 Rules of conduct for professional educators

Management Resources:

COUNCIL OF CHIEF STATE SCHOOL OFFICERS PUBLICATIONS

Standards for School Leaders, 1996

NATIONAL EDUCATION ASSOCIATION PUBLICATIONS

Code of Ethics of the Education Profession, 1975

WEB SITES

CSBA: http://www.csba.org

Association of California School Administrators: http://www.acsa.org

California Department of Education: http://www.cde.ca.gov

California Federation of Teachers: http://www.cft.org

California School Employees Association: http://www.csea.com

California Teachers Association: http://www.cta.org

A993

http://gamutonline.net/district/lomaprieta/DisplayPolicy/763838/4                    Page 2 of 3

007090

A994

Marked for ID D6

GAMUT Online : Loma Prieta Jt Un SD : Professional Standards BP  4119.21                    12/26/20, 2:26 PM

Commission on Teacher Credentialing: http://www.ctc.ca.gov

Council of Chief State School Officers: http://www.ccsso.org

Policy LOMA PRIETA JOINT UNION ELEMENTARY SCHOOL DISTRICT

adopted: May 9, 2012 Los Gatos, California

A994

*007091*

**Professional Standards**

BP 4119.21 4219.21,4319.21

**Personnel**

The Governing Board expects district employees to maintain the highest ethical standards, behave professionally, follow district policies and regulations, abide by state and federal laws, and exercise good judgment when interacting with students and other members of the school community. Employees shall engage in conduct that enhances the integrity of the district, advances the goals of the district's educational programs, and contributes to a positive school climate.

(cf. 0200 - Goals for the School District)
(cf. 4119.1/4219.1/4319.1 - Civil and Legal Rights)
(cf. 5131 - Conduct)
(cf. 5137 - Positive School Climate)

The Board encourages district employees to accept as guiding principles the professional standards and codes of ethics adopted by educational or professional associations to which they may belong.

(cf. 2111 - Superintendent Governance Standards)
(cf. 9005 - Governance Standards)

Each employee is expected to acquire the knowledge and skills necessary to fulfill his/her responsibilities and to contribute to the learning and achievement of district students.

(cf. 4112.2 - Certification)
(cf. 4131 - Staff Development)
(cf. 4231 - Staff Development)
(cf. 4331 - Staff Development)

Inappropriate Conduct
Inappropriate employee conduct includes, but is not limited to:
1.     Engaging in any conduct that endangers students, staff, or others, including, but not limited to, physical violence, threats of violence, or possession of a firearm or other weapon

(cf. 0450 - Comprehensive Safety Plan)
(cf. 3515.7 - Firearms on School Grounds)
(cf. 4158/4258/4358 - Employee Security)

2.     Engaging in harassing or discriminatory behavior towards students, parents/guardians, staff, or community members, or failing or refusing to intervene when

LP000641

an act of discrimination, harassment, intimidation, or bullying against a student is observed

(cf. 0410 - Nondiscrimination in District Programs and Activities)
(cf. 4119.11/4219.11/4319.11 - Sexual Harassment)
(cf. 5131.2 - Bullying)
(cf. 5145.3 - Nondiscrimination/Harassment)
(cf. 5145.7 - Sexual Harassment)

3.     Physically abusing, sexually abusing, neglecting, or otherwise willfully harming or injuring a child

4.     Engaging in inappropriate socialization or fraternization with a student or soliciting, encouraging, or maintaining an inappropriate written, verbal, or physical relationship with a student

5.     Possessing or viewing any pornography on school grounds, or possessing or viewing child pornography or other imagery portraying children in a sexualized manner at any time

6.     Using profane, obscene, or abusive language against students, parents/guardians, staff, or community members

7.     Willfully disrupting district or school operations by loud or unreasonable noise or other action

(cf. 3515.2 - Disruptions)

8.     Using tobacco, alcohol, or an illegal or unauthorized substance, or possessing or distributing any controlled substance, while in the workplace, on district property, or at a school-sponsored activity

(cf. 3513.3 - Tobacco-Free Schools)
(cf. 3513.4 - Drug and Alcohol Free Schools)
(cf. 4020 - Drug and Alcohol-Free Workplace)
(cf. 4112.41/4212.41/4312.41 - Employee Drug Testing)
(cf. 4112.42/4212.42/4312.42 - Drug and Alcohol Testing for School Bus Drivers)

9.     Being dishonest with students, parents/guardians, staff, or members of the public, including, but not limited to, falsifying information in employment records or other school records

10.    Divulging confidential information about students, district employees, or district operations to persons or entities not authorized to receive the information

(cf. 3580 - District Records)

LP000642

(cf. 4119.23/4219.23/4319.23 - Unauthorized Release of Confidential/Privileged Information)
(cf. 5125 - Student Records)
(cf. 5125.1 - Release of Directory Information)

11.    Using district equipment or other district resources for the employee's own commercial purposes or for political activities

(cf. 4119.25/4219.25/4319.25 - Political Activities of Employees)

12.    Using district equipment or communications devices for personal purposes while on duty, except in an emergency, during scheduled work breaks, or for personal necessity

Employees shall be notified that computer files and all electronic communications, including, but not limited to, email and voice mail, are not private.  To ensure proper use, the Superintendent or designee may monitor employee usage of district technological resources at any time without the employee's consent.

(cf. 4040 - Employee Use of Technology)

13.    Causing damage to or engaging in theft of property belonging to students, staff, or the district

14.    Wearing inappropriate attire

(cf. 4119.22/4219.22/4319.22 - Dress and Grooming)

Reports of Misconduct

An employee who observes or has evidence of another employee's inappropriate conduct shall immediately report such conduct to the principal or Superintendent or designee. An employee who has knowledge of or suspects child abuse or neglect shall file a report pursuant to the district's child abuse reporting procedures as detailed in AR 5141.4 - Child Abuse Prevention and Reporting.

(cf. 1312.1 - Complaints Concerning District Employees)
(cf. 5141.4 - Child Abuse Prevention and Reporting)

Any reports of employee misconduct shall be promptly investigated. Any employee who is found to have engaged in inappropriate conduct in violation of law or Board policy shall be subject to disciplinary action and, in the case of a certificated employee, may be subject to a report to the Commission on Teacher Credentialing. The Superintendent or designee shall notify local law enforcement as appropriate.

(cf. 4117.7/4317.7 - Employment Status Reports)
(cf. 4118 - Dismissal/Suspension/Disciplinary Action)

LP000643

(cf. 4218 - Dismissal/Suspension/Disciplinary Action)

An employee who has knowledge of but fails to report inappropriate employee conduct may also be subject to discipline.

The district prohibits retaliation against anyone who files a complaint against an employee or reports an employee's inappropriate conduct.  Any employee who retaliates against any such complainant, reporter, or other participant in the district's complaint process shall be subject to discipline.

Notifications
The section(s) of the district's employee code of conduct addressing interactions with students shall be provided to parents/guardians at the beginning of each school year and shall be posted on school and/or district web sites.  (Education Code 44050)

(cf. 1113 - District and School Web Sites)
(cf. 5145.6 - Parental Notifications)

Legal Reference:
EDUCATION CODE
200-262.4  Prohibition of discrimination
44050 Employee code of conduct; interaction with students
44242.5  Reports and review of alleged misconduct
48980  Parental notifications
PENAL CODE
11164-11174.4  Child Abuse and Neglect Reporting Act
CODE OF REGULATIONS, TITLE 5
80303  Reports of dismissal, resignation and other terminations for alleged misconduct
80331-80338  Rules of conduct for professional educators

Management Resources:
COMMISSION ON TEACHER CREDENTIALING PUBLICATIONS
California Professional Standards for Educational Leaders, February 2014
California Standards for the Teaching Profession, 2009
COUNCIL OF CHIEF STATE SCHOOL OFFICERS PUBLICATIONS
Professional Standards for Educational Leaders, 2015
NATIONAL EDUCATION ASSOCIATION PUBLICATIONS
Code of Ethics of the Education Profession, 1975
WESTED PUBLICATIONS
Moving Leadership Standards into Everyday Work: Descriptions of Practice, 2003
WEB SITES
CSBA:  http://www.csba.org
Association of California School Administrators: http://www.acsa.org
California Department of Education: http://www.cde.ca.gov

LP000644

California Federation of Teachers: http://www.cft.org
California School Employees Association: http://www.csea.com
California Teachers Association: http://www.cta.org
Commission on Teacher Credentialing: http://www.ctc.ca.gov
Council of Chief State School Officers: http://www.ccsso.org
WestEd: http://www.wested.org

Policy        LOMA PRIETA JOINT UNION ELEMENTARY SCHOOL DISTRICT
adopted: May 9, 2012   Revised: February 12, 2020       Los Gatos, California

LP000645

**Professional Standards**

E 4119.21

**Personnel**

CODE OF ETHICS OF THE EDUCATION PROFESSION

Preamble

The educator, believing in the worth and dignity of each human being, recognizes the supreme importance of the pursuit of truth, devotion to excellence, and the nurturing of democratic principles.  Essential to these goals is the protection of freedom to learn and to teach and the guarantee of equal educational opportunity for all.  The educator accepts the responsibility to adhere to the highest ethical standards.

The educator recognizes the magnitude of the responsibility inherent in the teaching process.  The desire for the respect and confidence of one's colleagues, of students, of parents, and of the members of the community provides the incentive to attain and maintain the highest possible degree of ethical conduct.  The Code of Ethics of the Education Profession indicates the aspiration of all educators and provides standards by which to judge conduct.

Principle I.  Commitment to the Student

The educator strives to help each student realize his/her potential as a worthy and effective member of society.  The educator therefore works to stimulate the spirit of inquiry, the acquisition of knowledge and understanding, and the thoughtful formulation of worthy goals.

In fulfillment of the obligation to the student, the educator:

1.      Shall not unreasonably restrain the student from independent action in the pursuit of learning

2.      Shall not unreasonably deny the student access to varying points of view

3.      Shall not deliberately suppress or distort subject matter relevant to the student's progress

4.      Shall make reasonable effort to protect the student from conditions harmful to learning or to health and safety

5.      Shall not intentionally expose the student to embarrassment or disparagement

LP000646

6.    Shall not on the basis of race, color, creed, gender, national origin, marital status, political or religious beliefs, family, social, or cultural background, or sexual orientation, unfairly:

a.    Exclude any student from participation in any program

b.    Deny benefits to any student

c.    Grant any advantage to any student

7.    Shall not use professional relationships with students for private advantage

8.    Shall not disclose information in the course of professional service unless disclosure serves a compelling professional purpose or is required by law

Principle II.  Commitment to the Profession

The education profession is vested by the public with a trust and responsibility requiring the highest ideals of professional service.

In the belief that the quality of the services of the education profession directly influences the nation and its citizens, the educator shall exert every effort to raise professional standards, to promote a climate that encourages the exercise of professional judgment, to achieve conditions that attract persons worthy of the trust to careers in education, and to assist in preventing the practice of the profession by unqualified persons.

In fulfillment of the obligation of the profession, the educator:

1.    Shall not in any application for a professional position deliberately make a false statement or fail to disclose a material fact related to competency and qualifications

2.    Shall not misrepresent his/her professional qualifications

3.    Shall not assist any entry into the profession of a person known to be unqualified in respect to character, education, or other relevant attribute

4.    Shall not knowingly make a false statement concerning the qualifications of a candidate for a professional position

5.    Shall not assist a noneducator in the unauthorized practice of teaching

6.    Shall not disclose information about colleagues obtained in the course of professional service unless disclosure serves a compelling professional purpose or is required by law

LP000647

7.    Shall not knowingly make false or malicious statements about a colleague

8.    Shall not accept any gratuity, gift, or favor that might impair or appear to influence professional decisions or action

Source:  National Education Association, 1975

Exhibit          LOMA PRIETA JOINT UNION ELEMENTARY SCHOOL DISTRICT
adopted: February 12, 2020                                    Los Gatos, California

LP000648

Declaration of Service

I, the undersigned, declare: That I am over the age of eighteen years and not a party to the case; I am employed in, and am a resident of, the County of San Diego, California, where the service occurred; and my business address is: 5942 Priestly Drive, Suite 100, Carlsbad, California 92008.

On June 9, 2023, I served the following documents: **LP000641-LP000648; DECLARATION OF SERVICE**, in the following manner:

☐          By personally delivering copies to the person served.

☐          By placing a copy in a separate envelope, with postage fully prepaid, for each addressee named below and depositing each in the U.S. Mail at Carlsbad, California.

☒          By electronic service, in accordance with the Federal Rules of Civil Procedure and the rules governing the electronic service of documents in the United States District Court for the Northern District of California, as to the following parties:

William J. Becker, Jr.
Freedom X
11500 Olympic Boulevard, Suite 400
Los Angeles, California 90064
Email:  freedomxlaw@gmail.com
Counsel for Plaintiff, David M. Kissner

I declare under penalty of perjury, pursuant to the laws of the United States of America and the State of California, that the foregoing is true and correct. Executed June 9, 2023, in Carlsbad, California.

By: /s/ Daniel S. Modafferi
Email: *dmodafferi@fdmattorneys.com*



### Loma Prieta
#### JOINT UNION SCHOOL DISTRICT

*23800 Summit Road, Los Gatos California 95033*
*Phone: (408) 353-1101    Fax: (408) 353-8051*
*www.loma.k12.ca.us*
*Lisa Fraser, Superintendent*
*Karren Zook, Principal*

To:      David Kissner
From:   Lisa Fraser, Superintendent  *L. Fraser*
Date:    March 31, 2020
Subj:    Warning of Unprofessional Conduct

On November 8, 2019, I was contacted by a parent of a student in your 8th grade Science class concerned about a discriminatory comment you allegedly made in the presence of several students in your classroom. The two students were joking with one another. Student A was laughing at Student B's skinny arms in a lighthearted fashion. Student B then turned to you, again joking around, and stated that "Student A is bullying me," to which you replied, "You should make fun of his slitty eyes." It should be noted that Student A is of Asian descent.

By request, I met with Student B's Mom the following week, wherein she recounted the incident above and expressed concern for the impact your discriminatory comment may have had on both her son and his friend. She indicated she had shared this information with Student A's parent who acknowledged that the comment was inappropriate but was concerned about possible negative repercussions for her son should she make a formal complaint.

In accordance with BP 1312.3 – Uniform Complaint Procedures, and given the complaint included allegations of discrimination, I met with Student A's parent on December 2, 2019 to discuss the complaint, the complaint process, and to ascertain the well-being of the student. The parent acknowledged the inappropriateness of your discriminatory comment but expressed that she was not sure she wanted to make waves or file a formal complaint due to the very close relationship her son has with you, his teacher and coach. She indicated she would discuss the situation with her husband and her son and would get back to me promptly.

I met with Student A's parent again on December 3, 2019. She said her husband was unwilling to make a complaint and did not want his son talked to, but she confirmed that the discriminatory comment had been made. Student A's parents agreed it shouldn't have been said, but they did not wish to make a formal complaint. As such, I indicated I would proceed with the fact-finding process absent their participation. She understood that I would still be meeting with you based upon Student B's parent's

*Board of Trustees:*
*Deana A. Arnold, President    Kerrie Mills, Vice-President*
*Ben Abeln, Member    Ron Bourque, Member    Alex Hall, Member*

complaint. A follow-up meeting with Student B and his parent(s) was scheduled for December 10, 2019. The meeting was cancelled by the parent(s) due to extenuating circumstances within the family.

On December 20, 2019, I requested an opportunity to meet with you regarding the complaint noted above such that I could hear your accounting of the events. In an email sent on January 6, 2020, you stated that you were not willing to meet with me for this purpose. I shared that as an employee of the district, you have a duty to cooperate with the fact-finding process and I scheduled a time for you, Staci Ljepava and I to meet on Thursday, February 13, 2020 at 2:00 p.m. You were additionally advised of your right to bring representation with you if you preferred. On February 11, 2020, you stated via email that you would not be attending this meeting.

Due to extenuating family circumstances, student privacy issues, and the employee's unwillingness to fully cooperate with the fact-finding process, it has not been practicable to complete the fact-finding process within customary timelines.

Nevertheless, based upon the information provided by both Student A and Student B, on November 4, 2019, which has not been refuted by you, I have concluded that you made a discriminatory comment in the presence of two students during your 8th grade science class. Your conduct violates the provisions of BP 4119.21 -- Professional Standards, which states that engaging in discriminatory behavior towards students represents inappropriate professional conduct.

Your conduct negatively impacted the safety and well-being of students inasmuch as the students were subjected to unprofessional, discriminatory comments within the classroom setting. You have an obligation to model professional behavior and to maintain a positive classroom learning environment at all times.

Effective immediately, you are directed to stop this conduct. Failure to do so will result in further corrective action up to and including a second letter of reprimand. It should also be noted that acts of discrimination are a violation of state and federal law and may be subject to more formal Uniform Complaint procedures. If you have any questions about these directives, please contact me.

A copy of this document will be placed in your personnel file after 10 days. You may prepare a response and have that response attached to this document.

3 April, 2020

From:   David Kissner, Teacher, CT English Middle School
To:     Lisa Fraser, Superintendent, Loma Prieta Joint Union School District
CC:     Board of Trustees, Loma Prieta Joint Union School District

Subject: RESPONSE TO LETTER DATED 31 MARCH, 2020

1. The following is submitted as a response to the letter which is to be placed in my file, dated 31 March, 2020.

2. The description of the incident in question is factually inaccurate.

3. As noted separately, Superintendent Fraser demonstrated a lack of regard for our Collective Bargaining Agreement in that she received a parent complaint and did not notify me for over 6 weeks while she secretly investigated the matter. This is not the first time this has happened.

