**No. 24-1261**

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

DAVID M. KISSNER, an individual,

*Plaintiff-Appellant*,

v.

LOMA PRIETA JOINT UNION SCHOOL DISTRICT; ET AL.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of California, San Francisco
No. 5:22-cv-00949-CRB
Hon. Charles R. Breyer

**APPELLANT'S REQUEST FOR JUDICIAL NOTICE**

WILLIAM J. BECKER, JR., ESQ.
Bill@FreedomXLaw.com
FREEDOM X
11500 Olympic Blvd., Suite 400
Los Angeles, California 90064
Telephone: (310) 636-1018

Attorneys for Appellant
DAVID M. KISSNER

Pursuant to Fed. R. Evid. 201, Appellant David M. Kissner respectfully requests that this Court take judicial notice of the following court proceedings and filings from another jurisdiction, which are relevant to the issues presented in this appeal:

1. *David M. Kissner v. Commission on Professional Competence*, Case No. 22CV393046
   - Statement Of Decision Re: Order Granting In Part The Petition For Writ Of Administrative Mandamus; Judgment, filed on November 22, 2023

2. *David M. Kissner v. Commission on Professional Competence*, Case No. 22CV393046
   - Writ of Administrative Mandamus, filed on October 11, 2024

3. *In the Matter of the Dismissal of: David Kissner, A Permanent Certificated Employee, Respondent*, OAH No. 2021050291.1,

   - Order Setting Oral Argument On Remand, filed on October 11, 2024.

## I.      LEGAL BASIS FOR REQUEST

Under Fed. R. Evid. 201(b), judicial notice may be taken of facts that are not subject to reasonable dispute because they:

1.      Are generally known within the trial court's territorial jurisdiction, or

2.      Can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

Court records and rulings are proper subjects of judicial notice under Fed. R. Evid. 201 because they constitute official government records and their authenticity

1

is beyond dispute. See *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) (holding that courts "may take judicial notice of court records in another case").

These documents are directly relevant because they demonstrate that the Commission on Professional Competence's original decision, which the District Court and the Panel relied upon, is void and cannot be considered valid evidence supporting the Commission's determinations.

## II.     CONCLUSION

For the foregoing reasons, Appellant respectfully requests that this Court take judicial notice of the above-identified records.

Date: February 5, 2025                      FREEDOM X

                                            /s/ William J. Becker, Jr.
                                            WILLIAM J. BECKER, JR.
                                            Bill@FreedomXLaw.com
                                            11500 Olympic Blvd., Suite 400
                                            Los Angeles, California 90064
                                            Telephone: (310) 636-1018

                                            Attorneys for Appellant,
                                            DAVID M. KISSNER

**EXHIBIT 1** – SUPERIOR COURT REMAND ORDER

FILED

NOV 22 2023

Clerk of the Court
Superior Court of CA County of Santa Clara
BY_____DEPUTY
C. Pha

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SANTA CLARA**

| Matter of: | Case No. 22CV393046 |
|---|---|
| DAVID M. KISSNER, | |
| Petitioner/Plaintiff, | **STATEMENT OF DECISION RE: ORDER GRANTING IN PART THE PETITION FOR WRIT OF ADMINISTRATIVE MANDAMUS; JUDGMENT** |
| vs. | |
| COMMISSION ON PROFESSIONAL COMPETENCE, | |
| Respondent/Defendant. | |
| LOMA PRIETA JOINT UNION SCHOOL DISTRICT, | |
| Real Party in Interest. | |

On January 5, 2022, Petitioner David M. Kissner filed for a peremptory writ of administrative mandamus under Code of Civil Procedure sections 1085 and 1094.5. Kissner is represented by William J. Becker, Jr., Esq. The real party in interest, Loma Prieta Joint Union School District, is represented by Brian Bock, Esq. and Mary Ellyn Gormley, Esq. Kissner seeks review of the Decision made by the Commission on Professional Competence that Kissner should be dismissed for "evident unfitness for service" under Education Code section 44932,

1

1    subdivision (a)(6).[1]  Having reviewed and considered the administrative record and the written

2    submissions of the parties, and having listened carefully to the parties' arguments, the Court

3    rules as follows:

4    **I.      BACKGROUND**

5           **A.      Procedural History**

6           The Loma Prieta Joint Union School District ("District") consists of an elementary school

7    and a middle school with a total of about 500 students.  Kissner began teaching mathematics (for

8    which he is certificated) and science (for which he is not certificated) in the middle school in

9    2012.  He also coached the middle school's wrestling team.

10          On February 12, 2021, the District served on Kissner a Notice of Proposed Intent to

11   Dismiss; Statement of Charges.  On June 11, 2021, the District served on Kissner an Amended

12   Notice of Proposed Intent to Dismiss with Statement of Charges; Amended Statement of

13   Charges.  The District alleged three causes for dismissal under section 44932:  (1) persistent

14   violation of, or refusal to obey, state laws and regulations; (2) immoral conduct; and (3) evident

15   unfitness for service.  Kissner timely requested an administrative hearing before the Commission

16   on Professional Competence ("Commission") as provided under section 44944.  The

17   Commission's members were Katherine Everett, Santa Clara County Office of Education; Scott

18   Guagliardo, Downtown College Prep.; and Administrative Law Judge Juliet E. Cox, State of

19   California, Office of Administrative Hearings.  The Commission hearing commenced, by video

20   conference, on October 4, 2021 and continued for a total of eleven days.

21          The Commission's 38-page decision is dated December 7, 2021 (the "Decision").  The

22   Decision sets forth the Commission's factual findings and legal conclusions regarding Kissner's

23   (1) teaching credentials and experience; (2) trip to Las Vegas in 2019; (3) seventh grade

24   pre-algebra class; (4) remote teaching; (5) resistance to supervision; (6) grading; (7) false

25   statements and testimony; (8) challenge to Board policy 4119.21; and (9) teaching skill.

26

27

28   _____

[1] Unless otherwise indicated, all references are to the Education Code.

2

ORDER GRANTING IN PART THE PETITION FOR WRIT OF ADMINISTRATIVE MANDAMUS

1        The Commission found that the evidence did not support the District's claim that Kissner

2   was liable for persistent violation of, or refusal to obey, state laws and regulations. The

3   Commission also concluded that Kissner's actions did not constitute immoral conduct. The

4   Commission did find, however, that Kissner was properly dismissed on the ground of evident

5   unfitness for service under section 44932, subdivision (a)(6).

6        On January 5, 2022, Kissner filed a Verified Petition for Peremptory Writ of

7   Administrative Mandamus; Complaint for Declaratory and Injunctive Relief and Application for

8   Stay ("Petition"), which is now before the Court.[2] The administrative record includes 8,634

9   pages of exhibits, rulings, and hearing transcripts. It also includes audio and video recordings.

10  A complicating issue is that many exhibits offered by both sides were not admitted for the truth

11  but instead, for non-hearsay purposes such as the effect on the recipient.

12       After the parties submitted lengthy briefs, a merits hearing took place on June 26, 2023.

13  Both parties requested a statement of decision under Code of Civil Procedure section 632 and

14  Rule 3.1590 of the California Rules of Court ("CRC"). In its tentative decision filed on July 10,

15  2023, the court denied Kissner's request for a writ of mandamus. The court directed each of the

16  parties to prepare and file proposed statements of decision under CRC 3.1590(f) and objections

17  under CRC 3.1590(g). The parties prepared and filed the proposed statements of decision and

18  objections as directed.

19       On August 25, 2023, the court issued an order finding that because of the size of the

20  administrative record and the length of the parties' submissions, there was good cause to extend

21  time period set forth in CRC 3.1590(*l*), as permitted under CRC 3.1590(m). The court stated that

22  it "expects it will sign and file a final statement of decision and judgment on or before October

23  27, 2023."

24       Kissner had earlier requested a hearing under CRC 3.1590(k). On November 8, 2023, the

25  court set a hearing on November 15, 2023. The notice identified the issues that would be

26  discussed. The hearing took place as scheduled. During the hearing the court requested that on

27

28  _____

[2] The District is not challenging any findings or conclusions in the Decision.