4. Superintendent Fraser did not have the benefit of hearing from me on this matter because I refused to participate in her inquiry. I will not participate in any inquiry of any sort conducted by this district because of how the last inquiry was handled, and until the following issues are addressed:

   a. Following the walkout controversy of 2018, I was lied to about the nature of the "facilitation" that I agreed to. *(The district instead launched a secretive and invasive investigation).*

   b. The underlying premise for agreeing to the facilitation/investigation turned out to have been a lie *(student grades were supposed to be "no-grade," instead, they were secretly and artificially inflated).*

   c. I was lied to about the investigation concluding. *(I, the community, and the media were all told that the investigation had concluded – this was a lie. I was brought back into the classroom whilst still being investigated secretly).*

   d. I was lied to about the scope of the investigation. *(The district-hired investigator investigated irrelevant and inappropriate lines of questioning, such as my religious beliefs).*

   e. I was lied to about the district's willingness to share results of the investigation. *(The results of what was supposed to be a "facilitation" has been kept in complete secrecy).*

   f. I was lied to about the impartiality of the investigation.

**ER-220**





*Loma Prieta*
JOINT UNION SCHOOL DISTRICT
*23800 Summit Road, Los Gatos California 95033*
*Phone: (408) 353-1101    Fax: (408) 353-8051*
*www.loma.k12.ca.us*
*Lisa Fraser, Superintendent*
*Karren Zook, Principal*

To:    David Kissner
From:  Karren Zook, Principal
Date:  April 2, 2020
Subj:  Warning of Unsatisfactory Performance

On Friday, March 6, 2020, you were engaged in the following conduct:

> During lunchtime, a student arrived late to a lunch detention assigned by you. Upon reporting, she stated that you were angry and "slammed your fist on the table." When the student exclaimed that "it was going to be a waste of time to come to your room first," she reports that you said, "No shit, Claire." This statement was made with several other students in the room.

On Friday, March 9, 2020, I received notice of the above incident. On Tuesday, March 10, 2020, I requested to meet with you on Friday, March 13, 2020 at 2:00 p.m. to discuss the incident. On Thursday, March 12, 2020, you replied via email, "Hi Karren, I'm sorry, but I will not be able to meet. Thanks, David."

On Friday, March 13, 2020, I sent the following clarifying email: "Please clarify, are you unable to make this meeting time, if so, I can reschedule, or are you unwilling to meet regarding this topic?" You responded the same day stating, "Hi Karen, I am not willing to meet regarding this topic. Thanks, David."

On Monday, March 9, 2020, a student present during the March 6, 2020 lunchtime interaction, was interviewed and confirmed that you used profanity directed at the student assigned detention.

Your conduct lacked good professional judgement, which requires that you refrain from using profane language in conversations with students. Your conduct caused embarrassment to the student and had a negative impact on the student's sense of safety in your classroom.

Effective immediately, you are to refrain from using profanity as a method of managing student behavior. Failure to do so will result in further corrective action up to and including a formal letter of reprimand. If you have any questions about this directive, please contact me.

A copy of this document will be placed in your personnel file after 10 days. You may prepare a response and have that response attached to this document.

*Board of Trustees:*
*Deana A. Arnold, President    Kerrie Mills, Vice-President*
*Ben Abeln, Member    Ron Bourque, Member    Alex Hall, Member*

3 April, 2020

From:   David Kissner, Teacher, CT English Middle School
To:     Karren Zook, Loma Prieta Joint Union School District
CC:     Lisa Fraser, Superintendent, Loma Prieta Joint Union School District

Subject: RESPONSE TO LETTER DATED 2 APRIL, 2020

1. The following is submitted as a response to the letter (Warning of Unsatisfactory Performance) which is to be placed in my file, dated 2 April, 2020.

2. The description of the incident in question is factually inaccurate and lacks context.

3. Principal Zook did not have the benefit of hearing from me on this matter because I refused to meet with her to discuss it. I will not participate in any inquiry of any sort conducted by this district because of how the last inquiry was handled, and until the following issues are addressed:

   a. Following the walkout controversy of 2018, I was lied to about the nature of the "facilitation" that I agreed to. *(The district instead launched a secretive and invasive investigation).*

   b. The underlying premise for agreeing to the facilitation/investigation turned out to have been a lie *(student grades were supposed to be "no-grade," instead, they were secretly and artificially inflated).*

   c. I was lied to about the investigation concluding. *(I, the community, and the media were all told that the investigation had concluded – this was a lie. I was brought back into the classroom whilst still being investigated secretly).*

   d. I was lied to about the scope of the investigation. *(The district-hired investigator investigated irrelevant and inappropriate lines of questioning, such as my religious beliefs).*

   e. I was lied to about the district's willingness to share results of the investigation. *(The results of what was supposed to be a "facilitation" has been kept in complete secrecy).*

   f. I was lied to about the impartiality of the investigation.
      i. *(The investigator, chosen and hired by the district leadership without my input, had access to all of my emails, but no others).*
      ii. *(Pages of the investigation that I was allowed to view concluded that I was wrong and Superintendent Kidwell was in the right. Yet the district has been forced to concede that all of my concerns will be corrected for next time, completely vindicating my position in the walkout mess. This*

*indicates a flawed, worthless, and skewed investigation.  I still have no answer as to why the report that costs tens of thousands of dollars concluded that I was in the wrong, but the superintendent has indicated that every one of my concerns will be corrected for next time.)*

g.  District leadership has made it clear on numerous occasions that they are looking for damaging information on me and will twist innocuous situations to make them appear problematic.  The district is also clearly trying to create a document trail to be used against me in the future.

h.  The district refuses to communicate directly with me about any of those issues.  *(The board and superintendent have refused multiple attempts at communication at various levels).*

David M. Kissner



www.FreedomXLaw.com

March 22, 2021

**Via E-Mail Only**
brian@proactiveblg.com

Brian Bock, Esq.
THE BOCK LAW GROUP, P.C.
31610 Railroad Canyon Road, Suite 2
Canyon Lake, CA 92587

          Re:   Kissner Dismissal
          Client: David Kissner

Dear Brian:

At the outset, we want to thank you and the Board for the opportunity to be heard, even briefly, on Thursday. We understand that this accommodation is not necessarily required. Nevertheless, it is appropriate as a "predeprivation safeguard[] [that] minimize[s] the risk of error in the initial [] decision" to deprive David of his property interest in the continuation of his employment. *See Skelly v. State Personnel Bd.*, 15 Cal. 3d 194, 209 (1975) (listing factors satisfying due process).[1] We take particular exception to the *Skelly* hearing officer's failure to note David's evidence in mitigation and refutation. *See, e.g., id.* At 200 (noting employee's age, honorable career, physical impairments, et al.).

While the Board's role at this stage is not necessarily evidentiary, it should be given the opportunity to understand that moving forward with a dismissal process carries potentially adverse consequences for the District and that, in light of the perfunctory *Skelly* findings, this might be the appropriate time to put the brakes on dismissal proceedings before the public issues underlying

---

[1] We can agree to disagree on this point but, in our view, the *Skelly* hearing officer improperly proceeded with a hearing without first obtaining confirmation from David that he would be attending it. The assumption the hearing officer made – that David was waiving his right to appear – was, in the absence of confirmation or by placing a call to David, at best, injudicious. I have been to court numerous times where an attorney was late or had miscalendared a hearing and was called by the clerk or was allowed another chance to appear. That's due process. Then, when advised that your emails attempting to notify David of the hearing date went to David's spam folder and that David was requesting an opportunity to appear at a rescheduled hearing, the hearing officer denied the request. And while he agreed to accept David's written response to the charges, he offered absolutely no analysis of the reasonableness of the charges in light of David's defenses. His report does <u>nothing</u> to minimize the risk of error in these initial stages of the dismissal process, and the Board simply can't intelligently or fairly rely on it.

11500 Olympic Blvd., Suite 400, Los Angeles, CA 90064
310.636.1018   Toll Free 866.649.6057   Fax 310.765.6328

**FREEDOM X**

Brian Bock, Esq.
THE BOCK LAW GROUP, P.C.
March 22, 2021
Page 2 of 6
_____

this matter take flight in the media, needlessly drawing adverse attention to the District and potentially exposing it to defamation and other liability.

We request that this letter be forwarded to the Board for review prior to the meeting. I also may be presenting a 15-minute PowerPoint presentation and therefore request that Zoom permissions for screen sharing be authorized.

## I.   GENERAL DEFENSES

David generally contends that the timing of the investigations and charges is more than coincidental and that they coincide with his public statements relating to the 2018 student walkout and his opposition to Measure N in 2020. These highly public controversies brought David into the media spotlight and generated resentment towards his political positions throughout the community.

David's political speech is protected under Cal. Educ. Code §§ 7052 and 7057. He is protected from viewpoint discrimination pursuant to 18 U.S.C. § 1983.[2]

## II.   QUALITY OF THE DISTRICT'S EVIDENCE

Simply put, the Statement of Charges is based almost entirely on inadmissible hearsay; false, salacious, slanderous, trivial, misunderstood, incomplete, and retaliatory information; unlawfully proffered documentary evidence; and desperately contrived accusations of unprofessionalism. It is our purpose here to survey as much of these evidentiary errors as practicable to put the Board on notice of the District's lax consideration of their legal effect.

### A.   Immoral Conduct

We begin with the salacious, slanderous and scandalous charges of immoral conduct.

David is a decorated veteran who spent nine years in uniform serving with the U.S. Navy and Marines as a midshipman and as an artillery and provisional infantry officer in Fallujah, Iraq. He has been married seven years to his wife, Stacy, and has a son who recently turned five. David is a Christian who is active in his church, which he has been attending for eight years. He's involved in youth ministry and prayer groups. For 13 years, he and his wife have operated a Christian youth ministry sponsoring outdoor activities for youth and their families in a Christian environment.

_____

[2] Claims involving these legal theories would differentiate legal action arising from dismissal in this matter from *Crawford v. Commn. on Prof. Competence of Jurupa Unified Sch. Dist.*, 53 Cal. App. 5th 327 (Cal. App. 4th Dist. 2020), review denied (Nov. 24, 2020).

**FREEDOM X**

Brian Bock, Esq.
THE BOCK LAW GROUP, P.C.
March 22, 2021
Page 3 of 6
_____

David has been employed with the District almost nine years teaching math and science and coaching wrestling.

David has never been accused of a crime or, until now, crimes of moral turpitude. Yet, none of these mitigating facts, which describe a person of high moral character, appear in the phony investigative reports on which the charges principally rely or the superficial *Skelly* report offshoot.

What does appear?

    1.   Providing Alcohol To Minors (Statement of Charges ("SOC"), ¶ 4)

David has admitted to offering a high school aged student a sip of alcohol more than four years ago, and evidence of it is therefore inadmissible in dismissal proceedings. Cal. Educ. Code § 44944 ("Testimony shall not be given or evidence shall not be introduced relating to matters that occurred more than four years before the date of the filing of the notice…"). The youth was not a District student at the time and it did not occur at a District event. All of the purported accusations of repeating this one-time incident amounts to inadmissible hearsay.

    2.   "Potential Grooming Behavior" (SOC, ¶ 4(g))

These slanderous charges lack any substance and are shamelessly based on nothing more than anonymous inadmissible hearsay. Accusations of "potential grooming," asking about sex, etc., are made with NO SOURCE, NO VICTIM, NO DETAILS, NO OFFICIAL COMPLAINT, NO REPORTS. A silly incident involving a binder clip is transformed into a sinister act of predation.[3] We question the competency of the investigator, the *Skelly* officer, and the Superintendent for including these unsubstantiated salacious charges. This is the work of depraved, cowardly saboteurs seeking to destroy an honorable man at any cost. Should these accusations remain in these proceedings or otherwise find their way toward republication, we will not hesitate to hold the District and each person involved accountable.

    **B.**    **Unprofessional Conduct**

The charges purportedly describing unprofessional conduct constitute an assortment of contrived offenses. To our knowledge, the District never once complied with Cal. Educ. Code § 44938[4] and

---

[3] A student in David's wrestling class asked to go to the bathroom and David remembers responding, "Not now." He tossed a binder clip at the kid in jest. We welcome the chance to litigate this shocking offense.

[4] "The governing board of any school district shall not act upon charges of unprofessional conduct unless at least 45 calendar days prior to the date of the filing, the board or its authorized representative has given the employee against whom the charge is filed, written notice of the

**FREEDOM X**

Brian Bock, Esq.
THE BOCK LAW GROUP, P.C.
March 22, 2021
Page 4 of 6

_____

cannot vote on such charges now. *See Galland v. Governing Bd. of the Los Angeles Unified Sch. Dist.*, B258018, 2015 WL 6750091, at *3 (Cal. App. 2d Dist. Nov. 5, 2015), as modified on denial of reh'g (Nov. 30, 2015) ("The governing board then votes on whether to suspend or dismiss the teacher based upon the statement of charges. (Citation omitted.) If the charges involve 'unprofessional conduct,' the board cannot vote until the district has given the teacher a 45–day 'opportunity to correct his or her faults.'").

Although the SOC does not specify which particular offenses the District has identified as unprofessional conduct subject to section 44938, the Board is prohibited from voting on them because David either was never given 45 days to correct his faults or never was found to re-offend.

### C.    Unsatisfactory Performance

In the same manner, any charge of Unsatisfactory Performance cannot form the basis for dismissal because, to our knowledge, the District has not complied with Cal. Educ. Code § 44938, subd. (b).[5] *See Vergara v. State of California* (2016) 246 Cal.App.4th 619, 630 ("A school district that intends to dismiss a permanent certificated teacher for 'unsatisfactory performance' must provide the teacher with a 'written notice of the unsatisfactory performance' specifying instances of

_____

unprofessional conduct, specifying the nature thereof with such specific instances of behavior and with such particularity as to furnish the employee an opportunity to correct his or her faults and overcome the grounds for the charge."

[5] "(b) The governing board of any school district shall not act upon any charges of unsatisfactory performance unless it acts in accordance with the provisions of paragraph (1) or (2):

"(1) At least 90 calendar days prior to the date of the filing, the board or its authorized representative has given the employee against whom the charge is filed, written notice of the unsatisfactory performance, specifying the nature thereof with such specific instances of behavior and with such particularity as to furnish the employee an opportunity to correct his or her faults and overcome the grounds for the charge. The written notice shall include the evaluation made pursuant to Article 11 (commencing with Section 44660) of Chapter 3, if applicable to the employee.

"(2) The governing board may act during the time period composed of the last one-fourth of the schooldays it has scheduled for purposes of computing apportionments in any fiscal year if, prior to the beginning of that time period, the board or its authorized representative has given the employee against whom the charge is filed, written notice of the unsatisfactory performance, specifying the nature thereof with such specific instances of behavior and with such particularity as to furnish the employee an opportunity to correct his or her faults and overcome the grounds for the charge. The written notice shall include the evaluation made pursuant to Article 11 (commencing with Section 44660) of Chapter 3, if applicable to the employee."

**FREEDOM X**

Brian Bock, Esq.
THE BOCK LAW GROUP, P.C.
March 22, 2021
Page 5 of 6
_____

unsatisfactory behavior with enough particularity to allow the teacher an opportunity to correct his or her faults. […] After the written notice is issued, the teacher is provided at least 90 days to attempt to correct his or her deficient performance and overcome the grounds for the charge. (§ 44938, subd. (b)(1).)").

Notwithstanding this serious procedural deficiency, once again, the charges levied against David for unsatisfactory performance lack any substance. There are no charges indicating that David failed to maintain proper control of assigned students, or a suitable learning environment, that he had deficiencies in classroom management, student engagement, instructional strategies and lesson design, or that he was unable to perform other duties and responsibilities of his position.

    1.   Failing to timely file grades or communicate to parents.

These charges fail to recognize David's exemplary service to his students and arise from complaints that, coincidentally, were (1) not made until shortly after Measure N was defeated, (2) brought by parents who backed Measure N, and (3) are unprecedented in David's career until a period of remote learning brought on by a pandemic. The policy for grading and feedback during this period is so unclear that, on February 10, 2021, Principal Martin wrote to David and said, "I heard and acknowledge your request for additional clarity regarding grading and reporting expectations. As a first step in providing that information, I will be gathering data from all content area teachers to assess current practices to ensure my expectations are equitable. Once this data is collected, I will be better able to provide clear, equitable, and actionable expectations."

The District charges that David ignored their questions, sent on November 12, 2020, but David answered them fully, stating, "I have never skipped or canceled a Zoom meeting" (in response to their request about "synchronous Zoom classes") and "the only time that I have not utilized near the full scheduled Zoom time were the few days where there were power outages on the mountain or evacuations."

A letter of reprimand is included in the charges, but it was removed from David's file before the charges were brought, depriving David of an opportunity to engage in grievance procedures required by the Collective Bargaining Agreement.

    2.   Failure to attend all synchronous classes via Zoom.

David has maintained that he never failed to attend a synchronous Zoom class, and that no synchronous Zoom classes were cut short other than as required by District policy during power outages on the mountain. The District cannot prove that he violated any policy or engaged in any performance irregularity.

**FREEDOM X**

Brian Bock, Esq.
THE BOCK LAW GROUP, P.C.
March 22, 2021
Page 6 of 6

_____

      3.  Failure to attend required office hours.

The charges include no evidence of a District policy relating to what times or how often to conduct office hours. No such requirements were communicated to David prior to these charges. Furthermore, the charges indicate that David has gone above and beyond the call of duty to help and assist his students outside of scheduled synchronous Zoom classes, even providing advanced math learning to students the District recognized would be treated inequitably if they were not provided advanced math instruction.

## III.    CONCLUSION

On the basis of the foregoing reasoning, it is evident that the District has done nothing to minimize the risk of error in the initial decision to deprive David of his property interest in the continuation of his employment. In fact, it has compounded the risk of error by ignoring David's statutory rights, by alleging potentially defamatory claims, by relying on anonymous sources, by relying on politically-motivated sources without questioning their credibility, by relying on hearsay upon hearsay, and in countless other ways.

Does the Board really wish to be complicit with the District's amateurish attempt to set David up for a fall? We can't understand why, nor can we reasonably expect it to act without taking a serious and deliberate look at the real facts through a competently-managed administrative process. If David were the villain the District has chosen to portray him as, they would have acted in 2018. They have slept on their rights. We urge the Board to vote against moving this matter forward and restore David to his teaching positions without delay. I will be ready to address any questions you may have at the meeting on Thursday.

<div align="center">

**FREEDOM X**

Sincerely,

William J. Becker, Jr., Esq.