ORDER GRANTING IN PART THE PETITION FOR WRIT OF ADMINISTRATIVE MANDAMUS

1  or before November 20, 2023 the parties each submit a list of exhibits that were admitted for a

2  limited purpose. The parties complied with this request.

3      **B.**    **Timeline of Relevant Events**

4      The Decision includes 108 factual findings and 27 legal conclusions.

5      Factual findings 1 through 10 set forth background information and Kissner's education

6  and professional experience. The court finds that Findings 1 through 10 are supported by the

7  evidence. Factual findings 11 through 26 follow the heading "Timeline of Investigations and

8  Related Events." At a high level, the parties do not contest the facts set forth in the timeline,

9  though both sides argue additional facts and arguments should be considered.

10      We begin in March and April 2018 when Kissner and the District received media

11  attention because of conflict within and between the District and the community. The District

12  conducted an investigation into the conflict. After the investigation, the District took no

13  disciplinary action against Kissner.

14      In that same period of time, the District's Board of Trustees ("Board") received an

15  anonymous letter alleging that Kissner misbehaved outside the school setting. The District

16  retained an independent investigator to probe the allegations. In October 2018, District

17  Superintendent Lisa Fraser delivered a letter to Kissner summarizing what the investigation had

18  shown and warning him that behavior similar to the substantiated allegations would result in

19  disciplinary action.

20      Kissner pressed Superintendent Fraser during the 2018-2019 school year for additional

21  information about the conflict, the allegations in the anonymous letter, and the investigation.

22  Superintendent Fraser told Kissner that the District's Board and administrators preferred not to

23  "re-hash" that conflict. In April 2019, Kissner began an effort to obtain public records from the

24  District regarding the investigations described above. He also filed an administrative

25  employment complaint.

26      In 2019 the Board agreed to place a local school tax measure (Measure N) on the

27  November 2020 ballot. In December 2019, Kissner informed Superintendent Fraser that he

28  intended to oppose it. Kissner was prominent in the campaign against Measure N, including

ORDER GRANTING IN PART THE PETITION FOR WRIT OF ADMINISTRATIVE MANDAMUS

1   debating the measure in social media. In mid-December 2020, certified election returns showed

2   that Measure N had failed.

3         Kissner's wife ran for the Board in the November 2020 election. She was not elected.

4   Soon after the November 2020 election, a Board member who was elected resigned. Board

5   members voted to appoint a replacement. Kissner and other community members advocated for

6   the District instead to conduct a special election.

7         The court finds that Findings 11 through 26 are supported by the evidence that was

8   presented to the Commission. Finding 27, titled "Alleged Grounds for Dismissal," is technically

9   correct, though as set forth below, an event that took place more than three years before the

10  charges were filed concerned Kissner's credibility.

11  **II.     STANDARD OF REVIEW**

12        Code of Civil Procedure section 1094.5 discusses judicial review of a final administrative

13  determination by writ of mandamus. Subdivision (b) states that "[t]he inquiry in such a case

14  shall extend to the questions whether the [agency] proceeded without, or in excess of

15  jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of

16  discretion. Abuse of discretion is established if the [agency] has not proceeded in the manner

17  required by law, the order or decision is not supported by the findings, or the findings are not

18  supported by the evidence." Subdivision (c) states that "[w]here it is claimed that the findings

19  are not supported by the evidence, in cases in which the court is authorized by law to exercise its

20  independent judgment on the evidence, abuse of discretion is established if the court determines

21  that the findings are not supported by the weight of the evidence. In all other cases, abuse of

22  discretion is established if the court determines that the findings are not supported by substantial

23  evidence in the light of the whole record."

24        Here, the court is required to exercise its independent judgment on the evidence.

25  (§ 44945.) The independent judgment test requires the court to not only examine the

26  administrative record for errors of law, but also exercise its independent judgment upon the

27  evidence in a limited trial de novo. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143.) The court is

28  permitted to draw its own reasonable inferences from the evidence and make its own credibility

1   determinations. (*Morrison v. Housing Authority of the City of Los Angeles Bd. of Comrs.* (2003)

2   107 Cal.App.4th 860, 868.)  The court must afford a strong presumption of correctness to the

3   administrative findings and require the challenging party to demonstrate that such findings are

4   contrary to the weight of the evidence. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817.)

5   "In exercising its independent judgment, a trial court must afford a strong presumption of

6   correctness concerning the administrative findings, and the party challenging the administrative

7   decision bears the burden of convincing the court that the administrative findings are contrary to

8   the weight of the evidence." (*Id.*)  The question is not whether any rational fact finder could

9   make a finding, as in substantial evidence review, but whether the reviewing trial court believes

10  the finding was actually correct. (*Alberda v. Board of Retirement of Fresno County Employees'*

11  *Retirement Assn.* (2013) 214 Cal.App.4th 426, 435)  In other words, "The strong presumption of

12  correctness . . . is not the same as a substantial evidence review and does not relieve the trial

13  court of its obligation to make its own findings.  The presumption provides the trial court with a

14  starting point for review – but it is only a presumption and may be overcome.  Because the trial

15  court ultimately must exercise its own independent judgment, that court is free to substitute its

16  own findings after first giving due respect to the agency's findings." (*San Diego Unified School*

17  *Dist. v. Commission on Professional Competence* (2013) 214 Cal.App.4th 1120, 1141, citation

18  omitted].)

19          In this matter there is oral testimony that conflicts with other testimony and evidence.

20  The court "may weigh the credibility of the witnesses in determining whether the findings of the

21  agency are supported by the weight, or preponderance, of the evidence." (*Duncan v. Dept. of*

22  *Personnel Admin.* (2000) 77 Cal.App.4th 1166, 1174, citations omitted.)  It has done so.  But the

23  court recognizes that the Commission was in a better position to assess certain aspects of

24  credibility, including the demeanor of the witnesses, how quickly they answered questions, their

25  tone of their voice, and other attributes.

26  **III.    SUBSTANTIVE LAW**

27          Kissner was dismissed for evident unfitness for service under section 44932, subdivision

28  (a)(6).  The court must consider a number of factors in determining "unfitness":

In determining whether the teacher's conduct thus indicates unfitness to teach the board may consider such matters as the likelihood that the conduct may have adversely affected students or fellow teachers, the degree of such adversity anticipated, the proximity or remoteness in time of the conduct, the type of teaching certificate held by the party involved, the extenuating or aggravating circumstances, if any, surrounding the conduct, the praiseworthiness or blameworthiness of the motives resulting in the conduct, the likelihood of the recurrence of the questioned conduct, and the extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the teacher involved or other teachers.

(*Morrison v. State Board of Education* (1969) 1 Cal.3d 214, 229 (*Morrison*).) In addition, there must be "a nexus between government employment and alleged employee misconduct stemming from the principle that '[n]o person can be denied government employment because of factors unconnected with the responsibilities of that employment.' " (*San Diego Unified School Dist. v. Commission on Professional Competence* (2011) 194 Cal.App.4th 1454, 1462, citing *Morrison* (*SDUSD*).)

A teacher may be discharged where the teacher's conduct "has gained sufficient notoriety so as to impair his on-campus relationships." (*Board of Trustees v. Stubblefield* (1971) 16 Cal.App.3d 820, 826.) " ' "[T]he calling [of a teacher] is so intimate, its duties so delicate, the things in which a teacher might prove unworthy or would fail are so numerous that they are incapable of enumeration in any legislative enactment. . . . His ability to inspire children and to govern them, his power as a teacher, and the character for which he stands are matters of major concern in a teacher's selection and retention." ' [Citation.] There are certain professions which impose upon persons attracted to them, responsibilities and limitations on freedom of action which do not exist in regard to other callings. Public officials such as judges, policemen and schoolteachers fall into such a category. . . . And as our Supreme Court said in *Board of Education v. Swan* (1953) 41 Cal.2d 546, 552, overruled on other grounds in *Bekiaris v. Board of Education* (1972) 6 Cal.3d 575, 588, footnote 7, 'A teacher . . . in the public school system is regarded by the public and pupils in the light of an exemplar, whose words and actions are likely to be followed by the [students] coming under [his] care and protection.' " (*Board of Trustees v. Stubblefield, supra,* 16 Cal.App.3d at p. 824.)