</div>

cc:    David Kissner

Admitted X

B1407

Thursday, April 15, 2021 at 11:24:53 AM Pacific Daylight Time

**Subject:** Update: 6th Grade Program Model 2021-2022
**Date:** Monday, April 12, 2021 at 1:28:30 PM Pacific Daylight Time
**From:** Lisa Fraser
**To:** Billy Martin

Dear Loma 5th grade Families,

Upon our return from spring break, we have had a number of inquiries from 5th grade families as to the 6th grade instructional program model being planned for the 2021-22 school year based upon the district's need to make significant budget reductions and due to declining middle school enrollment.

Currently, 6th grade students attend four academic classes: English/Language Arts, Social Studies, Math and Science. They also attend a physical education class, an exploratory/boot camp course which rotates each quarter, and they have a choice of taking either music or art as an elective.

The proposed plans for next year would be very similar for 6th grade students. They will still have four academic classes, though these classes will be scheduled as an ELA/Social Studies and Math/Science core class each taught by a multiple subject teacher. This mirrors the same "team teaching" model Mrs. Ramsay and Mrs. Cole have employed this year.

6th grade students will still have a physical education class and an exploratory class. The one reduction at this time is that students will not have a "choice" of music or art. Pullout music has been retained thanks to LPEF funding commitments. In order to restore the art option that 6th grade students currently enjoy, we will need to generate additional revenue through the KEEP campaign.

We are hopeful that with the support of the Loma community, LPEF will exceed their fundraising goals such that we can entertain restoring elective choice in 6th grade. I hope this helps to clarify and dispel the myth that programming will be drastically different in 2021-2022.

Sincerely,

Lisa Fraser                    Billy Martin
Superintendent                 Principal

1  Golnar J. Fozi (Cal. Bar No. 167674)
   Daniel S. Modafferi (Cal. Bar No. 294510)
2  Fozi Dwork & Modafferi, LLP
   5942 Priestly Drive, Suite 100
3  Carlsbad, California 92008
   Tel: (760) 444-0039; Fax: (760) 444-0130
4  Email:   gfozi@fdmattorneys.com
            dmodafferi@fdmattorneys.com
5
   Attorneys for Defendants,
6  Lisa Fraser, Kevin Grier, Billy Martin, Deana
   Arnold, Ben Abeln, Ron Bourque, Charlotte
7  Khandelwal, and Erin Asheghian

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10

11  DAVID M. KISSNER,                    **Case No.:  3:22-cv-00949-CRB**
                                         **Assigned to: Hon. Charles R. Breyer**
12           Plaintiff,
                                         **DEFENDANTS LISA FRASER,**
13      v.                               **KEVIN GRIER, BILLY MARTIN,**
                                         **DEANA ARNOLD, BEN ABELN,**
14  LOMA PRIETA JOINT UNION              **RON BOURQUE, CHARLOTTE**
    SCHOOL DISTRICT, et al.,             **KHANDELWAL, AND ERIN**
15                                       **ASHEGHIAN'S NOTICE MOTION**
             Defendants.                 **AND MOTION FOR SUMMARY**
16                                       **JUDGMENT OR, IN THE**
                                         **ALTERNATIVE, PARTIAL**
17                                       **SUMMARY JUDGMENT**
18
                                         **Date:   July 28, 2023**
19                                       **Time:   10:00 a.m.**
                                         **Ctrm:  6**
20
                                         **Case Filed:  February 16, 2022**
21                                       **Trial Date:  None Set**
22

23       **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

24       **PLEASE TAKE NOTICE** that, on July 28, 2023, at 10:00 a.m., or as soon

25  thereafter as the matter may be heard, in Courtroom 6 of the United States District

26  Court for the Northern District of California, in the courtroom of the Honorable

27  Charles R. Breyer, Senior United States District Judge, located at 450 Golden Gate

28  Avenue, 17th Floor, San Francisco, California 94102, defendants Lisa Fraser, Kevin

                                       1
─────────────────────────────────────────────────────────
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT     3:22-cv-00949-CRB

1    Grier, Billy Martin, Deana Arnold, Ben Abeln, Ron Bourque, Charlotte Khandelwal,

2    and Erin Asheghian will, and hereby do, move the Court, pursuant to Federal Rule of

3    Civil Procedure 56, for summary judgment against plaintiff David M. Kissner, and in

4    favor of defendants, for costs of suit, and for such further relief as may be just. In the

5    alternative, defendants respectfully request that the Court grant partial summary

6    judgment as to individual claims, defenses, and/or issues, as detailed in the summary

7    of argument and the memorandum of points and authorities attached hereto.

8         This motion is made on the grounds that there is no genuine dispute of material

9    fact, and the defendants are entitled to judgment as a matter of law.

10        This motion will be based on this notice, the points and authorities in support,

11   the declaration of Daniel S. Modafferi, all documentary evidence attached to the

12   foregoing declarations, all matters of which the Court may take judicial notice, all

13   pleadings and papers on file in this action, any reply or supplemental briefing allowed

14   by the Court, any arguments which may be presented at the time of hearing on this

15   motion, and such matters and arguments as may be presented at the time of the

16   hearing.

17   Dated: June 23, 2023                    Fozi Dwork & Modafferi, LLP

18

19                              By:   /s/ Daniel S. Modafferi
                                     _____
20                                   Golnar J. Fozi
                                     Daniel S. Modafferi
21                                   Attorneys for Defendants,
                                     Lisa Fraser, Kevin Grier, Billy Martin,
22                                   Deana Arnold, Ben Abeln, Ron Bourque,
                                     Charlotte Khandelwal, and Erin
23                                   Asheghian

24

25

26

27

28

                                         2

1

## TABLE OF CONTENTS

2

TABLE OF AUTHORITIES .................................................................5

SUMMARY OF ARGUMENT .........................................................7

MEMORANDUM OF POINTS AND AUTHORITIES .......................................9

    I.     INTRODUCTION ...............................................................9

    II.    SUMMARY OF RELEVANT FACTS AND PROCEDURAL
         HISTORY ........................................................................9

    III.   SUMMARY JUDGMENT STANDARD ........................................12

    IV.   PLAINTIFF CANNOT MEET HIS BURDEN OF PROOF FOR
         A PROCEDURAL DUE PROCESS CLAIM, BECAUSE HE
         WAS AFFORDED ALL PROCESS REASONABLY DUE ..........13

    V.    PLAINTIFF CANNOT MAINTAIN A SUBSTANTIVE DUE
         PROCESS CLAIM, BECAUSE THE MORE SPECIFIC FIRST
         AMENDMENT RETALIATION STANDARD APPLIES.............15

    VI.   PLAINTIFF'S EQUAL PROTECTION CLAIM FAILS,
         BECAUSE IT AMOUNTS TO A FIRST AMENDMENT
         RETALIATION CLAIM ......................................................16

    VII.  SEVERAL DEFENDANTS PLAYED NO ROLE IN THE
         LAYOFF DECISION, AND EVEN THOSE WHO DID
         PARTICIPATE IN THAT DECISION ARE ENTITLED TO
         ABSOLUTE IMMUNITY ...................................................19

         A.   Grier Was Not Employed at the District When the Layoff
             Took Place........................................................19

         B.   Khandelwal Was Not on the Board When the Layoff Was
             Approved.........................................................20

         C.   Martin and Fraser Cannot Be Liable for the Board's
             Layoff Decision...................................................20

         D.   All of the Defendants Who Participated in the Layoff Are
             Entitled to Absolute Legislative Immunity...........................21

    VIII. PLAINTIFF'S CLAIM FOR STIGMA-PLUS DEFAMATION
         FAILS, BECAUSE PLAINTIFF WAS AFFORDED DUE
         PROCESS ......................................................................23

         A.   Martin and the Board Member Defendants Cannot Be
             Liable for Stigma-Plus Defamation, Because They Did Not
             Participate in the Disclosure of the Allegedly Defamatory
             Materials.........................................................24

3

B.    Plaintiff Cannot Maintain a Claim for Stigma-Plus
       Defamation against Any of the Defendants, Because He
       Was Afforded Due Process in the Course of the
       Termination Proceedings ........................................................24

IX.    PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIM
       IS BARRED UNDER *MOUNT HEALTHY* .....................................25

X.     PLAINTIFF CANNOT PRODUCE EVIDENCE SUFFICIENT
       TO CREATE A TRIABLE ISSUE OF FACT AS TO
       CONSPIRACY ..........................................................................27

XI.    CONCLUSION ..........................................................................28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT     3:22-cv-00949-CRB

1                            <u>**TABLE OF AUTHORITIES**</u>

2     **Cases**

3     *Albright v. Oliver* (1994) 510 U.S. 266 ................................................ 15

4     *Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242 ......................... 12

5     *Arizona Students' Assoc. v. Arizona Bd. of Regents* (9th Cir. 2016) 824 F.3d 858 16

6     *Ashcroft v. Iqbal* (2009) 556 U.S. 662 ............................................... 20

7     *Barren v. Harrington* (9th Cir. 1998 152 F.3d 1193 ......................... 17

8     *Bell Atlantic Corp. v. Twombly* (2007) 550 U.S. 544 ......................... 27

9     *Bernheim v. Litt* (2d Cir. 1996) 79 F.3d 318 ...................................... 18

10    *Bogan v. Scott-Harris* (1998) 523 U.S. 44 ..................................... 8, 21

11    *Boyd v. Ill. State Police* (7th Cir. 2004) 384 F.3d 888 ....................... 18

12    *Celotex Corp. v. Catrett* (1986) 477 U.S. 317 ................................... 12

13    *Clements v. Airport Auth. of Washoe Cnty.* (9th Cir. 1995) 69 F.3d 321 ........ 7, 13

14    *Daniels v. Williams* (1986) 474 U.S. 327 ......................................... 15

15    *Doe v. Pasadena Unif. Sch. Dist.* (9th Cir. 2020) 810 F'Appx. 500 ......... 7, 17, 18

16    *Doe v. Pasadena Unif. Sch. Dist.* (C.D. Cal. Sept. 26, 2018) 2018 WL 5880187 17,

17           18

18    *Garcia v. City of Newport Beach* (C.D. Cal. Apr. 7, 2020) 2020 WL 5778133 . 27

19    *Graham v. Connor* (1994) 490 U.S. 386 ............................................. 15

20    *Harlow v. Fitzgerald* (1982) 457 U.S. 800 ........................................ 19

21    *Ingraham v. Wright* (1977) 430 U.S. 651 ........................................... 13

22    *Kirby v. City of Elizabeth City* (4th Cir. 2004) 388 F.3d 440 ............... 18

23    *Lacey v. Maricopa Cnty.* (9th Cir. 2012) 693 F.3d 896 ....................... 27

24    *Lal v. California* (9th Cir. 2014) 746 F.3d 1112 ............................... 19

25    *Mount Healthy Sch. Dist. Bd. of Ed. v. Doyle* (1977) 429 U.S. 274 .......... 8, 25

26    *Nestor Colon Medina & Sucesores, Inc. Custodio* (1st Cir. 1992) 964 F.2d 32 . 18

27    *Papas v. Leonard* (D. Or. Apr. 25, 2012) 2012 WL 1445853 .................. 18

28    *Paul v. Davis* (1976) 424 U.S. 693 ................................................... 23

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT       3:22-cv-00949-CRB

1    *Pearson v. Callahan* (2009) 555 U.S. 223 ............................................................ 19

2    *Ratliff v. Dekalb Cnty.* (11th Cir. 1995) 62 F.3d 338 .......................................... 18

3    *Schmidt v. Contra Costa Cnty.* (9th Cir. 2012) 693 F.3d 1122 .......................... 23

4    *Segal v. City of N.Y.* (2d Cir. 2006) 459 F.3d 207 .......................................... 8, 24

5    *Siegert v. Gilley* (1991) 500 U.S. 226 .................................................................. 23

6    *Tenney v. Brandhove* (1951) 341 U.S. 367 .......................................................... 21

7    *U.S. v. Raya-Vaca* (9th Cir. 2014) 771 F.3d 1195 .............................................. 13

8    *Webber v. First Student, Inc.* (D. Or. July 12, 2011) 2011 WL 3489882 ............ 18

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT     3:22-cv-00949-CRB

### SUMMARY OF ARGUMENT

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (FRCP 56(c).) Defendants request summary judgment as to the following claims, defenses, and/or issues:

Defendants are entitled to judgment as a matter of law on plaintiff's procedural due process cause of action. Due process requires "*notice* and *an opportunity to respond*" (*Clements v. Airport Auth. of Washoe Cnty.* (9th Cir. 1995) 69 F.3d 321, 331-332), and the undisputed evidence establishes that plaintiff was afforded both.

Defendants are also entitled to judgment as a matter of law on any claim for substantive due process. "Where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing [the plaintiff's] claims." (*Albright v. Oliver* (1994) 510 U.S. 266, 273.) Plaintiff's claims for free speech retaliation arise under the First Amendment, and therefore, they are not actionable under substantive due process.

Similarly, defendants are entitled to judgment as a matter of law on plaintiff's equal protection claim. Where the plaintiff's equal protection claim is based on being treated differently *because of* the plaintiff's engagement in speech and/or conduct protected under the First Amendment, that claim must be "analyzed under the rubric of the First Amendment," not as an equal protection claim. (*Doe v. Pasadena Unif. Sch. Dist.* (9th Cir. 2020) 810 F'Appx. 500, 503.)

Several of the defendants did not participate in the decision to lay plaintiff off from the District. Those who did are entitled to absolute legislative immunity, as "unlike the hiring or firing of a particular employee," the "termination of a position" has "prospective implications that reach well beyond the particular occupant of the office" and is therefore inherently legislative in nature. (*Bogan v. Scott-Harris* (1998)

7

523 U.S. 44, 56.)

Defendants are entitled to judgment as a matter of law on plaintiff's stigma-plus due process claim. As discussed above, plaintiff received adequate procedural protections before and after his termination and layoff took effect. "[T]he availability of adequate process defeats a stigma-plus claim." (*Segal v. City of N.Y.* (2d Cir. 2006) 459 F.3d 207, 213.)

Defendants are entitled to judgment as a matter of law on plaintiff's First Amendment Retaliation claim. The undisputed evidence establishes that the District would have terminated even in the absence of plaintiff's protected conduct, because the termination decision was made by an independent Commission on Professional Competence that was not influenced by any alleged political animus. (See *Mount Healthy Sch. Dist. Bd. of Ed. v. Doyle* (1977) 429 U.S. 274, 287.)

Finally, defendants are entitled to judgment as a matter of law on plaintiff's civil rights conspiracy claim. Plaintiff cannot present evidence sufficient to create a triable issue of fact as to whether the defendants conspired to violate his rights.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT     3:22-cv-00949-CRB

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Lisa Fraser, Kevin Grier, Billy Martin, Deana Arnold, Ben Abeln, Ron Bourque, Charlotte Khandelwal, and Erin Asheghian respectfully submit the following points and authorities in support of their motion for summary judgment:

## I.   INTRODUCTION

Plaintiff David Kissner was fired from his employment at Loma Prieta Joint Union School District in 2021, after a three-member Commission on Professional Competence concluded plaintiff was unfit for service. Plaintiff claims the District Board members and administrators who initiated his termination were actually motivated by a desire to retaliate against him due to plaintiff's political speech and activities, such as campaigning against a school-funding tax measure that the defendants supported and petitioning the Board to fill a vacant Board seat by special election rather than appointing a replacement. As demonstrated herein, however, the undisputed evidence in this case does not support plaintiff's claims. Instead, the law and facts dictate that judgment be entered in favor of defendants as a matter of law.

## II.   SUMMARY OF RELEVANT FACTS AND PROCEDURAL HISTORY

Plaintiff was employed by the District as a middle school teacher from 2012 to 2021. (ECF No. 16, 3:18-19.) On March 14, 2018, in response to the high school shooting in Parkland, Florida, students nationwide participated in a walkout from schools to protest in favor of gun control legislation. (ECF No. 16, 14:23-15:2.) Plaintiff informed his students that any student who chose to participate in the walkout would be deemed absent without excuse and would not be permitted to make up the classwork missed. (ECF No. 16, 18:18-20.) Plaintiff's stance with respect to the walkout led to controversy within the District and the local community, with parents and community members taking sides for and against plaintiff. (ECF No. 16, 18:22-19:14.)

Shortly after the walkout controversy arose, the District received an anonymous letter, accusing plaintiff of engaging in inappropriate behavior with minors, which the

1  anonymous author of the letter described as "grooming." (ECF No. 16, 28:16-18.) The
2  District retained outside counsel to conduct an investigation into the allegations of
3  inappropriate behavior by plaintiff. (ECF No. 16, 37:1-4.) Through the investigation,
4  the District discovered that plaintiff had furnished alcohol to at least one minor. (ECF
5  No. 16, 29:11-15.) After several months of investigation, the District concluded that
6  plaintiff's conduct had had a negative impact on students. The District did not
7  terminate plaintiff as a result of the findings in the 2018 investigation (ECF No. 16,
8  39:11-12), but the then-Superintendent, Lisa Fraser, issued plaintiff a written letter of
9  warning, advising him that any further instances of inappropriate behavior could result
10  in disciplinary action, up to and including termination. (Kissner Depo., 68:10-17, Exh.
11  13 pp. PL000811-PL000812.)

12       Finally, on February 12, 2021, Fraser issued plaintiff a written Notice of
13  Proposed Intent to Dismiss with Statement of Charges. (Kissner Depo., 68:10-17,
14  Exh. 13.) The notice charged plaintiff with violations of the Education Code which
15  the District alleged constituted grounds for termination. (*Ibid.*)

16       On March 25, 2021, the District Board of Trustees met in closed session to
17  determine whether to proceed with termination proceedings against plaintiff. (Request
18  for Judicial Notice, Exh. C.) Plaintiff and his counsel appeared at the Board meeting
19  and presented their reasons why the Board should not move forward with termination.
20  (*Id.*; Kissner Depo., 70:15-71:1.) At the conclusion, the Board voted to move forward
21  with termination proceedings. (*Ibid.*)

22       Plaintiff then requested a hearing before a three-member Commission on
23  Professional Competence. (Kissner Depo., 69:12-20.) In preparation for the hearing,
24  plaintiff had the right to conduct formal discovery, subpoena witnesses, depose
25  witnesses, request documents, and to be represented by counsel. (Kissner Depo., 71:7-
26  20.) Then, during the multi-day hearing, plaintiff had the right to call witnesses to
27  testify, to present evidence in his defense, and to be represented by counsel. (Kissner
28  Depo., 71:21-72:6.)