1    If a teacher is found to be unfit, the next step is to determine if the teacher meets the

2    standard for "*evident* unfitness for service." In *Woodland Joint Unified School Dist. v.*

3    *Commission on Professional Competence* (1992) 2 Cal.App.4th 1429, 1444 (*Woodland*), that

4    term is defined as "clearly not fit, not adapted to or unsuitable for teaching, ordinarily by reason

5    of temperamental defects or inadequacies. Unlike 'unprofessional conduct,' 'evident unfitness

6    for service' connotes a fixed character trait, presumably not remediable merely on receipt of

7    notice that one's conduct fails to meet the expectations of the employing school district."

8    Evident unfitness may exist, for example, when a teacher is repeatedly and incurably

9    insubordinate, or is incapable of maintaining cordial, cooperative relationships with colleagues.

10   (*Id.* at pp. 1436-1440.)

11   **IV.    REQUESTS FOR JUDICIAL NOTICE**

12   This action concern's Kissner's dismissal. Kissner filed a separate writ action (Case No.

13   21CV383749) challenging the District's decision to lay him off (the "Layoff Case"). The Notice

14   of Intent to Layoff was served on March 12, 2021. A two-day administrative hearing was

15   conducted. On May 6, 2021 the Office of Administrative Hearings issued a decision affirming

16   the layoff. On June 7, 2021, Kissner filed a writ of mandamus challenging that decision. The

17   writ of mandamus was denied in an order filed on January 13, 2023. Kissner timely appealed.

18   In this action, both parties have filed requests for judicial notice of materials filed in the

19   Layoff Case under Evidence Code section 452, subdivision (d). Kissner filed his request on

20   April 24, 2023. The District filed its request on May 22, 2023. The court GRANTS the requests

21   of both parties, but the court cannot take judicial notice of the truth of any findings of fact, only

22   that such findings were made. (*Barri v. Workers' Comp. Appeals Board* (2018) 28 Cal.App.5th

23   428, 437-438.) Moreover, the documents are subject to Evidence Code section 352 and may not

24   be relevant as they are not part of the administrative record on which the court must rely.

25   **V.    STATEMENT OF DECISION**

26   As noted above, both parties requested an SOD. There is, however, a somewhat

27   awkward fit between an SOD and a writ of mandamus. Code of Procedure section 632, upon

28   which SODs are based, states that an SOD must provide "the factual and legal basis for its

1  decision as to each of the principal controverted issues *at trial*" and addresses "the parties

2  appearing *at trial.*"  Likewise, CRC 3.1590(a) of the Rules of Court begins with the phrase "On

3  *the trial* of a question of fact by the court...."  A writ of mandamus proceeding is not a trial.

4  Instead, it is an "inquiry" that "shall extend to the questions whether the respondent has

5  proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there

6  was any prejudicial abuse of discretion." (Civ. Proc. Code § 1094.5, subd. (b).)  Nonetheless,

7  consistent with the requirements for an SOD, the court sets forth "the grounds upon which the

8  judgment rests, without necessarily specifying the particular evidence considered by the trial

9  court in reaching its decision." (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106,

10  1125.)  "In other words, a trial court rendering a statement of decision is required only to set out

11  ultimate findings rather than evidentiary ones." (*Id.*)

12  **VI.    DISCUSSION**

13       The parties identified the principal controverted issues as:  (1) Whether the Commission

14  abused its discretion by failing to specify Kissner's underlying misconduct; (2) Whether the

15  Commission abused its discretion by making findings of evident unfitness that were not

16  supported by the evidence; (3) Whether the Commission abused its discretion by admitting

17  impeachment evidence of events occurring more than four years before the issuance of the

18  Notice of Intent to Terminate; and (4) Whether the Commission abused its discretion by finding

19  that Kissner had not met his burden in proving his affirmative defense of retaliation.  Each of

20  these issues is discussed below.  Ultimately, the court concludes that certain findings cannot be

21  used to support the conclusion that Kissner should be dismissed for evident fitness for service.

22  Consequently, the court must remand the Decision for further consideration by the Commission.

23       **A.    Whether the Commission abused its discretion by failing to specify**
            **Kissner's underlying misconduct**
24

25       During the November 15, 2023 hearing, and in his PSOD, Kissner stated he was no

26  longer asserting that the Commission abused its discretion by failing to specify his underlying

27  misconduct.

28

**B.**    **Whether the Commission abused its discretion by making findings of evident unfitness that were not supported by the evidence**

**1.    Furnishing alcohol to teens in Las Vegas**

Findings 15, 17 and 28 through 45 in the Decision set forth the Commission's findings concerning the claim that Kissner furnished alcohol to teenagers in Las Vegas in 2019.

To put this in context, Findings 11 through 18 describe events in 2018, including investigations of Kissner based on anonymous letters. Finding 15 states, in part, "The District's investigation of these allegations revealed evidence supporting some of the allegations. The investigation did not substantiate the letter's most serious allegations." Finding 17 states, "District administrators did not conclude that the investigation described in Finding 15 had revealed misconduct warranting Kissner's dismissal from employment. In October 2018, Superintendent Fraser delivered a letter to Kissner summarizing what the investigation had shown, and warning Kissner that further behavior similar to the substantiated allegations would result in disciplinary action."

Finding 28 states that one of the anonymous letters stated that Kissner "had served alcohol to at least three teenage boys during camping trips" and had "admitted to doing it one time." Finding 29 states, "During the investigation described above in Finding 15, Kissner repeated his admission that he had served alcohol to a teenage boy during a 2016 camping trip. The letter described above in Finding 17 refers to this admission and warns Kissner that "any further report of providing alcohol to a minor will result in further corrective action up to and including criminal charges and/or possible termination of your employment."

Finding 26 states that in early March 2021 the District received written statements regarding a camping trip in Death Valley that Kissner had organized. This event was not included in the Statement of Charges dated March 12, 2021. It was, however, included in the Amended Statement of Charges dated June 11, 2021.

Findings 28 through 45 state that in April 2019 Kissner organized a week-long camping trip in Death Valley. It was not sponsored by the District. During the trip Kissner and four boys under 18 years old drove to Las Vegas to fix a leaf spring on a trailer. In the hotel where they

ORDER GRANTING IN PART THE PETITION FOR WRIT OF ADMINISTRATIVE MANDAMUS

1  stayed two of the boys consumed whisky that Kissner had purchased. Finding 42 states that

2  Kissner took no effective steps to stop the boys from consuming the alcohol. Finding 43 states

3  that the two boys "spend between two and four hours exploring the Las Vegas strip on foot."

4      Kissner disagrees with the findings. He contends that the evidence did not show he had

5  offered alcohol to the minors. Kissner also contends there is no evidence that he knew the

6  minors had consumed alcohol and no evidence that he allowed them to explore the Las Vegas

7  strip at night. Kissner states the trip was not related to the District and did not involve District

8  students.

9      The District argues that Kissner took the minors to Las Vegas without their parents'

10  knowledge or authorization. The District further argues that Kissner knew that two of the minors

11  (both former District students) had just the day before smoked marijuana. The District states that

12  it is undisputed Kissner purchased whiskey, left it in an area accessible to the minors, and fell

13  asleep. According to the District, the evidence shows Kissner left the minors free to drink the

14  whiskey and explore the Las Vegas strip unsupervised.

15      As a preliminary matter, section 44944, subdivision (b)(2)(A), states that with respect to

16  dismissal or suspension hearings, "Testimony shall not be given or evidence shall not be

17  introduced relating to matters that occurred more than four years before the date of the filing of

18  the notice." Subdivision (b)(2)(B) states "no decision relating to the dismissal or suspension of

19  an employee shall be made based on charges or evidence of any nature relating to matters

20  occurring more than four years before the filing of the notice." Further below the court

21  addresses the application of this statute to assessing credibility. Here, however, evidence of a

22  separate incident in 2016 during which Kissner served alcohol to a minor relates to the merits of

23  the charges themselves. Therefore, to the extent Findings 28 and 29 discuss events more than

24  four years from the date of the filing of the Notice of Proposed Intent to Dismiss, which was

25  February 12, 2021, they cannot be considered by the court as evidence of "evident unfitness for

26  service" and must be stricken to the extent they concern that substantive issue.