---

10

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT     3:22-cv-00949-CRB

1       After considering all of the evidence presented by both sides, as well as the
2  arguments of counsel, the Commission on Professional Competence issued a written
3  decision on December 7, 2021, directing the District to terminate plaintiff's
4  employment, based on plaintiff's evident unfitness for service. (Request for Judicial
5  Notice, Exh. E.)

6       In late 2020 and early 2021, the District's Budget Advisory Committee
7  identified a budget shortfall and recommended that the District layoff four full-time
8  teachers for the upcoming school year. (ECF No. 16, 49:23-50:2.) In deciding which
9  teachers to layoff, the District prioritized retaining teachers with multiple subject
10  credentials. (Request for Judicial Notice, Exh. A.) Because plaintiff held only a single
11  subject credential, his position was identified for layoff. (Kissner Depo., Exh 12 pp.
12  Z11-Z12.)

13       Plaintiff requested an administrative hearing before an Administrative Law
14  Judge to determine whether the statutory grounds for layoff had been met. (Kissner
15  Depo., 67:5-16.) Plaintiff was represented by counsel during that hearing. (Kissner
16  Depo., 67:17-18.) At the conclusion of the hearing, the ALJ concluded that plaintiff's
17  layoff was consistent with the Education Code. (Kissner Depo., 67:19-21; Request for
18  Judicial Notice, Exh. D.)

19       On February 16, 2022, plaintiff filed this lawsuit. (ECF No. 1.) The operative
20  second amended complaint originally alleged 19 causes of action, under both federal
21  and state law. (ECF No. 16.) On June 9, 2022, however, plaintiff voluntarily dismissed
22  all state law claims. (ECF No. 50.) Furthermore, on August 25, 2022, plaintiff
23  voluntarily dismissed all remaining claims against the District. (ECF No. 66.)
24  Therefore, the only remaining claims are: claim 1 for First Amendment retaliation;
25  claim 3 for stigma-plus defamation; claim 16 for violation of the Fourteenth
26  Amendment right to due process; claim 17 for violation of the Fourteenth Amendment
27  right to equal protection; and claim 18 for civil rights conspiracy. Each of the moving
28  defendants is a party to each of the remaining federal constitutional claims.

III.    **<u>SUMMARY JUDGMENT STANDARD</u>**

Summary judgment serves to isolate and dispose of factually unsupported claims. (*Celotex Corp. v. Catrett* (1986) 477 U.S. 317, 323-324.) Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (FRCP 56(c); *Celotex Corp. v. Catrett, supra*, 477 U.S. at p. 322.) The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which the nonmoving party has the burden of proof. (*Id.* at pp. 322-23.) A party opposing summary judgment may not rest upon mere allegations or denials of pleadings, but must set forth specific facts showing that there is a genuine issue for trial. (*Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242, 248.)

The moving party may satisfy its initial burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of its claim on which that party will bear the burden of proof at trial. (*Celotex Corp. v. Catrett, supra,* 477 U.S. at pp. 322-23.) If the moving party meets the initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing there is a genuine issue for trial." (*Anderson v. Liberty Lobby, Inc., supra*, 477 U.S. at p. 256.) A fact is material only if proof of that fact would establish or refute one of the elements of a claim or affirmative defense at issue, and only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. (*Ibid.*)

///

///

///

///

**IV.   PLAINTIFF CANNOT MEET HIS BURDEN OF PROOF FOR A PROCEDURAL DUE PROCESS CLAIM, BECAUSE HE WAS AFFORDED ALL PROCESS REASONABLY DUE**

The 16th cause of action in plaintiff's operative complaint alleges that defendants deprived plaintiff of his right to due process of law under the Fourteenth Amendment. Plaintiff's complaint does not specify whether he is alleging violations of procedural due process, substantive due process, or both. To the extent plaintiff claims he was deprived of procedural due process, however, he cannot meet his burden of proof, because he was afforded all process reasonably due.

The Due Process Clause prohibits the government from depriving an individual of life, liberty, or property without providing "notice and an opportunity to respond," or, in other words, the opportunity to present reasons not to proceed with the deprivation and have them considered. (*U.S. v. Raya-Vaca* (9th Cir. 2014) 771 F.3d 1195, 1204.) "Application of this prohibition requires the familiar two-stage analysis: We must first ask whether the asserted individual interests are encompassed within the Fourteenth Amendment's protection of 'life, liberty or property'; if protected interests are implicated, we then must decide what procedures constitute 'due process of law.'" (*Ingraham v. Wright* (1977) 430 U.S. 651, 672.)

"It is well settled that the root requirement of the Due Process Clause is that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." (*Clements v. Airport Auth. of Washoe Cnty.* (9th Cir. 1995) 69 F.3d 321, 331 (quotes, cites, and brackets omitted) (emphasis in original).) "Although the pre-termination hearing need not be elaborate, "some kind of hearing" must be afforded the employee prior to termination. The essential requirements of this pre-termination process are *notice* and *an opportunity to respond*." (*Id.* at pp. 331-332 (quotes and cites omitted) (emphasis in original).)

In this case, it is undisputed that, prior to his termination, plaintiff received written notice of the District's intent to terminate him. (Kissner Depo., 68:10-17, 69:3-

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT          3:22-cv-00949-CRB

1    11, Exh. 13 pp. PL000778-PL000779.) It is also undisputed that plaintiff was afforded
2    the opportunity to respond to the notice of intent to terminate in a meeting with the
3    Board. (Kissner Depo., 69:12-16, 70:19-71:1; Request for Judicial Notice, Exh. C.)
4    Plaintiff was represented by counsel at the Board meeting, and he and his counsel
5    presented their responses to the charges on which the District proposed to terminate
6    plaintiff's employment. (*Ibid.*) Nevertheless, the Board voted to allow the termination
7    proceedings to move forward. (*Ibid.*)

8       It is undisputed that, during the course of the termination proceedings, plaintiff
9    was represented by counsel, conducted formal discovery, deposed opposing
10   witnesses, and subpoenaed favorable witnesses. (Kissner Depo., 71:7-20.) Plaintiff
11   was then afforded a full evidentiary trial before a three-member administrative panel,
12   at which he was again represented by counsel, called witnesses to testify, presented
13   documentary evidence, and cross-examined the District's witnesses. (Kissner Depo.,
14   71:21-72:6; Request for Judicial Notice, Exh. E.) Plaintiff's termination took effect
15   only *after* the administrative panel concluded the District had met its burden of proof
16   to establish statutory grounds for termination. (Kissner Depo., 72:10-14; Request for
17   Judicial Notice, Exh. E.) Then, once his termination took effect, plaintiff had the right
18   to appeal the administrative panel's decision, which he did by filing a petition for writ
19   of administrative mandate in state court. (Kissner Depo., 72:15-25.) These pre- and
20   post-termination procedures were more than adequate to satisfy the requirements of
21   the Due Process Clause.

22      Similarly, prior to the layoff taking effect, it is undisputed that plaintiff received
23   written notice of the District's intent to lay him off. (Kissner Depo., 64:24-65:8, Exh.
24   12 pp. Z11-Z12.) It is also undisputed that plaintiff was afforded the right to a hearing
25   before an administrative law judge to determine whether the statutory grounds for
26   layoff had been met. (Kissner Depo., 67:5-16.) Plaintiff was represented by counsel
27   during that hearing. (Kissner Depo., 67:17-18.) At the conclusion of the hearing, the
28   ALJ concluded that plaintiff's layoff was consistent with the Education Code.

14

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT      3:22-cv-00949-CRB

1   (Kissner Depo., 67:19-21; Request for Judicial Notice, Exh. D.) Thereafter, plaintiff

2   had the right to appeal the ALJ's decision, which he did by filing a petition for writ of

3   administrative mandate in state court. (Kissner Depo., 67:22-68:9.) As with the

4   termination, these pre- and post-layoff procedures were more than adequate to satisfy

5   the requirements of the Due Process Clause.

6        Because plaintiff was afforded notice, multiple opportunities to respond, and

7   the right to appeal *both* his termination *and* his layoff, he has no claim for deprivation

8   of the right to procedural due process.

9   **V.    PLAINTIFF CANNOT MAINTAIN A SUBSTANTIVE DUE PROCESS**

10       **CLAIM, BECAUSE THE MORE SPECIFIC FIRST AMENDMENT**

11       **RETALIATION STANDARD APPLIES**

12       To the extent plaintiff's due process claim is based on a deprivation of

13  substantive due process, defendants are entitled to summary judgment, because the

14  more specific First Amendment retaliation standard applies. The courts have long held

15  that the Due Process Clause "contains a substantive component, sometimes referred

16  to as substantive due process, which bars certain arbitrary government actions

17  regardless of the fairness of the procedures used to implement them." (*Daniels v.*

18  *Williams* (1986) 474 U.S. 327, 337 (Stevens, J., concurring in the judgments) (quotes

19  and cites omitted).) However, "[w]here a particular amendment 'provides an explicit

20  textual source of constitutional protection' against a particular sort of government

21  behavior, 'that Amendment, not the more generalized notion of substantive due

22  process, must be the guide for analyzing [the plaintiff's] claims.'" (*Albright v. Oliver*

23  (1994) 510 U.S. 266, 273 (quoting *Graham v. Connor* (1994) 490 U.S. 386, 395).) In

24  this case, plaintiff's claim of termination in retaliation for his political speech and

25  activities arises under the First Amendment and therefore is not actionable under a

26  Fourteenth Amendment substantive due process theory.

27       Plaintiff's due process claim alleges that he was terminated and laid off "in

28  retaliation for his political advocacy." (ECF No. 16, 86:3-4.) Plaintiff further alleges

15

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT    3:22-cv-00949-CRB

that his "(1) political opposition to the student walkouts and (2) opposition to Measure N, (3) advocacy for a special trustee board election, and (4) promoting board reform were protected activities," that the defendants "were aware of the protected activities," and that "the adverse actions of layoff and dismissal followed within a relatively short time thereafter." (ECF No. 16, 86:5-9.) According to plaintiff, "[b]ut for his unpopular views regarding the student walkouts, Measure N, the trustee board special election, and budget reform, Kissner would have remained a teacher employed by the District." (ECF No. 16, 86:11-13.)

The right to engage in political speech and/or activity free from government retaliation is wholly protected under the First Amendment. (See *Arizona Students' Assoc. v. Arizona Bd. of Regents* (9th Cir. 2016) 824 F.3d 858, 868 (collecting cases).) Therefore, plaintiff cannot use the more general standard of substantive due process to vindicate his rights. If plaintiff has any constitutional claim arising from alleged retaliation for his political speech and activity, the claim arises exclusively under the First Amendment.

## VI.   PLAINTIFF'S EQUAL PROTECTION CLAIM FAILS, BECAUSE IT AMOUNTS TO A FIRST AMENDMENT RETALIATION CLAIM

The 17th cause of action in plaintiff's operative complaint alleges that defendants deprived plaintiff of his right to equal protection of law under the Fourteenth Amendment. Plaintiff alleges that, "[a]fter [he] engaged in political speech, the Individual District Defendants discriminated against him because of the content of that speech." (ECF No. 16, 87:13-14.) More specifically, plaintiff alleges that defendant "sought to punish [him] because of his opposition to the student walkouts and Measure N, his support for a special trustee board election, and political pressure he brought to bear on the Individual District Defendants to balance their budget and comply with the law." (ECF No. 16, 88:10-14.) Plaintiff claims that defendants "have treated [him] differently from other teachers, staff, faculty, and administrative employees, who" express political views different from plaintiff's.

1   (ECF No. 16, 88:19-22.)

2       "To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection

3   Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted

4   with an intent or purpose to discriminate against the plaintiff based upon membership

5   in a protected class." (*Barren v. Harrington* (9th Cir. 1998 152 F.3d 1193, 1194.)

6   However, where the plaintiff's equal protection claim is based on being treated

7   differently *because of* the plaintiff's engagement in speech and/or conduct protected

8   under the First Amendment, that claim must be "analyzed under the rubric of the First

9   Amendment," not as an equal protection claim. (*Doe v. Pasadena Unif. Sch. Dist.* (9th

10  Cir. 2020) 810 F'Appx. 500, 503.)

11      The plaintiff in *Doe* alleged that she met with the principal of her children's

12  elementary school to complain about the school's policy of throwing away students'

13  lunches if the students did not finish them in a short period of time. (*Doe v. Pasadena

14  Unif. Sch. Dist.* (C.D. Cal. Sept. 26, 2018) 2018 WL 5880187, *1.) The plaintiff told

15  the principal she would file a complaint against him with the school board if he

16  continued to enforce the policy. (*Ibid.*) According to the plaintiff, the principal

17  responded by threatening to contact federal immigration enforcement against the

18  plaintiff if she made a complaint about the principal to the school board. (*Ibid.*) The

19  plaintiff brought suit, alleging both First Amendment retaliation and an equal

20  protection claim. (*Ibid.*)

21      The District Court granted summary judgment in favor of the principal on the

22  equal protection claim, holding that her complaint of retaliation for engaging in

23  protected speech "is not an equal protection claim, but a First Amendment retaliation

24  claim." (*Id.* at p. *4.) The court explained, "Although the Ninth Circuit has not

25  considered the issue, the First, Second, Fourth, Seventh, and Eleventh Circuits have

26  all concluded that allegations that a plaintiff was treated differently in retaliation for

27  the exercise of First Amendment rights do not implicate the Equal Protection Clause."

28  (*Id.* (citing *Nestor Colon Medina & Sucesores, Inc. Custodio* (1st Cir. 1992) 964 F.2d

17

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT          3:22-cv-00949-CRB

1   32, 45; *Bernheim v. Litt* (2d Cir. 1996) 79 F.3d 318, 323; *Kirby v. City of Elizabeth*

2   *City* (4th Cir. 2004) 388 F.3d 440, 447; *Boyd v. Ill. State Police* (7th Cir. 2004) 384

3   F.3d 888, 898; *Ratliff v. Dekalb Cnty.* (11th Cir. 1995) 62 F.3d 338, 340-341; *Papas*

4   *v. Leonard* (D. Or. Apr. 25, 2012) 2012 WL 1445853, *14-15; *Webber v. First*

5   *Student, Inc.* (D. Or. July 12, 2011) 2011 WL 3489882).) The court concluded that

6   the plaintiff could not "simply recharacterize [her] First Amendment retaliation claim

7   as a violation of the Equal Protection Clause." (*Ibid.*)

8       On appeal, the Ninth Circuit affirmed the summary judgment in favor of the

9   principal as to the equal protection claim, concluding that the parent's "Equal

10   Protection claim also fails because it amounts to a First Amendment retaliation claim,

11   not an Equal Protection claim." (810 F'Appx. at p. 502.) Because the principal's threat

12   was in retaliation for the parent's protected speech, and not because of her

13   immigration status, the Ninth Circuit held that the complaint must be brought under

14   the First Amendment, not the Equal Protection Clause. (*Id.* at pp. 502-503.)

15       Similarly, in this case, plaintiff's equal protection cause of action is premised

16   entirely on alleged retaliation for speech and/or conduct protected under the First

17   Amendment. Plaintiff does not allege, and cannot prove, that any of the defendants

18   discriminated against him on the basis of race, sex, or any characteristic protected

19   under the Equal Protection Clause. Therefore, defendants are entitled to summary

20   judgment as to the equal protection claim, because it amounts to a claim for First

21   Amendment retaliation, not an equal protection violation.

22       At minimum, defendants are entitled to qualified immunity with regard to the

23   equal protection claim, because it was not clearly established, as of February 2021

24   when plaintiff's termination was initiated, that public employees had a right under the

25   Equal Protection Clause to be free from political retaliation. "The doctrine of qualified

26   immunity protects government officials 'from liability for civil damages insofar as

27   their conduct does not violate clearly established statutory or constitutional rights of

28   which a reasonable person would have known.'" (*Pearson v. Callahan* (2009) 555

18

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT    3:22-cv-00949-CRB

1   U.S. 223, 231 (quoting *Harlow v. Fitzgerald* (1982) 457 U.S. 800, 818.) "In

2   determining whether an officer is entitled to qualified immunity, we consider (1)

3   whether there has been a violation of a constitutional right; and (2) whether that right

4   was clearly established at the time of the officer's alleged misconduct." (*Lal v.*

5   *California* (9th Cir. 2014) 746 F.3d 1112, 1116.) As of February 2021, no Ninth

6   Circuit case had held that political retaliation claims were actionable under the Equal

7   Protection Clause. On the contrary, less than a year before the District initiated

8   plaintiff's termination, the Ninth Circuit had held in *Doe*, *supra*, that such claims *were*

9   *not* actionable. Numerous other circuits had reached similar conclusions, as noted by

10  the district court in *Doe*. Therefore, there was no clearly established right under the

11  Equal Protection Clause to be free from political retaliation. Defendants are entitled

12  to qualified immunity.

13  **VII.  <u>SEVERAL DEFENDANTS PLAYED NO ROLE IN THE LAYOFF</u>**

14  **<u>DECISION, AND EVEN THOSE WHO DID PARTICIPATE IN THAT</u>**

15  **<u>DECISION ARE ENTITLED TO ABSOLUTE IMMUNITY</u>**

16         Each of plaintiff's causes of action arises, in whole or in part, from the reduction

17  in force which resulted in plaintiff being laid off from the District in 2021. As detailed

18  herein, however, several of the defendants played no role in the layoff decision, and

19  even those who did participate in that decision cannot be liable for it as a matter of

20  law. Therefore, defendants are entitled to summary judgment as to all claims arising

21  from the layoff.

22         **A.  <u>Grier Was Not Employed at the District When the Layoff Took Place</u>**

23         Defendant Kevin Grier is the current Superintendent of the District. (ECF No.

24  16, 6:4.) Grier took over as Superintendent in July 2021, after Lisa Fraser retired.