27      After its independent review of the evidence, the court concludes that Findings 30

28  through 45 are supported by the weight of the evidence. It is undisputed that Kissner purchased

1    a bottle of whisky before arriving at the Las Vegas hotel. It is undisputed that before falling

2    asleep at the hotel Kissner poured himself a cup of whisky and consumed it. The Decision does

3    not state that Kissner served alcohol to the minors. Instead, Finding 42 states "after bringing

4    whiskey to the hotel room, Kissner took no effective steps to stop [the minors] from consuming

5    it." This statement is supported by the evidence.

6         But even if the findings are supported by the evidence, the court must consider whether

7    the Commission correctly applied the law concerning unfitness for service. *Morrison* requires

8    the court to consider a number of factors in deciding unfitness. One such factor is whether the

9    conduct "adversely affected students or fellow teachers." In this regard, it is notable that Legal

10   Conclusion 5 states that Kissner never offered alcohol to a District student. The Las Vegas event

11   was investigated after the initial Charges were served, suggesting that any effect on parents,

12   students, teachers, and school administrators was not significant. Overall, the evidence suggests

13   that any nexus between Kissner's involvement in the Las Vegas event and his employment is

14   weak at best.

15        During the November 15, 2023 hearing the court asked the District's counsel to clarify

16   whether the District was arguing that the Las Vegas event demonstrated insubordination of the

17   sort mentioned in *Woodland*. The District's counsel said no. Instead, the District argued that the

18   Las Vegas event demonstrated unfitness for service under the same rationale as *SDUSD*, in

19   which the Petitioner's "conduct interfered with his ability to serve as a role model at school"

20   because he posted a graphic, pornographic advertisement that was viewed by a parent and a

21   school administrator. (*SDUSD, supra*, 194 Cal.App.4th at p. 1463.) The court finds that

22   Kissner's failure to stop two 17 year olds who were not District students from consuming

23   whiskey and exploring the Las Vegas strip did not interfere with Kissner's ability to serve as a

24   role model at school, and thus the rationale in *SDUSD* does not apply.

25        Based on its review of the facts and applicable law, the court concludes that Findings 28

26   through 45 cannot be a basis for concluding that Kissner demonstrated unfitness for service.

27

28

ORDER GRANTING IN PART THE PETITION FOR WRIT OF ADMINISTRATIVE MANDAMUS

## 2.     The seventh grade pre-algebra class

Findings 46 through 60 concern math instruction by Kissner.  Kissner taught above-level mathematics during the 2018-19 and 2019-20 school years.  His teaching occurred during regular class time and in before-school meetings.  In March 2020, Kissner's ability to continue teaching the participating students was hampered by the pandemic  At the beginning of the 2020-21 school year, Kissner and some parents made suggestions on ways the students could continue with above-level instruction.  Superintendent Fraser and school principal Dr. Billy Martin deemed these proposals impractical and inadvisable.  The above-level students were placed in the regular seventh-grade pre-algebra math class.

To address the fact that higher-level math students in seventh grade were no longer receiving above-level instruction in algebra, a videoconference mathematics tutoring program called the Mountain Math Institute ("MMI") was started at the end of August 2020 through which Kissner was able to teach algebra to the above-level students.  Kissner did not use the District videoconferencing or virtual classroom services, nor did he use District email addresses to communicate with students.  Kissner taught the course in the mid- to late afternoon, after the middle school instruction day had ended.

Finding 52 states that "Kissner told students who were in his [middle school] Math 7 course, and who also had signed up for the MMI after-school algebra course, that they did not need to attend both class sessions.  He told these students, and their parents, that he would treat the students as having attended their videoconference Math 7 class, even if they had not, if they attended the videoconference MMI class instead.  He also told parents and students that students' participation and performance in the MMI algebra course would qualify them for full Math 7 credit."

Findings 54 and 55 describe Principal Martin's concerns that Kissner was stating that MMI students could skip the regular 7th grade math class.  These concerns were communicated in emails dated September 9, 2020, September 14, 2020, and October 8, 2020.  In the October 8, 2020 email Principal Martin asked Kissner to send "a list of students with whom attendance at [the middle school] may have been communicated as optional or who believe participation in

ORDER GRANTING IN PART THE PETITION FOR WRIT OF ADMINISTRATIVE MANDAMUS

1    Mountain Math Initiative counts as attendance/participation for their CTE classes." Finding 56

2    states, "Kissner did not send Principal Martin any such list. Instead, he sent Principal Martin a

3    complete roster of his Math 7 students. Kissner also sent Principal Martin a lengthy email

4    response explaining why he intended to continue treating his MMI algebra class as equivalent to

5    the Math 7 class." The subsequent Findings show students continued to believe they were not

6    required to attend the regular math course, and even after Kissner moved the class to

7    instructional hours in the school day, he did not use his District videoconference account for the

8    class sessions, and he continued to communicate with students about the class using personal

9    rather than school email addresses. In mid-October, Kissner stopped teaching the MMI algebra

10   class, and later, some above-level students were permitted to attend the school's algebra class.

11        Kissner disagrees with some of the Findings. He contends the Commission "afforded

12   improper weight to a simple miscommunication issue." Kissner states he began providing

13   supplemental math instruction in 2018. The lessons took place before school. During the

14   pandemic the lessons were taught remotely. Kissner argues, and the Commission agreed, that

15   there was some initial confusion with the remote learning attendance requirements. Kissner

16   argues that Principal Martin gave him guidance that conflicted with earlier directives that

17   Kissner could not award attendance or course credit for work that students completed outside

18   their scheduled class time.

19        The District argues that Kissner ignored unambiguous statements by Principal Martin.

20   On September 9, 2020, the Principal Martin sent an email to Kissner informing him that MMI

21   students were required to adhere to school attendance policies and directing him not to inform

22   students to skip their District seventh grade math class if they were participating in MMI. These

23   instructions were repeated on September 14, 2020 and October 8, 2020. Kissner did not comply.

24   Instead, he sent the principal a lengthy email stating that he intended to continue to treat his MMI

25   class as equivalent to the regular math class. The principal responded again on October 14,

26   2020, warning Kissner that continuing to treat MMI instruction as equivalent to District

27   instruction "is not acceptable practice."

28

1  Principal Martin testified that he was initially concerned about MMI because it was an

2  outside-of-school program that used students' in-District email addresses. He was also

3  concerned that the MMI instruction was taking place during school hours despite the fact it could

4  not be reported as a student activity and not count towards school credit. His related concern

5  was that Kissner was assigned duties during the school day for which he received pay from the

6  District and which could not be used for MMI, which was not an authorized school activity.

7  Principal Martin testified about another concern: "if they were skipping their [regular math

8  class], but then participating in an outside-of-school program that I don't know how it's run or

9  how it's accredited or what instruction or curriculum is being taught, I can't monitor that which

10  is – my job is to ensure that the program is being adhered to and taught, and I can't do that with

11  an outside-of-school program." In a mid-September meeting with Kissner, Principal Martin

12  testified that he "made it very clear that it could not supplant – 'supplant' was the word that I

13  used often in describing this – that basically, it was not allowed to replace what a student was

14  supposed to do when enrolled in their C.T. Middle School courses."

15  Kissner testified that he was doing the right thing for the students. Some parents testified

16  that they were thankful with Kissner's commitment to teaching higher-level math to their

17  children. Kissner's commitment, however, is not at issue. The issue is that Kissner led an

18  unsanctioned math class and informed parents and students, to their detriment, that the regular

19  math class could be skipped. Kissner was repeatedly asked to correct his actions. Kissner failed

20  to respond to some of the requests made by the principal, and when he did respond, the

21  communications were evasive. His resistance to making changes over four weeks put both the

22  school and its students at risk.