25  (Fraser Depo., 8:9-20.) By the time Grier joined the District, the Board had already

26  adopted Resolution No. 21-XII on February 10, 2021, approving the procedure for

27  determining the order of seniority of the District's employees during the layoff

28  process (Request for Judicial Notice, Exh. A); the Board had also already adopted

1   Resolution No. 21-VIV on March 10, 2021, *recommending a reduction in particular*
2   *kinds of services* (Request for Judicial Notice, Exh. B); and the ALJ had already issued
3   the decision recommending plaintiff's layoff on May 3, 2021. (Request for Judicial
4   Notice, Exh. D.) Even plaintiff admits that Grier was not Superintendent at the time
5   plaintiff was laid off (Kissner Response to Request for Admission No. 7), was not
6   employed at the District at the time plaintiff was laid off (Kissner Response to Request
7   for Admission No. 8), and was not employed at the District at any time between the
8   date plaintiff was hired by the District and the date plaintiff was laid off (Kissner
9   Response to Request for Admission No. 9). As a matter of law, no person can be held
10  liable under section 1983 unless he or she personally participates in the deprivation of
11  the plaintiff's rights. (*Ashcroft v. Iqbal* (2009) 556 U.S. 662, 676 ("Because vicarious
12  liability is inapplicable to… § 1983 suits, a plaintiff must plead that each Government-
13  official defendant, through the official's own individual actions, has violated the
14  Constitution.").) Because Grier did not personally participate in the layoff decision,
15  he cannot be liable for any constitutional claim arising from that decision.

16      **B.      Khandelwal Was Not on the Board When the Layoff Was Approved**

17          Defendant Charlotte Khandelwal is a current member of the School Board.
18  (ECF No. 16, 6:23-24.) However, Khandelwal did not join the Board until *after* the
19  layoff resolutions had been adopted. (Kissner Depo., 49:8-11.) In particular, plaintiff
20  concedes that Khandelwal was not on the Board at the time that the Board adopted
21  Resolutions 21-XII (Kissner Depo., 64:3-7; see also Request for Judicial Notice, Exh.
22  A) and 21-XIV (Kissner Depo., 64:8-11; see also Request for Judicial Notice, Exh.
23  B.) Therefore, Khandelwal cannot be liable for any constitutional claim arising from
24  the layoff decision, which predated her membership on the Board.

25      **C.      Martin and Fraser Cannot Be Liable for the Board's Layoff Decision**

26          Defendant Billy Martin is the former principal of the school. (ECF No. 16, 6:9.)
27  Defendant Lisa Fraser is the former Superintendent of the District. (ECF No. 16,
28  5:23.) Neither Martin nor Fraser was a member of the Board, at any time. The layoff

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT          3:22-cv-00949-CRB

1  was effected by means of two legislative actions adopted by the Board: Resolution
2  No. 21-XII on February 10, 2021, approving the procedure for determining the order
3  of seniority of the District's employees during the layoff process (Request for Judicial
4  Notice, Exh. A); and Resolution No. 21-VIV on March 10, 2021, recommending a
5  reduction in particular kinds of services (Request for Judicial Notice, Exh. B).
6  Because neither Martin nor Fraser had the power to adopt the layoff resolutions or the
7  authority to rescind the resolutions following adoption by the Board, they cannot be
8  liable for any constitutional claim arising from the Board's layoff decision.

9      **D.    All of the Defendants Who Participated in the Layoff Are Entitled to**
10          **Absolute Legislative Immunity**

11      As detailed above, the layoff was effected by means of the Board's adoption of
12  two legislative resolutions. Because the adoption of a reduction in force is inherently
13  legislative in character, any and all defendants who participated in the layoff decision
14  are entitled to absolute legislative immunity. Therefore, all claims arising from the
15  layoff must be summarily adjudicated in favor of defendants.

16      "Absolute legislative immunity attaches to all actions taken 'in the sphere of
17  legitimate legislative activity.'" (*Bogan v. Scott-Harris* (1998) 523 U.S. 44, 54
18  (quoting *Tenney v. Brandhove* (1951) 341 U.S. 367, 376).) Whether an action is
19  legislative "turns on the nature of the act, rather than on the motive or intent of the
20  official performing it." (*Ibid*.) "The privilege of absolute immunity would be of little
21  value if legislators could be subjected to the cost and inconvenience and distractions
22  of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them
23  based upon a jury's speculation as to motives." (*Id.* (quotes and brackets omitted).)
24  "[I]t simply is not consonant with our scheme of government for a court to inquire
25  into the motives of legislators." (*Id.* at p. 55 (quotes omitted).)

26      The Supreme Court's decision in *Bogan* dictates that the reduction in force
27  decision in this case was legislative in nature, and therefore, absolute legislative
28  immunity applies in this case. The *Bogan* case arose from a similar internal dispute

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT     3:22-cv-00949-CRB

1   within a local government entity. Janet Scott-Harris was employed by the City of Fall

2   River, Massachusetts, as administrator of the city's Department of Health and Human

3   Services (DHHS). (*Id.* at p. 46.) Scott-Harris brought termination charges against a

4   subordinate employee for allegedly making racial and ethnic slurs about her

5   colleagues. (*Ibid.*) The subordinate used her political connections with members of

6   the City Council to fight the termination, and ultimately, the Mayor, Daniel Bogan,

7   substantially reduced the charges against the subordinate. (*Id.* at p. 47.)

8        While the charges against the subordinate were pending, Bogan prepared a

9   budget proposal for the following fiscal year, calling for the elimination of DHHS,

10  which would relate in Scott-Harris being laid off. (*Ibid.*) The City Council approved

11  an ordinance eliminating DHHS, and Bogan signed the ordinance into law. (*Ibid.*)

12       Scott-Harris alleged that the elimination of her position violated her rights to

13  equal protection and free speech, as the decision was motivated by racial animus and

14  a desire to retaliate against her for exercising her First Amendment rights in filing the

15  complaint against the subordinate. (*Ibid.*) However, the Supreme Court held that the

16  city councilmembers and the Mayor were all protected by absolute legislative

17  immunity, and therefore, Scott-Harris's claims were barred.

18       "[U]nlike the hiring or firing of a particular employee," the "termination of a

19  position" has "prospective implications that reach well beyond the particular occupant

20  of the office." (*Id.* at p. 56.) Thus, the Supreme Court held that the ordinance

21  eliminating DHHS "reflected a discretionary, policymaking decision implicating the

22  budgetary priorities of the city and the services the city provides to its constituents."

23  (*Id.* at pp. 55-56.) The Court held that the alleged unconstitutional motives for the

24  ordinance could not even be taken into account. Because the elimination of a position

25  is legislative in nature, absolute immunity applies, irrespective of the alleged motive.

26       Furthermore, "officials outside the legislative branch are entitled to legislative

27  immunity when they perform legislative functions." (*Id.* at p. 55.) For example, in

28  *Bogan*, the Mayor's acts of proposing the budget to the city council which eliminated

22

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT        3:22-cv-00949-CRB

1  DHHS and signing the ordinance into law were both protected, because they were

2  "integral steps in the legislative process." (*Ibid*.) Therefore, even if there were a

3  dispute of fact regarding Martin or Fraser's (or any other defendant's) participation in

4  the layoff by proposing the layoff criteria to the Board, they are each entitled to

5  absolute legislative immunity to the same extent as the Board member defendants are.

6          Finally, legislative immunity bars *all* claims under section 1983 – not just

7  claims for damages. (*Schmidt v. Contra Costa Cnty.* (9th Cir. 2012) 693 F.3d 1122,

8  1132.) Therefore, even plaintiff's claims for injunctive relief are barred to the extent

9  they arise from the layoff. Defendants are entitled to summary judgment as to all

10  claims for damages and injunctive relief which arise from the decision to lay plaintiff

11  off from his employment.

## VIII. PLAINTIFF'S CLAIM FOR STIGMA-PLUS DEFAMATION FAILS, BECAUSE PLAINTIFF WAS AFFORDED DUE PROCESS

14          The 3rd cause of action in plaintiff's operative complaint alleges "civil rights

15  defamation" under section 1983. "Defamation, by itself, is a tort actionable under the

16  laws of most States, but not a constitutional deprivation." (*Siegert v. Gilley* (1991)

17  500 U.S. 226, 233.) However, if a government official's act of defamation results in

18  a plaintiff being deprived of a previously held constitutionally protected right, a

19  plaintiff may be able to state a claim for defamation under section 1983 on the theory

20  that he or she has been deprived of a constitutionally protected right without the

21  procedural guarantees of the Fourteenth Amendment. (See *Paul v. Davis* (1976) 424

22  U.S. 693, 708-709.) To establish a "stigma-plus" due process claim, "a plaintiff must

23  show: (1) the public disclosure of a stigmatizing statement by the government; (2) the

24  accuracy of which is contested; (3) *plus* the denial of some more tangible interest such

25  as employment. (*Chaudry v. Aragon* (9th Cir. 2023) 68 F.4th 1161, 1170 (quotes,

26  cites, and brackets omitted) (emphasis in original).)

27  ///

28  ///

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT          3:22-cv-00949-CRB

A.      **Martin and the Board Member Defendants Cannot Be Liable for Stigma-Plus Defamation, Because They Did Not Participate in the Disclosure of the Allegedly Defamatory Materials**

The "stigma" alleged by plaintiff arises from the District's disclosure of the original and amended statements of charges. Both statements of charges included references to the "potential grooming behavior" which was the subject of the anonymous letter and for which plaintiff was investigated in 2018. By disclosing the statements of charges in response to public records requests in 2021, plaintiff alleges the defendants defamed him. (ECF No. 16, 59:12-15.)

However, plaintiff concedes that only the Superintendents actually participated in the decisions to disclose the statements of charges in response to the public records requests. Plaintiff *does not contend* that former Principal Billy Martin or Board members Deana Arnold, Ben Abeln, Ron Bourque, Charlotte Khandelwal, or Erin Asheghian participated in the disclosure of the statements of charges. (Plaintiff's Responses to Abeln's Interrogatories Nos. 6 & 8, Arnold's Interrogatories Nos. 6 & 8, Asheghian's Interrogatories Nos. 17 & 19, Bourque's Interrogatories Nos. 6 & 8, Khandelwal's Interrogatories Nos. 6 & 8, and Martin's Interrogatories Nos. 6 & 8.) Therefore, none of these defendants can be liable under the 3rd cause of action.

B.      **Plaintiff Cannot Maintain a Claim for Stigma-Plus Defamation against Any of the Defendants, Because He Was Afforded Due Process in the Course of the Termination Proceedings**

Even to the extent plaintiff can establish that any of the defendants participated in the disclosure of the statements of charges, his stigma-plus claim fails, because he cannot meet his burden to establish that he was deprived of his right to public employment *without procedural due process*. "[T]he availability of adequate process defeats a stigma-plus claim." (*Segal v. City of N.Y.* (2d Cir. 2006) 459 F.3d 207, 213.)

As detailed above, it is undisputed that plaintiff received notice, hearings, the right to counsel, the right to conduct discovery, the right to call witnesses, and the

24

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT          3:22-cv-00949-CRB

**ER-254**

1  right to appeal, in connection with the termination and layoff proceedings against him.

2  Indeed, at the conclusion of the administrative hearing, the administrative panel

3  concluded that the evidence *was not sufficient to support a finding of immoral conduct*

4  against plaintiff. (ECF No. 16, 59:18-21.) Thus, plaintiff *was not* deprived of his right

5  to due process of law under the Fourteenth Amendment. Defendants are entitled to

6  judgment as a matter of law with regard to the stigma-plus defamation claim.

7  **IX.   PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIM IS**

8  **BARRED UNDER *MOUNT HEALTHY***

9       The 1st cause of action in plaintiff's operative complaint alleges First

10  Amendment retaliation. A section 1983 action based upon alleged retaliation for

11  exercising the First Amendment right to free speech is evaluated under the standard

12  enunciated by the Supreme Court in *Mount Healthy Sch. Dist. Bd. of Ed. v. Doyle*

13  (1977) 429 U.S. 274, 287. *Mount Healthy* establishes a three-step inquiry for

14  retaliation claims. First, the plaintiff must establish that his conduct was entitled to

15  constitutional protection. (See *Gillette v. Delmore* (9th Cir. 1989) 886 F.2d 1194,

16  1197.) Second, the plaintiff must demonstrate that his conduct, if protected, was a

17  "substantial" or "motivating" factor in the defendants' decision to take adverse action

18  against him. (*Alpha Energy Savers, Inc. v. Hansen* (9th Cir. 2004) 381 F.3d 917, 923.)

19  Once the plaintiff has met this burden, the burden shifts to the defendants to show by

20  a preponderance of the evidence that they would have reached the same decision even

21  in the absence of the protected conduct. (*Mount Healthy*, *supra*, 429 U.S. at p. 287.)

22       In this case, the matter of plaintiff's termination was decided by a disinterested,

23  three-member administrative panel. Plaintiff can present no evidence that any of the

24  panel members had a retaliatory motive to recommend plaintiff's termination. Indeed,

25  the administrative panel's written decision explicitly disclaims any such motive: "The

26  Commission does not direct the District to dismiss respondent from employment to

27  punish him, or to retaliate against him for having exercised his rights to express his

28  opinions and to participate in the community's political life." (Request for Judicial

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT          3:22-cv-00949-CRB

Notice, Exh. E, p. 37.) Rather, the panel members heard evidence presented by both the District and plaintiff and decided whether that evidence was sufficient to demonstrate cause for plaintiff's termination in accordance with the Education Code: "The Commission directs the District to dismiss respondent from employment because a preponderance of the evidence before the Commission establishes his evident unfitness to continue teaching District students." (*Ibid*.)

Plaintiff alleged in the administrative proceeding that "the District's effort to dismiss him from employment constitutes unlawful retaliation against him for exercising his rights under the California and United States Constitutions to express his personal views and to participate in his community's political life. (Request for Judicial Notice, Exh. E, p. 35.) The administrative panel *rejected* that contention:

> The totality of evidence in this matter does not establish an effort by the Board or by District administrators to discipline or to dismiss respondent because of his opinions or political activity. To the contrary, all evidence in this matter shows that after significant conflict within the District in March and April 2018, the District in October 2018 offered respondent the opportunity to save face and move on. Respondent emphatically rejected this opportunity. Instead, between October 2018 and the hearing, respondent made repeated efforts to reopen and revisit the 2018 conflicts. He also responded to new potential and minor conflicts by amplifying them into major conflicts; he became increasingly insubordinate and uncommunicative regarding school activities, even during the novelty and uncertainty of the COVID-19 pandemic; and he continued to exercise very poor judgment outside school in circumstances involving his supervision of teenagers.

(Request for Judicial Notice, Exh. E, p. 37.) The panel noted that, under the Education Code, it held the sole discretion whether or not to direct the District to dismiss plaintiff, independent of any alleged political animus on the part of the defendants. (Request for Judicial Notice, Exh. E, pp. 36-37.) The panel ordered plaintiff's termination based on its conclusion that plaintiff was unfit for service, as defined by Education Code, section 44932, subdivision (a)(7). (Request for Judicial Notice, Exh. E, pp. 30-35.)

///

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT          3:22-cv-00949-CRB

1    Because the ultimate termination decision was made by a disinterested
2    administrative panel, and the undisputed evidence clearly establishes that the panel
3    members were not motivated by political animus against plaintiff, but rather, by their
4    own conclusion that plaintiff was unfit for service, defendants are entitled to summary
5    judgment, *even if there is a triable issue of fact as to whether or not defendants*
6    *initiated the termination out of political animus*. Pursuant to *Mounty Healthy*, the
7    panel's direction that the District terminate plaintiff due to evident unfitness for
8    service was wholly sufficient to support the termination.

9    **X.   PLAINTIFF CANNOT PRODUCE EVIDENCE SUFFICIENT TO**
10   **      CREATE A TRIABLE ISSUE OF FACT AS TO CONSPIRACY**

11        Separate and apart from his substantive constitutional claims, the 18th cause of
12   action in plaintiff's operative complaint alleges the defendants conspired to violate
13   plaintiff's rights. "Conspiracy is not itself a constitutional tort under 21 1983." (*Lacey*
14   *v. Maricopa Cnty.* (9th Cir. 2012) 693 F.3d 896, 935.) Conspiracy cannot "enlarge the
15   nature of the claims," but can "enlarge the pool of responsible defendants by
16   demonstrating their causal connections to the violation." (*Ibid*.) Because plaintiff's
17   substantive constitutional claims fail, so, too, does his conspiracy claim.

18        Even if plaintiff can establish a triable issue of fact as to any of his claims
19   against any of the defendants, however, he cannot present admissible evidence
20   sufficient to establish a triable issue of fact as to the existence of a conspiracy between
21   the defendants. "Without more, parallel conduct does not suggest conspiracy." (*Bell*
22   *Atlantic Corp. v. Twombly* (2007) 550 U.S. 544, 556-557.) "The mere fact that
23   [plaintiff contends his] constitutional rights were violated by more than one
24   wrongdoer does not support a plausible inference of conspiracy." (*Garcia v. City of*
25   *Newport Beach* (C.D. Cal. Apr. 7, 2020) 2020 WL 5778133, *8.) Because plaintiff
26   cannot present admissible evidence of a "meeting of the minds" between the
27   defendants, no reasonable jury could draw an inference that the defendants conspired
28   to violate plaintiff's rights. Therefore, the conspiracy claim must be adjudicated in

27

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT          3:22-cv-00949-CRB

1  favor of defendants.

2  **XI.   <u>CONCLUSION</u>**

3        For all of the foregoing reasons, defendants are entitled to summary judgment

4  or, alternatively, partial summary judgment on individual claims, defenses, and issues.