23  The court concludes that Findings 46 through 60 are supported by the evidence that was

24  presented to the Commission. The court further concludes that Findings 46 through 60 show that

25  Kissner demonstrated evident unfitness for service because he acted with a temperamental defect

26  which was insubordinate and not cordial or cooperative, and which impaired his on-campus

27  relationships.

28

### 3. Remote teaching

Findings 61 through 70 concern Kissner's remote teaching in the fall of 2020. Finding 61 states, "On August 26, 2020, Fraser received a report by email suggesting that Kissner was conducting in-person teaching for District students at one or more locations outside the District's schools." Superintendent Fraser emailed Kissner to ask questions about this, stating she had concerns about conflicts with regular school hours and other issues. Finding 64 states that Kissner's response stated simply that he would not "share details" about his "private life" with Fraser. In subsequent Findings the Commission found that Superintendent Fraser sought further clarification on August 28, 2020, November 3, 2020, and November 5, 2020. On November 7, 2020, Kissner finally responded. Finding 67 states that Kissner "did not answer any of Fraser's questions clearly" and then it quotes Kissner's response. Finding 69 states, "Kissner also testified that he regrets having given Fraser such terse answers to her questions and believes in hindsight that he should have been more forthcoming in addressing her concerns. He also testified, however, that at the time he considered his remote teaching plans to be 'none of Ms. Fraser's business.' " Finding 70 acknowledges that Kissner did not neglect his duties, did not provide in-person teaching to any District students, and did not represent to anyone that the District had endorsed his trips.

Kissner disagrees with some of the findings and agrees with others. He agrees that during the pandemic he conducted some of his teaching from campsites far away from the District. Kissner states he taught his students online as he would from anywhere else and never taught any student in person. Kissner also argues he did not violate any policy, guidance, law, or regulation, and always responded to emails sent by District personnel.

The District argues that Kissner responded rudely and inappropriately to District inquiries and took no actions to address the District's concerns. The District also explains that its concerns were real, including compliance with state laws and potential legal liability. Superintendent Fraser's email sent to Kissner on August 27, 2020 states, "Without a full description of what is being proposed, it is difficult for me to fully assess the potential liability risks involved for you personally, and for the district. At first glance, without having the benefit

1   of specific details, your alleged activities could be unlawful and/or a violation of Public Health

2   regulations." Having not received a satisfactory response, the District sent a more detailed letter

3   to Kissner dated August 28, 2020. On November 5, 2020, Superintendent Fraser again requested

4   information from Kissner – this time in the form of 20 questions, some of which sought

5   information about Covid precautions and compliance. Kissner responded that (1) he would

6   continue to meet his professional obligations to all his students; (2) neither his physical location

7   nor the people around him had any impact on the performance of his professional duties;

8   (3) nothing about his physical location nor the people around him had anything to do with the

9   District; and (4) he was not in violation of any laws or District policies. He did not, however,

10  provide the information requested by Superintendent Fraser.

11          The court concludes that Findings 61 through 70 are supported by the evidence that was

12  presented to the Commission. The court further concludes that Findings 61 through 70 show that

13  Kissner demonstrated evident unfitness for service because he acted with a temperamental defect

14  which was insubordinate and not cordial or cooperative, and which impaired his on-campus

15  relationships.

16          **4.   Resistance to supervision**

17          Findings 71 through 75 of the Decision set forth factual findings concerning Kissner's

18  resistance to supervision. The first finding references an October 2018 letter that was delivered

19  to Kissner. To put this in context, the evidence shows that the District received a typewritten

20  undated anonymous letter in an envelope postmarked March 20, 2018 that made serious

21  allegations about Kissner's conduct with children. On April 27, 2018, the Board initiated an

22  investigation. Given the seriousness of the allegations made in the anonymous letter, the District

23  also referred the matter to the Sheriff's office. The District's investigation was undertaken by

24  Patricia Elliot, an attorney in Los Gatos. After the investigation was completed, Superintendent

25  Fraser prepared the October 2018 letter that was delivered to Kissner.

26          Finding 71 references Finding 17, which states that in October 2018, Superintendent

27  Fraser delivered a letter to Kissner that summarized what the investigation referenced in Finding

28  15 had shown, including its statement that it "was determined that there are instances of your

1    conduct with children that represent either a lack of professional boundaries or questionable

2    teaching practices, as noted below." The letter also advised Kissner to be mindful of the

3    possibility that parents or children could misperceive his mentorship as inappropriate sexual

4    interest and offered "a list [from the National Education Association] of commonsense pointers

5    for avoiding false allegations which you may be wise to review and consider in your future

6    interactions with youth."

7         Finding 72 states that Kissner took great offense to the content of the letter. It further

8    states that "rather than considering Fraser's advice about avoiding even the appearance of

9    impropriety, Kissner answered her October 18, 2018 letter with a four-page, single-spaced

10   memorandum insisting that he always maintained appropriate boundaries, that he intended to

11   change nothing about his behavior, and that every aspect of the anonymous letter and the

12   District's resulting investigation was 'the very definition of a witch hunt.' " In particular, the

13   cover letter of Kissner's October 28, 2018 response includes the following statements:

14       • The contents of this disciplinary letter are the result of a personal character attack

15         perpetrated by anonymous cowards who sought retribution for my stance in the

16         March 14, 2018 walkout.

17       • This free-wheeling investigation of every aspect of my personal life and how I

18         perform my professional responsibilities is the very definition of a

19         witch-hunt – a campaign against a person holding unpopular views. It is both

20         unethical and illegal to retaliate against an employee in this way.

21       • I am saddened by the fact that the district leadership has apparently joined in the

22         same nasty, personal, divisive political fray that consumes our nation in this era.

23         A different view in a political discourse does not merit an invasive assault on a

24         person's character and life. To use baseless accusations leveled by anonymous

25         cowards in the heat of a political conflict as a pretense for a limitless investigation

26         into a person's life and work is shameful. To then take the empty results of said

27         investigation and craft a disciplinary letter that insinuates that there is some merit

28         to the accusations is all the more shameful. To direct these attacks against

1    someone who has proven over years to be a tireless servant of kids and families in
2    the community is reprehensible.

3 Kissner elaborates on what he believed were the shortcomings of the investigation in the three

4 pages that follow his cover letter, and continues to attack the District.

5    Finding 73 details Kissner's hostile and unprofessional responses to communications

6 from District personnel. Finding 74 describes a video made by Kissner that expressed his

7 unhappiness with the events in 2018 and 2019.

8    Finding 75 concludes that Kissner's conduct and communications "confirmed that neither

9 Kissner's behavioral patterns nor his views about the District's authority to advise or supervise

10 him have changed since October 2018."

11    Kissner disagrees with the findings. His opening brief states, "The evidence simply does

12 not reveal that Kissner sought to be part of an acrimonious relationship with his supervisors...."

13 He contends many disputes were instigated by the District; that others were isolated and

14 anecdotal; and still others were "simple misunderstandings." In turn, the District argues Kissner

15 was uncooperative, uncommunicative, and eventually openly defiant; that he refused to

16 cooperate with or accept supervision from his supervisors. This is illustrated by the testimony of

17 Superintendent Fraser, when she testified: "I don't believe that Mr. Kissner was open to my

18 guidance. I feel like – I feel like he's been adversarial, to be honest, and I – you know, I

19 understand he may not trust administration, but that doesn't make me untrustworthy. And I've

20 tried to show up every day to have a relationship with him, but that hasn't really been possible."

21    The court concludes that Findings 71 through 75 are supported by the evidence that was

22 presented to the Commission. The court further concludes that Findings 71 through 75 show that

23 Kissner demonstrated evident unfitness for service because he acted with a temperamental defect

24 which was insubordinate and not cordial or cooperative, and which impaired his on-campus

25 relationships.