5  Dated: June 23, 2023                         Fozi Dwork & Modafferi, LLP

6

7                              By:    /s/ Daniel S. Modafferi

8                                     Golnar J. Fozi
                                      Daniel S. Modafferi

9                                     Attorney for Defendants,
                                      Lisa Fraser, Kevin Grier, Billy Martin,

10                                    Deana Arnold, Ben Abeln, Ron Bourque,
                                      Charlotte Khandelwal, and Erin

11                                    Asheghian

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT          3:22-cv-00949-CRB

**BEFORE A**
**COMMISSION ON PROFESSIONAL COMPETENCE**
**LOMA PRIETA JOINT UNION SCHOOL DISTRICT**
**STATE OF CALIFORNIA**

**In the Matter of the Dismissal of:**

**DAVID KISSNER, A Permanent Certificated Employee,**

**Respondent.**

**OAH No. 2021050291**

**DECISION**

A Commission on Professional Competence (Commission) heard this matter by videoconference on October 4, 5, 6, 8, 11, 12, 13, 14, 15, 25, and 28, 2021. The Commission's members were Katherine Everett, Santa Clara County Office of Education; Scott Guagliardo, Downtown College Prep (San Jose); and Administrative Law Judge Juliet E. Cox, State of California, Office of Administrative Hearings, who presided.

Attorneys Brian D. Bock and Amanda S. Georgino represented the Loma Prieta Joint Union School District.

Attorneys William J. Becker, Jr., and Jeremiah D. Graham represented respondent David Kissner, who was present throughout the hearing.

The Commission received oral opening statements, testimonial and documentary evidence (including audio and video recordings), and oral closing

the District and to resist any efforts by District administrators to control or supervise his teaching.

### Temperament

19.     As summarized in Findings 69, 72, 100, and 101, respondent expressed minimal remorse before the Commission for any of the conduct showing his unfitness for service. To the contrary, and as summarized in Findings 14, 56, 74, 77, 98, and 99, and in Legal Conclusions 20 through 23, respondent presented himself to the Commission as someone who deserves respect for his moral courage but who instead faces persecution. These matters, all together, make respondent's unfitness evident.

## Retaliation for Constitutionally Protected Activities

20.     Respondent contends that the District's effort to dismiss him from employment constitutes unlawful retaliation against him for exercising his rights under the California and United States Constitutions to express his personal views and to participate in his community's political life.

21.     Respondent contends specifically that the Board revised Board Policy 4119.21 in February 2020 to target him for dismissal. The matters stated in Findings 19 and 103 through 106, and in Legal Conclusion 6, do not support this contention.

22.     As additional support for his retaliation defense, respondent identified many examples that he characterized as acts by community members and by fellow District faculty members arising from their hostility to respondent's views and political positions. Because such examples, if true, might undermine these people's credibility, the Commission has addressed credibility where relevant. Such examples would not establish unlawful retaliation against respondent by the District itself, however,

35

because every community member and District faculty member has the same personal rights respondent has to state opinions and to petition government agencies for action. Whether wise or unwise, respondent's neighbors and colleagues have the right to express disagreement or disrespect to respondent on social media or to his face; to ignore or even to criticize him in faculty meetings; and to ask the District to dismiss him because of real or imagined deficiencies in his performance or his character.

23.    Respondent also contends that Board members and administrative staff have displayed animus toward respondent because of his political opinions and activities, and that this animus proves that his dismissal from employment would constitute unlawful retaliation against him for exercising his right to free speech and political participation. This contention ignores two key protections the Education Code gives respondent.

a.    First, the District cannot dismiss respondent unilaterally. Rather, under Education Code sections 44943 and 44944, because respondent requested a hearing, this Commission—comprising by law persons who have no prior relationship with respondent, with the District's administrators and elected officials, or with the events at issue—must decide whether or not the District should dismiss respondent from employment.

b.    Second, under Education Code section 44932, this Commission may direct the District to dismiss respondent only if statutory cause exists to dismiss him, and not otherwise. As with community members and fellow faculty members, Board members' and administrators' animus toward respondent, if proven, might have affected their credibility before the Commission. Any such animus did not prevent the Commission's finding cause to dismiss respondent, however.

36

24.    Although the Commission has found cause to dismiss respondent, the Commission has discretion to decline to dismiss him. (*Fontana Unified Sch. Dist. v. Burman* (1988) 45 Cal.3d 208, 222.) Respondent's contention that his dismissal would constitute unlawful retaliation against him is most relevant to the Commission's exercise of this discretion.

25.    The totality of evidence in this matter does not establish an effort by the Board or by District administrators to discipline or to dismiss respondent because of his opinions or his political activity. To the contrary, all evidence in this matter shows that after significant conflict within the District in March and April 2018, the District in October 2018 offered respondent the opportunity to save face and move on. Respondent emphatically rejected this opportunity. Instead, between October 2018 and the hearing, respondent made repeated efforts to reopen and revisit the 2018 conflicts. He also responded to new potential and minor conflicts by amplifying them into major conflicts; he became increasingly insubordinate and uncommunicative regarding school activities, even during the novelty and uncertainty of the COVID-19 pandemic; and he continued to exercise very poor judgment outside school in circumstances involving his supervision of teenagers.

26.    The Commission finds the matters stated in Findings 30 through 44, 51 through 69, 71 through 75, and 78, and in Legal Conclusions 9 through 19 to justify respondent's dismissal from employment regardless of his opinions or his participation in political activity within the District.

27.    The Commission does not direct the District to dismiss respondent from employment to punish him, or to retaliate against him for having exercised his rights to express his opinions and to participate in the community's political life. The Commission directs the District to dismiss respondent from employment because a

preponderance of the evidence before the Commission establishes his evident unfitness to continue teaching District students.

## ORDER

Respondent David Kissner is dismissed from his position as a permanent certificated employee of the Loma Prieta Joint Union School District due to evident unfitness for service.

DATE: **12/07/2021**

*Juliet E. Cox*

JULIET E. COX

Commission Member

Administrative Law Judge

Office of Administrative Hearings

DATE: **12/06/2021**

*Katherine E. Everett*
Katherine E. Everett (Dec 6, 2021 09:19 PST)

KATHERINE EVERETT, Ed.D.

Commission Member

DATE: **12/07/2021**

*Scott Guagliardo*
Scott Guagliardo (Dec 7, 2021 17:33 PST)

SCOTT GUAGLIARDO

Commission Member

38

**ER-263**



### Loma Prieta
JOINT UNION SCHOOL DISTRICT

*23800 Summit Road, Los Gatos California 95033*
*Phone: (408) 353-1101    Fax: (408) 353-8051*
*www.loma.k12.ca.us*
*Lisa Fraser, Superintendent*
*Dr. Billy Martin, Principal*

## NOTICE OF PROPOSED INTENT TO DISMISS WITH STATEMENT OF CHARGES

February 12, 2021

**VIA PERSONAL DELIVERY AND REGISTERED U.S. MAIL
(RETURN RECEIPT REQUESTED)**

David Kissner
25059 Skyland Road
Los Gatos, CA 95033

Dear Mr. Kissner:

You are hereby given notice of your dismissal, based upon the enclosed Statement of Charges ("Charges"). The proposed dismissal is under the authority of Education Code section 44932. Enclosed are copies of these Education Code sections, as well as documents upon which the Charges are based upon.

Before the Loma Prieta Joint Union School District ("District") administration makes a recommendation to the Governing School Board of Trustees concerning your dismissal, you have the right to respond to the Charges. For that purpose, I have scheduled a meeting on Monday, February 22, 2021 at 1:00 p.m. to be conducted via Zoom teleconference, at such time you will be provided an opportunity to respond to the Charges. You are advised that you may have a representative of your choice at the meeting. After the meeting, the administration will make a decision whether to proceed forward with this disciplinary action or otherwise, based upon the information available, including your response to the Charges.

During the pendency of this action, the District has determined to place you on paid administrative leave pending further notice. As such, you will remain on payroll and you will continue to receive full pay and benefits.

Until further notice, you are directed not to perform any duties for the District or District schools. You are to remain away from all District facilities, schools, and property unless you first obtain a written authorization from me, the District Superintendent. You are directed to return all District property in your possession immediately to Principal Billy Martin, including, but not limited to,

*Board of Trustees:*
*Deana A. Arnold, President    Ron Bourque, Vice-President*
*Ben Abeln, Member    Erin Asteghian, Member*

Kissner 6-9-23
**EX. 13**

**PL000778**

keys, files and other documents, supplies and security codes. Please plan to meet with Principal Martin at 12:00 p.m. on Tuesday, February 16, 2021 in order to surrender those items. In the event that you need to retrieve any personal items from your worksite, please let me or Principal Martin know, and we will make arrangements for you to retrieve those items.

You are also directed not to discuss this matter with co-workers, students, parents, and others, except that this directive does not affect your right to discuss this matter, your employment, or any related matter with an attorney or representative of your choice. If you need to contact a District employee regarding a matter unrelated to this action (e.g., benefits questions and the like), you may do so by first contacting my office so that I may schedule a meeting on your behalf.

Please understand that during your administrative leave, you are required to remain available to the District for telephone calls and meetings during normal working hours (if requested to attend by my office or your Principal). Otherwise, you will be notified subsequently if your status with the District changes.

Pursuant to Education Code section 44031, this document and its attachments will be placed in your personnel file within ten (10) days or shortly thereafter.  You have a right to submit a written response, which will be included in your personnel file.

Sincerely,

Lisa Fraser
Superintendent
Enclosures:     Statement of Charges
Education Code sections 44031, 44932, and 44939
Exhibits 1-34

PL000779

## <u>ACKNOWLEDGEMENT OF RECEIPT</u>

_____          _____
Signature of David Kissner                    Date

Employee's signature does not signify agreement with the contents of this Notice, but merely confirms receipt of this Notice.  You are hereby informed that pursuant to Education Code section 44031, a copy of this Notice will be placed in your personnel file.  You have the right to prepare a written response to this Notice that will be attached hereto before placement in your file.

3

PL000780

## STATEMENT OF CHARGES AGAINST DAVID KISSNER

I, Lisa Fraser, Superintendent, for the Loma Prieta Joint Union School District ("District"), hereby charge that there exists cause to dismiss David Kissner as a permanent certificated employee of the District.

## CAUSES FOR DISMISSAL

The specific causes for your dismissal are:

1.  Immoral Conduct [Ed. Code § 44932(a)(1);
2.  Unprofessional Conduct [Ed. Code, § 44932, subd. (a)(2)];
3.  Unsatisfactory Performance [Ed. Code § 44932, subd. (a)(5)];
4.  Evident Unfitness for Service [Ed. Code, § 44932, subd. (a)(6)]; and
5.  Persistent violation of or refusal to obey the school laws of the state or reasonable regulations prescribed for the government of the public schools by the state board or by the governing board of the school district employing him or her [Ed. Code, § 44932, subd. (a)(8)].

## SPECIFIC ACTS OR OMISSIONS

The specific acts or omissions that constitute this Statement of Charges include, but are not limited to, the following:

1.  As a certificated employee of the District, you are required to maintain the highest ethical standards, exhibit professional behavior, and follow District policies and regulations. You are further expected to exercise good judgment and maintain professional standards and boundaries when interacting with students.
    (BP/E 4119.21.)

See Board Policy 4119.21, attached as Exhibit 1.

2.  As an employee of the District, you are expected to exhibit professional and appropriate conduct.

3.  As you are aware, in 2018, very serious allegations of misconduct on your part were brought to the District's administration's attention via an anonymous complaint, which necessitated a formal investigation. As such, an outside professional investigation firm was brought in to conduct the investigation. The independent investigator, who interviewed multiple witnesses, reviewed documentation and other evidence, ultimately determined that you engaged in very serious misconduct. These findings were carefully reviewed by the District and resulted in your receiving a formal letter of reprimand from the Superintendent.

See Letter of Reprimand dated October 18, 2018, attached as Exhibit 2.

4

PL000781

4. Among the findings, which were made by the Investigator as part of the October 2018 allegations, by a preponderance of evidence, were the following:

    a.  It was determined that you knowingly provided an alcohol beverage to a minor(s) (District student, likely Grade 9 or 10) during a non-District activity organized and/or conducted by you.

    b.  Not only was it concluded that you knowingly provided an alcoholic beverage to a minor District student, but the Investigator also found that you ultimately admitted to this egregious conduct, claiming that you only gave the boy a "toast" and just a "sip of an alcoholic beverage", claiming it was "after a significant outdoor achievement." You also claimed that this involved a "high school age person." Despite admitting to this egregious and unlawful misconduct, you incredibly tried to justify your actions by claiming that the "offense in question is the legal equivalent of a traffic ticket…."

See October 18, 2018 D. Kissner Response, attached as Exhibit 3.

    c.  Contrary to your claims in defense of your egregious misconduct, the Investigator uncovered evidence that you:
        i.  You poured the minor a glass of whiskey in a "red cup";
        ii.  The minor was 15-years old;
        iii.  This incident occurred while others had gone on a walk and you remained alone with the minor back at the campsite;
        iv.  The minor did not go on the walk claiming he was tired;
        v.  Instead of going on the walk, you and the minor listened to the others on a walkie-talkie type device;
        vi.  You and the minor laughed at the others who went on the walk;
        vii.  You were confronted by the minor's parents and Pastor Haak in a later meeting also attended by the Pastor's wife and your wife as well. Once again, you admitted to serving the alcohol, specifically whiskey. In fact, you also claimed you "sinned in front of [ ] God," among other statements.
        viii.  The minor's family was extremely upset with you, and that you potentially exposed their son to a "potential addiction", given that their family has a history of alcoholism killing several relatives.
        ix.  In this encounter, you insisted you only had "one glass of whiskey" with the minor.
        x.  Additionally, it was discussed that you had "guns" on the campsite premises at that same time.

    d.  Further, the Investigator noted that you were involved in a prior incident also involving another minor and alcohol. This incident was reported to the Investigator by Sheriff's Deputy Koenig.

PL000782

See Investigation Report of Patricia Elliott, Attorney At Law, attached as Exhibit 4.

e.   As a result of these astonishing findings, the investigator determined that you have a history of improperly providing alcohol to minors and persons under the age of 21, since it was also determined that you had been disciplined during your military service for giving alcohol to underage troop members.  In fact, you admitted such past misconduct in a student interview you gave as part of a school assignment and have also told others of this incident, including Pastor Haak.

f.   In addition, there were reports of other incidents involving you providing alcohol to minors on the same and other student trips.  Interestingly, in your interview with the Investigator, when discussing the whiskey incident, you also claimed:

- The minor was a "co-leader" on a backpacking trip;
- You gave him "some extra responsibility to lead the kids";
- At the "end of the hike, I gave him a sip of whiskey as a toast, kind of like 'good job on your accomplishments'";
- "There were no incidents of anything beyond that";
- You also claimed that "I was just trying to treat him as an adult…";
- You have a tradition on these trips to have a "100 ML [of alcohol] in the evening," to enjoy your evening;
- When you gave the minor the whiskey, you and he were "alone", and the younger kids "went on a night hike";
- Had the younger ones been there, you would "obviously not have offered" the minor the whiskey.  "It was meant to be discreet"; and
- You did not know at the time of the incident that the minor was suffering from mental health issues, but the minor's mother did inform you of that in the meeting with Pastor Haak and others after the incident occurred.

g.   In addition to the alcohol incident(s) and other related findings, the Investigator determined there were other serious infractions on your part, which were also reviewed by the Superintendent and included in the October 18, 2018 reprimand.  It was determined that there were other instances of misconduct by you with children that represent and compound the finding of a lack of professional boundaries and/or questionable teaching practices on your part.  These include:

- Failing to maintain professional boundaries, including via technology and sharing private texts/messages with minors/students.
- Sharing personal information that could offend/frighten students.
- Telling students inappropriate comments of a sexual nature, including informing male student that you could give him a "small binder clip" he could use on his penis to stop his need to go to the

6

PL000783

                 bathroom, after you denied him the ability to leave class to go to the restroom.

- Potential grooming behavior, such as: singling out a minor and being alone with a minor; offering alcohol; asking about sex/sexual encounters; and posting images of youth partially unclothed on the internet.

5. As part of her investigation, the Investigator made the following specific findings by a preponderance of evidence with respect to additional incidents beyond the alcohol incident[s]:

    a. You have made inappropriate personal comments to students/minors about death/violence, including, stories in class (6th and 8th grades) about serving in Iraq and traveling thereafter such as:
- A soldier being blown up while in a porta-potty;
- Others being "blown up by terrorists";
- "Bodies littering the road";
- People being "completely blown up";
- People being blow up so that only "their boot is left of them";
- Telling 6th graders that your troops had to "kill individual people";
- How you were "almost blown up by a rocket missile";
- Held at "gunpoint" with a "gun to [your] throat" during a biking trip;
- Setting up a bomb that "killed a bunch of terrorists"
- Troops were laughing watching "like twenty people being blown up";
- You thought it was funny since just before a dog was blown up and troops were very upset; and
- Telling violent stories.

    b. Telling students that you liked the video(s) of Bambi (Disney character) being killed - even as a child - since you hated Disney.

    c. You often showed video clips to students depicting death and violence.

    d. Inappropriate classroom exercises/instruction included math "word problems" involving violence/death including:
- "Kids falling off cliffs" to find velocity;
- "Time to impact" using same example above;
- People dying;
- People falling out of buses;
- Children drowning;
- Children dying;

7

PL000784

- Being thrown off a cliff;
- Around Christmas, using Santa Claus, as being "Hung, dying" by rope to figure out the concept of force;
- Using names of actual students and being killed/harmed, such as: Student "gets punched in the face", where guns are involved, "getting eaten by bears";
- Students being "sacrificed" (oftentimes these are students that are perceived to be disliked by you previously, or who may wear glasses, or be short, or other characteristics).

e. When interviewed by the investigator regarding these incidents, you did not deny these actions, and instead admitted that you have a "morbid sense of humor"; "kids love [your] math tests"; the word problems are "humorous" - and "I have got child labor and kids eaten by bears."

f. Also, the Investigator found that you inappropriately physically wrestled with boys on the classroom floor.

See Exhibit 4.

6. Further, the investigator noted that when you were placed on paid administrative leave on or about May 1, 2018 you were given specific written directives including an obligation of confidentiality/protection of the confidentiality of information. Specifically, you were informed that you had "an obligation to maintain the confidentiality of both the fact of and information concerning the investigation, and to not disclose such information to others, including employees, parents, and students of the District." Moreover, you were provided notice that "violations of this policy may result in appropriate disciplinary action."