26    **5.    Grading practices**

27    Findings 76 to 79 of the Decision set forth factual findings concerning Kissner's grading

28 practices in the fall of 2020. In summary, the Decision states that Kissner did not provide timely

ORDER GRANTING IN PART THE PETITION FOR WRIT OF ADMINISTRATIVE MANDAMUS

1   feedback to students on their class performance.  To add detail, on October 18, 2020, Kissner

2   responded to a parent complaint.  Kissner wrote that he was late in updating students' grades

3   because he was "answering insane amounts of emails, and [doing] other time-consuming admin

4   tasks like attendance that takes all day."  The Decision states Kissner also blamed students'

5   "poor work habits" for his inability to give the students timely feedback and that Kissner's

6   responses were "unprofessional in tone because they deflected parent's concerns about Kissner

7   onto students and onto District administrators."  Legal Conclusion 10 states that Finding 78

8   shows Kissner communicated unprofessionally with parents.

9       Kissner disagrees with the findings.  He contends there is only evidence of one parent's

10   concern that Kissner's "tone" in his communications were unprofessional.  Kissner argues that a

11   single complaint is not cause for the dismissal of a teacher.  Kissner also notes that the Decision

12   states that his performance in grading was no worse than his colleagues.

13       The District argues substantial evidence supports the Commission's conclusion that

14   Kissner did not provide timely feedback to students on their class performance.  The District

15   cites Principal Martin who described one parent's concern about not being able to address a

16   student's falling grades because Kissner's grades were entered late.  The school's IEP instructor

17   also noted Kissner was late in entering grades.  The District notes that parents complained as

18   well.  The District argues that timely entering grades was important during the pandemic because

19   many parents were serving as tutors, and that Kissner agreed his grades were turned in late.

20   Principal Martin testified that Kissner was the only teacher who was having this issue.

21       The court finds that Findings 76 through 79 do not support Kissner's "evident unfitness

22   for service."  There is one communication that used somewhat unprofessional language (i.e.,

23   Kissner wrote to a parent that he was "answering insane amounts of emails").  There is also

24   evidence, however, that Kissner stated there were delays, and in one email to a parent, he

25   apologized.  Many exhibits were not admitted for the truth and could not be relied upon by the

26   Commission, and Kissner makes the credible assertion that some parents may have coordinated

27   in sending letters to the District regarding the late grading.  Further, the evidence shows the

28

ORDER GRANTING IN PART THE PETITION FOR WRIT OF ADMINISTRATIVE MANDAMUS

1  District's grading policies were unclear, and some evidence shows Kissner was performing no
2  worse than his colleagues.

3      The court concludes that Findings 76 through 79 cannot be a basis for finding that
4  Kissner demonstrated evident unfitness for service.[3]

5              **6.    Applying the *Morrison* factors to the Findings**

6      In Legal Conclusions 11 through 19, the Commission assesses factors in *Morrison* that
7  may be considered in deciding whether Kissner is unfit for service. The factors include
8  (1) adverse impact on students and fellow teachers; (2) proximity or remoteness in time;
9  (3) extenuating or aggravating circumstances; (4) Kissner's motives; (5) likelihood of
10 recurrence; and (6) temperament. The Decision identifies Findings that relate to each factor and
11 concludes that the evidence supports a finding of unfitness for service. The court finds that the
12 Commission's application of the *Morrison* factors to the Findings is consistent with the law
13 except for its references to facts set forth in Findings 28 through 45 and Findings 76 through 79.
14 On remand, the Commission will need to conduct a similar analysis, but without considering
15 Findings 28 through 45 and Findings 76 through 79.

16             **7.    Evident Unfitness for Service**

17     Legal Conclusion 10 addresses the issue of *evident* unfitness for service. It cites
18 *Woodland* which states that evident unfitness for service means "clearly not fit, not adapted to or
19 unsuitable for teaching, ordinarily by reason of temperamental defects or inadequacies."
20 *Woodland* further states that evident unfitness may exist, for example, "when a teacher is
21 repeatedly and incurably insubordinate, or is incapable of maintaining cordial, cooperative
22 relationships with colleagues." In addition, *Board of Trustees v. Stubblefield* states that a teacher
23 may be discharged if the teacher's conduct "has gained sufficient notoriety so as to impair
24 on-campus relationships. On remand the Commission will need to take another look at its

25
26
27

28  [3] Findings 80 through 84 are captioned "Other Events Alleged as Grounds for Dismissal." The Decision is clear that some of these events were not supported by the evidence. For others, it is not. To be clear, the court is not relying on Findings 80 through 84 to reach its conclusions.

1   conclusion that Kissner exhibited "evident unfitness for service" in the absence of Findings 28

2   through 45 and Findings 76 through 79.

3       **C.    Whether the Commission abused its discretion by admitting**
                  **impeachment evidence of events occurring more than four years**

4                     **before the issuance of the Notice of Intent to Terminate**

5         Findings 86 through 102 set forth the basis for the Commission's finding that Kissner

6   made false statements during his testimony.  The issue was whether Kissner was telling the truth

7   when he testified that he gave a minor "a single sip of an alcoholic beverage" during a camping

8   trip in 2016.  While there was conflicting testimony, the Commission found that Kissner was

9   dishonest; that he testified he gave a minor "one sip of alcohol" when the evidence showed that

10  Kissner gave the minor more than "one sip of alcohol" on more than one occasion.  Legal

11  Conclusion 15 states that Kissner's dishonesty was "a significantly aggravating circumstance in

12  the matter."

13        Kissner argues in detail that the evidence used to impeach his credibility was without

14  basis, that the witnesses who testified against him were not credible, and that the Commission

15  made a legal error.  With respect to the factual findings, the Commission acknowledged that this

16  part of the parties' dispute concerns credibility and motives.  Findings 98 and 99, for example,

17  address Kissner's arguments that certain testimony "embellished the incident" and that there

18  were discrepancies and exaggerations.  Nonetheless, the Commission concluded that Kissner was

19  not truthful.  The court has independently reviewed the evidence and finds that it supports the

20  Commission's Findings.  The court notes there is conflicting oral testimony.  The Commission

21  was able to assess credibility, including the demeanor of the witnesses, how quickly they

22  answered questions, their tone of their voice, and other attributes.  The court must afford a strong

23  presumption of correctness to the administrative findings and require the challenging party to

24  demonstrate that such findings were contrary to the weight of the evidence.  (*Fukuda v. City of*

25  *Angels* (1999) 20 Cal.4th 805, 817.)  Kissner has not done so.  The court concludes that Findings

26  86 through 102 are supported by the evidence that was presented to the Commission.

27        Kissner's legal argument relies on section 44944, subdivision (b)(2)(A), which states that

28  with respect to dismissal or suspension hearings, "Testimony shall not be given or evidence shall

1    not be introduced relating to matters that occurred more than four years before the date of the

2    filing of the notice." It also relies on subdivision (b)(2)(B), which states, "no decision relating to

3    the dismissal or suspension of an employee shall be made based on charges or evidence of any

4    nature relating to matters occurring more than four years before the filing of the notice."

5    Because the 2016 camping trip occurred more than four years before the Notice of Proposed

6    Intent to Dismiss dated February 12, 2021, Kissner argues the impeachment evidence should

7    have been excluded.

8        Only a few cases address these sections of the Education Code. The leading case states,

9    "We hold that equitable estoppel may apply to section 44944(a)'s four-year time limitation. We

10    express no opinion on whether the district could have satisfied the doctrine's requirements here.

11    Nor need we decide whether other equitable principles might apply. We simply conclude that

12    *the four-year time limitation is not absolute.*" (*Atwater Elementary School Dist. v. California*

13    *Dept. of General Services,* 41 Cal.4th 227, 233, emphasis added.) In dicta, an earlier opinion

14    stated that section 44944 "seems to be more of a bar against the use of stale information to

15    buttress a *current charge* than a true statute of limitations restricting a district's options."

16    (*Fontana Unified School Dist. v. Burman* (1988) 45 Cal.3d 208, 222, fn. 15, emphasis added.)