7. Despite these strict directives and mandate of confidentiality, the Investigator found that you *failed* to comply and, in fact, disclosed information about the investigation to others, including District parents. When interviewed in 2018, you <u>admitted</u> to the Investigator that you *failed* to comply with the confidentiality directives, but claimed it was "to a very limited degree"; then claimed to parents, you were on leave "related to the Walkout". Also, despite telling the Investigator that your communication with District parents regarding the investigation was person-to-person, not via email; the Investigator found evidence to show that you were, in fact, communicating with numerous parents via email regarding your leave and pending investigation and lobbying them to pressure the District to bring you back from leave. Among such was a mass email from your personal email account to undisclosed persons entitled: "Support Mr. Kissner - Our voices are stronger together!"

See April 30, 2018 Letter, attached as Exhibit 5, Investigation Report of Patricia Elliott, Attorney At Law (Exhibit 4), and email entitled "Support Mr. Kissner-Our voices are stronger together!", attached as Exhibit 6.

8

PL000785

8.  Thereafter, on March 31, 2020, you received a formal Warning of Unprofessional Conduct, following the receipt and review of concerns raised by a parent related to your treatment of her son in a discriminatory and derogatory manner in the presence of other students during an 8th grade science class. Specifically, it was found that when the student professed to you that another student was "bullying" him, you responded, "You should make fun of his slitty eyes". It was determined that this Warning of Unprofessional Conduct was necessary and placed into your personnel file to ensure that you understood the serious nature of the concerns and refrained from such misconduct in the future.

9.  Moreover, you were also given an opportunity to meet and respond to the allegations contained in the March 31, 2020 Warning of Unprofessional Conduct, but instead refused to meet and/or provide any factual information to refute the claims. Your refusal to meet and discuss the allegations and findings was in violation of your duty as a District employee to cooperate with the fact-finding process. Ultimately, you provided a written statement which did not provide any factual response, but instead focused on other irrelevant matters related to another personnel matter from 2018.

    See March 31, 2020 Warning of Unprofessional Conduct (and Response), attached as Exhibit 7.

10. Thereafter, on April 2, 2020, you received an additional formal Warning of Unsatisfactory Performance following another student incident. In this case, it was found that after a student arrived late to a lunch detention, instead of handling this additional infraction in a civil and professional manner as the teacher, you became very angry and slammed your fist on the table. When the student attempted to explain why she was late, you loudly stated, "No shit, Claire." Not only was this uncalled for, it upset the student and the rest of the students present. It was determined that this Warning was necessary and placed into your personnel file to ensure that you understood the serious nature of the concerns and refrained from such unsatisfactory misconduct in the future.

11. Once again, you were given an opportunity to meet and respond to the allegations, but refused to meet and/or provide any factual information to refute the claims. Your refusal to meet and/or respond to the allegations was in violation of your duty as a District employee to cooperate with the fact-finding process. Ultimately, you provided a written statement which did not provide any factual response, but instead again focused on other irrelevant matters related to another personnel matter from 2018.

    See April 2, 2020 Warning of Unsatisfactory Performance (and Response), attached as Exhibit 8.

12. On August 27, 2020, you were sent a Request for Information (regarding Remote Wilderness School Camps), from the Superintendent based on the District's receipt of concerns raised by a community member with respect to the Remote Wilderness School Camps ("Camps"). The Camps were referencing trips conducted by you and in apparent conflict with regular school days/hours for District students, as well as contracted work hours for you as a teacher. As a result, you were directed to provide by the next day,

9

PL000786

August 28, 2020, a description of the Camps proposed activities planned during school hours. The purpose was to ensure legality for the District and protection for you from potential liability as well related to the Camps. You *failed* to comply with the directive and provide the District with the requested relevant information.

See August 27, 2020 Request for Information, attached as Exhibit 9.

13. Following your failure to comply with the prior directive/request for information, it was then necessary for the District to follow-up with you for more specific information to ensure the Camps were appropriate for District students and for you as an employee to attend. As such, on August 28, 2020, you were provided with a detailed written questionnaire, which you also ignored and *failed* to provide a response. By failing to respond to the questionnaire you once again ignored specific directives given to you by the District. Each of the questions contained in the questionnaire were necessary for the District to determine the appropriateness and legality of your participation and administration of these Camps trips involving District students potentially during school hours and/or your duty time.

See August 28, 2020 Remote Wilderness School Camps memo, attached as Exhibit 10.

14. Following the above-described incidents, shortly thereafter, the District received a new further concern related to you sending emails to District student(s) directly on their personal/school accounts, as well as to many parents in the community as well. In one instance, you sent an email to an 11-year old student's school email account. Your email to the 11-year old student concerned student grading and providing extra math help through an "online after school homework center" with a direct link to your personal website(s), included the En Gedi Project and an opportunity to donate money. Sending personal emails to students and parents advertising your own online personal website and soliciting donations is inappropriate.

See September 8, 2020 emails, attached as Exhibit 11.

15. As a result of the concerns received from community members about your September 8, 2020 emails, your site Principal, Billy Martin, contacted you on September 14, 2020 to inquire about the matters as they related to your promotion of Mountain Math Initiative ("MMI") and other non-District activities. Specifically, Mr. Martin requested to know whether you were emailing students directly and/or mass emailing students; whether the MMI class was taking place during your District duty time; whether you informed a student/parent that MMI attendance would qualify for school credit or replace missing credits; and whether you recommended MMI to the family of a special-needs student as an alternative resource.

16. Rather than simply providing Principal Martin with the information he requested from you, you requested a meeting with him expressing that you were "getting a bit frustrated with how this is playing out." In response, Mr. Martin offered you several times to meet that day and the next. You then disrespectfully responded that you would meet with him

10

the next day and "sit on my frustrated and sarcastic email reply for now (said frustration and sarcasm not at all directed towards you)."

See September 14, 2020 emails, attached as Exhibit 12.

17. In October of 2020, the District received a complaint from a parent regarding your teaching practices. Specifically, the parent mentioned that her son was a former student of yours and that you chastised her son and physically tore up her son's math work in front of the class because he used a pen (instead of pencil) on a math assignment. She went on to request that her daughter not be placed in your class for the current school year.

18. In the fall of 2020, due to parent concerns and confusion over whether some students in Math 7 were allowed to receive class attendance credit for alternatively attending your MMI outside Math program, Principal Martin and Superintendent Fraser met with parents to discuss such concerns. Following that meeting, on October 8, 2020, Principal Martin emailed you with a summary of the meeting, which included specific parameters for Math 7 and requirements for participation. Parents were also informed and assured that MMI is an outside enrichment program - not supplanting/replacing any District Math course/coursework; and confirming that attendance in MMI did not count as attendance in any District Math course/class, including CTE, etc.

In closing to his October 8, 2020 email, Principal Martin directed you to provide a "list of students with whom attendance at CTE may have been communicated as optional or who believe participation in Mountain Math Initiative counts as attendance/participation for their CTE classes. I want to make sure those families get the same message as the ones with whom I met today."

See October 8, 2020 emails, attached as Exhibit 13.

19. Despite the October 8, 2020 email directive from Principal Martin in which you were clearly directed to provide the list of students who were misinformed by you that attendance at CTE was optional or who participated in MMI program; as of October 13, 2020, you had *failed* to adhere to said request. As such, on October 13, 2020, Principal Martin emailed you again with his request and further stated, "I am unable to tell from your previous response if you are refusing to provide me the requested information or if you need additional time to do so." The previous response he referenced was a three-page email you wrote which clearly disagreed with the District's approach and directives, but also *failed* to include the student list required of you on October 8th.

See October 13, 2020 (and related) emails, attached as Exhibit 14.

20. Although on October 13, 2020, you finally provide a student list to Mr. Martin, the list was in fact just an entire class roster and was not in compliance with the prior and specific directive to provide a list of students that were informed by you that MMI would count towards attendance credit for District Math courses; you also informed Principal

11

PL000788

Martin that you incorrectly communicated to students/parents that "any interaction whatsoever with a teacher during the day qualifies as being present in class for attendance purposes." As a result of your statements, on October 14th, Principal Martin informed you that several parents still conveyed that they understood that students are "not required to attend their CT math course if they are participating in Mountain Math Initiative and that the work done and the grade earned for that after school enrichment course will be applied to their CT math course." Principal Martin reiterated to you "[t]his clearly indicates an intention of supplanting that after school activity for their CT math course." Principal Martin went on to reemphasize to you, "This is an action I need to make clear is not [an] acceptable practice." He also re-emphasized that "a qualifying attendance event must be completed by the end of the school day for the day the attendance to count. A qualifying attendance event must happen within the school day; after school hours do not count toward positive attendance."

In closing, Principal Martin re-directed you to provide the actual list of students (names of families who have been explicitly told their child does not have to attend your CT math course and instead can attend Mountain Math for District math credit/attendance).

See October 13, 2020 and October 14, 2020 emails, attached as Exhibit 15.

21. On October 18, 2020, the District learned from a disgruntled parent(s) that you were very late with your Math grading, and as a result they were uninformed that their child's grade had dropped from an "A/B" to a "C" on the last day of the quarter. Further, the late grade report showed the parent that their son had low marks on several assignments from a full month prior. The parent expressed great concern and frustration since he/she frequently checked the online system (PowerSchool) and saw no signs of problems prior to the low grade being given - which indicated that you *failed* to enter such relevant information until the very end of the period. Not only had you not properly/timely entered the information, but you also neglected to otherwise communicate concerns with the parent during the quarter. The parent closed their email to you (copied to your Principal) declaring, "Poorly done!"

See October 14, 2020 emails, attached as Exhibit 16.

22. Although that same day you responded to the parent in an email seemingly to apologize for your failures, you then inappropriately went on attempt to excuse your behavior by claiming, "I can assure that this is not for lack of time spent lesson planning, delivering instruction, meeting with students who need help, answering insane amounts of emails, and other time-consuming admin tasks like attendance that take all day." Not only was this additional information uncalled for in an "apology" to a parent, but much of it was untrue and frankly embarrassing to you and the District. Further, you then continued on for an additional two paragraphs, placing the blame on the student/parents for the problems with the student's grades, before apologizing again for your failures to timely update and grade the student's assignments.

See October 18, 2020 email, attached as Exhibit 17.

12

PL000789

23. Besides inappropriately emailing that parent, you also proceeded to mass-email each family in your 7th grade Math class to seemingly update and explain grading and other class activities on October 18th (then other classes on October 22nd [8th Grade Physical Science] and 26th [6th Grade Math]).   In virtually identical letters, although you attempted to apologize for being "behind" on PowerSchool, you also used poor judgment in stating: "this has been a 'try to keep my head above water' type of quarter."   You further made a proofing/typographical error in *each* (almost identical) letter by stating: "I am foregoing [sp] the normal labs…".   Moreover, the October 22nd letter to 8th Grade "Physical Science" families incorrectly addresses "7th grade math classes."   That letter was also sent to families at 1:49 a.m. – which may explain the apparent "cut and paste" error.

See October 18, 22, 26, 2020 emails, attached as Exhibit 18.

24. Subsequently, you were contacted by various District administrators/staff to help you with PowerSchool, to allow you to improve your updating of grades and to facilitate IEP goal updates as well.   In an effort to assist you, Staci Ljepava, Director of Student Services and Special Education and Randy Cohen, RSP Teacher/Case Manager, each reached out to you with respect to assist you with properly utilizing PowerSchool. Nevertheless, as of October 27, 2020, according to the Director Ljepava, you had still *failed* to enter the necessary IEP goal information into Power School.   In fact, you had not done so by October 23rd despite Dr. Cohen's efforts to help you gather such data. Further, it was discovered that you had not updated 6th grade Math scores since September 11, 2020 (42 days prior).   As a result, in an October 27th email from Director Ljepava, she informed you that this required "immediate action" and she added that "[i]n the future, if you need more time please communicate this with the case manager…to remain in IEP compliance."   She then directed you to "Please update myself and the case manager on the status of your grade updates, so I can respond accordingly to the [IEP] team with next steps."

See October 27, 2020 email, attached hereto as Exhibit 19.

25. On November 3, 2020, the District received a further complaint from a 6th Grade parent, who was upset with your teaching her child's class.   Specifically, the parent stated that there were several Zoom class sessions recently (while you were apparently "away in Tahoe") "ending after just a few minutes or just canceled out right".   Additionally, the parent was upset that you instructed students to grade their own tests.   The parent felt that students self-grading their own tests neglected the student's need to learn from mistakes - rather than just check for the "right answer".   The parent was also put off by your prior mass email on October 26th updating parents on the late grading/PowerSchool concerns but stating that you were "trying to keep my head above water" - as part of your excuse/apology.   Of particular note, the parent remarked in closing, "I know he has been providing education assistance for kids during his camping trips, but it seems this is causing him issues in keeping up with his teaching position at CT."

The parent went on to note, "He is planning another lengthy (3 week) trip in November - is there a way to have someone in the administration join [Student] classes to make sure he is providing the lessons for kids in his CT classes?"

See November 3, 2020 and related emails, attached as Exhibit 20.

26. As a result of the November 3rd complaint, your Principal informed you of the concerns, and provided you with an email (at 10:21 a.m. - November 12, 2020) containing specific requests for information in order to commence a proper review. These included the following:

> "To date, have you canceled any synchronous Zoom classes that are regularly planned for Mondays, Tuesday, Thursdays. Or Fridays?
> If yes, what days and/or what classes were canceled?
> If a class was canceled what was the reason for the cancellation?
> How far in advance are notified of cancellations?
> How do you notify students of the cancellation?
> Did you assign to students of any canceled classes work or other instruction equal to 35 minutes?"

In response to these simple and specific requests which were necessary to make sure that you were complying with proper remote learning attendance and credit requirements, you responded in the evening at 9:36 p.m. that, "In general, I do not participate in any investigation or inquiry being conducted by the school district because of previous experiences."

You went on to add, "I have never skipped or canceled a Zoom meeting." Further, you stated that, "The only time that I have not utilized near the full scheduled Zoom time were the few days where there were power outages on the mountain or evacuations."

See November 12, 2020 email, Correspondence attached as Exhibit 21.

27. As a further result of the November 3rd complaint and information brought to the District's attention as to your Remote Wilderness School Camps trip planned for November, on November 5, 2020, the Superintendent provided you with a letter requesting important and necessary information (similar to the directive you received in August of 2020- to which you *failed* to respond) to better assess the situation and provide assurances that your planned activities were appropriate and within the state and federal education law confines and mandates for a District teacher and its students involved.

In sum, this letter reminded you of recent Covid-19 restrictions and related State and local policies and mandates. It also cautioned you to adhere to other state mandates based on your intended destination(s) since you were to be transporting and otherwise supervising District students.

14

PL000791

Furthermore, the letter specifically directed you "as part of the District's responsibilities owed to all students and staff" to "promptly provide us with information concerning [20 listed areas of concern: ranging from names of each student; Covid-19 preparations and appropriate distance learning/teaching methods; insurance information; parent permission slips; methods of transport/safety; adult supervision/precautions, and activities beyond teaching/learning etc.].

Additionally, this letter referenced and re-incorporated the prior August 28, 2020 notice/directives for your response as well.

In closing, the Superintendent's notice made it abundantly clear that, "If you are unable or unwilling to [provide the information] promptly, completely, and in writing, before you depart", you must "advise the [Superintendent] immediately and appropriately action will be taken as permitted by the circumstances." You were also cautioned that "We all have an obligation to comply with existing health and safety laws during this time, along with longstanding standards for remote learning opportunities and education law requirements. It is trusted that you understand the importance of meeting our respective obligations." You were also reminded that your failure to comply could result in disciplinary action.

See November 5, 2020 Letter from Superintendent, attached as Exhibit 22.

28. Despite the very clear, comprehensive, and imperative directives/information requests given to you in the aforementioned November 5th Superintendent's letter, on November 7, 2020, you responded in a short email to the Superintendent as follows:

"Dear Lisa,

Thank you for your email outlining your concerns. I am confident that: I have been - and will continue to - fully meet (and exceed) my professional obligations equitably to all of my students; Nothing about my physical location or the people that happen to be in my vicinity have any impact on my performance of my professional duties; There is nothing about my physical location or the people that happen to be in my vicinity that has anything to do with the District; and I am not in violation of any laws or District policies.

Sincerely,
David Kissner"

To date, you have *failed* to comply with the specific requested information from the November 5th letter and/or the August 28th letter.

See November 7, 2020 email to Superintendent, attached as Exhibit 23.

29. Thereafter, on December 11, 2020, you received email correspondence from a parent of a student in one of your math classes regarding his child's math grade. Mr. Martin was carbon copied on the email. The parent detailed that he once again found himself in the

15

"uncomfortable potion of not knowing what [his child's] math grade will be for the end of the semester." The parent complained that no homework grades have been posted by you to Powerschool since before Halloween. The parent went on to complain that no grades have been posted by you to google classroom either. The parent noted the importance of parent involvement in the remote schooling process and stated that he is "not able to do [his] job to make sure [his child] lives up to school requirements unless his performance is visible to [him]." The parent asked that grades be updated by you to be current.

See December 11, 2020 email to you from I. Ollmann, attached as Exhibit 24.

30. That same day, you also received email correspondence from another parent in one of your classes regarding her child's grade. Mr. Martin was copied on this email. The parent noted that she was emailing you again about the lack of parental knowledge of student progress in your class. The parent noted that Powerschool has only one grade posted since October 28, 2020, a test taken on November 16, 2020. She went on to detail that not one assignment prior or after the November 16, 2020 test has been posted. The parent also detailed that Google classroom does not have her child's progress updated either. She noted in Google classroom she can only see that one assignment has been submitted by her child. The parent related that that you have *failed* to provide viable feedback on either platform about her daughter's progress. She related that she is unable to get her child the help that she will need to succeed without feedback from you as her teacher.