17        The District argues that Kissner's direct testimony "opened the door" to the 2016

18    incident. (See Evid. Code § 780, subd. (i).) On the first hearing day Kissner was asked

19    questions about the 2016 camping trip and Kissner's attorney did not object. On the second

20    hearing day Kissner's attorney objected to one question about the incident, but to others, he did

21    not. On the fifth hearing day Kissner's attorney asked on direct examination the following

22    question: "Q··So in 2016, there has been testimony about an incident where you allegedly gave

23    a minor alcohol, and that has come out several times.· I would like you to explain what happened

24    there." Kissner answered the question, and the topic was the subject of further questions and

25    answers for the next ten pages of the hearing transcript. Kissner also testified about the incident

26    on the ninth and tenth hearing days. Finding 86 states that Kissner "volunteered testimony about

27    these incidents [in 2016]" which is true.

28

1    The court finds that the Commission properly considered testimony about the 2016

2  incident to assess Kissner's credibility.  The testimony was *not* used to support "a current

3  charge" or to reach the conclusion that Kissner should be dismissed for "evident unfitness for

4  service."  It was used only "in determining appropriate discipline."  This is consistent with the

5  Evidence Code, section 44944 and applicable caselaw.

6    **D.    Whether the Commission abused its discretion by finding that Kissner**
      **had not met his burden in proving his affirmative defense of**
7      **retaliation**

8    Kissner asserts his dismissal violated California Labor Code sections 1101, 1102, and

9  1102.5 which prohibit adverse employment actions for "political activities or affiliations" and

10 "to retaliate against an employee for refusing to participate in an activity that would result in a

11 violation of a state or federal statute, or a violation of or noncompliance with a local, state, or

12 federal rule or regulation."  Kissner argues that the District's actions constituted impermissible

13 retaliation for his walkout grading decision, his work on Measure N, the adoption of Board

14 policy 4119.21, and the election and appointment of District Trustees.  Kissner argues that

15 retaliation is further proven by the Intent to Layoff with which he was served on March 12, 2021.

16    As an initial point, the District argues that because in the Layoff Case Kissner withdrew

17 his retaliation claims, he waived them in this action.  The court disagrees.  The law and facts

18 raised in the Layoff Case are substantially different than those here.  Moreover, Kissner

19 withdrew his retaliation claim in the Layoff Case after the judge issued her tentative ruling.  This

20 court cannot speculate on Kissner's reasons for doing so, but suffice to say, it could have had

21 nothing to do with the merits of his retaliation claims.  The court therefore rejects the District's

22 argument.

23    For assessing whether an adverse employment action is retaliatory, California has

24 adopted a three-step burden-shifting test that is similar to the one set forth in *McDonnell Douglas*

25 *Corp. v. Green* (1973) 411 U.S. 792.  "This so-called *McDonnell Douglas* test reflects the

26 principle that direct evidence of intentional discrimination is rare, and that such claims must

27 usually be proved circumstantially.  Thus, by successive steps of increasingly narrow focus, the

28

1    test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and

2    are not satisfactorily explained." (*Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 354.)

3    To establish a prima facie case of retaliation under California's application of *McDonnell*

4    *Douglas* "a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer

5    subjected the employee to an adverse employment action, and (3) a causal link existed between

6    the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36

7    Cal.4th 1028, 1042.) "Once an employee establishes a prima facie case, the employer is required

8    to offer a legitimate, nonretaliatory reason for the adverse employment action." (*Id.,* citations

9    omitted.) "If the employer produces a legitimate reason for the adverse employment action, the

10    presumption of retaliation drops out of the picture, and the burden shifts back to the employee to

11    prove intentional retaliation." (*Id.,* citations and internal quotation marks omitted.)

12    For some protected activities, Kissner has made a prima facie showing that the District

13    subjected him to an adverse employment action. For others, he did not, primarily because they

14    were remote in time. (*Arteaga v. Brink's, Inc.* (2008) 163 Cal. App. 4th 327, 354 ["[C]ases that

15    accept mere temporal proximity … as sufficient evidence of causality to establish a prima facie

16    case uniformly hold that the temporal proximity must be 'very close.' " (citing *Strong v.*

17    *University Healthcare System, L.L.C.* (5th Cir. 2007) 482 F.3d 802, 808)].)

18    The time between the revisions in February 2020 to Board policy 4119.21, and Kissner's

19    dismissal, was about a year. The court finds the adoption of Board policy 4119.21 does not

20    establish a prima facie case of retaliation because it was not proximate in time. The time

21    between the March and April 2018 grading walkout issues and the investigations that followed is

22    also too attenuated to establish a prima facie case of retaliation. The District argues that

23    Kissner's opposition to Measure N was not proximate in time to the District's notice of

24    dismissal. It states that Kissner opposed Measure N as early as December 2019, approximately

25    15 months before Kissner was laid off and dismissed. The court is not persuaded by this

26    argument. It is true that Kissner opposed Measure N. His advocacy commenced in December

27    2019, and continued until December 2020 when the final votes were tallied. Therefore, the time

28    between the end of his advocacy and his dismissal in March 2021 was just a few months, which

1  satisfies the temporal proximity test.  Moreover, his involvement in Board elections and

2  appointments occurred immediately before his dismissal.

3  Because Kissner established a prima facie case of retaliation with respect to his

4  opposition to Measure N and his involvement in Board elections and appointments, the District

5  must offer a legitimate, nonretaliatory reason for the adverse employment action.  Here, the

6  Findings and Legal Conclusions that are supported the evidence and law establish evident

7  unfitness for service even in the absence of Findings 28 through 45 and Findings 76 through 79.

8  The District has thus proven a legitimate, nonretaliatory reason for the adverse employment

9  action.

10  Under *McDonnell Douglas,* Kissner must therefore prove intentional retaliation.  He has

11  failed to do so.  Legal Conclusion 21 states that Findings 19, Findings 103 through 106, and

12  Legal Conclusion 6 show that the revisions to Board policy 4119.21 were not made to target

13  Kissner for dismissal.[4]  As noted above, the revisions were not proximate in time to Kissner's

14  dismissal, and Kissner did not present evidence of the content of the revised policy.  Moreover,

15  oral testimony supported the District's contention that Board Policy 4119.21 was revised as part

16  of an ongoing effort to bring Board policies up to date with current standards.

17  Kissner must also prove intentional retaliation in response to his opposition to

18  Measure N, his involvement in Board elections and appointments, and the investigations.[5]  Legal

19  Conclusion 22 explains that Kissner "identified many examples that he characterized as acts by

20  community members and by fellow District faculty members arising from their hostility to

21  Kissner's views and political positions."  It also points out that "such examples would not

22  establish unlawful retaliation against respondent by the District itself, however, because every

23  community member and District faculty member has the same personal rights as Kissner has to

24  state opinions and to petition government agencies for action.  Whether wise or unwise,

25  Kissner's neighbors and colleagues have the right to express disagreement or disrespect to

26

27  ———————————

28  [4] Findings 19 and 103 through 106 are supported by the evidence.

[5] With respect to retaliation being based on his wife seeking election to the District Board, Kissner testified, "I don't think anyone retaliated against me because [my wife] ran, per se."

ORDER GRANTING IN PART THE PETITION FOR WRIT OF ADMINISTRATIVE MANDAMUS

Kissner on social media or to his face; to ignore or even to criticize him in faculty meetings; and to ask the District to dismiss him because of real or imagined deficiencies in his performance or his character." More broadly, this legal conclusion is consistent with the fact that the District can only be liable for actions taken by a majority of its Board, actions by the superintendent, and certain delegated actions by the principal.[6] Actions by community members and teaching colleagues cannot be a basis for finding the District liable.

Legal Conclusions 23, 24, and 27 explain that due process protections in sections 44932, 44943, and 44944 mean that a District cannot unilaterally dismiss a teacher; that the independent Commission members are charged with that responsibility. Here, the Commission members concluded that Kissner should be dismissed based on the evidence presented to it, and not for any retaliatory reason.

During the hearings Kissner testified that District officials never stated that his protected activities caused his dismissal. He was asked "Did any District official ever tell you directly that we're terminating you because of your political activism?" He responded, "I don't think anybody would ever say that directly, Bill."