Further, the parent mentioned that when she expressed her concerns about your failure to provide feedback or update grades via PowerSchool or Google classroom last quarter, you assured her that her child was doing fine and said that you would be more vigilant about posting grades in PowerSchool for parents to access and see the progress of their child. The parents stated, "this has not happen." The parent then noted that since it is almost the end of the quarter, it would be very difficult to improve the grade. The parent stated that she: "is thoroughly disappointed in the lack of information from you and [she] know[s] of many other families that have expressed the same frustrations and concerns.

See December 11, 2020 email from C. Norquist, attached as Exhibit 25.

31. Thereafter, on December 14, 2020, Mr. Martin, your supervising Principal at CT English Middle School, received email correspondence from another parent whose child is enrolled in your math class. The parent provided feedback to Mr. Martin that you had *failed* to grade old assignments. He noted that a few assignments, four, had been graded from November 16, 2020 and December 1-4, 2020; but that no assignments had been graded since December 4, 2020. The parent stated that he is "VERY UNHAPPY and . . . formally making a complaint." (emphasis in the original) The parent also detailed that other parents are complaining about your failures to update and post grades in a timely fashion to allow parents and students to track their progress and allow for improvement.

See December 14, 2020 email correspondence to B. Martin, attached as Exhibit 26.

16

PL000793

32. That same day, the Superintendent and Mr. Martin received email correspondence from another parent whose student is enrolled in your math class. The parent related that their child's math grade was not only "NOT current", but that you had not "even been grading or checking" homework "ALL quarter." The parent went on to note that it looked like you had started grading "the kid's papers now-at the END of the quarter." The parent stated that he had been checking Google classroom and at no point had you given his child feedback on progress. The parent questioned how his child can be expected to improve his/her math skills, or course correct throughout the quarter, if he/she does not know when his/her homework is correct. The parent expressed frustration that because you had not provided feedback or updated grades throughout the quarter, there is now no way to turn things around.

The parent went on to note that while they are trying to be patient with distant learning, some accountability from the teachers is required and based on his communications with you, their family has not found you to be accountable. The parent then inquired as to how your failures will be fixed moving forward.

See December 14, 2020 email correspondence to B. Martin and L. Fraser, attached as Exhibit 27.

33. Appropriately, on December 16, 2020, you received a Letter of Reprimand from Mr. Martin regarding your failure of duties and unprofessional email response. Mr. Martin detailed that on December 11, 2020 he was made aware of your continued inability to provide timely progress reports regarding grades to your students and families. Mr. Martin noted that you were contacted via email, with him being cc'd, on December 11, 2020 by a parent concerned that there had not been adequate information provided to determine his child's math grade. Mr. Martin also noted that he had received an additional parent complaint along the same vein reporting that you had not made updates to grades since mid-October 2020. Lastly, Mr. Martin detailed that he was in receipt of two additional complaints via email on December 14, 2020 by another family indicating this behavior is a dis-service to students and families.

Mr. Martin provided that upon review of PowerSchool, it was confirmed that you had not fulfilled your professional obligation of reporting student grades and progress. For example, during the period of October 30, 2020 to November 30, 2020, only one grade had been posted for your students in your period 2 Math 6 course. Mr. Martin informed you that "this negatively impacts the learning of students in that they are not provided accurate and timely feedback related to their completed assignments. This failure on your part hinders the ability of students to take corrective measures to seek assistance when needed."

Mr. Martin proceeded to note that this behavior had also previously occurred during the first quarter of the 2020 school year and at that time, you noted you were behind, trying to keep your head above water, and that it was something you were committed to working on. During a phone conversation with Mr. Martin on October 28, 2020, he

17

PL000794

discussed with you the topic of grading and feedback and you indicated that you were aware of this being an issue and believed you would rectify the situation for quarter 2. Appropriately, at that time, Mr. Martin encouraged you to reach out to him if you needed additional support to be able to report grades and provide feedback in a timely manner.

Mr. Martin then reminded and reprimanded you that "providing feedback, grades, and progress reports is a basic and important function of teaching."  He noted that "your inability to clearly and regularly communicate student progress and grades to students and families demonstrates a failure to perform the functions of your position as a classroom teacher. This behavior negatively impacts student performance and the ability of families to provide adequate support for their child."

Mr. Martin further reprimanded you regarding an inappropriate, disrespectful, and unprofessional email response you sent to a parent on December 12, 2020, after she provided you her recurring concerns about your ongoing failure to properly and in a timely manner communicate grades and performance with students and families. Incredibly, your December 12th response to this parent did not address her concern(s), and instead was laced with sarcasm and disrespect for her issues. Mr. Martin admonished you that "responding in this manner adversely affects the professional relationship with the parent that is necessary for student success - and frankly makes a bad situation even worse."   Mr. Martin went on to detail that this is not the type of professional communication expected of you in the performance of your duties. He reminded you that you are expected to respond to parent inquiries in a professional, courteous and supportive manner. He detailed that your responses should directly address the question or concern only, without the inclusion of sarcasm, excuses, or other inappropriate discussion.

Accordingly, Mr. Martin advised you that effective immediately, and until further notice, you are required to:

    a. Update PowerTeacher Pro at least one time each week in a manner that clearly communicates student grade progress; and otherwise not allow yourself to continue to fall behind on PowerSchool and/or timely providing parents/students with grades and progress.

    b. Send responses to parent complaints and/or concerns to me, as your Principal, for review and approval *prior* to sending the response to any parent/student.

    c. Always communicate with parents/students and others in a professional manner.

See December 16, 2020 Letter of Reprimand, attached hereto as Exhibit 28.

34. The next day, December 17, 2020, Mr. Martin sent you an email correspondence entitled "Response Requested-Alleged Algebra Course".  In this email Mr. Martin informed you that it had recently been brought to his attention that you may be hosting an unapproved Algebra course for a select group of students during the time designated as "office hours and student support" from 1:00 p.m. to 2:30 p.m.  Appropriately, to help him understand

18

the situation and so that he could determine what, if anything needs to be done further, he asked that you provide answers to each of the following questions by December 18 at 3 p.m.:

    a.  Are you currently conducting a class on Mondays, Tuesdays, and Thursdays at 1p.m. for algebra instruction?

    b.  Are you hosting this class using a non-school provided platform or a personal Zoom account?

    c.  Are the students attending the course currently enrolled in any of your CT math courses?

    d.  How have the students participating in this class been chosen?

    e.  Is this class open to any student at any grade who wishes to participate?

    f.  What arrangements have you made for students enrolled in your CT courses to access you for help and support during the office hours that are impacted by this class?

    g.  What arrangements have you made for students participating in this class to access office hours and supports offered by other teachers?

    h.  The students participating in this class are receiving an additional 90+ minutes of instruction per week. What plans have you made to provide supplemental instructional minutes to other students, particularly any students in your 1-6 period classes who struggle?

    i.  How have you communicated the logistics of this class to participants and parents?

    j.  Did you seek parent permission for students to participate in this class?

To date, you have *failed* to provide a response to Mr. Martin's questions in violation of his directives to do so.

See December 17, 2020 email correspondence entitled "Response Requested-Alleged Algebra Course", attached hereto as Exhibit 29.

35.  Recently, on January 28, 2021, the District received a note of concern from a parent, who wanted to bring attention to the fact that you previously (in or about October 2020) shared graphic stories with his son and other classmates related to your military experience in Afghanistan, and specifically "combat fatalities." This parent, currently serving overseas, felt your stories were highly inappropriate for youth, but specifically, his son, while he was away serving - and facing the peril(s) of military action.

See January 28, 2021 email correspondence entitled "Class Discussions", attached hereto as Exhibit 30.

36.  Not only does this email concern the District in that it comes from a military parent about your inappropriate discussions, but further it shows that - almost two (2) years after the 2018 investigation and aftermath, including specific reprimand and counseling, you continued to engage in this inappropriate conduct and flatly refused to follow prior directives.

19

**PL000796**

37. In addition, in the January 28th Email forwards, you mentioned to that parent (in an October 19, 2020 email) that you could not meet in person - since you have "been out of state since March - taking remote teaching to new levels of remote." This statement is not only inappropriate to provide to a parent, but, if true, would indicate - by your admission - that you were neglecting your duties and using your "remote" teaching as an excuse.

38. On or about January 28-29, 2021, the District, through the office at CT English Middle School, received a parent inquiry about student attendance the prior week. Specifically, the parent inquired about her daughter possibly missing a "1PM Math class" and was concerned. This inquiry caused some confusion in the office, since there was no such class, so the office asked the parent to clarify and she then confirmed after talking to her child that it was "the after school math class with Mr. Kissner at 1 p.m." The parent apologized for the "confusion." Most concerning to the District, this exchange shows that you - as recently as January 25th - continued to ignore prior directives to cease this activity during school and duty hours.

    See January 28-29, 2021 Email correspondence entitled "Power outage 1/25", attached hereto as Exhibit 31.

39. Similarly, on January 29th, the District received additional information showing that you continued to violate its directives, after another student informed Principal Martin that he could not move math classes (Math 7 to 8) because he already attends a "1pm advanced math class with Mr. Kissner."

    See January 29, 2021 email correspondence entitled "dk algebra class", attached as Exhibit 32.

40. Among other instances, the District also has determined that back in November, you also appear to have violated these directives as well. Specifically, in this email exchange between you and a student, after the student informed you that he could not make it to "math" that day, you responded by asking if he was "planning to continue to meet at 1 Mon, Tue, Thur for algebra separately."

    See November 9, 2021 Zoom chat correspondence (snapshot), attached as Exhibit 33.

41. To compound your failures and misconduct in Charges 38-40, your actions directly evidence insubordination after you had been repeatedly directed to not conduct the "after school math class."

42. Also, upon a recent review of District Zoom records (applicable to you and during your required duty time for "office hours" this past school year), it appears that you *failed* to conduct and/or attend required "office hours" on numerous occasions (approximately 29 days) from August 2020-January 2021. Incredibly, it appears that many of these were shortly after your Principal made a formal directive(s) for information and confirmation

20

in November/December to which you ignored and *failed* to respond. (matters discussed in Charges 26 and 34 above).

See Zoom usage log (account:dkissner@loma.k12.ca.us), attached as Exhibit 34.

43. Moreover, it now also appears that you were dishonest to the District in November when, in response to your Principal, you specifically stated in your November 12th email (Charge 26 - Exhibit 21) that:

    a. "I have never skipped or canceled a Zoom meeting"; and
    b. "The only time that I have not utilized near the full scheduled Zoom time were the few days where there were power outages on the mountain or evacuations."

See Exhibit 21 (Charge 26).

44. In sum, your misconduct as identified herein is contrary to the District's expectations that our teachers, and frankly all staff, create and maintain a productive, safe, inclusive, and effective learning environment in our schools. Furthermore, your actions demonstrate your inability and/or failure to comply with the District's policies, administrative regulations, school rules, management directives, and the duties and responsibilities of your position as a certificated teacher, as previously described above. Specifically:

    a. You have repeatedly chosen to ignore District directives and counseling regarding remote instruction and instead have chosen to operate as you "want" without authorization to do so.

    b. By meeting, traveling, and/or providing instruction with select District students and conducting "in person" instruction during the current COVID 19 pandemic while at the time the District itself had only been authorized to conduct "remote" instruction due to state and public health orders and restrictions, you are in violation of District policies, directives, intent, and local/state mandates.

    c. Failing to seek prior authorization for these non-sanctioned "in person" instruction classes that are/were taking place off-District premises during the school day and duty time, is insubordinate and unacceptable conduct, as well as further evidence that you are unable and unwilling to follow state, local and District instructional and operation protocols and rules.

    d. By conducting un-sanctioned "in person" instruction in violation of current COVID restrictions in place for the District and its students, staff and families, you also have potentially exposed students to physical danger, as well as the District to liability and government sanction.

45. Your overall conduct as detailed herein negatively impacts your working relationships with students and your colleagues, your job effectiveness, the efficiency of operations, overall staff and student/parents morale, and has compromised the safety and welfare of

students. Moreover, your actions have had a detrimental effect on your students/parents and the operations of the District.

The foregoing causes and specific charges stated herein, individually and collectively, are sufficient grounds for your dismissal from the position of a certificated employee. Subsequent to the service of this Statement of Charges, amended or supplemental charges may be served upon you. If the amended or supplemental charges present new information, the District will assume that you deny such charges, and you will be afforded an opportunity to respond to the amended or supplemental charges.

Please be advised that retaliation in any form is unacceptable. Any such retaliation against anyone who participated in the investigation of this matter will not be tolerated and may result in further disciplinary action against you.

Pursuant to Education Code section 44031, a copy of this letter and its attachments will be placed in your personnel file shortly. A copy of Education Code section 44031 is attached to this letter. You may prepare a response and have that response attached to this document to be placed in your personnel file.

The undersigned declares that, under penalty of perjury and the laws of the State of California, the foregoing is true and correct to the best of my information and belief.

Dated: February 12, 2021

Lisa Fraser
Superintendent

22

PL000799

**CALIFORNIA EDUCATION CODE**

## § 44031

(a) Every employee has the right to inspect personnel records pursuant to Section 1198.5 of the Labor Code.

(b) In addition to subdivision (a), all of the following shall apply to an employee of a school district:

(1) Information of a derogatory nature shall not be entered into an employee's personnel records unless and until the employee is given notice and an opportunity to review and comment on that information. The employee shall have the right to enter, and have attached to any derogatory statement, his or her own comments. The review shall take place during normal business hours and the employee shall be released from duties for this purpose without salary reduction.

(2) The employee shall not have the right to inspect personnel records at a time when the employee is actually required to render services to the district.

(3) A noncredentialled employee shall have access to his or her numerical scores obtained as a result of a written examination.

(4) Except as provided in paragraph (3), nothing in this section shall entitle an employee to review ratings, reports, or records that

(A) were obtained prior to the employment of the person involved,

(B) were prepared by identifiable examination committee members, or

(C) were obtained in connection with a promotional examination.

## § 44932

(a) A permanent employee shall not be dismissed except for one or more of the following causes:

(1) Immoral conduct, including, but not limited to, egregious misconduct. For purposes of this chapter, "egregious misconduct" is defined exclusively as immoral conduct that is the basis for an offense described in Section 44010 or 44011 of this code, or in Sections 11165.2 to 11165.6, inclusive, of the Penal Code.

(2) Unprofessional conduct.

(3) Commission, aiding, or advocating the commission of acts of criminal syndicalism, as prohibited by Chapter 188 of the Statutes of 1919, or in any amendment to that chapter.

(4) Dishonesty.

(5) Unsatisfactory performance.

(6) Evident unfitness for service.

(7) Physical or mental condition unfitting him or her to instruct or associate with children.

(8) Persistent violation of or refusal to obey the school laws of the state or reasonable regulations prescribed for the government of the public schools by the state board or by the governing board of the school district employing him or her.

23

(9) Conviction of a felony or of any crime involving moral turpitude.

(10) Violation of Section 51530 or conduct specified in Section 1028 of the Government Code, added by Chapter 1418 of the Statutes of 1947.

(11) Alcoholism or other drug abuse that makes the employee unfit to instruct or associate with children.

(b) The governing board of a school district may suspend without pay for a specific period of time on grounds of unprofessional conduct a permanent certificated employee or, in a school district with an average daily attendance of less than 250 pupils, a probationary employee, pursuant to the procedures specified in Sections 44933, 44934, 44934.1, 44935, 44936, 44937, 44943, and 44944. This authorization does not apply to a school district that has adopted a collective bargaining agreement pursuant to subdivision (b) of Section 3543.2 of the Government Code.

(Amended by Stats. 2015, Ch. 303, Sec. 86. Effective January 1, 2016.)

### § 44939

(a) This section applies only to dismissal or suspension proceedings initiated pursuant to Section 44934.

(b) Upon the filing of written charges, duly signed and verified by the person filing them with the governing board of a school district, or upon a written statement of charges formulated by the

governing board of a school district, charging a permanent employee of the school district with immoral conduct, conviction of a felony or of any crime involving moral turpitude, with incompetency due to mental disability, with willful refusal to perform regular assignments without reasonable cause, as prescribed by reasonable rules and regulations of the employing school district, or with violation of Section 51530, the governing board of the school district may, if it deems that action necessary, immediately suspend the employee from his or her duties and give notice to him or her of his or her suspension, and that 30 days after service of the notice

of dismissal, he or she will be dismissed, unless he or she demands a hearing.

(c) (1) An employee who has been placed on suspension pursuant to this section may serve and file with the Office of Administrative Hearings a motion for immediate reversal of suspension. Review of a motion filed pursuant to this section shall be limited to a determination as to whether the facts as alleged in the statement of charges, if true, are sufficient to constitute a basis for immediate suspension under this section. The motion shall include a memorandum of points and authorities setting forth law and argument supporting the employee's contention that the statement of charges does not set forth a sufficient basis for immediate suspension.

(2) The motion shall be served upon the governing board of the school district and filed with the Office of Administrative Hearings within 30 days after service upon the employee of the initial pleading in the matter. The governing board of the school district has the right to serve and file a written response to the motion before or at the time of hearing.

(3) The hearing on the motion for immediate reversal of suspension shall be held no later than 30 days after the motion is filed with the Office of Administrative Hearings.

24

PL000801

(4) The administrative law judge shall, no later than 15 days after the hearing, issue an order denying or granting the motion. The order shall be in writing, and a copy of the order shall be served by the Office of Administrative Hearings upon the parties. The grant or denial of the motion shall be without prejudice to consideration by the Commission on Professional Competence, based upon the full evidentiary record before it, of the validity of the grounds for

dismissal. The ruling shall not be considered by the commission in determining the validity of the grounds for dismissal and shall not have any bearing on the commission's determination regarding the grounds for dismissal.

(5) An order granting a motion for immediate reversal of suspension shall become effective within five days of service of the order. The school district shall make the employee whole for any lost wages, benefits, and compensation within 14 days after service of an order granting the motion.

(6) A motion made pursuant to this section shall be the exclusive means of obtaining interlocutory review of suspension pending dismissal. The grant or denial of the motion is not subject to interlocutory judicial review.

(d) A motion for immediate reversal of suspension pursuant to this section does not affect the authority of a governing board of a school district to determine the physical placement and assignment of an employee who is suspended or placed on administrative leave during the review of the motion or while dismissal charges are pending.

25

PL000802