Kissner contends that the work environment was hostile. Some of the hostility, Kissner complains, was caused by the District responding to frivolous claims by third parties. Those claims included serving alcohol to children, grooming behaviors, anger management issues, discrimination, and classroom violence. The court finds that given the serious nature of the third party claims, the District responded appropriately with investigations. Superintendent Fraser testified, "I feel like the safety of children is pretty critical and important, and when kids are at risk, I think we have an obligation to pursue that.· And in addition, David, being an employee of the District, there could be legal ramifications for that as well." Kissner also argues that the District delved into issues that were none of its business. As set forth above, however, the court finds District officials made reasonable requests for information and it was Kissner's failure to provide responsive information that was the problem. Finally, Kissner has not shown that his

---

[6] Kissner testified that Board member Abeln made threats to a person (not Kissner) who opposed Measure N at a barbeque. The District cannot be liable for an errant remark made by a single Board member.

1   activities other than his opposition to Measure N and his involvement in Board elections and

2   appointments were proximate in time to his dismissal, thus reinforcing the lack of causation.

3        In sum, the court finds that Legal Conclusions 20 through 27 that conclude the District

4   did not unlawfully retaliate against Kissner are supported by the evidence and law cited therein

5   even in the absence of Findings 28 through 45 and Findings 76 through 79.

6  **VII.**    **DISPOSITION**

7        As explained in detail above, the court has conducted a careful review of the facts and

8   conclusions in the Decision and has determined that the Commission cannot rely on Findings 28

9   through 45, and Findings 76 through 79, to reach the conclusion that Kissner demonstrated

10   evident unfitness for service under section 44944, subdivision (a)(6). Kissner's request for a

11   peremptory writ of administrative mandamus is therefore GRANTED IN PART.

12        The Commission is commanded to set-aside the Decision. The Commission shall

13   reconsider its actions in light of the Order and Judgment, including whether there is sufficient

14   evidence to show that Kissner demonstrated evident unfitness for service under section 44944,

15   subdivision (a)(6), whether discipline is warranted, and if discipline is warranted, what the

16   appropriate discipline should be. Nothing herein affects in any way the discretion vested in the

17   Commission. A return must be filed within 150 days of service of the peremptory writ of

18   administrative mandamus, which must set forth the actions taken to comply. The court retains

19   jurisdiction to ensure full compliance with the writ.

20        Kissner's claims for declaratory and injunctive relief are denied as moot.

21        THIS IS A FINAL JUDGMENT.

22

23   Dated:  November 22, 2023

24                                   Thomas E. Kuhnle

                                      Judge of the Superior Court

25

26

27

28

ORDER GRANTING IN PART THE PETITION FOR WRIT OF ADMINISTRATIVE MANDAMUS

Í

**EXHIBIT 2** – SUPERIOR COURT WRIT OF MANDATE

1
2
3
4
5
6
7
8

**SUPERIOR COURT FOR THE STATE OF CALIFORNIA**
**COUNTY OF SANTA CLARA**

9

10 | **DAVID M. KISSNER,** | Case No.: 22CV393046

Petitioner/Plaintiff,

11

12 | v. | **WRIT OF ADMINISTRATIVE**
**MANDAMUS**

13 | **COMMISSION ON PROFESSIONAL**
14 | **COMPETENCE,**

15 | Respondent/Defendant.

16

17 | **LOMA PRIETA JOINT UNION SCHOOL**
**DISTRICT,**

18

19 | Real Party in Interest.

20

21 TO THE COMMISSION ON PROFESSIONAL COMPETENCE, RESPONDENT, AND LOMA

22 PRIETA JOINT UNION SCHOOL DISTRICT, REAL PARTY:

23     WHEREAS on November 22, 2023, the Court's "Statement of Decision re: Order Granting

24 in Part the Petition for Writ of Administrative Mandamus; Judgment" (Order and Judgment) was

25 entered in this action ordering that a peremptory writ of administrative mandamus issue from this

26 Court,

27

28

1

**Writ of Administrative Mandamus**                      Case No.: 22CV393046

1     WHEREAS on December 4, 2023, a writ of mandate consistent with the Order and

2  Judgment was issued and mailed by the clerk's office but apparently lost in transmission as the

3  intended recipient never received it,

4     YOU ARE HEREBY COMMANDED, upon service and receipt of this writ, to set aside

5
6  your decision of December 7, 2021, in the Matter of the Dismissal of David Kissner, A Permanent

7  Certificated Employee, Respondent (OAH No. 2021050291), which proceedings are hereby

8  remanded to you, for reconsideration in light of the Order and Judgment of this Court. The

9  Commission shall reconsider its actions in light of the Order and Judgment, including whether there

10  is sufficient evidence to show that Kissner demonstrated evident unfitness for service under section

11  44944, subdivision (a)(6), whether discipline is warranted, and if discipline is warranted, what the

12
13  appropriate discipline should be. Nothing herein affects in any way the discretion vested in the

14  Commission. A return must be filed within 150 days of service of the peremptory writ of

15  administrative mandamus, which must set forth the actions taken to comply. The court retains

16  jurisdiction to ensure full compliance with the writ.

17  Date: **10 – 11 – 24**



By Deputy Clerk
Santa Clara Superior Court

J. SILVEIRA

Writ of Administrative Mandamus                Case No.: 22CV393046

**EXHIBIT 3** – COMMISSION ON PROFESSIONAL COMPETENCE SCHEDULING ORDER

# BEFORE A
# COMMISSION ON PROFESSIONAL COMPETENCE
# LOMA PRIETA JOINT UNION SCHOOL DISTRICT
# COUNTY OF SANTA CLARA
# STATE OF CALIFORNIA

## In the Matter of the Dismissal of:

## DAVID KISSNER, A Permanent Certificated Employee,

## Respondent.

## OAH No. 2021050291.1

### ORDER SETTING ORAL ARGUMENT ON REMAND

This matter came on by videoconference for a prehearing and status conference with Administrative Law Judge Juliet E. Cox on October 10, 2024. Attorneys Brian Bock and Mary Ellyn Gormley appeared for the superintendent of the Loma Prieta Joint Union School District. Attorney William Becker appeared for respondent David Kissner.

Counsel expect a writ of mandate to issue to the Commission from the Santa Clara County Superior Court within 30 days, formally remanding this matter to the Commission for reconsideration.

The Office of Administrative Hearings will open a new Case Center case for this remand, and will invite all counsel, respondent, and the Commission members to it. Counsel for the District must arrange at or before 5:00 p.m. Pacific Standard Time on January 13, 2025, to upload the entire administrative record the parties used to litigate this matter in the Santa Clara County Superior Court to the remand Case Center case,

so that it will be readily available to the Commission members on reconsideration. Counsel for the District also should include copies of the Santa Clara County Superior Court's statement of decision and writ of mandate, because these documents describe the superior court's instructions to the Commission on remand. Aside from the administrative record generated through the original proceedings before the Commission, the statement of decision, and the writ of mandate, the Commission should not need to refer to any other documents prepared for or generated by the Santa Clara County Superior Court or the Sixth District Court of Appeal.

Also at or before 5:00 p.m. Pacific Standard Time on January 13, 2025, either party may serve the other party and the Commission members with a memorandum of points and authorities on remand. The parties may exchange these memoranda with one another and with the Commission members by uploading them to Case Center. The Administrative Law Judge will confirm that the Commission members can access these documents and the administrative record, to enable them to prepare to receive oral argument.

Oral argument on remand will occur on Tuesday, February 11, 2025, beginning at 1:00 p.m. The argument will occur by Zoom for Government videoconference and the District must arrange for a certified shorthand reporter. Electronic meeting invitations will be sent to counsel from the Office of Administrative Hearings during the week before the argument.

If either party learns of any reason why any aspect of the schedule stated in this order is, or becomes, inconvenient, that party must notify the other party and the Office of Administrative Hearings promptly.

DATE: 10/11/2024

*Juliet E. Cox*

JULIET E. COX

Administrative Law Judge

Office of Administrative Hearings

## CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: February 5, 2025

FREEDOM X


/s/ William J. Becker, Jr.
WILLIAM J. BECKER, JR
Attorneys for Appellant,
DAVID M. KISSNER

3